United States District Court
Southern District of Texas
FILED

FEB 27 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DAN MORIN | { | CIVIL ACTION NO. B-00-104 |
| | { | |
| V. | { | |
| | { | |
| CITY OF HARLINGEN, ET AL. | { | |
| | | |
| and | | |
| | | |
| DONALD MORIN, ET AL. | { | CIVIL ACTION NO. B-00-104 |
| | { | |
| V. | { | |
| | { | |
| CITY OF HARLINGEN, ET AL. | { | |

---

**DEFENDANT CITY OF HARLINGEN'S RESPONSE TO
PLAINTIFFS' MOTION FOR CONTINUANCE TO
RESPOND TO RULE 56 MOTION FOR SUMMARY JUDGMENT**

---

Walter J. Passmore
LAW OFFICE OF WALTER J. PASSMORE, PC
P. O. Drawer 3187
McAllen, TX 78502-3187

Attorney for Defendant R.D. Moore

Tom Lockhart
Roger W. Hughes
ADAMS & GRAHAM, L.L.P.
P. O. Box 1429
Harlingen, TX 78551-1429

Attorneys for Defendants
City of Harlingen and
R.D. Moore

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.  Summary of Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Evidence & Objections to Plaintiffs' Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.     Standard for Rule 56(f) Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.     Ownership of the MAK-90 ("AK-47") Rifle . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.     New Theories Plaintiffs Wish to Investigate Are Unsupported and
               Do Not Fall Within Section 101.021's Waiver of
               City's Sovereign Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

AFFIDAVIT AUTHENTICATING EXHIBITS BY TOM LOCKHART  . . . . . . . . . . . 12

## TABLE OF AUTHORITIES

Cite:                                                                    Page:

*Access Telecomm., Inc. v. MCI Telecomm. Corp.,*
    197 F.3d 694 (5th Cir. 1999), *reh. denied,*
    210 F.3d 365 (5th Cir. 2001), *cert. denied,*
    531 U.S. 917 (2000) ........................................... 3, 4, 7

*Axtell v. University of Texas at Austin,* 69 S.W.3d 261
    (Tex. App.–Austin 2002, no pet.) ................................... 7-9

*City of Hidalgo Ambulance Service v. Lira,*
    17 S.W.3d 300 (Tex. App.–Corpus Christi 2000,
    no pet.) ...................................................... 8

*City of San Antonio v. Hernandez,* 53 S.W.3d 404
    (Tex. App.–San Antonio 2001, pet. denied) ............................ 8

*Exxon Corp. v. Crosby-Mississippi Resources, Ltd.,*
    40 F.3d 1474 (5th Cir. 1995) ........................................ 4

*Krim v. BancTexas Group, Inc.,* 989 F.2d 1435
    (5th Cir. 1993) ................................................. 4

*Prairie View A & M University v. Mitchell,* 27 S.W.3d 232
    (Tex. App.–Houston [1st Dist.] 2000, pet. denied) ..................... 8, 9

*Sawyer v. Texas Dept. of Criminal Justice,* 983 S.W.2d 310
    (Tex. App.–Houston [1st Dist.] 1998, pet. denied) ..................... 8, 9

*Texas Dept. of Public Safety v. Petta,* 44 S.W.3d 575
    (Tex. 2001) .................................................... 9

*United States v. Bloom,* 112 F.3d 200 (5th Cir. 1997) ...................... 3

*University of Tex. Med. Branch v. York,*
    871 S.W.2d 175 (Tex. 1994) ........................................ 7

*University of Texas Med. Branch v. Mullins,* 57 S.W.3d 653
(Tex. App.–Houston [14th Dist.] 2001, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Washing v. Allstate Ins. Co.,* 901 F.2d 1281
(5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3


<u>Texas Civil Practice & Remedies Code:</u>

§101.021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

§101.021(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

§101.057 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9


<u>Federal Rules of Civil Procedure:</u>

Rule 56(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4


<u>Federal Rules of Evidence:</u>

Rule 602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Rule 801(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Rule 802 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Rule 805 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

iv

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Defendant **CITY OF HARLINGEN, TEXAS**, and files this its **Response to Plaintiffs' Motion for Continuance to Respond to Rule 56 Motion for Summary Judgment** and would show the Court as follows:

### I. Summary of Argument

Plaintiffs Dan and Don Morin, et al., belatedly move to continue the submission of Harlingen's Motion for Summary Judgment. FED. R. CIV. P. 56(f); Dkt Nos. 47, 49. Their Motion should be denied.

Plaintiffs claim they need discovery to create a fact question on ownership of the MAK-90 (a/k/a "AK-47") rifle. However, on September 18, 2000, their counsel told Magistrate Judge Black that they had a sworn statement from a former City police officer that the AK-47 belonged to the police department and that the ownership issue would be the subject of a summary judgment motion. Exh. 1, pp. 4 & 18. Instead of producing the sworn statement, Plaintiffs claim they need to investigate newspaper reports concerning reported evidence in a related case. The actual transcript of that evidence (Exh. 2, attached) shows the testimony concerned another rifle that was not involved in the events at the Morin household.

Plaintiffs then claim they wish to do discovery into a new, unalleged claim that Defendant Moore used the Harlingen Police Department's computer to access state law enforcement databases to obtain Morin's address to inform Ernest as to their location so

1

Ernest could shoot them. Again, their sole support is a newspaper article concerning what Defendant Moore allegedly said in another trial; a review of his actual testimony establishes he did not say this. Moreover, even if Moore did get the Morin address in this way and gave it to his son (which Defendants deny), there would be no waiver of sovereign immunity for such acts.

In short, two and a half years ago Plaintiff told the Court they had the proof to support their allegation that HPD owned the AK-47 and now they say they do not have it. Now they claim they rely upon newspaper reports of evidence at the February, 2002 trial; the trial transcript establishes this was a privately owned rifle. All this proves that, four years after the shooting, Plaintiff want this Court to issue them an unrestricted fishing license to try to excuse their baseless pleadings which have been on file two and a half years.

## II.  Evidence & Objections to Plaintiffs' Evidence

A.    Defendant City of Harlingen offers the follow exhibits in opposition to Plaintiffs' motion:

| Exh. | Documents |
|------|-----------|
| 1. | Hearing Transcript of September 18, 2000 |
| 2. | Excerpts from transcript of trial in *Salinas, et al. v. City of Harlingen,* Cause No. 98-162, USDC-Brownsville, in February, 2002 (testimony of James Scheopner, R.D. Moore and Texas Ranger Rudy Jaramillo) |
| 3 | Excerpts from PX-10 from *Salinas, et al. v. City of Harlingen*, Cause No. 98-162, USDC-Brownsville |

2

4.        PX-19A & 19B ATF Form 4473 and receipt, from *Salinas, et al. v. City of Harlingen,* Cause No. 98-162, USDC-Brownsville

5.        Texas Ranger Rolando Castaneda's Investigation Report

Exhs. 2, 3 and 4 are offered solely in opposition to Plaintiffs' motion for continuance and not in support of the City's motion for summary judgment.

B.    Defendant objects to the newspaper/website articles attached to Mr. Segi's affidavit for the reason that same are hearsay and contain "hearsay within hearsay." FED. R. EVID. 801(c), 802, 805. The newspaper reports are not affidavits by the author; the putative authors do not explain how they have personal knowledge of the events. FED. R. EVID. 602. The reports quote hearsay from various persons who are not parties to this suit, constituting "hearsay-within-hearsay." FED. R. EVID. 805.

Defendant further objects to Plaintiffs' motion for the reason that it is untimely. It was not filed by the submission deadline for Defendant's motion, i.e., February 12, 2003.

### III. Argument and Authorities

A.    Standard for Rule 56(f) Motion

There is no requirement that any discovery take place before summary judgment can be granted. *United States v. Bloom,* 112 F.3d 200, 205 n. 17 (5th Cir. 1997), citing *Washing v. Allstate Ins. Co.,* 901 F.2d 1281, 1285 (5th Cir. 1990). A Rule 56(f) motion need not be granted simply because discovery has been stayed. *See Access Telecomm., Inc. v. MCI Telecomm. Corp.,* 197 F.3d 694, 719-20 (5th Cir. 1999), *reh. denied,* 210 F.3d 365 (5th Cir.

3

2001), *cert. denied,* 531 U.S. 917 (2000).

Rule 56(f) permits a continuance when, by affidavits, the opponent shows that he cannot present by affidavits facts to justify his opposition; the court may then continue the motion so that the opponent can obtain admissible evidence in the form of affidavits or depositions. The opponent must file the motion, put the court on notice of what discovery is needed, and demonstrate how that discovery pertains to the pending motion. *Exxon Corp. v. Crosby-Mississippi Resources, Ltd.,* 40 F.3d 1474, 1487 (5th Cir. 1995). The movant must do more than make vague assertions that discovery will produce unspecified facts. *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1442 (5th Cir. 1993); *Access Telecomm.,* 197 F.3d at 720. He must explain how that discovery will create a genuine issue on a material fact. *Krim,* 989 F.2d at 1442; *Access Telecomm.,* 197 F.3d at 720.

B.    Ownership of the MAK-90 ("AK-47") Rifle

Plaintiffs Motion, ¶¶ 2.2 and 2.6, claims that Defendant Moore testified in another lawsuit that he bought the MAK-90 ("AK-47") himself and that the ATF forms could not lawfully be completed to effect the sale to Ernest. The sole support for this is a newspaper 2002 article which reports purported testimony from Defendant Moore.

First, during the September 18, 2000, pre-trial hearing, counsel for Donald Morin advised the Court that they had recently found an individual who has provided a statement that the AK-47 used in the Rio Hondo shooting had been given to the Harlingen Police Department. Exh. 1, p. 4 (lines 18-23). Counsel for Plaintiff Dan Morin told the Court that

they had a sworn affidavit from a former Harlingen police officer that the AK-47 had been brought to the police department to have it destroyed and became HPD property and would be a fact issue taken up on a summary judgment motion. Exh. 1, p. 18 (lines 8-17). Plaintiffs do not explain what has happened to the sworn statement or why they cannot obtain an affidavit from this witness now.

Second, Moore's testimony in the *Salinas* case was about a Colt Sporter (a/k/a "AR-15") purchased by Ernest. In June, 1998, Det. Moore used his son's money to purchase the Colt Sporter AR-15. Exh. 2, pp. 433 (line 5)- 437(line 14). The ATF Form in question was for the sale of the Colt Sporter AR-15, not the MAK-90 ("AK-47"). Exh. 2, pp. 433 (line 5)- 437(line14); Exh. 4.

The Motion, ¶ 2.4, then cites the newspaper report that Scheopner testified he approved the assignment of the MAK-90 to Det. Moore and allowed Moore to store it at home. Scheopner actually testified the City's *AR-15 rifle* was assigned to Det. Moore. Exh. 2, pp. 304 (line 24)-305 (line 3).

Third, Plaintiffs Motion, ¶ 28, claim they have no access to the evidence available to Defendant City. This excuse is transparent. In September, 2000, they claimed they had an affidavit from a former police officer. They do not offer it or explain why not. Also, the Rio Hondo shootings and the AK-47's ownership were investigated by the Texas Rangers, assisted by the ATF, the Cameron County Sheriff, etc. Exh. 5 (Castaneda's report ¶¶ 25-28). Defendant City obtained Ranger Castaneda's report through Open Records request. The trial

5

record from *Salinas* and its exhibits are still with the district court. The trial testimony of

Texas Ranger Rudy Jaramillo establishes that the AK-47 was used in Rio Hondo and was

privately owned. Exh. 2 pp. 156 (line 3)-157 (line 19), 163 (line 4)-164 (line 5); Exh. 3,

excerpts of Jaramillo's report. Plaintiffs do not explain why they cannot get what they want

from these sources or other investigations by public law enforcement agencies and why they

relied upon unsubstantiated newspaper reports for the representations to this Court.

Plaintiffs claim the newspaper accounts of *Salinas* are new and are the support for

their claim the City owned the rifle. Motion, ¶ 2.6; Sergi Affidavit, ¶ 3. Their counsel told

the Court in September 2000 they already had sworn proof for this claim. The actual

transcript does not support their allegations. From this, the Court should infer that Plaintiffs

have no rebuttal to the City's evidence and they really want an unrestricted fishing license.

C.    New Theories Plaintiffs Wish to Investigate Are Unsupported and Do Not Fall
      Within Section 101.021's Waiver of City's Sovereign Immunity

Citing a newspaper report of Defendant Moore's testimony, Plaintiffs' Motion, ¶¶ 2.4

and 2.6, argues they wish a continuance to obtain discovery to substantiate a suspicion that

Defendant Moore improperly accessed the NCIC database through City computers to obtain

the Morin's address; Plaintiff's speculate that Det. Moore then gave the address to Ernest for

the purpose of "taking care" of the drug dealers dating Julie Cox (i.e., the Morins). Plaintiffs

make an inflammatory racial allegation that is not supported by the record. Plaintiffs'

speculation is not supported by the record. Additionally, Texas courts have rejected claims

6

that obtaining/sharing information gained via computers is a "use" of "tangible personal property" under section 101.021.

First, Det. Moore said he investigated a car license number that Ernest thought might belong to someone involved with drugs. Exh. 2, p. 411 (lines 1-12). Det. Moore found out the license number belonged to someone in Harlingen, not Rio Hondo. Exh. 2, pp. 412 (lines 7-18), 413 (lines 3-5). He did not tell his son who or where that person was. Exh. 2, p. 412 (lines 3-6, 19-23).

Second, this claim will not solve the problem of sovereign immunity. Plaintiffs claim this evidence will show Det. Moore (or other City employees) used computers to obtain information that he shared with Ernest. Motion, ¶ 2.6. Such a claim will not fall within the waiver of immunity in section 101.021. This is nothing more than the use of information which is not "tangible personal property" under section 101.021(2). A party is not entitled to a continuance to obtain discovery, if that evidence will not create a material fact question on a genuine issue. *Access Telecom.*, 197 F.3d at 720.

Information which may or may not be recorded is not tangible personal property under section 101.021(2). *University of Tex. Med. Branch v. York*, 871 S.W.2d 175, 179 (Tex. 1994). Consequently, claims that officers used tangible property to obtain or provide information does not establish facts that waive immunity. *See e.g., Axtell v. University of Texas at Austin*, 69 S.W.3d 261, 264 (Tex. App.–Austin 2002, no pet.); *University of Texas Med. Branch v. Mullins*, 57 S.W.3d 653, 657 (Tex. App.–Houston [14th Dist.] 2001, no

pet.)(no waiver for claim that hospital failed to advise patient that test results show she was HIV positive); *City of San Antonio v. Hernandez,* 53 S.W.3d 404, 410 (Tex. App.–San Antonio 2001, pet. denied)(no waiver for claim that police officers erroneous reported by police radio that deceased was dangerous); *Prairie View A & M University v. Mitchell,* 27 S.W.3d 232, 327 (Tex. App.–Houston [1ˢᵗ Dist.] 2000, pet. denied); *City of Hidalgo Ambulance Service v. Lira,* 17 S.W.3d 300, 304 (Tex. App.–Corpus Christi 2000, no pet.)(no waiver for claim that emergency personnel did not use radio telephone timely to summon help); *Sawyer v. Texas Dept. of Criminal Justice,* 983 S.W.2d 310, 312 (Tex. App.–Houston [1ˢᵗ Dist.] 1998, pet. denied).

In *Sawyer,* a prisoner alleged that the TDCJ provided a computer printout that falsely showed that 2024 was his parole date, causing him mental anguish. 983 S.W.2d at 311. The Houston Court concluded that it was not the computer or the printout that injured him; he was injured by the information. *Id.* at 312. Claims based on use of computers, telephones, or other electronic devices to collect or transmit information do not constitute a "use" of tangible personal property. *Id.* Information or misinformation, even when transmitted by devices, remained intangible. *Id.* The court of appeals affirmed a dismissal. *Id.*

In *Axtell,* a student basketball player had been suspended; portions of his academic records were faxed to an Austin radio station which broadcasted them. 69 S.W.3d at 263. The Austin court of appeals affirmed a dismissal of the claim. *Id.* at 267. The claim turned on the fact of release of confidential information; section 101.021(2) did not waive immunity

8

for misuse of information. *Id.* The statute did not encompass an injury from disclosure of confidential information, however the information is transmitted. *Id.* at 263.

In *Mitchell*, plaintiff alleged he was denied employment because the university falsely reported to a prospective employer he had not graduated. 27 S.W.3d at 324. He alleged this was caused by improper use of computers to record and store information. *Id.* at 324, 326. The Houston court of appeals reversed and rendered for the university. *Id.* at 327. The alleged injury resulted from the information conveyed and therefore was caused by intangible property not the computers. *Id.* at 327, citing *Sawyer,* 983 S.W.2d at 312.

The Motion, ¶ 2.6, claims that Moore provided the information to Ernest so that "he could send his revenge crazed son to murder" Plaintiffs. The Tort Claims Act does not waive immunity for any claim that Det. Moore participated in the murders as a principal. TEX. CIV. PRAC. & REM. CODE ANN., § 101.057 (Vernon 1997). Section 101.057 provides that immunity is not waived for intentional torts. There is no waiver for conduct that amounts to assault and battery. *Texas Dept. of Public Safety v. Petta,* 44 S.W.3d 575, 580 (Tex. 2001) (immunity not waived for allegations that officer hit plaintiff's car, aimed a gun at her, or shot the car's tires).

In short, the purported source for the new claims Plaintiffs wish to investigate does not support their theory. Even if some evidence did support their new theory (which Defendants deny), section 101.021(2) would not waive the City's immunity. Because the

9

continuance will not lead to evidence that create a fact question on a material issue, the court should deny it.

**WHEREFORE, PREMISES CONSIDERED**, Defendant City of Harlingen prays the motion for continuance be denied and that its motion for summary judgment that the remaining claims of all Plaintiffs in these causes be dismissed and they take nothing against Defendant City of Harlingen.

Respectfully submitted,

By: _____

TOM LOCKHART
Federal ID No. 2257
State Bar No. 12473500
ROGER W. HUGHES
Federal ID No. 5950
State Bar No. 10229500
**ADAMS & GRAHAM, L.L.P.**
P. O. Drawer 1429
Harlingen, Texas 78551-1429
956/428-7495; FAX: 956/428-2954

Attorney-in-Charge for Defendant,
CITY OF HARLINGEN AND R.D. MOORE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document was forwarded on this _27_ day of February, 2003, to the following counsel of record and interested parties:

Attorney of record for Plaintiff, DAN MORIN, et al:

    Mr. David Sergi                      <u>CM/RRR #7002 0510 0004 1769 6208</u>
    **SERGI & ASSOCIATES**
    109 E. Hopkins
    Suite 200
    San Marcos, TX 78666

Attorney of record for Plaintiff, DONALD MORIN, et al:

    Mr. Jerry J. Trevino                 <u>CM/RRR #7002 0510 0004 1769 6215</u>
    **ATTORNEY AT LAW**
    1125 South Port Avenue
    Corpus Christi, TX 78405

Attorney of record for Defendant, R.D. MOORE. individually:

    Mr. Walter Passmore                 VIA ORDINARY MAIL
    **LAW OFFICE OF WALTER J. PASSMORE, P.C.**
    P. O. Drawer 3187
    McAllen, TX 78502-3187

                                TOM LOCKHART

## AFFIDAVIT AUTHENTICATING EXHIBITS BY TOM LOCKHART

STATE OF TEXAS

COUNTY OF CAMERON

BEFORE ME, the undersigned Notary Public in and for the State

of Texas, on this day personally appeared TOM LOCKHART, known to me to be the person

whose name is subscribed hereto, who being first duly sworn in the manner provided by law,

on oath stated as follows:

1.     My name is Tom Lockhart, I'm over the age of 18 years and I'm competent to make this affidavit.

2.     I am lead counsel for Defendant City of Harlingen in the above-styled and reference case.  I was also lead counsel for the City of Harlingen in "Salinas, et al. v. City of Harlingen," case number 98-162 in the United States District Court for the Southern District of Texas, Brownsville; the *Salinas* came to trial in February, 2002.

3.     Attached as Exh. 2 is a true and correct copy of excerpts from the trial transcript in the Salinas case of testimony by witnesses Ranger Jaramillo, James Scheopner and Ralph D. Moore.  To the best of my knowledge, the original transcript is on file with the Court.

4.     Attached as Exh. 3 & 4 are true and correct copies of (1) excerpts of PX-10 and (2) all of PX-19A & 19B, admitted in the Salinas case.  The original exhibits are in the custody of the Court to the best of my knowledge.

5.     Attached as Exh. 5 is a true and correct copy of a report from the Texas Rangers concerning an investigation into the shootings in Rio Hondo which have become the subject of this suit.  I obtained a copy from the Department of Public Safety by making a written request under the Texas Open Records Act.

The above and foregoing is true to my personal knowledge.

12



TOM LOCKHART

SWORN TO AND SUBSCRIBED before me, the undersigned authority, by the said TOM LOCKHART on the 27th day of February, 2003, to certify which witness my hand and seal of office.

[Notary Seal]

Notary Public in and for
The State of Texas

My Commission Expires: 5-30-03

FLORA GOMEZ
Notary Public
STATE OF TEXAS
My Comm. Exp 05-30-2003

13

United States District Court
Southern District of Texas
FILED

FEB 2 4 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION


DAN MORIN                          § CASE NO. CA-B-00-104
                                   §            CA-B-00-105
                                   §
VERSUS                             § BROWNSVILLE, TEXAS
                                   § SEPTEMBER 18, 2000
RALPH D. MOORE, ET AL              § 1:42 P.M. TO 2:10 P.M.


<u>PRETRIAL CONFERENCE</u>


BEFORE THE HON. JOHN WM. BLACK, UNITED STATES MAGISTRATE JUDGE


APPEARANCES:


For the Plaintiffs:          SEE NEXT PAGE


For the Defendants:          SEE NEXT PAGE


Court Recorder:              Gabriel Mendieta


PREPARED BY:

JUDICIAL TRANSCRIBERS OF TEXAS, INC.
P. O. Box 925674
Houston, Texas 77292-5675
(713) 697-4718
(713) 697-4722 (fax)

Proceedings recorded by electronic sound recording:
transcript produced by transcription service.

APPEARANCES:

FOR THE PLAINTIFF:                RAY ALEXANDER
                                  2202 TIMBERLOCH PLACE
                                  SUITE 250
                                  THE WOODLANDS, TEXAS 77380


                                  JERRY TREVINO
                                  (INFORMATION NOT PROVIDED)


                                  ROBERT VILLEGAS
                                  (INFORMATION NOT PROVIDED)


FOR THE DEFENDANT:                TOM LOCKHART
                                  P.O. BOX 1429
                                  HARLINGEN, TEXAS 78551-1429


                                  WALTER PASSMORE
                                  (NO INFORMATION PROVIDED)

1

1    THE COURT:  Good afternoon.  Please be seated.

2     Okay, we've got two cases:  B-00-104, Morin and

3 others against Moore and others; and 105, Morin and all

4 against Moore and others.

5     Who's here in 104?

6    MR. ALEXANDER:  Your Honor, Ray Alexander on behalf

7 of behalf of Bob Patterson for Dan Morin.  I filed a motion

8 for appearance as counsel.

9    THE COURT:  Okay.  Just a second.

10    MR. ALEXANDER:  Yes, sir.

11    THE COURT:  Okay?

12    MR. TREVINO:  Your Honor, Jerry Trevino, here for

13 the other cause in --

14    THE COURT:  105?  Right.  Okay.

15    MR. TREVINO:  Yes.  Yes, in 105.

16    THE COURT:  Okay.  Okay.

17    MR. TREVINO:  And Albert Villegas here as co-counsel

18 on the case.

19    THE COURT:  Okay.  All right.

20    MR. LOCKHART:  Tom Lockhart on behalf of individuals

21 in both cases.

22    THE COURT:  All right.

23    MR. LOCKHART:  And also, Walter Passmore is here

24 representing two of the individual defendants:  Shoepner and

25 Moore.

1          THE COURT:  Okay.  Let me ask you this:  Is there

2    any reason these case should not be consolidated?

3          MR. LOCKHART:  I can't think of any.

4          THE COURT:  Any dissenters?

5      (No audible response)

6          THE COURT:  Okay.  I'll go ahead and do that then.

7               Let me ask you another question.  I know that

8    there are some other cases pending here arising out of this

9    incident that were brought, I think, by the border patrol

10   agent's family and -- help me out.  Who else?  There was

11   somebody else that was --

12         MR. LOCKHART:  Border Patrol agents' families and

13   the wounded deputy sheriff, Raul Rodriguez.  Those have been

14   consolidated for discovery purposes in Judge Tagle's court?

15         THE COURT:  Okay.

16         MR. LOCKHART:  There is also a pending motion to

17   intervene by six deputy sheriffs seeking intervention in that

18   case.

19         THE COURT:  Okay.

20         MR. LOCKHART:  And there is also a lawsuit assigned

21   to Judge Tagle.  The plaintiff's name is Carleson [sp.ph.], a

22   neighbor that has also filed suit against Cameron County, City

23   of Harlingen and the individual officers.

24         THE COURT:  An intentional infliction of emotional

25   distress cases?

3

1          MR. LOCKHART:  Yes.

2          THE COURT:  Well, wouldn't want to plan on college

3   tuition out of those.

4       (Laughter)

5          THE COURT:  Okay, are those cases different enough

6   that we should not be thinking about consolidating these with

7   those?  Or -- and I'm just talking out loud here.  I'm just --

8   this is early innings and I'm just trying to get a handle on

9   what's happening.

10          MR. LOCKHART:  I think they are, your Honor,

11   because, number one, the Morin cases arise out of the shooting

12   in Rio Hondo.

13          THE COURT:  Yeah.  Well, I knew -- yeah.

14          MR. LOCKHART:  And the border patrol cases arise out

15   of the shootings in San Benito.  And until very recently,

16   there has not even been a suggestion that the AK-47 that was

17   used in the Rio Hondo shootings was other than privately owned

18   by Ernest Moore.  We just had an amended complaint that --

19          THE COURT:  Okay.

20          MR. LOCKHART:  -- just kind of hit us out of the

21   clear blue.  So, we don't think they're similar enough to --

22          THE COURT:  Okay.  Any dissenters?

23          MR. VILLEGAS:  Yes.  On the plaintiff's side, your

24   Honor, I think that facts now that are alleged in the most

25   recent complaint that was filed, basically, all of the claims

*JUDICIAL TRANSCRIBERS OF TEXAS, INC.*
*Office 713.697.4718 ♦ Fax 713.697.4722*

4

1  are going to be the same.  Everything's going to come out of

2  City of Harlingen's patterns, practices and policies.

3  Everything's going to be to discovery.  The same defendants

4  are going to be deposed or will have been deposed.

5              There might be one or two things.  The location

6  of the shooting is going to probably be the only thing

7  different in this whole case.  The facts now have to do --

8  that both guns were given to Harlingen Police Department.

9  Both guns were, essentially, assigned to Mr. Moore, Sr., and

10 both guns got to Ernest.

11             And the inception deal, allegations that are

12 present right now, is that the patterns and manner of which

13 they allowed these guns to be used and subsequently allowed to

14 be kept at home, that's the same thing they're alleging in

15 that border patrol, deputy case.  So, I don't think you're

16 going to find much difference in the allegations that are now

17 present.

18             Initially, there was no evidence that this

19 other gun had actually been in possession of Harlingen Police

20 Department.  But there was an individual found who has given a

21 statement that indicates, specifically, that that AK-47 used

22 in the Rio Hondo shooting, the Morin shooting, was, in fact,

23 given to the Harlingen Police Department.

24             So, it's all going to come down to the same

25 facts.  If they had one gun, they had the other gun.  How they

1  handled the gun, the entrustment, et cetera, is all going to

2  be born out in the same case, your Honor.

3              So, basically, they're going to have to defend

4  the same allegations, the same -- you know, once or twice.

5  Depositions, the same people are going to be taken once or

6  twice.  I know that they have started some discovery, but I

7  think that we're going to be looking at the same thing now.

8          MR. PASSMORE:  Judge, the new pleadings we have

9  discussed with the Court or with opposing counsel, whether we

10  would oppose their filing or not, it's my belief that the

11  amended complaints which have been filed late last week are in

12  prime rule of evidence sanctions territory.  It's an effort to

13  try to make the gun a Harlingen gun.  You know, we have the

14  receipt which shows that the gun was purchased by a private

15  individual from a Houston person at a gun show.

16          THE COURT:  Okay.  Now, that's been filed in 105?

17  Is there --

18          MR. PASSMORE:  104 and 105.  Both of them.

19          THE COURT:  Okay.  That one apparently hasn't worked

20  its way up in the system yet.  Okay.

21          MR. PASSMORE:  In one case, I forget which number is

22  which.  The motion -- amended pleading was filed without

23  motion for leave.  And the other one, it was filed with motion

24  for leave, but without consultation.  But that's a -- you

25  know, we can talk about those issues at the appropriate time.

6

1          My interest in the case lies with the two
2     individual officers.
3          THE COURT:  Mm-hmm.
4          MR. PASSMORE:  Moore and Shoepner.  Moore and
5     Shoepner were named as individual defendants in the three
6     earlier filed cases which have been consolidated into Cause
7     No. 162.  In those three cases, they have been dismissed
8     pursuant to their qualified immunity defense.
9          THE COURT:  Qualified immunity?
10         MR. PASSMORE:  And they had been nonsuited as to
11    remaining state claims.  So, the current posture is that
12    they're no longer in that case.  And if we were to try to
13    consolidate these cases, that creates a procedural problem as
14    to those individuals who would then be pulled back into that
15    case which have already been dismissed from.
16         THE COURT:  Well, let's put that one aside for the
17    moment.  Anyway, I'll go ahead and consolidate these two.
18    And, of course, that will be under Cause No. 104.
19         Have you all talked about any scheduling?  And
20    it's obvious to me from just a very hasty look at this,
21    there's going to be some fairly substantial and serious up-
22    front motion briefing and all that.  So, you know, what I
23    would like to do is to talk about some kind of schedule on
24    that before we get down to talking about the trial schedule.
25    I noticed that the defendants have filed a 12(b)(6) Motion in

1  both cases.

2  　　　　　MR. LOCKHART:  Yes, your Honor.

3  　　　　　THE COURT:  Okay.

4  　　　　　MR. LOCKHART:  And we have 12(b)(6) -- we have

5  withdrawn the 12(b)(4) and (5).

6  　　　　　THE COURT:  Okay.

7  　　　　　MR. LOCKHART:  12(b)(6), we have them filed on

8  behalf of the individual officers --

9  　　　　　THE COURT:  Okay.

10  　　　　　MR. LOCKHART:  -- on the basis of qualified

11  immunity, and I don't even think those have been responded to.

12  　　　　　THE COURT:  No, it's early innings on that.  Okay.

13  　　　　　MR. LOCKHART:  But we also have a pending Rule

14  12(b)(6) Motion as to all defendants.  It was my understanding

15  that the Court was going to set or had set for a hearing

16  today, the Qualified Immunity Rule 12(b)(6).

17  　　　　　THE COURT:  Well, I -- okay.  Yeah, so we have.

18  　　　　　MR. LOCKHART:  And it's important that that matter

19  be resolved.

20  　　　　　THE COURT:  Well, not only important, but that's

21  what they told me we need to do.  That always works.  Okay.

22  We've got the 12(b)(6) Motions.

23  　　　　　MR. VILLEGAS:  Your Honor, before the hearing, a

24  motion for leave was filed to file a first amended complaint

25  on the plaintiff's behalf in 105.  Based on further

1  information that we got about that particular -- the arms.

2  One of the things -- and I'll address that consolidation issue

3  again, is that that issue, if what they're telling us here,

4  that issue has already been addressed, as to the individuals.

5  It seems as though if it was addressed in another court as to

6  those individuals, we may be barking up the wrong tree and

7  looking at what they're there -- what's there.  We may just

8  agree with the Court's finding on that, but that still will

9  leave them in a status of both case almost exactly the same.

10  The allegations, causes of action, et cetera, are basically

11  going to be the same.

12          So, for discovery, for trial purposes, those

13  kind if things, if we're going to be on different -- setting

14  up defendant depositions, it seems as though, if we're going

15  to be in two different cases, we got Mr. Lockhart setting up

16  the same persons two or three times, twice, at least.  That

17  issue, you may want to visit early on.

18          THE COURT:  Well, no, I'm going to.  I just, as I

19  say, this is fairly early innings and I had -- really, until I

20  started punching up the docket sheets on these, had not fully

21  appreciated the fact that these other cases were pending; and

22  I just threw out that question earlier to see what your

23  feelings were.  But we'll get to that.

24          Let me -- you mentioned something early.  You

25  filed a motion for leave to amend in 105.

```
 1              MR. VILLEGAS:  Correct, your Honor.

 2              THE COURT:  Okay.

 3              MR. VILLEGAS:  We'd like to get that ruled on,

 4   and --

 5              THE COURT:  All right.  And that's fine.  I don't --

 6   you know, I'll go ahead and sign the order on that one.

 7                   So, you have amended complaint now in both

 8   cases, right?

 9              MR. ALEXANDER:  That's correct, your Honor.

10              THE COURT:  Okay.  Okay.  What impact does that have

11   on the 12(b)(6) Motions for today?  Any?

12              MR. ALEXANDER:  I believe it does, your Honor.  It

13   includes, as Mr. Lockhart alluded to, some new allegations

14   based on evidence that we newly discovered early last week

15   that suggests that our weapon, like the border patrol agent

16   weapon, was turned into the Harlingen Police Department,

17   became property of that department.  So, it changes the nature

18   of our allegations.

19              THE COURT:  Well, let me ask this because, you know,

20   I'm also very cognizant of the fact that 12(b)(6), I've got to

21   look at solely on the basis of the pleadings.  And if you're

22   talking about evidentiary matters that go outside the

23   pleadings -- you know, I have the capability of all of a

24   sudden calling 12(b)(6), 54.  You know, I mean, we can do

25   that, but I -- you know, I'll ask you.
```

1          You've seen the -- you, Mr. Lockhart, have seen

2     the pleading, which I have not.  Is there anything in that

3     would lead you to the conclusion that you might want to

4     convert 12(b)(6) into a summary judgement motion?

5          MR. LOCKHART:  No, your Honor.

6          THE COURT:  Okay.

7          MR. LOCKHART:  Not on the qualified immunity.

8          THE COURT:  Okay.

9          MR. LOCKHART:  Because even taking it separate and

10    apart from the fact that this whole scenario was investigated

11    by every law enforcement agency, probably, south of the Red

12    River, and all evidence said that this gun was privately

13    owned, including the ATF, Tracer, everything else.  But

14    putting that aside, even if their allegations are taken as

15    true, which the Court needs to do --

16         THE COURT:  Yeah.

17         MR. LOCKHART:  -- for purposes of -- for the Rule

18    12(b)(6) Motion, it doesn't make any difference.  Then it

19    becomes just like the allegations in Judge Tagle's court as to

20    the officers and as which she's already disposed, ruling that

21    even if their pleadings were sufficient to state a State-

22    Created Danger Doctrine or cause of action under the

23    Fourteenth Amendment, that it is conclusive that it was not

24    clearly established at the time of this event.

25              And in fact, to this day, neither the Fifth

1    Circuit, nor the U.S. Supreme Court has adopted the State-

2    Created Danger Doctrine. So, they have to show that not only

3    have they alleged a Constitutional deprivation, but that it

4    clearly established at the time.

5             So, we would -- we were not going to oppose

6    their motions which the Court's already ruled on if we were --

7    if we had permission to direct our Qualified Immunity Rule

8    12(b)(6) Motion on qualified immunity on behalf of individual

9    officers through their amended complaint. We're ready to

10   argue it right now.

11            THE COURT: Okay. You know, I'm going to let him

12   amend. I mean, I'm not going to get caught in that trap.

13            Okay. Are you prepared to address the 12(b)(6)

14   Motions?

15            MR. ALEXANDER: Yes, sir.

16            THE COURT: Okay. Do you have anything in writing,

17   or --

18            MR. ALEXANDER: Yes. We filed a response and an

19   amended response, as well.

20        (Pause)

21            THE COURT: Okay. Let me just make sure I'm -- you

22   have filed in both these cases, 12(b)(6) Motions.

23            MR. LOCKHART: Two motions. What I call the general

24   motion on behalf of all the defendants, and also the qualified

25   immunity motion on behalf of the individual officers.

12

1          THE COURT:  All right.  Okay, I see.  You filed the

2    qualified immunity one back at the end of July.  I apologize

3    to you for not being more up to speed on this.

4          (Pause)

5          THE COURT:  Okay, I see.  You've gotten past the

6    service issue, haven't you?

7          MR. LOCKHART:  Yes, your Honor.

8          THE COURT:  Okay.

9          MR. LOCKHART:  It's only the Rule 12(b)(6) Motions.

10          THE COURT:  Yeah.  That's why you said that earlier.

11    I'm sorry.

12               Now, let me ask this:  What you're telling me

13    is that this particular issue, with respect to the qualified

14    immunity, has already been addressed by Judge Tagle in the

15    other cases?

16          MR. ALEXANDER:  It has, your Honor.  Both,

17    specifically, as the individual officers, and I think there is

18    a consensus among the attorneys on 104 and 105, that we're not

19    refuting that qualified immunity defense on behalf of the

20    individual officers.

21          THE COURT:  Had you appealed that?  She's gone ahead

22    and granted your qualified immunity defense, hasn't she?

23          MR. LOCKHART:  But as to other claims.

24          MR. ALEXANDER:  That's the case.

25          THE COURT:  But as to other plaintiff, but, I mean,

1  the same --

2          MR. LOCKHART:  Right.  And they did not appeal it

3  and so that's over with.

4          THE COURT:  Yeah.  But, I mean, what I'm trying to

5  get at is -- we may be able to short-circuit a lot of this.

6  Is there any difference in these cases, with respect to the

7  individual defendants, between the issues raised in the

8  qualified immunity as here as opposed to cases in front of

9  her?

10         MR. ALEXANDER:  As to the individual defendants, I

11  don't believe so, your Honor.

12         THE COURT:  Well, then --

13         MR. ALEXANDER:  Our claim, our federal claim, 1983

14  claim --

15         THE COURT:  What's Mr. Passmore doing here then?

16      (Laughter)

17         MR. ALEXANDER:  Our federal claim is going to be

18  limited to the City of Harlingen.

19         THE COURT:  Okay.  Well, are you -- let me ask it in

20  a different way then.  Are you willing to agree to the

21  dismissal of the individual defendants on the -- under the

22  Qualified Immunity 12(b)(6) Motion?

23         MR. ALEXANDER:  As to our federal claims, I believe

24  that's true, but not as to the state law claims.

25         THE COURT:  What's the status of those in the other

14

1    case?

2               MR. LOCKHART:  They were voluntarily dismissed by

3    the plaintiffs.

4               THE COURT:  Okay.  What's the difference between

5    that and this?

6               MR. ALEXANDER:  Your Honor --

7               THE COURT:  You know, pretty clearly, I don't want

8    us to look -- you know, rightly, wrongly, or indifferently, I

9    don't want to do anything different than has been done in the

10   other cases.

11              MR. ALEXANDER:  I understand.

12              THE COURT:  And if you've got issues that you're

13   going to take up, you might as well take them up in both of

14   them.

15              MR. ALEXANDER:  And we made an effort, your Honor,

16   in drafting our petitions or complaints to limit out

17   allegations to those claims that were preserved by Judge

18   Tagle.  We believe we've done that.

19              THE COURT:  Well, but wait a minute.  I'm -- maybe

20   I'm missing something here.  I thought that the individual

21   defendants were gone in the other cases.

22              MR. ALEXANDER:  Correct.

23              THE COURT:  Okay.  And as you just said, I think,

24   you were going to limit your claims only to the federal claims

25   against the City of Harlingen.

15

1          MR. ALEXANDER:  And state law claims against both
2    the City and individual defendants.
3          THE COURT:  All right.  Well, what's the status of
4    the state law claims against the individual defendants in
5    Judge Tagle's cases?
6          MR. ALEXANDER:  I believe Mr. Lockhart has
7    represented that they have been nonsuited.  I was not aware of
8    that.
9          THE COURT:  Okay.  Is that the case?
10         MR. LOCKHART:  That's correct.
11         THE COURT:  Yeah.  Okay.
12         MR. LOCKHART:  And Judge Tagle acknowledged that and
13   signed an order --
14         THE COURT:  Okay.  So then, what you're telling me
15   and to, perhaps, restate the obvious:  With respect to the
16   individual defendants here today, the only thing you're still
17   interested in pursuing are the state law claims.
18         MR. ALEXANDER:  That's correct, your Honor.
19         THE COURT:  All right.  Which are?
20         MR. ALEXANDER:  Individually, the negligent
21   entrustment, essentially, by city officials to Vasquez
22   [sp.ph.], and Vasquez to R.D. Moore, and R.D. Moore to Ernest
23   Moore.
24         THE COURT:  Okay.
25         MR. ALEXANDER:  As well as Tort Claims Act,

1  responsibility by the City for those negligent acts which were

2  done in the course of employment because we believe it was

3  Harlingen PD weapon.

4          THE COURT:  Well, but from everything I'm hearing

5  Mr. Lockhart tell me, is that the evidence in the other case

6  was pretty strong that it was not a weapon --

7          MR. LOCKHART:  No, your Honor.  That's a different

8  rifle.

9          THE COURT:  Oh, okay.  See, I -- yeah.

10          MR. LOCKHART:  That one -- there's two rifles.

11          THE COURT:  Okay.

12          MR. LOCKHART:  The AK-47 was used in Rio Hondo.  The

13  AR-15, which was Harlingen Police Department property, was

14  used in Rio Hondo.

15          MR. ALEXANDER:  It's going to be --

16          MR. LOCKHART:  I mean San Benito.  Excuse me.

17          MR. ALEXANDER:  And as to our weapon, it's clearly

18  going to be a fact issue, your Honor.  And we haven't had an

19  opportunity to conduct, really, any discovery as to the

20  individual officers because of the qualified immunity defense.

21  I think the law precludes us from doing that at this point.

22      (Pause)

23          THE COURT:  What do you want to tell me about the

24  qualified immunity defense with respect to the state law

25  claims that you don't have in your brief?  Anything?

1          MR. ALEXANDER:  Well, your Honor, my understanding

2  was that qualified immunity was a defense directed to my 1983

3  claim, so -- am I misunderstanding that?

4          THE COURT:  Well, yeah.  No, you're right.  So then,

5  with respect to the individuals, the only thing that you're

6  talking about, again, to repeat, is the state law claims, not

7  the 1983 claims.

8          MR. ALEXANDER:  Correct, your Honor.  As to our

9  federal claim against the City defendants, Shoepner may be

10  implicated in that in his capacity as chief of police.

11          THE COURT:  Was he a policymaker?

12          MR. ALEXANDER:  That's my understanding, your Honor.

13          THE COURT:  Do you dispute that?

14          MR. LOCKHART:  Well, not in the general sense; but

15  as it -- the trouble we're having here, Judge, is, like I say,

16  this thing about alleging that the AK-47 was other than

17  private property is a complete surprise to us because it's

18  contrary to all the evidence, all the evidence.  And so, the

19  chief, Shoepner was a policymaker --

20          THE COURT:  Well --

21          MR. LOCKHART:  -- as it pertains to San Benito and

22  as it pertains to the assignment of that gun.  But in Rio

23  Hondo, it's been the clear understanding through all of the

24  investigation from all the agencies that that was a private

25  gun and didn't involve HPD property.  So, he doesn't have any

1  relationship with that case.  That's our position.  As a

2  policymaker or otherwise, he made no decisions regarding that.

3             MR. ALEXANDER:  Your Honor, based on the evidence

4  that we've obtained -- we haven't seen that receipt.  That's

5  never been produced to us.  My understanding was it was Mr. --

6  Captain Vasquez said he never -- couldn't find one.

7  Apparently, he's found one somewhere.

8             But our evidence, in the form of a sworn

9  statement from a former Harlingen police officer, indicates

10  that the AK-47 was brought to the department by a citizen

11  seeking to have it destroyed.  It became Harlingen Police

12  Department property, would have been -- found its way to

13  Captain Vasquez, entrusted to him, transferred to him by way

14  of an official or unofficial practice or policy of the City of

15  Harlingen Police Department.

16             And I understand that's going to be a fact

17  issue taken up on a summary judgement motion.  I believe that

18  would be premature today, in the event that -- in light of the

19  fact that we have not been able to conduct any depositions.

20             MR. LOCKHART:  Judge, if you take their statement

21  that with this newly discovered evidence that it parallels the

22  San Benito case that involves the Harlingen Police Department

23  rifle -- well, just for the purposes of argument today, let's

24  say that he does.  We know that Judge Tagle has already found

25  that all of the individual officers have qualified immunity,

1    even with the allegations against the police chief as a

2    policymaker in their individual capacities.

3                    Now, if he's acting as an officer that binds

4    the City in a policymaking capacity, then that's an action of

5    the City, but it doesn't keep him from having qualified

6    immunity as an individual.

7                    MR. ALEXANDER:  I agree with that, your Honor.

8                    THE COURT:  Yeah.  Well, I tell you what I'd like to

9    do.  It's pretty obvious, I'm sure, to all of you by now that

10   I don't know enough about this file to talk with any degree --

11   either of these files, to speak with any degree of

12   intelligibility.

13                    What I would like to do is spend some time

14   looking -- are you all happy with the paper that's been filed

15   so far?  I mean, and I'm not -- that's not an invitation to

16   file anymore.  I mean, you got Hughes working on this case and

17   I don't want --

18            (Laughter)

19                    THE COURT:  I don't want to have your Supreme Court

20   briefed on just yet, okay?  But, you know, if you're content

21   with what's here, what I'd like to do is go through this, and

22   also read what Judge Tagle has written in connection with the

23   other case.

24                    MR. LOCKHART:  We would -- like I say, if we can

25   have permission that our Rule 12(b)(6) Motions are directed to

1    their most recent amended complaint.

2         THE COURT:  Yeah.  No, that's fine.

3         MR. LOCKHART:  And if we had permission, and I'll

4    tell Roger to keep it short, to just file a supplemental

5    response to their latest pleading.

6         THE COURT:  Okay.

7         MR. VILLEGAS:  Your Honor, are they going to use

8    this newly discovered receipt somehow in terms of support?

9    Because ATF had looked for it for a number -- a period of

10   time.

11        THE COURT:  Well, I don't want to second-guess what

12   they might do.

13        MR. VILLEGAS:  I'm just wondering because if so, we

14   would -- I mean, then we would like to file --

15        THE COURT:  Well --

16        MR. VILLEGAS:  -- a response to whatever they're

17   going to be using, if they're bringing you this kind of

18   evidence.

19        MR. LOCKHART:  We're not talking about evidence.

20        MR. ALEXANDER:  No.

21        THE COURT:  No.

22        MR. VILLEGAS:  Well, in terms of what they're --

23        MR. PASSMORE:  Pleadings and the law.

24        THE COURT:  Okay.  I'll tell you what I'll do.  I'll

25   give you -- let's see, today is the 18th.  How about to

1  October, the 2nd, to file a response to these?  For the

2  defendants to supplement their response.

3          MR. LOCKHART:  I'm sorry, your Honor.  October 2nd?

4          THE COURT:  Yeah.  And to let the -- if the

5  plaintiffs feel it's necessary, and don't jump on that one,

6  how about to October 27th?

7          MR. ALEXANDER:  All right.

8          THE COURT:  That gives you about three weeks, all

9  right?

10          MR. ALEXANDER:  Yes, sir.

11          THE COURT:  Okay.  But please try and keep it short.

12  In the meantime, I'm going to read Judge Tagle's memos in the

13  other case and see where we're headed with that.  And also,

14  give some thought to consolidation or not with the other

15  cases.  We will see what we will see.  At that point, I think,

16  let me work on the qualified immunity stuff first and, you

17  know, try and get that out of the way.  And then we can get

18  back together and speak in terms of scheduling.

19          For the sake of our meeting here today, let's

20  pretend that we're not going to consolidate these cases with

21  the others, and I'm going to encourage you to try and get

22  together and see if you can come up with some kind of a

23  scheduling order.  I mean, you know my practice is always to

24  let people do their own scheduling.  So, I mean, if you want

25  to take a shot at that, I would certainly encourage you to do

1   that.

2            How far along is the other case, with respect

3   to discovery?

4            MR. LOCKHART:  Your Honor, in that case, after Judge

5   Tagle issued her orders in which she granted the officers

6   qualified immunity in which she said that she was not going to

7   dispose of the State-Created Danger Doctrine at the pleading

8   stage as it related to the City, but would allow discovery to

9   go forward.  And she set forth in a very recent opinion what

10  -- I took it as a road map of what she was interested in, to

11  deal with in a factual stage.

12           THE COURT:  Okay.

13           MR. LOCKHART:  And pursuant to that, we took a first

14  round of depositions, including three of the INS officers that

15  were there, the two partners of the decedent, Sergeant Ronnie

16  Sange [sp.ph.] with the Cameron County Sheriffs Department who

17  was in charge of the manhunt.  And the plaintiffs deposed

18  Chief Shoepner and R.D. Moore.  And that is the first round of

19  depositions.

20           We filed a motion for summary judgement back, I

21  believe, at the end of July, which is pending.  There is a

22  motion for leave of the plaintiffs to conduct additional

23  discovery before responding to that.  Judge Tagle presently

24  has stayed all discovery and has ordered the parties in that

25  consolidated case to have a Rule 26(f) meeting and file a

1    scheduling order with her and a proposed discovery plan by

2    October 4th.

3            THE COURT:  Well, let me ask you this -- and I'm

4    thinking now in terms of just the points that were raised

5    about, you know, multiple depositions and all that.  Would

6    there be any problem with trying to do that in this case, too?

7    I mean, it sounds to me that no matter what happens with these

8    -- with this case, whether it's consolidated or not, that

9    you're going to be running down a lot of the same tracks.  And

10   just for purposes of your own efficiency, it would strike me

11   that if you could come up with some kind of a joint plan, it

12   might be better for everybody.

13           MR. LOCKHART:  Are you talking about between the Rio

14   Hondo case and San Benito?

15           THE COURT:  Yeah.

16           MR. LOCKHART:  Well, again, going back to what

17   Walter was talking about, of course, in the border patrol and

18   Raul Rodriguez, the individual officers are gone.

19           THE COURT:  Yeah.

20           MR. LOCKHART:  We still have a pending Rule 12(b)(6)

21   Motion, Qualified Immunity, which, of course, they're immune

22   from suit.  So, until that's resolved, we're really not in a

23   position to even discuss depositions and that type of thing.

24           THE COURT:  Okay.  The long and the short of it is

25   I've got to do something with the 12(b)(6) Motions before you

1    can do -- okay.  Okie doke.

2                    Well, let's do that then.  Let's address those

3    as quickly as we can and move forward and see what's going on

4    with the rest of it.  Okay.  Too early to do any talking about

5    talking, I assume.

6            MR. LOCKHART:  Yes, your Honor.

7            THE COURT:  Okay.  For the same reason we were just

8    talking.  Okay.

9                    All right.  Well, anyway, let's go ahead and if

10   you want to file a supplement, supplemental response based on

11   the amended complaint, do that by October 2nd.  I'll give the

12   plaintiffs until October 27th, if they choose.  And, again,

13   that's -- don't conceive that to be an invitation to respond

14   to that.  We'll go forward with that.

15                   Okay, gents.  Well, I appreciate seeing all of

16   you.  Always good to talk to you.

17           MR. ALEXANDER:  Thank you, your Honor.

18       (This proceeding concluded at 2:10 p.m.)

19

20

21

22

23

24

25                          *  *  *  *  *

# C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_Lissa Bowman_
Signature of Transcriber

_February 20, 2003_
Date

_21494_
JTT#

1           IN THE UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF TEXAS
2                  BROWNSVILLE DIVISION

3    ———————————————————————————  )
                                  )
ARTURO GUILLERMO SALINAS, ET AL   )
4                                 )
                                  ) CIVIL ACTION NO.
5    VS.                          ) B-98-162
                                  )
6    CITY OF HARLINGEN, ET AL     )
                                  )
     ———————————————————————————  )
7

8

9                        VOLUME I
                         JURY TRIAL
10      BEFORE THE HONORABLE HILDA G. TAGLE
                    FEBRUARY 19, 2002
11
     APPEARANCES:
12

13   For the Plaintiffs,         MR. BROADDUS A. SPIVEY
     Salinas and Rodriguez:      MR. PRICE AINSWORTH
14                               Attorneys at Law
                                 Austin, Texas
15
     For the Plaintiff,          MRS. SONIA LOPEZ
16   Rodriguez:                  MR. RAMON GARCIA
                                 Attorneys at Law
17                               Edinburg, Texas

18   For the Defendants:         MR. TOM LOCKHART
                                 MR. ROGER HUGHES
19                               Attorneys at Law
                                 Harlingen, Texas
20
     Transcribed by:             BRECK C. RECORD
21                               Official Court Reporter
                                 600 E. Harrison, Box 16
22                               Brownsville, Texas  78520
                                 (956)548-2510
23
                                 ‹u ‹ ʒ4ᥑ6
24

25

           Captured and Transcribed by Computer - Eclipse



them that.

    THE COURT:  Sustained.

    MR. SPIVEY:  May the witness be excused, Your Honor?

    THE COURT:  Yes.  Any other questions, Mr. Lockhart?

    MR. LOCKHART:  No, Your Honor.

    THE COURT:  Madam, you may step down.

Call your next witness.

    MR. AINSWORTH:  Call Texas Ranger Jaramillo, Your Honor.

    MR. SPIVEY:  May this witness be excused, Your Honor?

    THE COURT:  Yes.  I'm sorry, Mr. Lockhart?

    MR. LOCKHART:  Yes, Your Honor.

    THE COURT:  All witnesses will be excused unless you're requesting that they stand by.

Sir, have a seat.

    THE WITNESS:  Thank you.

            RODOLFO JARAMILLO,

the witness, having been first duly cautioned and sworn to tell the truth, the whole truth and nothing but the truth, testified as follows:

            DIRECT EXAMINATION

BY MR. AINSWORTH:

Q     State your full name for the record.

A     My name is Rudy Jaramillo.

Q     And how are you employed?

A     With the Texas Rangers.

Q    And how long have you been with the Texas Rangers?

A    On June 1st will be six years.

Q    How does one become a Texas Ranger?  What is your work history, sir?

A    To become a Texas Ranger, you qualify by background investigation that is conducted by the Texas Rangers and also, by the experience of the work performance that you have.  I was a highway patrolman in Goliad for 12 years.  So they take all that in consideration, the criminal and whether they were misdemeanor or felony apprehensions that have gone through court.

Q    And if we go back in time, before you became a Texas Ranger back when you were a DPS trooper out of Goliad for a dozen years, I take it before that time you had to have had some specific training to become a DPS trooper?

A    Yes, sir.  Before you become a DPS trooper, you have to go to the DPS academy for four months in Austin.

Q    So I take it after that training, the 12 years as a DPS trooper and then six years as a Ranger, does that take us to about 18 years or so that you've been involved in law enforcement?

A    That's correct, sir.

Q    Now, it is my understanding that back on July 7th, 1998, you were called upon to investigate a double murder here in the San Benito area?

A    That's correct.

Q    And was that the kind of thing that, while hopefully it wasn't a double murder that you were investigating every day, that you were frequently called upon as a Texas Ranger to investigate?

A    Yes, sir.  That's part of our duties.

Q    What is that facet of your duties?  What is it that you typically do in an investigation like this?

A    Whenever we investigate, most of the time we are the assisting agency.  Every once in a while we'll take the lead role in investigating a murder, capital murders.  And what we do is we gather all the information, evidence, witness statements and start focusing to see if there's any other suspects or what the motivation is for the murder.

Q    Yes, sir.  If there's a situation where other law enforcement agencies such as the sheriff's department or a police department or even federal agencies might be involved, does it fall upon the Texas Rangers from time to time to coordinate the efforts of the various agencies?

A    Sometimes what we do is with other agencies, we coordinate with the agency to see who is going to take the lead in the investigation and if it falls on our level, then we go ahead and coordinate with the agencies assisting us.  It depends on whether it is going to be federal level or state level.

Q    And then at the same time, do you have to do the actual gum

1   that right?

2   A   Yes, sir.

3   Q   Okay.  Now, the trace eventually came back from the gun that

4   you had traced; is that right?

5   A   That's correct.

6   Q   At that point I guess it was a little late getting back to

7   you.  So you started calling around trying to find out where it

8   was; is that right?

9   A   I'm sorry?

10   Q   Anyway, you got the report back from the trace, correct?

11   A   Correct.

12   Q   And you were able to determine that the weapon trace came

13   back to Dr. Thomas E. Pirtle from Harlingen.  I don't know.  I'm

14   looking at 114 there.

15   A   Yes, sir.

16   Q   As you followed up on that, you were told that Dr. Pirtle

17   had relinquished the AR-15 to the Harlingen Police Department?

18   A   Yes, sir.

19   Q   Okay.  The AK-47, that's the weapon that was used to shoot

20   up the Rio Hondo home?

21   A   Yes.

22   Q   It came back registered to police Captain Joe Vasquez; is

23   that right?

24   A   Yes, sir.

25   Q   You refer to him as Captain Vasquez in your report?

1    A    Correct.

2    Q    And he's a captain in the Harlingen Police Department,

3    right?

4    A    Yes, sir.

5    Q    Okay.  And so you went to Captain Vasquez and asked him

6    about some of this stuff, didn't you?

7    A    Yes, sir.

8    Q    And you asked him about why that AK-47 was at the Moore

9    home, and he told you he sold it to the Moores; is that right?

10   A    Yes, sir.

11   Q    Okay.  Then he told you that the AR-15 was brought in to be

12   relinquished, is the word that was used by Captain Vasquez; is

13   that right?

14   A    I'm not sure if that was relinquished, if that was his

15   terminology or mine.

16   Q    In any event, the weapon was not disposed of, but instead

17   was according to Captain Vasquez issued to Detective Moore to

18   use as a service weapon; is that right?

19   A    Correct.

20   Q    Now, when Captain Vasquez was talking to you about this, he

21   knew that you were investigating at least a double murder,

22   right?

23   A    Yes, sir.

24   Q    He knew this was a serious investigation, that a Texas

25   Ranger come in to talk to him.  And what he told you was that

Q   But you are there, as the saying goes, just to find the facts, ma'am; isn't that right?

A   That's correct.

Q   In this particular instance, you ultimately came to the conclusion, didn't you, that this was an AR-15 that had been brought in for disposal by Sylvia Pirtle for the Harlingen Police Department?

A   Yes, sir.

Q   Rather than being disposed of, the weapon found its way into R.D. Moore's home, the AR-15?

A   I'm sorry, what was that again?

Q   That the AR-15, rather than being disposed of, found its way into Detective Moore's home?

A   Yes, sir.

Q   That eventually it was put in a gun safe that was in Detective Moore's son's room, Ernest Moore?

A   Correct.

Q   And that Ernest Moore had all kinds of problems that ranged from mental health problems, to taking Prozac, to using cocaine, to using alcohol, to using marijuana?

A   Yes, sir.

Q   That on the occasion in question, he had killed two people earlier in the day with an AK-47 and then at his own home, he rose up out of a field across from his house and shot down two border patrol agents and wounded a Cameron County sheriff's

1  officer?

2  A   Yes, sir.

3  Q   And he was using an AR-15 that belonged constructively

4  possessed by the City of Harlingen when he did that?

5  A   Yes, sir.

6       MR. AINSWORTH:  I think that's all I have right now,

7  Your Honor.

8       THE COURT:  Members of jury, I'm going to recess you for

9  20 minutes.  During this recess, you are still in my

10  admonishment, that you must not form or express any opinion

11  about the facts of this case until it has been submitted to you

12  for your deliberation.  You'll be in recess for 20 minutes.

13  Thank you.

14       (Jury out.)

15       THE COURT:  All right.  We're in recess.

16       (Recess taken.)

17       (Jury in.)

18       THE COURT:  Members of the jury, are you comfortable or

19  is the temperature a little warm?  Anybody expressing an

20  opinion?  You can have an opinion about that.  Well, if it is

21  warm for you to have to remove your jacket, then you can get

22  somebody to take care of you -- the temperature, Stella?

23       CASE MANAGER:  Yes, Judge.

24       THE COURT:  Mrs. Lopez?

25                    DIRECT EXAMINATION


       Captured and Transcribed by Computer - Eclipse

1            IN THE UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF TEXAS
2                 BROWNSVILLE DIVISION

3    ————————————————————————————    )
                                     )
     ARTURO GUILLERMO SALINAS, ET AL )
4                                    )
                                     ) CIVIL ACTION NO.
5    VS.                             ) B-98-162
                                     )
6    CITY OF HARLINGEN, ET AL        )
     ————————————————————————————    )

7

8

9                        VOLUME II
                         JURY TRIAL
10        BEFORE THE HONORABLE HILDA G. TAGLE
                    FEBRUARY 20, 2002
11

     APPEARANCES:
12

13   For the Plaintiffs,        MR. BROADDUS A. SPIVEY
     Salinas and Rodriguez:     MR. PRICE AINSWORTH
14                              Attorneys at Law
                                Austin, Texas
15

     For the Plaintiff,         MRS. SONIA LOPEZ
16   Rodriguez:                 MR. RAMON GARCIA
                                Attorneys at Law
17                              Edinburg, Texas

18   For the Defendants:        MR. TOM LOCKHART
                                MR. ROGER HUGHES
19                              Attorneys at Law
                                Harlingen, Texas
20

     Transcribed by:            BRECK C. RECORD
21                              Official Court Reporter
                                600 E. Harrison, Box 16
22                              Brownsville, Texas  78520
                                (956)548-2510
23

24

25

        Captured and Transcribed by Computer - Eclipse

1          (Jury in.)

2               THE COURT:  Call your next witness.

3               MR. SPIVEY:  Call Jim Scheopner.

4                    JAMES SCHEOPNER,

5     the witness, having been first duly cautioned and sworn to tell

6     the truth, the whole truth and nothing but the truth, testified

7     as follows:

8                    DIRECT EXAMINATION

9     BY MR. SPIVEY:

10    Q    You are Officer Jim Scheopner?

11    A    Yes, sir.

12    Q    You were chief of the police in Harlingen, Texas, July the

13    7th, 1998?

14    A    Yes, sir.

15    Q    You were born when?

16    A    September 2nd, 1950.

17    Q    And you came with the police department when?

18    A    June 16, 1972.

19    Q    And became chief of police in when?

20    A    April 1st, 1993.

21    Q    What time of the day July 7th, 1998 did you first become

22    aware of shootings by Ernest Moore?

23    A    About 6:55 a.m.

24    Q    How did that happen?

25    A    Received a telephone call at my house.

                Captured and Transcribed by Computer - Eclipse

1   Q    So you, R.D. Moore and Captain Vasquez have been working for

2   the Harlingen Police Department now for in excess of 28 years?

3   A    Yes, ma'am.

4   Q    They have been working for the Harlingen Police Department

5   in excess of 30 years; isn't that correct?

6   A    Well, Moore quit at one point, went down to the sheriff's

7   department and came back.  So I don't know what his total tenure

8   is, but Captain Vasquez has been there 30 or 32 years.

9   Q    And that's how long you-all have known each other?

10  A    Yes, ma'am.

11  Q    And did that have any reason or was that the reason why

12  policies and procedure were violated, was because you-all had

13  known each other for such a long time that there was just a

14  disregard for policy and procedure?

15  A    No, ma'am.

16  Q    Were in effect policies and procedures violated by R.D.

17  Moore?

18  A    Procedures were, yes, ma'am.

19  Q    And were in effect policies and procedures violated by

20  Captain Vasquez?

21  A    Yes, ma'am.

22  Q    And were in effect policies and procedures violated by you?

23  A    No, ma'am.

24  Q    Is it your testimony to this jury that you issued the AR-15

25  that killed the two border patrol agents and seriously injured

1   Raúl Rodriguez because you had assigned R.D. Moore as a sharp

2   shooter team?

3   A   Yes, ma'am.

4   Q   I want to refer to what's been previously admitted and

5   marked as Plaintiff's Exhibit No. 46.  Under Section 4.04.001 of

6   the Harlingen Police Department -- 4.04, I'm sorry, authorized

7   weapons.  The department authorizes officers to carry certain

8   weapons and authorizes the use of those weapons only when

9   necessary to lawfully accomplish departmental goals.  Officers

10  carry and use only those weapons approved and authorized by the

11  department.

12  A   Yes, ma'am.  That's the policy, and the rest of the items

13  are procedures on how to accomplish the policy.

14  Q   Isn't it true, Mr. Schoepner, that there was no departmental

15  goal for adopting a sharp shooter team?

16  A   No, ma'am.

17  Q   Are you stating to this jury that there was such a

18  departmental goal?

19  A   Yes, ma'am.

20  Q   There was no documentation, was there, to support your

21  position that the department had a sharp shooter team?

22  A   I don't believe I ever put it in writing.

23  Q   And assistant city manager Joe LaBeau reviewed that and

24  found there was no documentation to support your position that

25  this AR-15 had been issued because there was some policy that

A    One more.

Q    How many have you had at all?

A    This would be three.

Q    You're saying that there's only three sexual harassment or sexual discrimination suits, not suits, but complaints against you?

A    Yes, sir.

        MR. SPIVEY:  No further questions at this time.

        MRS. LOPEZ:  Your Honor, I have no further questions on redirect.

        MR. LOCKHART:  No further questions of this witness.

        THE COURT:  Sir, you may step down.

    Call your next witness.

        THE WITNESS:  Your Honor, am I excused?

        THE COURT:  Well, I indicated that all witnesses are excused unless request is made to ask them to stand by.  So yes, you are excused.

        THE WITNESS:  Thank you.

        THE COURT:  Next witness.

        MR. AINSWORTH:  Call Mr. R.D. Moore to the stand, Your Honor.

                        R.D. MOORE,

the witness, having been first duly cautioned and sworn to tell the truth, the whole truth and nothing but the truth, testified as follows:

        Captured and Transcribed by Computer - Eclipse

DIRECT EXAMINATION

BY MR. AINSWORTH:

Q   Please state your full name.

A   Ralph Duane Moore.

Q   And how are you employed, Mr. Moore?

A   I'm employed with the City of Harlingen with the police
department.

Q   How long have you been with the Harlingen Police Department?

A   Be 30 years in July.

Q   What is your current rank with the Harlingen Police
Department?

A   Patrol officer?

Q   And were you with the Harlingen Police Department back in
July of 1997?

A   Yes.

Q   And what was your rank at that time?

A   Patrol officer.

Q   Is that essentially the same rank in July -- let's say July
6th of 1997 as you enjoy today?

A   Yes.

Q   Okay.  Do you have essentially the same duties with the
Harlingen Police Department today that you had in terms of rank
and authority that you had back on July 6th of 1998?

A   Yes.

Q   Have you been sanctioned or demoted or made to leave without

Captured and Transcribed by Computer - Eclipse

1   Q    Okay.  So you do admit to this jury that when Robert

2   Rodriguez arrived before Ronald Saenz showed up, you told him

3   that your son was upset at two drug dealers from Rio Hondo

4   because they had turned his girlfriend on to cocaine and that

5   his son was going to take care of that or might take care of

6   that, as you stated?

7   A    Right.  That's technically right.  That my son had mentioned

8   to me that he was -- because he was wanting me to assist him in

9   finding out any information I could on these particular people

10  because of the drug situation that Julie was becoming involved

11  in and he was doing everything he could at that point to try to

12  keep her away from the narcotics.

13  Q    Well, in an effort to try to assist him, are you the one who

14  gave him the phone number where Julie Cox was staying at with

15  this other individual?

16  A    I assisted him by running a few license plate numbers and

17  trying to do a little investigation on my own weeks prior to

18  this situation.

19  Q    You assisted your son in trying to get the license plates

20  number?

21  A    This was no assist.  They worked at Alla Texas.

22  Q    I'm sorry.  It is just that this is the first time that I

23  hear of this.

24  A    I did not assist him with anything.

25  Q    Not to use the word assist.  You were going run a license

1  plate just for your son to try to locate the address or phone

2  number where these people lived?

3  A   No, not the address or phone number where these people

4  lived.  I did not give him any information whatsoever.  In this

5  situation what I was doing, I was trying to compile maybe

6  something that I could turn over to our drug task force.

7  Q   What were you doing?  Were you trying -- were you running a

8  license plate search?

9  A   Yes, I run license plate search.

10  Q   And when you run a license plate search, as a police

11  officer, what information do you get?

12  A   Well, you get a name and an address.

13  Q   I'm sorry?

14  A   A name and an address.

15  Q   So you were able to get a name and an address?

16  A   Yes.

17  Q   Did you get a phone number?

18  A   No.

19  Q   So you got an address for your son to where these people

20  lived?

21  A   No, ma'am.  I did not relate any information to my son on a

22  particular license plate number that I did run.  I did not tell

23  him anything.

24  Q   Did you run the license plate number or not?

25  A   I ran the license plate number for my information only.

1  Q   And you got an address?

2  A   Yes.

3  Q   And you got an address to where two women from Rio Hondo

4  would later be killed?

5  A   No, that is incorrect.  That is incorrect.  The license

6  plate number I run did to come back to Rio Hondo at all.  It

7  came back to somewhere in north Harlingen.  I don't even

8  remember where, but it wasn't related to the situation at all.

9  Q   And after you're able to get an address, can't you get a

10 phone number?

11 A   I don't have that information.  The license plate number

12 that you're questioning me on was not a license plate number

13 that had anything to do with this particular situation.  It

14 turned out to be an address in Harlingen somewhere that had

15 nothing to do with anything.

16 Q   If you run a license plate search -- and I'm not asking

17 necessarily about the one that you ran here, but if you run a

18 license plate search and you get an address, can you then after

19 getting an address get a phone number?

20 A   I guess it is possible if you use the cross reference.

21 Q   And how do you use a cross reference?

22 A   Usually by name or by address.

23 Q   And how do you do that?  How does someone after they get an

24 address run a cross reference?

25 A   It is an index directory that has telephone numbers in it.

Captured and Transcribed by Computer - Eclipse

1    Q    And you're telling this jury that you ran a license plate

2    search and that you came back with an address and that it was

3    not where these two women were killed in Rio Hondo?

4    A    It was not, no.

5    Q    But you did run that search and it just didn't come back to

6    this address is what you're telling them?

7    A    Yes.

8    Q    And why did you run a license plate search?

9    A    I'm a police officer and in the event where there are crimes

10   possibly being committed, that's what our computer systems are

11   for, to check different addresses off the license plates.

12   Q    You're not a DEA agent, are you?

13   A    I'm a police officer and I am sworn to uphold the law.

14   Q    How did your son Ernest Moore get the phone number to where

15   Julie Cox was staying with this other fella?

16   A    I have no idea.

17   Q    You don't know how he got that?

18   A    Pardon me, ma'am?

19   Q    You don't know how he got that?

20   A    No, ma'am.

21   Q    And you don't know how he got that address?

22   A    I do not know.

23   Q    And you know that before July the 6th -- on July the 7th,

24   the two border patrol agents were killed.  Raul Rodriguez was

25   severely injured.  And the night before your son called your

1    A    You could have, yes.

2    Q    But in this case, we don't have any serial numbers; is that

3    correct?

4    A    That's correct.

5    Q    And the serial number for the Colt, not the Olympic Arms

6    that was used to kill the two border patrol agents and seriously

7    injured Raúl Rodriguez, but the other one that has been shown in

8    open court, the colt AR-15, that gun by running a trace comes

9    back to you; is that correct?

10   A    Yes.

11   Q    It doesn't come back to Ernest, does it?

12   A    No.

13   Q    It is not registered legally to Ernest; is that correct?

14   A    As far as registration goes in the State of Texas and what

15   you're implying here is when you initially purchase the gun,

16   that information does down as the person who bought it.  There's

17   no official registration other than the initial sale of the

18   weapon, if it is a federal firearms dealer.  Once that rifle is

19   passed on either as a gift or by selling it to someone else,

20   there is no registration transfer.  That person just has it and

21   you know who has it and there's no transfer.

22   Q    Okay.  But the Colt AR-15, you are the current registered

23   owner?

24   A    Yes, I'm listed as the initial buyer.

25   Q    And if ATF would run a search today, a gun trace today, it

1    would come back to you?

2    A    It would come back that I purchased the weapon and the date

3    that I purchased it, yes.

4    Q    And you still own that weapon?

5    A    I still have that weapon, yes.

6    Q    And it is yours?

7    A    Well, it is not mine.  It is -- was Ernest's weapon and I

8    still have that weapon, yes.

9    Q    But it is not yourself?

10   A    I had given it -- Ernest had bought that particular weapon

11   with his money.  I purchased it for him.

12   Q    Why did Ernest not fill out this ATF Form 4473?  If he

13   wanted to buy it, why didn't he fill out the form?

14   A    Ernest worked long hours and he never had the opportunity to

15   be free except on Saturdays.  This particular transaction took

16   place during the week while he was working.  He gave me the

17   money to buy it and I bought it for him.

18   Q    Is it true that the real reason why he didn't fill out that

19   form was because he could not have lawfully purchased it on his

20   own?

21   A    He could not have lawfully purchased it on his own?

22   Q    Yes, sir.

23   A    I believe that he could have.

24   Q    Isn't it true that if you do buy a gun where an ATF form has

25   to be filled out, since you bought it from a licensed firearms

1    dealer, Captain Vasquez, that it asks you -- there's some

2    questions on there that it asks you that you have to answer no

3    to because if you answer yes to any of them, that means you

4    cannot buy that gun?

5    A    Okay.  What are those?

6    Q    Is that true?

7    A    I don't know.  I need to read the questions.  I've read the

8    report, but I don't recall what they said.

9    Q    Let's refer to Plaintiff's Exhibit 19A.  8A, are you the

10   actual buyer of the firearm indicated below?  If you answer no

11   to this question, the dealer cannot transfer the firearm to you.

12   So you answer yes, you are the buyer.  B, are you under

13   indictment for information in any court for a crime for which

14   the judge could imprison you for more than one year and

15   information is formal accusation of a crime made by prosecuting

16   attorney?  The answer is no.  C, have you been convicted in any

17   court of a crime for which the judge could have imprisoned you

18   for more than one year, even if the judge actually gave you a

19   shorter sentence.  Your answer, no.  D, are you a fugitive from

20   justice?  No.  E, are you an unlawful user of or addicted to

21   marijuana or any depressant, stimulant or narcotic drug or any

22   other controlled substance?  No.  F, have you ever been

23   adjudicated mentally defected or have been committed to a mental

24   institution?  Answer, no.  Have you been discharged from the

25   armed forces under dishonorable conditions?  No.  Are you an

1    alien illegally in the United States?  No.  Have you ever

2    renounced your United States citizenship?  No.  Are you subject

3    to a court order restraining you from harassing, stalking or

4    threatening an intimate partner or child of such partner?  No.

5    Have you been convicted in any court of a misdemeanor crime of

6    domestic violence, this includes any misdemeanor conviction

7    involving the use or attempted use of physical force committed

8    by a current or former spouse, parent or guardian victim or by

9    person with similar relationship with the victim.  And lastly,

10   are you a citizen of the United States?  Yes.

11   A    Okay.

12   Q    As a result, you were able to purchase this weapon; isn't

13   that correct, Mr. Moore?

14   A    Yes.

15   Q    Your son under subsection E would have been an unlawful user

16   of or addicted to marijuana or cocaine or some controlled

17   substance, wouldn't the answer to that have to have been yes?

18   A    No.

19   Q    Why not?

20   A    Because I don't believe my son was addicted or is a regular

21   user of any controlled substance or drug.

22   Q    Your son was committed to a mental institution for drug

23   addiction?

24   A    He was admitted to MHMR, which is a mental health

25   organization, but he was -- it was done through another rehab

Captured and Transcribed by Computer - Eclipse

1    corporation that houses them there.  He was at MHMR, which is

2    mental health and mental retardation, but they do have a drug

3    clinic.  It doesn't mean that they are mentally retarded.  It

4    means that they have been on drugs and they're wanting to clean

5    theirselves up, which I believe he did clean himself up.

6    Q    Now, on the date of the incident in question, July 7th of

7    1998, your son was found to have cocaine and I believe marijuana

8    in his system; is that correct?

9    A    That's what they say.

10   Q    And if he had answered yes to E or to F, he could not have

11   purchased this weapon on his own?

12   A    At the time that they checked him for that, they possibly

13   could have checked him a month earlier and he would have checked

14   clean.

15          MRS. LOPEZ:  I have no further questions.  Thank you,

16   Mr. Moore.

17          THE WITNESS:  You're welcome.

18          THE COURT:  I have a couple of questions, sir.  During

19   your tenure as custodian, did you, in fact, ever have to conduct

20   destruction of contraband or weapons pursuant to court order?

21   You made representations to that.

22          THE WITNESS:  Yes, I did.  Right after I became

23   custodian back in I believe it was '82, I had a court order that

24   had already been in place and signed by -- I don't remember

25   which district judge it was at that time, but we had a lot of

Captured and Transcribed by Computer - Eclipse

<u>AFFIDAVIT OF RODOLFO C. JARAMILLO</u>

THE STATE              )
                              :
OF TEXAS              )

      BEFORE ME, the undersigned Notary Public in and for the State of Texas, on this day personally appeared **RODOLFO C. JARAMILLO**, known to me to be the person whose name is subscribed hereto, who being first duly sworn in the manner provided by law, on oath states as follows:

      "My name is **RODOLFO C. JARAMILLO.** I am over the age of twenty-one (21) years; am in all respects competent to testify about and have personal knowledge of the following facts:

      Since June 1, 1996, I have been a Sergeant with the Texas Department of Public Safety, Texas Ranger Division, Company D, stationed in Harlingen, Cameron County, Texas.

      In such capacity, on behalf of the Texas Department of Public Safety, I was in charge of the investigation of the following offenses:

| Offense #1: | Capital Murder - FC - 1900<br>San Benito, Cameron County, 031<br>RICARDO GUILLERMO SALINAS, W/M, 04-29-74<br>07-07-98 |
|---|---|
| Offense #2: | Capital Murder - FC - 1900<br>San Benito, Cameron County, 031<br>SUSAN LYNN RODRIGUEZ, W/F, Age 28<br>07-07-98 |
| Offense #3: | Attempted Murder - F1 - 1500<br>San Benito, Cameron County, 031<br>RAUL RODRIGUEZ, W/M, Age 32<br>07-07-98 |


PLAINTIFF'S EXHIBIT 10

As a result of the investigation and as part of my investigative duties, I prepared REPORTS OF INVESTIGATION.

Computerized scale crime scene drawings with measurements were prepared by the Texas DPS Mobile Incident Response Team under my direction and supervision as part of the investigation.

The attached ~~61~~ 63 pg. pages of documents is a true, accurate and complete copy of the REPORTS OF INVESTIGATION prepared by me and the four attached pages of drawings are true, accurate and complete copies of the computerized scale crime scene drawings with measurements and enlargements prepared under my direction and supervision as part of the investigation."

Further Affiant sayeth not.

RODOLFO C. JARAMILLO

COUNTY OF CAMERON

SWORN TO AND SUBSCRIBED before me, the undersigned authority, by the said RODOLFO C. JARAMILLO on the 30th day of May, 2001, to certify which witness my hand and seal of office.

Notary Public in and for
THE STATE OF TEXAS

[Notary Seal]                    My Commission Expires: 10-19-03



CONTINUATION

DATE:  10-12-98        PAGE: 31

| FILE TITLE      MASTER FILE | FILE NO.<br>RD098338 | TYPE<br>O | PROGRAM CODE<br>Criminal |
|---|---|---|---|
| 1 Capital Murder - FC - 1900<br>2 San Benito, Cameron County, 031<br>3 RICARDO GUILLERMO SALINAS, W/M, 04-29-74<br>4 07-07-98 | ACTIVE X  INACTIVE__ CLOSED__ RESTRICT__<br><br>BY: RODOLFO C. JARAMILLO, Sergeant # 5801 | | |

modem that was used to program the Energy Management System for the school district.

110. This writer came to the conclusion that the phone number was misread and should have been 956-748-4228, which belongs to the victim's residence at 311 Catherine St. in Rio Hondo.

111. Ranger PACHECO obtained statements from Border Patrol Agents, MICHAEL J. RILEY, GEORGE A. HUPP and DANIEL DIAZ.  MICHAEL RILEY was Agent RODRIGUEZ'S partner. (Refer to Ranger PACHECO'S CLE-1, Report of Investigation.)

112. Border Patrol Memorandum statements were submitted by Supervisory Agent, DOUGLAS L. SPIELMAN, and Agent KELLY. (Refer to Attachment DD, on Agent SPIELMAN'S statement and Attachment EE, for Agent KELLY'S statement.)

113. This writer contacted ATF Agent TONY VARGAS to inquire about the weapon trace.  Agent VARGAS informed this writer that Agent DANNY CARPENTER was in-charge of the trace, but had been ill.  Agent CARPENTER was going to inform this writer about the weapon being property of the Harlingen Police Department.

114. Agent VARGAS stated that the weapon trace came back to a Dr. THOMAS E. PIRTLE from Harlingen. Dr. PIRTLE relinquished the AR-15 to the Harlingen Police Department.  He also stated that the AK-47 came back registered to Harlingen Police Captain JOE BENNET VASQUEZ (hereinafter referred to as Captain VASQUEZ).

115. This writer contacted the Harlingen Police Department and spoke to Captain VASQUEZ in reference to the weapons.  VASQUEZ stated that he sold the AK-47 to Detective MOORE, and a private individual who wanted to relinquish the weapon to the Department brought in the AR-15.  He also stated that it was issued to Detective MOORE to use as a service weapon.

116. This writer requested all documents pertaining to the AR-15. Captain VASQUEZ stated that he wasn't sure if there was any, but he would look and get them to this writer.

117. On 07-09-98, Cameron County Sheriff's Senior Sergeant, RONALD K. SAENZ submitted a statement on the events of the shooting. (Refer to Attachment EE, statement submitted by Sgt. RONALD K. SAENZ.) Sgt. SAENZ states that he arrived at approximately 6:45 AM, and spoke to Detective MOORE. Sgt. SAENZ informed him (R.D.) that his son had killed

CLE-2(Rev. 12/88)

CONTINUATION

| | DATE: 10-12-98 | PAGE: 36 |
|---|---|---|

| FILE TITLE          MASTER FILE | FILE NO. RD098338 | TYPE O | PROGRAM CODE Criminal |
|---|---|---|---|
| . Capital Murder - FC - 1900 2 San Benito, Cameron County, 031 3 RICARDO GUILLERMO SALINAS, W/M, 04-29-74 4 07-07-98 | ACTIVE _X_ INACTIVE___ CLOSED___ RESTRICT___  BY: RODOLFO C. JARAMILLO, Sergeant # 5801 | | |

95.   Dr. PIRTLE also identified the weapon separately from Mrs. PIRTLE.  They both signed and dated the photograph.

144. Mrs. PIRTLE was very upset that the weapon she had relinquished to the Police Department had been used by suspect MOORE.  She stated that was why she had submitted the weapon to the Police Department in the first place, so that it would not get into the wrong hands.

145. The next day on Friday 07-17-98, this writer traveled to Brownsville to meet with Cameron County District Attorney, BILL HAGEN.  This writer informed HAGEN of the investigation and brought it to his attention that the AR-15 used by MOORE was a weapon that had been relinquished to the Harlingen Police Department to be destroyed. This writer asked HAGEN if he could do some research on whether there was any criminal offense; also informing him that there was no Court Order involved. HAGEN stated he did not see any criminal act, but he would look into it.

46. This writer met with Harlingen Police Chief, SCHOEPNER in reference to obtaining a statement from Detective MOORE.  Chief SCHOEPNER stated that his department and Detective MOORE were willing to cooperate on giving a statement. Chief SCHOEPNER also produced a statement from Captain VASQUEZ, who had his statement notarized on 07-13-98.  (Refer to Attachment NN, notarized statement submitted by Captain VASQUEZ.) Captain VASQUEZ states the following:

A.   On 06-23-95 SYLVIA PIRTLE from Harlingen came by the Police Department and donated two (2) firearms that she no longer wanted.

B.   One of the firearms was a 9 MM semi-automatic pistol and the other was a .223 AR-15 Franklin Arms.

C.   That Detective MOORE wrote up the paper work and gave her a receipt.

D.   That he relinquished the AR-15 to Detective MOORE to carry in his assigned police vehicle.

E.   That he sold the AK-47 used in the Rio Hondo murders, to Detective MOORE on September 1997.

F.   Captain VASQUEZ also provided the same copy of the receipt, as Mrs. PIRTLE.

147. Captain VASQUEZ was called into Chief SCHOEPNER'S office. This writer inquired about any documentation of the weapon relinquished to

OMB NO. 1512-0?

# DEPARTMENT OF THE TREASURY
## BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
## FIREARMS TRANSACTION RECORD PART I - OVER-THE-COUNTER

TRANSFEROR'S TRANSACTION SERIAL NUMBER

NOTE: Prepare in original only. All entries on this form must be in ink. See Important Notices, Definitions and Instructions

### SECTION A - MUST BE COMPLETED PERSONALLY BY TRANSFEREE (BUYER)

1. TRANSFEREE'S (Buyer's) NAME (Last, First, Middle)
_Moore, Ralph Dwayne_

☑ MALE  ☐ FEMALE

2. HEIGHT _5'11"_
3. WEIGHT _190_
4. RACE _Whi_

5. RESIDENCE ADDRESS (No., Street, City, County, State, ZIP Code) _Cameron, Co._
_Rt 1 Box 297 San Benito TX. 78586_

6. DATE OF BIRTH
MONTH _12_ DAY _2_ YEAR _46_

7. PLACE OF BIRTH (City) _Harlingen_
STATE OR FOREIGN COUNTRY _TX_

8. CERTIFICATION OF TRANSFEREE (Buyer) - Questions a. through l. must be answered with a "yes" or a "no" inserted in the box at the right of the question.

a. Are you the actual buyer of the firearm indicated below? If you answer no to this question the dealer cannot transfer the firearm to you. (See Important Notice 1.) _Yes_

b. Are you under indictment or information in any court for a crime for which the judge could imprison you for more than one year? An information is a formal accusation of a crime made by a prosecuting attorney. _No_

c. Have you ever been convicted in any court of a crime for which the judge could have imprisoned you for more than one year, even if the judge actually gave you a shorter sentence? (See Important Notice 3 and EXCEPTION.) _No_

d. Are you a fugitive from justice? _No_

e. Are you an unlawful user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance? _No_

f. Have you ever been adjudicated mentally defective or have you been committed to a mental institution? _No_

g. Have you been discharged from the Armed Forces under dishonorable conditions? _No_

h. Are you an alien illegally in the United States? _No_

i. Have you ever renounced your United States citizenship? _No_

j. Are you subject to a court order restraining you from harassing, stalking, or threatening an intimate partner or child of such partner? (See Important Notice 4 and Definition 4.) _No_

k. Have you been convicted in any court of a misdemeanor crime of domestic violence? This includes any misdemeanor conviction involving the use or attempted use of physical force committed by a current or former spouse, parent, or guardian of the victim or by a person with a similar relationship with the victim. (See Important Notice 5 and Definition 5.) _No_

l. Are you a citizen of the United States? _Yes_

m. What is your State of residence? _Texas_ (State)  If you are not a citizen of the United States, you have a State of residence only if you have resided in the State for at least 90 days prior to the date of this sale. (See Definition 6.)

I CERTIFY THAT THE ABOVE ANSWERS ARE TRUE AND CORRECT. I UNDERSTAND THAT A PERSON WHO ANSWERS "YES" TO ANY OF THE QUESTIONS 8b THROUGH 8k IS PROHIBITED FROM PURCHASING OR POSSESSING A FIREARM. I ALSO UNDERSTAND THAT THE MAKING OF A FALSE ORAL OR WRITTEN STATEMENT OR THE EXHIBITING OF ANY FALSE OR MISREPRESENTED IDENTIFICATION WITH RESPECT TO THIS TRANSACTION IS A CRIME PUNISHABLE AS A FELONY. ?RTHER UNDERSTAND THAT MY REPETITIVE PURCHASE OF FIREARMS FOR THE PURPOSE OF RESALE FOR LIVELIHOOD AND PROFIT WITHOUT A FEDERAL ?EARMS LICENSE IS A VIOLATION OF LAW. (SEE IMPORTANT NOTICE 6)

TRANSFEREE'S (Buyer's) SIGNATURE _RD Moore_
DATE _6-9-98_

### SECTION B - TO BE COMPLETED BY TRANSFEROR (SELLER)
### THE PERSON DESCRIBED IN THIS SECTION HAS IDENTIFIED HIMSELF/HERSELF TO ME IN THE FOLLOWING MANNER:

9. TYPE AND NUMBER OF IDENTIFICATION (Driver's license or identification which shows name, date of birth, place of residence, and signature. Purchasers who are aliens must provide a valid government-issued photo identification. See Instructions to Transferor 1 and 2).

10. TYPES AND DATES OF ADDITIONAL IDENTIFICATION REQUIRED FOR ALIENS (e.g., utility bills or lease agreements. See Instruction to Transferor 2).

_Tex DL  04073289_

On the basis of (1) the statements in Section A; (2) the verification of identity noted in Section B; and (3) the information in the current list of Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s), described below and on the back, to the person identified in Section A.

| 11. TYPE (Pistol, Revolver, Rifle, Shotgun, etc.) | 12. MODEL | 13. CALIBER OR GAUGE | 14. SERIAL NO. | 15. MANUFACTURER (and importer, if any) |
|---|---|---|---|---|
| 1. _Rifle_ | _Sporter_ | _.223_ | _MH014417149_ | _Colt_ |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |

PLAINTIFF'S EXHIBIT 19A B-98-1002

Complete ATF F 3310.4 for multiple purchases of handguns (See Instruction to Transferor 7.)

16. TRADE/CORPORATE NAME AND ADDRESS OF TRANSFEROR (Seller) (Hand stamp may be used.)

JOSEPH B. VASQUEZ
412-7571
212 E. JACKSON, HARLINGEN, TEXAS 78550

17. FEDERAL FIREARMS LICENSE NO. (Hand stamp may be used.)

JOSEPH B. VASQUEZ
412-7571
212 E. JACKSON, HARLINGEN, TEXAS 78550
FFL 5-74-031-01-0J-38500

THE PERSON ACTUALLY MAKING THE FIREARMS SALE MUST COMPLETE ITEMS 18 THROUGH 20.

18. TRANSFEROR'S (Seller's) SIGNATURE _Joseph B Vasquez_

19. TRANSFEROR'S TITLE _Owner_

20. TRANSACTION DATE _6-9-98_

ATF F 4473 (5300.9) PART I (4-97) PREVIOUS EDITIONS ARE OBSOLETE

JOSEPH B. VASQUEZ

| CUSTOMER'S ORDER NO. 412-7571 | DATE 6-7-98 |

212 E. JACKSON, HARLINGEN, TEXAS 78550
FFL 5-74-031-01-0J-32500

NAME R.D. Moore

ADDRESS

CITY, STATE, ZIP Harlingen Police Dept.

| SOLD BY | CASH | C.O.D. | CHARGE | ON ACCT. | MDSE RETD | PAID OUT |
|---------|------|--------|--------|----------|-----------|----------|

| | QUAN. | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|---|
| 1 | | | | |
| 2 | 1 | CoLT Sporter | | 900 00 |
| 3 | | #MHO 44174 | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | TAX | | 74 25 |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | 974 25 |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| RECEIVED BY | | | | ROC4705 |

KEEP THIS SLIP FOR REFERENCE
ORIGINAL


PLAINTIFF'S
EXHIBIT
19-B
B-98-162

**TEXAS DEPARTMENT OF PUBLIC SAFETY**
**TEXAS RANGER DIVISION**

| REPORT OF INVESTIGATION | Date: 07-14-98 |
|---|---|

| FILE TITLE  MASTER FILE | |
|---|---|
| 1 Capital Murder -FC-1900<br>2 Rio Hondo, Cameron County, 031<br>3 DELIA MORIN, WF, Age 31<br>4 00-07-98 | THIS REPORT IS THE PROPERTY OF TEXAS DPS-TEXAS RANGER DIVISION. NEITHER IT NOR ITS CONTENTS MAY BE DISSEMINATED OUTSIDE THE AGENCY TO WHICH LOANED. |

| ACTIVE:___XX_INACTIVE:____  CLOSED:____ RESTRICTED:____ | FILE NR | TYPE | PROGRAM |
|---|---|---|---|
| STATIONED: Brownsville, Texas | RD098312 | O | CRIMINAL |
| SUBMITTING INVESTIGATOR | DISSEMINATION | | CX RELATED FILES |
| INV-ID-NR:    4543         BY: ROLANDO CASTANEDA, Sergeant | D1 | | F1  RD098338 |
| SUP-ID-NR:   3079         BY: RAY CANO, Lieutenant | D2 | | F2 |
| CPT-ID-NR:                   BY: | D3 | | F3 |
| SEC-ID-NR:                   DATE: | D4 | | F4 |
| | D5 | | F5 |

RPT-RE: Offense Report (3 offenses)

## SYNOPSIS

This is a Master File containing three (3) offenses. On Tuesday, 07-07-98, at approximately 5:00 a.m., a male subject identified as ERNEST LANE MOORE (hereinafter refer to as MOORE), WM, DOB 12-23-72, entered a residence located at 311 Catherine in Rio Hondo, Cameron County, Texas and shot and killed two females and seriously wounded one male. Shot and killed were DELIA MORIN, HF, DOB 05-31-67, and MARGARITA FLORES, HF, DOB 03-02-45. Wounded at the residence was DAN MORIN, HM, DOB 01-25-76.

On same date, at approximately 6:00 a.m., this writer was telephonically contacted by Harlingen DPS Communication Dispatcher LINDA ARCHER. Dispatcher ARCHER advised this writer that Cameron County Sheriff's Investigator JAVIER REYNA was requesting this writer's assistance in the double murder investigation. This writer telephonically contacted Investigator REYNA and proceeded to said location.

On same date, at approximately 7:10 a.m., this writer arrived at the above location and met with Investigator REYNA. Investigator REYNA provided this writer with a brief synopsis of the above murders and advised that MOORE had been identified by eyewitnesses as the shooter in this investigation. Investigator REYNA further advised that Sheriff's Deputies were at the MOORE residence located on Gamble Road, in rural San Benito, Texas searching for MOORE.

At approximately 7:15 a.m., this writer heard Investigator REYNA's Cameron County radio transmission of officers being fired upon by MOORE and that officers were down (shot).

DPS SENSITIVE

CLE-1 (Rev. 6/91) vag:07-28-98

CONTINUATION

DATE: 07-14-98                    PAGE: 2

| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
|---|---|---|---|
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE_X__INACTIVE___CLOSED___RESTRICT___<br><br>BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

This writer, accompanied by Investigator REYNA and other Cameron County Investigators, proceeded to the shooting location. Upon this writer's arrival at the Gamble Road location, the gunfight had ceased and this writer learned and observed that two (2) United States Border Patrol Agents had been shot to death and that a Cameron County Sheriff's Deputy had been wounded. The assailant, who was identified as MOORE, was wounded and later died at Valley Baptist Hospital in Harlingen, Texas. The two (2) murdered U.S. Border Patrol Agents are identified as SUSAN LYNN RODRIGUEZ, WF, DOB 07-11-69, and RICARDO GUILLERMO SALINAS, HM, DOB 04-29-74. Shot and wounded was Cameron County Sheriff's Deputy RAUL RODRIGUEZ, HM, DOB 01-28-66. A search for additional suspects was negative.

This writer will assist the Cameron County Sheriff's Department in the Rio Hondo double murder investigation and will also assist Texas Rangers RUDY JARAMILLO and ISRAEL PACHEO in conducting the investigation of the Border Patrol shooting in conjunction with the Cameron County Sheriff's Office, FBI and the U.S. Border Patrol.

This investigation will continue.

DETAILS

Master Offenses:

    Offense #1:    As noted above.

    Offense #2:    Capital Murder - FC - 1900
                   Rio Hondo, Cameron County, 031
                   MARGARITA FLORES, HF
                   07-07-98

    Offense #3:    Attempted Murder - F1 - 1500
                   Rio Hondo, Cameron County, 031
                   DAN MORIN, H/M,
                   07-07-98

1.  On 07-07-98, this writer was contacted at approximately 6:00 a.m., by Harlingen DPS Communications reference Investigator REYNA's request for

DPS SENSITIVE

CLE-2(Rev. 12/88)

**CONTINUATION**

| | DATE: 07-14-98 | | PAGE: 3 |
|---|---|---|---|

| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
|---|---|---|---|
| Capital Murder - FC - 1900<br>Rio Hondo,  Cameron County, 031<br>DELIA MORIN, WF,  Age 31<br>07-07-98 | ACTIVE_X__INACTIVE___CLOSED___RESTRICT___<br><br>BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

writer's assistance in a double murder investigation in Rio Hondo. Writer telephonically contacted REYNA and proceeded to said location.

2.   While enroute to the scene, writer telephonically contacted DPS Crime Scene Criminalist Supervisor JOE MARCHAN reference assistance in processing above mentioned crime scene.

3.   At approximately 7:10 a.m., writer arrived at the double murder crime scene location and observed the following reference the residence:

    A.   Was pink in color
    B.   Was a single story dwelling
    C.   Was made of wood construction
    D.   Had black composition roof type material
    E.   The front door faced north toward Catherine

4.   Writer met with Investigator REYNA, who provided writer with a brief synopsis of the homicides and advised that several eyewitnesses had observed ERNEST MOORE commit the murders.  Investigator REYNA further stated that MOORE had also shot and wounded a male occupant of the residence.   The gunshot victim was identified as DAN MORIN, who was transported to Valley Baptist Medical Center, Harlingen, Texas.

5.   Investigator REYNA further advised that:

    A.   Cameron County Sheriff's Deputy ROBERT RODRIGUEZ had observed and pursued a white Chevrolet pickup allegedly belonging to MOORE on FM 385 in the San Benito area.

    B.   Deputy RODRIGUEZ had pursued the pickup, but had lost it in the FM 385 area.

    C.   Deputy RODRIGUEZ had seen three (3) occupants in the cab of the pickup.

    D.   Cameron County Sheriff's Deputies had discovered the above pickup on Gamble Road in rural San Benito.  Investigator REYNA further stated that the Cameron County Sheriff's Department was at the

**CONTINUATION**

| | DATE: 07-14-98 | | PAGE: 4 |
|---|---|---|---|
| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
| Capital Murder - FC - 1900<br>Rio Hondo,  Cameron County, 031<br>DELIA MORIN, WF,  Age 31<br>07-07-98 | ACTIVE_X__INACTIVE___CLOSED___RESTRICT___ | | |
| | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

location and was attempting to search for and arrest MOORE for the murders.

E.   The white pickup is described as a 1997 Chevrolet pickup having dark window coating material on all, windows and bearing Texas registration WS-6007 registered to ERNEST MOORE,

6.   At approximately 7:15 p.m., while Investigator REYNA was briefing this writer reference the double murder, a transmission was broadcast over the Cameron County Sheriff's Department radio that shots were being fired and that officers were down at the MOORE residence.

7.   This writer, along with Investigator REYNA and Cameron County Investigator ROBERT RODRIGUEZ (*Note - no relation to the ROBERT RODRIGUEZ mentioned on Detail 5a.), proceeded to the shooting location on Gamble Road.

8.   Arriving at the Gamble Road, writer observed numerous Cameron County Sheriff's Units and U.S. Border Patrol units at the shooting scene. Writer also observed the following:

A.   A male uniformed U.S. Border Patrol agent with blood on his head area, lying next to the left front tire of a U.S. Border Patrol unit identified as Unit #M-7365, said unit was also bearing U.S. Government registration J17308.  The Patrol Border Agent was later identified as SALINAS.

B.   A shirtless white male who was lying on the ground with blood on his body. Writer later learned this male was shooting suspect ERNEST MOORE.

C.   An AirCare helicopter to transport victims.

D.   This writer did not observe Border Patrol Agent RODRIGUEZ nor Deputy RODRIGUEZ at the scene.

**CONTINUATION**

| | DATE: 07-14-98 | | PAGE: 5 |
|---|---|---|---|
| FILE TITLE  MASTER FILE | FILE NO. | TYPE | PROGRAM CODE |
| | RD098312 | O | CRIMINAL |
| Capital Murder - FC - 1900 | | | |
| Rio Hondo,  Cameron County, 031 | ACTIVE_X__INACTIVE___CLOSED___RESTRICT__ | | |
| DELIA MORIN, WF,  Age 31 | | | |
| 07-07-98 | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

E.   Writer also observed MOORE's residence and described the residence as follows:

    (1)   A single story dwelling
    (2)   Constructed of white brick
    (3)   Attached garage facing northwest
    (4)   Black composition roof
    (5)   Front door faces northwest
    (6)   Gamble Road is an unapproved road, made of a caliche type material

9.   Writer then met with Cameron County Sheriff's Deputy Sergeant RONNIE SAENZ, who provided writer with a brief account of the shoot-out. Sgt. SAENZ advised this writer of the following (for details refer to Attachment A):

A.   Cameron County Deputies had located MOORE's white pickup at the residence of his father, Harlingen Police Detective R. D. MOORE.

B.   After deputies briefed Detective MOORE of his son's involvement in the Rio Hondo murders, Detective MOORE gave oral consent to the Sheriff's Department to search the residence for MOORE.

C.   Cameron County Deputies searched the residence and did not locate MOORE.

D.   U.S. Border Patrol Agents (SALINAS and RODRIGUEZ) had attempted to accompany the Sheriff's Department in searching for MOORE at the residence, but were refused access by Detective R. D. MOORE.

E.   While mentioned investigators, who were accompanied by the Border Patrol Agents, were walking back to their respected patrol units, MOORE appeared from the corn field located across the road from the MOORE residence and commenced firing at law enforcement officers with a large caliber assault rifle.

F.   MOORE shot and killed Border Patrol Agents SALINAS and RODRIGUEZ and seriously wounded Cameron County Deputy RODRIGUEZ.

CLE-2(Rev. 12/88)

**CONTINUATION**

| FILE TITLE  MASTER FILE | DATE: 07-14-98 | | PAGE: 6 |
|---|---|---|---|
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
| | ACTIVE _X_ INACTIVE___ CLOSED___ RESTRICT___ | | |
| | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

    G.   MOORE was eventually struck by gunfire.

    H.   MOORE, after being wounded, was asked by Sgt. SAENZ if MOORE had acted alone and he (MOORE) made an up and down gesture with his head indicating "yes".

10.  Sgt. SAENZ further stated that two (2) other subjects were allegedly involved and suspected of being in the cornfield. Sgt. SAENZ did advise that no one had seen the alledged suspects run into the cornfield, but during the pursuit by Deputy RODRIGUEZ at approximately 5:31 a.m., he (RODRIGUEZ) had seen three (3) occupants in the white pickup.

11.  Writer then requested assistance from the following:

    A.   Texas Rangers ISRAEL PACHECO and RUDY JARAMILLO

    B.   Texas Highway Patrol to secure the outer perimeter of the corn field and surrounding fields in search of the two (2) alleged suspects who were believed at large

    C.   Air support from the DPS Helicopter to search and locate MOORE's other two (2) alleged accomplices.

12.  This writer, accompanied by Cameron County Sheriff OMAR LUCIO and Federal Bureau of Investigation Special Agent FREDDIE VELA established a command post near the crime scene and formulated an operational plan to secure the immediate area in search for the two (2) alleged suspects still at large in the cornfield.

13.  The U. S. Border Patrol canvassed the surrounding residences in search of the two alleged suspects resulting in negative finding.

14.  Air support from the DPS and the U. S. Border Patrol assisted in the search for the two (2) alleged suspects resulting in a negative finding.

**CONTINUATION**

|  | DATE: 07-14-98 | | PAGE: 7 |
|---|---|---|---|
| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE_X__INACTIVE___CLOSED___RESTRICT___<br><br>BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

15.   Members of the U. S. Border Patrol Special Response  Team entered the corn field and attempted to identify and follow visual tracks made by Subject MOORE and/or suspects.  After initially identifying signs (footprints) in the edge of the cornfield, the U. S. Border Patrol was unable to establish any further movement into the interior of the cornfield.

16.   At this time, K-9 units of the Texas Department of Corrections arrived and searched said cornfield with negative results.

17.   At approximately 12:30 p.m., the FBI SWAT Team, accompanied by Special Response Units of the U. S. Border Patrol, Immigration and Naturalization Service, Brownsville Police Department SWAT, Edinburg Police SWAT and Texas Department of Public Safety, conducted a sweep of the entire length and width of the corn field.  Search resulted in negative finding of MOORE's alleged associates.

18.   Harlingen based Texas Ranger RUDY JARAMILLO arrived at the above crime scene and writer advised Ranger JARAMILLO that due to the magnitude of both crime scenes, writer would assume investigative responsibility in the Rio Hondo double murder investigation and Ranger JARAMILLO will take the lead in the investigation of the U. S. Border Patrol murders on Gamble Road in conjunction with the FBI (for details on the U. S. Border Patrol murders refer to Attachment B, CLE-1 written by Ranger JARAMILLO). This writer will also assist Ranger JARAMILLO in the investigation of the murders of the Border Patrol Agents and the wounding of the Cameron County Deputy Sheriff.

19.   This writer returned to the Rio Hondo double murders' crime scene and assisted Cameron County Sheriff's Department with the investigation.

20.   The DPS Crime Scene Team, consisting of Criminalist ALEX MADIGAL, ORLANDO OCHOA and JOE MARCHAN, were at the crime scene processing, photographing and gathering evidence (refer to Attachment C reference items recovered at the Crime Scene).

21.   Writer entered the residence and observed the following:

**DPS SENSITIVE**

**CONTINUATION**

| | DATE: 07-14-98 | | PAGE: 8 |
|---|---|---|---|
| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE_X__INACTIVE___CLOSED___RESTRICT___<br><br>BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

     A.    The residence was a seven (7) room house excluding the bathroom.

     B.    The residence consisted of three (3) bedrooms.

     C.    The residence had two (2) long hallways.

22.    Writer observed two (2) fully clothed females with blood on their clothing.

23.    Primary investigation has revealed the following:

     A.    That at approximately 5:00 a.m., a white male, who was later identified as ERNEST MOORE, had forced himself into the residence at gunpoint.  MOORE pointed a rifle at occupant DONALD MORIN, HM, DOB 09-16-68, and ordered him (DONALD MORIN) to open the back side door.

     B.    That MOORE was yelling for his estranged girlfriend, JULIE COX, WF, DOB 10-25-78.

     C.    That COX told MOORE that she would leave with him, and returned to her bedroom to retrieve her belongings.  MOORE then shot and killed Victims DELIA MORIN and MAGARITA FLORES as they approached him.  MOORE also shot and wounded COX' new intimate male friend, DAN MORIN.

     D.    That DONALD MORIN, MICHAEL MARTINEZ, HM, DOB 02-13-79, and WILLIAM MORIN had fought with MOORE relinquishing him of the murder weapon, a MAC-90 Chinese made AK-47.  DONALD MORIN pointed the weapon at MOORE in an attempt to shoot MOORE, but the weapon did not fire.  DONALD MORIN then placed the weapon in the residence front yard, so that MOORE would not get it and use it against them.

     E.    That the occupants of the residence had physically struck MOORE numerous times with the murder weapon.

     F.    That MOORE ran out the same way he came in and departed in his white Chevrolet pickup.

CLE-2(Rev. 12/88)

**CONTINUATION**

|  | DATE: 07-14-98 | | PAGE: 9 |
|---|---|---|---|
| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
| Capital Murder - FC - 1900<br>Rio Hondo,  Cameron County, 031<br>DELIA MORIN, WF,  Age 31<br>07-07-98 | ACTIVE_X_ INACTIVE___ CLOSED___ RESTRICT___<br><br>BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

24.  This writer has established MOORE's motive for these murders as being jealousy toward estranged girlfriend, JULIE COX, and her relationship with her intimate male friend, DAN MORIN. (*Note - autopsy performed on MOORE revealed that he was under the influence of alcohol, marihuana and cocaine, which may have contributed to the rage MOORE had and the act of violence that he committed.)

25.  Investigation reference the MAC-90 assault weapon revealed the following:

    A.  That Cameron County Deputy LEROY RICONES took custody of the weapon and secured it in his marked Cameron County Sheriff's patrol unit (refer to Attachment D).

    B.  When McAllen DPS Criminalist JOE MARCHAN arrived at the scene, RICONES relinquished custody of the weapon to Criminalist MARCHAN. Deputy RICONES first cleared the weapon and discovered it still contained a live round in it's chamber.  After removing the magazine, which contained live rounds, Deputy RICONES cleared the weapon.

    C.  DPS Criminalist JOE MARCHAN transported the weapon to the McAllen DPS Laboratory.

    D.  On 07-13-98, Investigator REYNA traveled to the McAllen DPS Laboratory and took custody of the weapon.  Investigator REYNA then transported same to the Austin DPS Crime Laboratory (Firearms) for examination (refer to Attachment E).

    E.  On 07-17-98, this writer contacted Austin DPS Crime Laboratory Examiner BILL SORROW.  Examiner SORROW advised this writer of the following:

        (1)  He had received the weapon and identified same as a MAC-90 assault weapon, Serial #9339798, Caliber 7.62 mm.

CLE-2(Rev. 12/88)

**CONTINUATION**

| | DATE: 07-14-98 | | PAGE: 10 |
|---|---|---|---|
| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE_X__INACTIVE___:CLOSED___RESTRICT__<br><br>BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

    (2)   SORROW had received one (1) MAC-90 magazine with thirteen (13) live 7.62 mm rounds.  SORROW further advised that he had also received one loose 7.62 mm round;

    (3)   One of the live rounds had pipped casing which is consistent when the firing pin strikes the primer, but fails to fire. (*Note- this is consistent to DONALD MORIN stating that he {MORIN} had pointed the rifle at MOORE and the rifle just clicked and did not fire {refer to detail 32} in this investigative report.)

    (4)   The eight (8) spent casing located at the Rio Hondo Crime Scene are the same type and make as the live rounds.  The head stamp of the casing depicts numbers 324-94.

    (5)   The submission form depicting the AMC-90, live rounds and spent casing were assigned Laboratory #L-264725 (also refer to Attachment E).

26.  The above weapon is described as the following:

    A.   34 inches in length, including butt stock
    B.   Brown butt stock
    C.   brown pistol grip
    D.   Brown fore stock
    E.   Black barrel
    F.   With green cotton sling
    G.   Said weapon had a black banana type bullet magazine.

27.  On 07-08-98, Texas Ranger RUDY JARAMILLO contacted Tobacco FireArms and Alcohol Special Agent TONY VASQUEZ reference obtaining a firearms trace on the MAC-90 (refer to Attachment F).  On 07-13-98, this writer obtained a copy of the trace reference this weapon. The tracer indicated that the weapon owner was JOSEPH BENNETT VASQUEZE of Harlingen.  VASQUEZE is a Captain with the Harlingen Police Department.

28.  On 07-04-98, this writer obtained a written statement from Captain VASQUEZE which indicated the following (refer to Attachment G):

CLE-2(Rev. 12/88)

CONTINUATION

| | DATE: 07-14-98 | | PAGE: 11 |
|---|---|---|---|

| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
|---|---|---|---|
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE_X_ INACTIVE___CLOSED___RESTRICT___<br><br>BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

A.   That on September 1997 he (VASQUEZE) sold the weapon to R. D. MOORE for $225.00 U.S. Dollars.

29.   Investigation has revealed that the following occupants were in the residence on Catherine at the time of the shooting (refer to Attachment H for residence diagram):

A.   Bedroom #1 - Room of DONALD MORIN, HM

   (1)   DAN MORIN, HM
   (2)   JULIE COX, WF

B.   Bedroom #2 - Room of DELIA MORIN, HF

   (1)   JENNIFER GWIN, HF, DOB 01-28-81
   (2)
   (3)

C.   Bedroom #3 - MARGARITA FLORES, HF

   (1)   FEDENCIO JARAMILIO. HM. DOB 12-16-45
   (2)

D.   Living room - WILLIAM ARTHUR MORIN, HM, DOB 02-13-79

   (1)   MICHAEL MARTINEZ, H/M, 09-17-76

30.   Statements from the residence occupants were obtained and occupant DONALD MORIN provided investigators with a written statement on 07-07-98 and again on 07-12-98.  A brief synopsis of DONALD MORIN's statement is as follows (refer to Attachment I):

A.   On 07-07-98, at approximately 4:50 a.m., DONALD had awaken and was drinking Kool-Aid in the kitchen area of the residence.

B.   He noticed some headlights in the driveway of his residence in the backyard area.

CLE-2(Rev. 12/88)                              DPS SENSITIVE

**CONTINUATION**

DATE: 07-14-98          PAGE: 12

| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
|---|---|---|---|
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE_X_ INACTIVE___CLOSED___RESTRICT___ | | |
| | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

C.   He noticed a white male with a rifle pointing it at him (DONALD) through the door in the back of the residence. (*Note - this door has a glass window.)

D.   The male subject told him to unlock the door, while pointing the rifle at him.  When DONALD opened the door, the white male grabbed him by the neck and placed the rifle to the back of his head.

E.   DONALD did not know the male, but JULIE COX called him by ERNEST MOORE.  MOORE is COX'S ex-boyfriend.

F.   DONALD and MOORE went into JULIE's bedroom and woke her up.

G.   MOORE and JULIE started arguing and they started to leave. DONALD went to his Mother's (MARGARITA) bedroom (Bedroom #3) to get his rifle and then to his brother's bedroom (Bedroom #2) when he heard gunshots.   DONALD later found his mother (MARGARITA) and his sister (DELIA) dead in the hallway of the residence

H.   DONALD then ran out the bedroom and observed his mother and sister (DELIA) in the hallway.   MOORE was still in the hallway when he (MOORE) turned around and shot his brother, DAN MORIN.

I.   He (DONALD) grabbed the end of the rifle and got MOORE to the floor and began to strike MOORE with it.  Also striking MOORE were MICHAEL MARTINEZ and WILLIAM MORIN, (DONALD MORIN's brother).

J.   He (DONALD) turned the weapon around on MOORE and attempted to shoot MOORE, but the rifle did not fire.  DONALD then went outside and set the rifle by a tree in the front yard of the residence in fear of being shot by MOORE.  DONALD then went back inside the residence.  *Note - Cameron County Sheriff's Deputy LEROY RINCONES took custody of said weapon and turned it over to the DPS Crime Laboratory Criminalist JOE MARCHAN (refer to Attachment H).

K.   MOORE ran out the same way he came in through the side back door. He did not see MOORE leave (because he was tending to his mother and sister).

**DPS SENSITIVE**

**CONTINUATION**

| | DATE: 07-14-98 | | PAGE: 13 |
|---|---|---|---|

| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
|---|---|---|---|
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE_X_ INACTIVE___ CLOSED___ RESTRICT___ | | |
| | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

L.    MOORE was wearing a white T-shirt, blue jeans and boots.

31.  House guest JULIE COX, who is DAN MORIN's intimate girlfriend, provided investigators with the following statement on 07-07-98 and again on 07-13-98.  A brief synopsis of same is as follows (refer to Attachment J):

A.    MOORE was her ex-boyfriend.

B.    She was staying with the MORIN's and she had an intimate relationship with DAN MORIN.

C.    DELIA MORIN had offered her residence on Catherine Street when MOORE kicked her out of his father's residence.

D.    MOORE had called her at the Catherine Street residence on 07-06-98, just to see what was going on.

E.    DONALD MORIN had stepped into her bedroom (Bedroom #2) stating that someone was there to see her.  She then saw MOORE with a gun (rifle) and he (MOORE) had the gun pointed at DONALD.

F.    She heard DELIA MORIN leave the bedroom.  DONALD, DELIA, MARGARITA, DAN and JULIE were together in the back of the residence and MOORE was pointing the gun around.  JULIE told MOORE that she was leaving with him and turned around and entered her bedroom to get her purse. She then heard approximately ten (10) gunshots coming from within the residence.

G.    She then saw DELIA, MARGARITA and DAN lying in the hallway of the residence and they appeared to have been shot.

H.    DONALD, WILLIAM and MICHAEL were beating on MOORE and DONALD took MOORE's rifle away from him.

I.    MOORE ran past her and she observed him stagger to his white pickup and take off.  She did not see anyone else with him in the pickup.

CLE-2(Rev. 12/88)

**CONTINUATION**

| | DATE: 07-14-98 | | PAGE· 14 |
|---|---|---|---|
| FILE TITLE  MASTER FILE | FILE NO. RD098312 | TYPE O | PROGRAM CODE CRIMINAL |
| Capital Murder - FC - 1900 Rio Hondo,  Cameron County, 031 DELIA MORIN, WF,  Age 31 07-07-98 | ACTIVE_X__INACTIVE___CLOSED___RESTRICT___ BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

    J.    MOORE was wearing a white T-shirt and blue jeans.

32.  House guest MICHAEL DANIEL MARTINEZ provided investigators with a written statement on 07-07-98.  A brief synopsis of same is as follows (refer to Attachment K):

    A.    He was sleeping on the living room couch of the residence.

    B.    At approximately 5:00 a.m., on 07-07-98, he heard arguing coming from the back of the residence.  He saw DONALD and some white guy fighting.

    C.    He went to call 911 and then he heard some gunshots.

    D.    He saw DONALD struggling with the guy and heard someone yell, "Mickey come help".  He saw DONALD with the gun and he joined DONALD in fighting this guy.

    E.    MOORE ran out the back of the house and he tripped over DELIA and MARGARITA and fell.

33.  Occupant WILLAM ARTHUR MORIN provided investigators with a written statement on 07-07-98 and again on 07-13-98.·· A brief synopsis of same is as follows (refer to Attachment L):

    A.    On 07-07-98, while asleep in the living room, he was awakened by people yelling.

    B.    He heard and recognized MOORE's voice.  He heard gunshots and saw DONALD wrestling with MOORE in the living room.  MOORE had a gun and it was black.  *Note - WILLIAM MORIN and JULIE COX work at A La Texas Restaurant in San Benito. This· is where WILLIAM MORIN met MOORE.

    C.    He and MICHAEL assisted DONALD in fighting MOORE and DONALD took the rifle away from MOORE.

**DPS SENSITIVE**

**CONTINUATION**

|  | DATE: 07-14-98 | | PAGE: 15 |
|---|---|---|---|
| FILE TITLE  MASTER FILE | FILE NO. RD098312 | TYPE O | PROGRAM CODE CRIMINAL |
| Capital Murder - FC - 1900 Rio Hondo, Cameron County, 031 DELIA MORIN, WF, Age 31 07-07-98 | ACTIVE_X_INACTIVE___CLOSED___RESTRICT___ | | |
|  | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

     D.    MOORE got up and ran out the back door and he observed MOORE get into his pickup.  He did not remember if MOORE got in the driver or passenger side of the vehicle.  He (MOORE) sped off towards Williams Road.

34.  Occupant JENNIFER GWIN MORIN provided investigators with a written statement on 07-07-98.  A brief synopsis of same is as follows (refer to Attachment M):

     A.    She heard JULIE yelling MOORE's name.

     B.    She and her sister, DELIA, got up and saw MOORE with a gun.

     C.    She heard gunshots and saw her mother, MARGARITA, and sister, DELIA, on the floor in the hallway of the residence.

     D.    She called 911.

35.  Occupant FEDENCIO JARAMILLO provided investigators with a written statement.  A brief synopsis of same is as follows (refer to Attachment N):

     A.    MARGARITA was his common-law wife.

     B.    On 07-07-98, at about 5:00 a.m., while asleep in his bedroom (Bedroom #3), he heard gunshots, put on his pants and opened his bedroom door where he observed MARGARITA and DELIA lying on the hallway floor unconscious.  He also saw that DAN had been shot.

     C.    He did not see anyone kill MARGARITA or DELIA.

36.  On 07-11-98, writer traveled to Valley Baptist Hospital and obtained a preliminary autopsy report on MARGARITA FLORES and DELIA MORIN.  The autopsy on DELIA MORIN reveals the following (refer to Attachment O):

     A.    The autopsy was performed on 07-08-98, by Dr. DAVENPORT.

CONTINUATION

| | DATE: 07-14-98 | | PAGE: 16 |
|---|---|---|---|

| FILE TITLE  MASTER FILE | FILE NO. RD098312 | TYPE O | PROGRAM CODE CRIMINAL |
|---|---|---|---|
| Capital Murder - FC - 1900 Rio Hondo, Cameron County, 031 DELIA MORIN, WF, Age 31 07-07-98 | ACTIVE_X__INACTIVE___CLOSED___RESTRICT___ BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

B.    DELIA MORIN died from two (2) gunshot wounds to the right side of the chest.

C.    One injured the right atrium of the heart, as well as both lungs. The other gunshot injured the left lobe on the liver.

D.    Gunshots appear to be distant range shots.

37.    Preliminary autopsy report on MARGARITA FLORES reveals the following (refer to Attachment P):

A.    The autopsy was performed on 07-08-98 by Dr. DAVENPORT.

B.    MARGARITA FLORES died from three (3) penetrating gunshot wounds to the chest and abdomen.

C.    The wound entrances are all near to each other in the left lateral breast and chest wall.

D.    Bullet fragments were retrieved within the liver and in subcutaneous tissues of the right lateral chest wall.

38.    On same date, when this writer concluded primary investigation of these homicides, this writer traveled back to the U. S. Border Patrol murders crime scene.    While at the crime scene, writer requested a written statement from R. D. MOORE reference same.    R. D. MOORE traveled to the Cameron County Sheriff's Office in Harlingen and attempted to provide writer with a written statement reference the Border Patrol shooting.

39.    At 4:00 p.m., on same date, R. D. MOORE was telephonically contacted by Investigator REYNA, who advised him that his son, ERNEST MOORE, was about to expire and that the hospital required his signature for organ donor request.    The interview was terminated and resumed on 07-08-98 (refer to Attachment Q).    ERNEST MOORE died at approximately 5:15 p.m., from mutiliple gunshot wounds.

CLE-2(Rev. 12/88)

**CONTINUATION**

| | DATE: 07-14-98 | | PAGE: 17 |
|---|---|---|---|

| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
|---|---|---|---|
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE_X__INACTIVE___CLOSED___RESTRICT___ | | |
| | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

40.  On Thursday, 07-09-98, at approximately 5:00 a.m., this writer, Ranger JARAMILLO, Investigator REYNA and Cameron County Deputy ARNULFO REYES, III, obtained verbal consent from Detective R. D. MOORE to utilize the white pickup used by MOORE to reconstruct the pursuit ERNEST MOORE had with Deputy RODRIGUEZ. The purpose of the reconstruction is to determine if Deputy RODRIGUEZ was able to view any occupants in the vehicle.  Reconstruction resulted in the following:

   A.  Ranger JARAMILLO and Investigator REYNA, while in a marked Cameron County patrol unit, pursued this writer, who was accompanied by Deputy REYES, on FM 345.  Ranger JARAMILLO and Investigator REYNA were unable to observe this writer or the deputy who accompanied writer while approximately 50 feet away.

   B.  While meeting the white pickup, Ranger JARAMILLO and Investigator REYNA were unable to observe this writer or any occupants in the vehicle.

   C.  While stopped at the intersection of U. S. 77 and FM 345, Ranger JARAMILLO and Investigator REYNA were unable to observe this writer or any occupants in the vehicle.

41.  On same date, this writer, accompanied by Investigator REYNA, briefed Cameron County District Attorney YOLANDA DE LEON reference this investigation.

42.  On Tuesday, 07-14-98, this writer interviewed Pathologist MARGIE CORNWELL in reference to MOORE's autopsy.  Doctor CORNWELL advised this writer that she had not noticed any bruising on MOORE's facial area. Doctor CORNWELL did advise that MOORE had bruising on his legs.  Doctor CORNWELL further advised that she had not examined MOORE's arms, scalp or brain.  This writer was attempting to determine if bruising was consistent to MOORE being beaten by the MORIN's.

43.  This investigation will continue in attempts to obtain a written statement from Victim DAN MORIN.  This writer will also continue to assist Ranger JARAMILLO in the U.S. Border Patrol murders.

DPS SENSITIVE

CONTINUATION

| | DATE: 07-14-98 | | PAGE: 18 |
|---|---|---|---|
| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE_X__INACTIVE___CLOSED___RESTRICT___<br><br>BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

CUSTODY OF EVIDENCE

1. All evidence seized in this investigation will be submitted to the DPS
   Laboratory in McAllen and Austin, Texas.

PHYSICAL DESCRIPTION

1.    ERNEST LANE MOORE, WM, 12-23-72    (DECEASED)
      5'11", 175 lbs., brown eyes, brown hair
      Texas DL #15705863
      RR1, Box 297/Gamble Road
      San Benito, Texas

WITNESSES AND INVESTIGATORS:

1.    LINDA ACHER, Dispatcher
      Harlingen DPS Communication
      US 77 Sunshine Strip
      Harlingen, Texas

2.    JAVIER REYNA, Investigator
      Cameron County Sheriff's Department
      974 E. Harrison
      Brownsville, Texas

3.    JOE MARCHAN, Criminalist Supervisor
      Texas Department of Public Safety Crime Laboratory
      1414 Bicenntial
      McAllen, Texas

4.    ROBERT RODRIGUEZ, Deputy
      Cameron County Sheriff's Department
      974 E. Harrison
      Brownsville, Texas

DPS SENSITIVE

CLE-2(Rev. 12/88)

CONTINUATION

| | DATE: 07-14-98 | | PAGE: 19 |
|---|---|---|---|

| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
|---|---|---|---|
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE _X_ INACTIVE___CLOSED___RESTRICT___<br><br>BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

5.   ROBERT RODRIGUEZ, Investigator
     Cameron County Sheriff's Department
     974 E. Harrison
     Brownsville, Texas

6.   RONNIE SAENZ, Sgt.
     Cameron County Sheriff's Department
     974 E. Harrison
     Brownsville, Texas

7.   ISRAEL PACHECO, Sgt.
     Texas Rangers, Company D
     1414 Bicenntial
     McAllen, Texas

8.   RUDY JARAMILLO, Sgt.
     Texas Rangers Company D
     US 77 Sunshine Strip
     Harlingen, Texas

9.   FREDDIE VELA, Special Agent
     Federal Bureau of Investigation
     1700 Parades Line Road
     Brownsville, Texas

10.  ALEX MADRIGAL, Criminalist
     Texas DPS
     1414 Bicenntial
     McAllen, Texas

11.  ORLANDO OCHOA, Criminalist
     Texas DPS
     1414 Bicenntial
     McAllen, Texas

12.  DONALD MORIN, eyewitness
     311 Catherine
     Rio Hondo, Texas

DPS SENSITIVE

**CONTINUATION**

|  | DATE: 07-14-98 | | PAGE: 20 |
|---|---|---|---|

| FILE TITLE  MASTER FILE | FILE NO.<br>RD098312 | TYPE<br>O | PROGRAM CODE<br>CRIMINAL |
|---|---|---|---|
| Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 | ACTIVE_X__INACTIVE___CLOSED___RESTRICT__<br><br>BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

13.  JULIE COX, eyewitness
     311 Catherine
     Rio Hondo, Texas

14.  LEROY RICONES, Deputy
     Cameron County Sheriff's Department
     974 E. Harrison
     Brownsville, Texas

15.  BILL SORROW, Firearms Examiner
     Texas DPS
     P. O. Box 4087
     Austin, Texas

16.  TONY VASQUEZ, Special Agent
     ATF
     McAllen, Texas

17.  MICHAEL DANIEL MARTINEZ, eyewitness
     Rt. 5, Box 5186-A, FM 1561
     San Benito, Texas

18.  WILLIAM ARTHUR MORIN, eyewitness
     311 Catherine
     Rio Hondo, Texas

19.  JENNIFER GWEN, eyewitness
     311 Catherine
     Rio Hondo, Texas

20.  FEDENCIO JARAMILLO, eyewitness
     311 Catherine
     Rio Hondo, Texas

21.  YOLANDA DE LEON, District Attorney
     Cameron County Sheriff's Department
     974 E. Harrison
     Brownsville, Texas

**DPS SENSITIVE**

CLE-2(Rev. 12/88)

CONTINUATION

DATE: 07-14-98          PAGE: 21

| FILE TITLE  MASTER FILE | FILE NO. | TYPE | PROGRAM CODE |
|---|---|---|---|
| | RD098312 | O | CRIMINAL |
| Capital Murder - FC - 1900 | | | |
| Rio Hondo, Cameron County, 031 | ACTIVE_X__INACTIVE___CLOSED___RESTRICT__ | | |
| DELIA MORIN, WF, Age 31 | | | |
| 07-07-98 | BY: ROLANDO CASTANEDA, Ssergent #4543 | | |

22.  MARGIE CORNWELL, Doctor
     Valley Baptist Hospital
     Ed Carey Drive
     Harlingen, Texas

**DPS SENSITIVE**

CLE-2(Rev. 12/88)

| | File Number |  |
|---|---|---|
| Texas Department of Public Safety<br>Criminal Law Enforcement Division | RD098312 | |
| **CASE REPORT**<br>MASTER FILE | Identifier | Program Code<br><br>Criminal |

| Defendants: | Violations |
|---|---|
| 1.  ERNEST LANE MOORE, WM 12-23-72<br>     (DECEASED) | Capital Murder - FC - 1900<br>Rio Hondo, Cameron County, 031<br>DELIA MORIN, WF, Age 31<br>07-07-98 |

| | County |  |
|---|---|---|
| | Cameron | |
| | Reported By | Date |
| | ROLANDO CASTANEDA  #4543 | 07-14-98 |

SYNOPSIS:

This report contains three (3) cases for the three (3) offenses in this Master File.  Defendant has been identified by eyewitnesses as the person who killed Victims #1 and #2 and attempted to murder Victim #3. Defendant was later killed in a shootout with officers at another location on this same date.

DETAILS

Master Cases:

Offenses #1, #2 and #3:  Defendant #1

PHYSICAL DESCRIPTION

1.  ERNEST LANE MOORE, WM, 12-23-72    (DECEASED)
    5'11", 175 lbs., brown eyes, brown hair
    Texas DL #15705863
    RR1, Box 297/Gamble Road
    San Benito, TX

COPY

| Signature (Preparer)<br><br>/s/ ROLANDO CASTANEDA, Sergeant #4543<br>CLE-2  **vag:07-28-98** | Approved (Named Title) |
|---|---|

**DPS SENSITIVE**
Texas Department of Public Safety
Criminal Law Enforcement Division

This report if the property of the Texas Department of Public Safety.  Neither it nor its contents may be disseminated outside the agency to which loaned.