United States District Court
Souther: District of Texas
FILED

JUN 0 2 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DAN MORIN                          {
                                   {
V.                                 {              CIVIL ACTION NO. B-00-104
                                   {
CITY OF HARLINGEN, ET AL.          {

and

DONALD MORIN, ET AL.               {
                                   {
V.                                 {              CIVIL ACTION NO. B-00-104
                                   {
CITY OF HARLINGEN, ET AL.          {

---

## DEFENDANTS' MOTION TO TRANSFER VENUE
## UNDER 28 U.S.C. § 1404(a)

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Defendants CITY OF HARLINGEN ("Harlingen") and R.D. MOORE and

files this Motion to Transfer Venue Under 23 U.S.C. § 1404(a) to another Division within the

Southern District of Texas and in support thereof would show the Court as follows:

### I. CERTIFICATE OF CONFERENCE

Defense counsel has conferred with lead counsel for Plaintiffs' they are opposed to this

Motion.

### II. STATUS OF CASE AND ISSUE PRESENTED

Discovery is closed and the case is currently set for Docket Call and Final Pretrial Conference on

June 5, 2003, at 8:30 a.m. and Jury Selection on June 6, 2003.

The issue presented is whether the media coverage concerning this case, particularly concerning inadmissible matters in reasonable probability will preclude the selection of a fair and impartial jury, thereby requiring a transfer under 28 U.S.C. § 1404(a) in the interest of justice.

### III. BACKGROUND

Since July 1998, the case has been the subject of extension media coverage on TV, radio, and in the newspapers, primarily in Harlingen's *The Valley Morning Star*. As a companion to this motion, Defendant is filing its Motion to Conduct Individual Questioning. Substantial and prejudicial media coverage of this litigation has occurred as evidenced by the Exhibits to Defendant's Motion for Permission to Conduct Voir Dire Questioning. See attached:

Exh. 1A-1O: Local newspaper reports (from original issues and published on their website) of *Salinas v. Harlingen*, Case No. 98-162;

Exh. 2: Affidavit and exhibits concerning trial publicity in *Salinas v. Harlingen*;

Exh. 3: Local newspaper reports (from original issues and published on their website) of this case; and

Exh. 4: Voir Dire in *Salinas v. Harlingen*, Case No. 98-162.

The continued and cumulative effect of this publicity, in reasonable probability, precludes the selection of a fair and impartial jury.

First, the extensive coverage linked in the mind of the public this case with *Salinas v. City of Harlingen*. See Exhs. 3E, 3F, 3I. Although the actual events took place at separate times and locations and were differently motivated, the media has frequently reported both as a single matter. This impairs Defendants' opportunity to obtain a panel without some opinions concerning this case that will affect their ability to hear and decide this case.

The *Salinas* trial was heavily reported, giving wide publication of the testimony of each

witness. Exh. 1A-1O. Voir dire in that case showed that over 70% of the prospective jurors had read or watched media reports; many had formed opinions. Exh. 4. The $35 million verdict was widely reported; even when the federal claims were dismissed the media reported that the state law negligence claims were affirmed. Exh. 1N, 1O. It will be difficult to find prospective jurors who are not already familiar with the testimony or the verdict finding state law negligence in *Salinas*. Thus, at the outset, the jurors may feel the *Salinas* verdict should control their reasoning here and put the burden on Defendants to prove their innocence.

Second, as the referenced newspaper articles demonstrate, there has been media coverage concerning pretrial rulings, collateral events and appeals, in both cases. The press reported on the City's insurance. Exhs. 1A, 1E. The press published testimony and exhibits from the *Salinas* case; it reported the contents of the City's motion in limine and motion to transfer venue due to pre-trial publicity. Exhs. 1G-1K. During the trial, one radio station held a phone poll on whether the City should settle the *Salinas* case. Exh. 2. Media reported on attempts to mediate. Exh. 2. The press reported the filing of this case, the pleadings, and dismissal. Exhs. 3B-3D, 3G. The appeal and remand of the state law negligence claims was noted. Exh. 3G, 3H, 3J. In short, the jurors will have received great exposure to inadmissible and irrelevant material that the court would normally exclude as both irrelevant and prejudicial error.

## IV. Argument

The court may order a transfer under section 1404(a) when pretrial publicity jeopardizes the selection of a fair and impartial jury. *Andrade v. Chojnacki,* 934 F.Supp. 817, 834 (S.D. Tex. 1996). The publication of evidence that might be inadmissible during the trial is a consideration on whether the Court should exercise its discretion to transfer venue. *See Rideau v. State of Louisiana*, 373 U.S. 723, 726, 730 (1963) (videotape of defendant's confession taken without advising him of right to

counsel shown extensively on TV pretrial).

In this case, the extensive publicity has not just dwelt on Plaintiffs' claims. It also has put before the pool of potential jurors inadmissible evidence. The Court's rulings on pretrial motions are usually not proper topics on which to voir dire the jury. Potential jurors have been exposed to a combination of extensive coverage and considerable reporting of matters that would be reversible error to admit at trial. This imperils Defendants right to selection of a fair and impartial panel.

**WHEREFORE, PREMISES CONSIDERED,** Harlingen and Moore pray that this Court grant this motion and transfer venue of this trial to another Division outside of the Rio Grande Valley in the Southern District of Texas.

Respectfully submitted,

By: _____

**Tom Lockhart**
Admissions ID No. 2257
Texas State Bar No. 12473500
**Roger W. Hughes**
Admissions ID No. 5950
Texas State Bar No. 10229500
**ADAMS & GRAHAM, L.L.P.**
P. O. Drawer 1429
Harlingen, Texas  78551-1429
956/428-7495; FAX: 956/428-2954

Attorney-in-Charge for Defendants
CITY OF HARLINGEN and R.D. MOORE

By; _____

**WALTER J. PASSMORE**
Admissions ID No. 2264
State Bar No. 15560400

**THE LAW OFFICE OF WALTER J. PASSMORE, PC**
2424 North 10th St., Suite 201; 78501

P. O. Drawer 3187
McAllen, TX 78502-3187
956/668-8750 107; FAX: 956/668-1714

Attorney for Defendant R.D. MOORE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document was forwarded on this __ th day of June, 2003, to the following counsel of record and interested parties:

Attorney of record for Plaintiff, DAN MORIN, et al:

Mr. David Sergi                          Via Facsimile: 512/392-504
**SERGI & ASSOCIATES**              & FedEx Tracking No. 828089606324
109 E. Hopkins
Suite 200
San Marcos, TX 78666

Attorney of record for Plaintiff, DONALD MORIN, et al:

Mr. Jerry J. Trevino                     Via Facsimile: 361/882-8355
**ATTORNEY AT LAW**                 & FedEx Tracking No. 828089606335
1125 South Port Avenue
Corpus Christi, TX 78405

Attorney of record for Defendant, R.D. MOORE. individually:

Mr. Walter Passmore                      Via Facsimile: 956/668-1714
**LAW OFFICE OF WALTER J. PASSMORE, P.C.**
P. O. Drawer 3187
McAllen, TX 78502-3187

ROGER W. HUGHES

| VALLEY | SPORTS | RIO LIV |
|---|---|---|
| **PROBATION REVOKED** | **SENIORS RULE** | **GAZEBO** |
| Judge cancels area man's freedom because of marijuana possession | The U.S. Senior Open continues | Victorian architecture prevails garden fixtu |
| A2 | B1 | |



# Valley Morn



Serving the
Rio Grande Valley

**SATURDAY, JUNE 30, 2001**   www.valleystar.com

# Politicians waffle on I

## Ortiz publicly opposed range but worked to lure site to Texas

**By SUZANNE GAMBOA**
Associated Press

WASHINGTON — Publicly, Rep. Solomon Ortiz joined fellow Congressional Hispanic Caucus members pressing for an end to bombing exercises at the Vieques Island training site in Puerto Rico.

Privately, Ortiz has known for four or five months that some of his constituents wanted a 222,000-acre Kenedy County site near Baffin Bay to be considered as a Vieques alternative.

Area business leaders "were working hard to get a plan to mold public opinion to get people to support it" until their efforts became public earlier this month, he said.

"Everything was going fine until this story leaked out," complained Ortiz, D-Corpus Christi.

Those most likely to oppose the idea said they learned of the proposal only last week.

"We think it was a little bit underhanded. They want economic development — so-called economic development — at any cost, is the way I look at it. They don't really care what the cost would be. And the cost would be too high," said Pat Suter, Coastal Bend

Sierra Club chairman and a board member of the Coastal Bend Bays and Estuaries Program.

The Navy has conducted bombing exercises and other training on Vieques for six decades and says the bombing range is vital for national defense.

But in response to opposition in Puerto Rico, where protesters say bombing was harming the environment and people's health, President Bush announced last week that the Navy would withdraw in two years.

The proposed South Texas area is a major migratory bird flyway, touted on state parks coastal birding trail maps.

*Please see 'ORTIZ', Page A8*

## Spokesman: based on inc

**Associated Press**

CORPUS CHRISTI — Rick Perry, who now Padre Island is under eration for amphibious ing training as part of a posed bombing range in S Texas, earlier relied on rect information that no exercises were planne spokesman says.

"He has since learned the Navy did have plan amphibious exercises," Sullivan, a spokesman governor, said Thursday.

A 222,000-acre Kenedy County is among tions being considered

# City concerned about insurance

## Harlingen faces

Salinas.
In the ambush, Ernest

# Rio Hondo of

MOTION TO TRANSFER
EXH. 1A

for Region One

alternative.

Area business leaders "were working hard to get a plan to mold public opinion to get peo-

at it. They don't really care what the cost would be. And the cost would be too high," said Pat Suter, Coastal Bend

flyway, ...ted on state parks coastal birding trail maps.

**Please see 'ORTIZ', Page A8**

governor, said Thurs... A 222,000-acre Kenedy County is a... tions being consid...

# City concerned about insurance

## Harlingen faces $20 million suit but has only half

### By FERNANDO DEL VALLE
Valley Morning Star

HARLINGEN — Just five weeks before the city is expected to go to trial, some officials are quietly sweating for fear that the city might not have enough insurance coverage to pay a judgment that could exceed $20 million.

The lawsuit filed by the families of two slain U.S. Border Patrol agents and a Cameron County sheriff's deputy demands more than $20 million.

But the city's insurance policy will not cover more than $10 million in damages.

"Yes, I am concerned — deeply concerned," said Marvin Hendrix, the city's risk manager. "Everybody's concerned."

Through the Texas Municipal League's Intergovernmental Risk Pool in Austin, the city pays $173,460 a year for an insurance plan that covers city officials for up to $10 million worth of liability, said Hendrix, who added the city cannot increase it's insurance based on the lawsuit.

"It's more than most cities carry around here," said Hendrix, who increased the premium from $2 million when he took the job in 1995.

"At the time they had adequate coverage," he said referring to the revised insurance plan.

But on July 7, 1998, the son of police Detective R.D. Moore used his father's police-issued assault rifle to kill Border Patrol agents Susan Lynn Rodriguez and Ricardo Guillermo

Salinas.

In the ambush, Ernest Moore critically wounded sheriff's Deputy Raul Rodriguez outside the Moore family's San Benito home.

In the lawsuit, the plaintiffs charge that R.D. Moore failed to warn the slain agents that his son was armed with an assault rifle as Ernest Moore hid in a nearby cornfield.

"You can't predict something like that," Hendrix said.

"When you buy insurance, you buy to protect against a catastrophic event, but you also buy within the constraints of your budget."

The city also has a cash reserve fund of about $5 million.

Despite the ominous legal threat, city officials have not considered how they would pay a costly judgment.

"We're not looking at that right now. First you have to have a judgment and we're a long way from that," City Manager Roy Rodriguez said.

"I don't want the trial would start, because I don't want to talk about hypothetical things anymore. To me, the sooner, the better. This is so tough on everybody."

If the civil case goes to trial as expected, the plaintiffs' lawyers would have to prove their case based on the evidence they present.

"It's by the preponderance of evidence, (whereas) a criminal case is beyond a reasonable doubt," said Ramon Garcia, whose law firm represents Raul Rodriguez.

In the civil trial, the jury would be asked to hand down a verdict based on evidence, said Sonia Lopez, the attorney representing Raul Rodriguez, who is seeking unspecified

**Please see 'SUIT', Page A8**

# Rio Hondo c

## School district chief wins award for Region One

### By DALE CULPEPPER
Valley Morning Star

RIO HONDO — Rolando Peña, the school district's superintendent, earned the superintendent of the year award for Region One.

"This is an honor, but credit should go to the community and the staff. It's not just the superintendent," Peña said.

Region One, which consists of 38 school districts from Brownsville to Laredo, selects one superintendent each year for the honor.

Board members from their respective school districts nominate those considered for the award.

A committee of five Region One Education Service Center board members reviews and discusses candidates' nominations.

This year was the first in which the committee interviewed candidates.

"Mr. Peña is always talking about his 'Team of 8,' so this (award) speaks well of them," said committee member and Harlingen school board trustee George McShan.

Peña has served eight years as superintendent for Rio Hondo schools, which have a large economically disadvantaged population.

During his tenure, the district has improved from "aca-



**BLUE-RIBBON SUP** intendent of Rio Hon selected by Region Center on Wednes...

demically acceptable nized" by the Texas Agency's rating syst...

Rio Hondo High ranked at "exemplar...

The district also $20 million from ... Instruction Facilit... ment.

The money is ... for the construction facilities, including mentary school, for dium and band hall

# Cameron County

## Constable charged with assault, abuse of power

### By ERNIE J. GARRIDO
The Brownsville Herald

BROWNSVILLE — A... Cameron County constable cha... ed assault and ... himself in ...





## 23.99
**ORIG. $49**

### misses 100% silk shantung blouse

Emma James three-quarter sleeve blouse with side slit in assorted summer colors.



## 9.99
**ORIG. $26**

### petites tees

Selected summer tees at a great price in assorted colors from **America's favorite designer.**



## 9.99
**ORIG. $20**

### ladies denim shorts

Denim cargo shorts from **Ty Wear** for petites 4P-14P, and Dillard's Woman 16W-24W.



## 19.00
**ORIG. $39**

### ladies casual shoes

Choose from our large selection of casual shoes from **Tommy Hilfiger** and **Keds.**



## 19.00
**ORIG. $59-$69**

### ladies Enzo shoes

Choose from the **Enzo** "Quincy" or "Roxanne" sandal in assorted colors and sizes.



## 19.00
**ORIG. $35**

### ladies Bass shoes

Save 45% on a selection of **Bass** canvas shoes in assorted styles and colors, perfect for summer fun!



## 66% off
**ORIG. $10-$12**

### kids Americana tees

Go Fourth with a selection of patriotic tees including glitter, gel, puff or ink screens for boys 4-20 and girls 4-16.



## 14.99
**ORIG. $25**

### men's designer tees

Find great **famous-maker** logo tees in assorted colors and styles to top off your summer wardrobe. Sizes M, L, XL, XXL.



## 50% off
**ORIG. 39.50-49.50**

### men's swimwear

Hit the beach in style with an assortment of swimwear from **Hobie** and other **famous names** in assorted colors, styles and sizes.

## SUIT / Out of money

damages.

"If you tip (the evidence) a little bit toward the plaintiff, you've made your case," Lopez said.

In the case, the families of the slain agents are each seeking $10 million in damages.

"I want to go to trial so the truth can come out, so the people who created this danger will have to account for it," said Gilbert Rodriguez, the husband of Susan Lynn Rodriguez and father of their daughter, Megan, 5.

"It's about honoring my wife — what happened to her that day," Rodriguez said.

"It's about what was lost — what my daughter lost, what I lost, what the family lost — her mom and dad. It's out of respect."

Both sides are prepared for a long legal battle.

The city will fight an adverse verdict, Hendrix said.

"They can get a judgment in court, but getting a judgment and collecting are two different things," Hendrix said.

"A jury's judgment can always be appealed."

The victims' families will not settle the case out of court, said Art Salinas, father of Ricardo Guillermo Salinas.

"I feel the same as I did the day it happened. I relive it everyday," Salinas said.

"Each day I live it, I'm more determined than ever. We're prepared for the long run. We're prepared to go all the way to the Supreme Court."



## Carpet Grass

**Sprinkler System
Landscaping, Carports
and Playnation Playsets**

Guajardo Turf

Harlingen
Weslaco



A2 - Thursday, July 19, 2001    **CITY / COUNTY**

# Commission reopens Rio

## Engineers again enable river to empty into the Gulf of Mexico

**By RACHEL BENAVIDEZ**
The Brownsville Herald

BROWNSVILLE — The International Boundary and Water Commission restored the Rio Grande's flow into the Gulf of Mexico, scooping out a formidable sand bar at the river's mouth Wednesday.

The work is part of the commission's ongoing operation and maintenance activities, IBWC officials said,

Using a bulldozer and excavator, crews from the IBWC's U.S. section cleared the 400-foot obstruction that has shut off the river's flow since early February.

The work is part of the commission's ongoing operation and maintenance activities, IBWC officials said, calling the task a short-term project.

"At this time, we don't know if it will be a permanent solution," said Sally Spener, public affairs officer at IBWC in El Paso.

"It will depend on natural circumstances."

While Rio Grande Valley and state water officials said they are hopeful the digging would permanently restore the river's course, at least

one area environmentalist skeptical.

"It sounds like a stopgap measure to me," said Mary Lou Campbell of the Sierra Club and a member of the Rio Grande Regional Water Planning Group.

IBWC officials said they offered the solution in response to growing public concern about the problem plagued river, which suffered from an infestation of h...



Star photo by Christy De La Garza

**CELEBRATING A FALLEN HERO:** Rebecca Block–Salazar, second wife of Harlon Block's father, stands in front of the new Weslaco Sports Complex in Weslaco on Wednesday afternoon. The new sports complex at 19th Street and Border Avenue is named after Harlon Block, a local football player who was killed during World War II. He is one of the Marines depicted in the Iwo Jima National

# Moth= victim

## Villarreal wants justice for her son's murder

**By VANESA SALINAS**
Valley Morning Star

HARLINGEN — The mother of a homicide victim is asking for help.

"I am trying to get help the assassination of my son," Elizabeth Villarreal said.

"If anybody knows of something they might have heard or seen that day."

Her son, Jesus Javier Villarreal, 21, was found dead May 25 at the Maryland Apartments in the 1400 block of Morgan Boulevard.

He had been shot several times and was pronounced

# U.S. Distri city to rel

**By FERNANDO DEL VALLE**
Valley Morning Star

HARLINGEN — City commissioners Wednesday moved behind closed doors with atto...

Motion to Transfer
Exh. 1B



Star photo by Christy De La Garza

r Avenue is named after
cal football player who was
d War II. He is one of the
in the Iwo Jima National

Elizabeth Villarreal said.
"If anybody knows of something they might have heard,
seen that day."

Her son, Jesus Javier Villarreal, 21, was found dead May
25 at the Maryland Apartments in the 1400 block of
Morgan Boulevard.

He had been shot several
times and was pronounced

change his shirt and he
come back," Villarreal said,
adding that nobody heard anything because the car radio
was loud.

Jesus' sister, Julie Villarreal, 24, said that a lady at
the apartments heard two
individuals argue in Spanish.

Julie believes Jesus might
have known the individual

received a threat he would
have not been with his two
daughters.

"We just want justice. We
don't know what type of people
they are or if they want to continue and do more harm,"
Elizabeth Villarreal said.

Anyone with information
may contact Harlingen Crime
Stoppers at 425-TIPS.

## Marine
## complex

A monument honoring
lock was moved to the Texas
National Guard Armory near
he city airport.

Rebecca Block Salazar, who
arried Harlon Block's father
d Block Sr. in 1951, and her
aughter from a previous marriage, Mary Taylor, attended
uesday's meeting and were
nthused by the city's action to
ame the new park for the fallen Marine.

Salazar said Wednesday
at people often mistakenly
fer to her as Harlon Block's
nother.

"I never got to meet him,"
he said.

"By the time I met Daddy
[d] Block, he (Harlon) was
lready in the service," she said.

# U.S. District Court judge orders
# city to release Roberson report

**By FERNANDO DEL VALLE**
Valley Morning Star

HARLINGEN — City commissioners Wednesday met
behind closed doors with attorneys who briefed them on the
status of the case of a detective's son who used a police-issued assault rifle to kill two
U.S. Border Patrol agents.

At about 5:55 p.m., commissioners met in closed session
with City Attorney Brendan
Hall and Tom Lockhart, the
lawyer appointed by the Texas
Municipal League to represent
the city in the $20 million lawsuit.

Lockhart refused comment
on the case.

Earlier Wednesday, U.S.
District Court Judge Hilda
Tagle ordered the city to
release to the plaintiffs the
findings of a city investigation
into the police department's
handling of the case.

Since Monday, the report by
law enforcement consultant
James Roberson had been
sealed for Tagle's review.

The report was unavailable

late Wednesday afternoon.

Since they filed the lawsuit
in August 1998, the plaintiffs
have refused to settle the case
out of court.

Aug. 2, Tagle will decide
whether the case will go to
trial. She has set jury selection
for Aug. 6.

In other business, commissioners launched their campaign to seek the title of All
America City.

About nine years after the
city won its first title, commissioners will focus their campaign on a revitalization project, City Manager Roy Rodriguez said in an interview.

"It's about revitalizing the
whole downtown area, from
sidewalks, drainage, streets
and parks," he said.

"It's rehabbing homes, apartments and businesses in the
old part of the city that we call
the heart of Harlingen."

While federal and local
money would be used to fund
part of the project, other funding could come from a bond
issue planned within two

year, said Rodriguez, who did
not have details on the project's cost readily available.

In other business, commissioners reviewed a county
report that showed toll revenues continued to slide at the
Free Trade Bridge at Los
Indios.

While county officials had
projected bridge revenues
would reach $1.9 million by
the end of the fiscal year in
September, revised estimates
put revenues at about $1.5
million, Cameron County
Auditor Mark Yates said.

A third quarter report
showed crossings down by 4
percent compared to the same
period last year.

"We had a slowdown in the
economy that caused commercial traffic to go down," Pete
Sepulveda, director of the
county's bridge system, said in
an interview.

"Seventy percent of commercial traffic is related to the
maquiladora industry, so when
the auto industry slows down
it's a domino effect."

# hurricane seminar

" There are going to be more storms
this year than last "
— Shawn Bennett
Brownsville NWS meteorologist

om William Gray, a scientist
the Atmospheric Science
epartment at Colorado State
niversity.

Meteorologists have considered Gray to be the nation's
p expert in hurricane prerictions for the past 15 years.

The meteorologists emphasized bi-national cooperation
if a disastrous hurricane was
to strike this area.

"There are going to be more
storms this year than last,"
said Brownsville NWS meteorologist Shawn Bennett,
"We don't know where they

# Sheriff's deputies arrest 3
# teen-age girls for burglary

Valley Morning Star

HARLINGEN — Three
Harlingen teen-age girls were
arrested by Cameron County
sheriff's deputies after they
were accused of burglarizing a
home on South Altas Palmas
Road.

A witness stated that he
saw three girls in the area at
the time a burglar alarm at
the home sounded Tuesday
afternoon.

Sheriff's Deputy Cesar
Diaz followed the tracks of the
girls through some brush and
detained them.

They were charged with

Justice Center in San Benito.

The homeowner is out of
town and it is unknown if any
items were taken.

### CORRECTION POLICY

The Valley Morning Star is
committed to accuracy in its
news reports. Although safeguards are taken to ensure
accurate reporting and spelling, mistakes can occur.

Confirmed factual errors
will be corrected in this space
daily. If you find a mistake,
call 436206 during business
hours.

## RIO GRANDE VALLEY

# Ex-police chief violated policies

**Report:** Findings also conclude Harlingen lawmen's actions warranted strict administrative action.

BY FERNANDO DEL VALLE
VALLEY MORNING STAR

BROWNSVILLE — A city consultant's investigation found former ex-Harlingen Police Chief Jim Scheopner violated several department policies in the handling of a police-issued rifle that 'a detective's son used to kill two U.S. Border Patrol agents.

In a document filed Tuesday in U.S. District Court, law enforcement consultant James Robenson also concluded the actions of Harlingen police Detective R.D. Moore and Capt. Joey Vasquez warranted strict administrative action.

In a report of the city-commissioned probe conducted in November 1998, Robenson cites Scheopner

department for destruction in June 1995.

"The person responsible for investigating whether the involvement of the Harlingen Police Department personnel and equipment was proper and correct according to the policies, directives and practices of the city of Harlingen and its police department was the chief of police," Robenson wrote in the report to city administrators. "The administrative action should have begun immediately.... It did not."

Scheopner declined comment, citing litigation. Moore and Vasquez have repeatedly declined comment on the case that stems from the shootings.

Tom Lockhart, a Texas Municipal League-appointed lawyer who is represent-

information surrounding the police department's handling of the assault rifle Ernest Moore used to kill agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas on July 7, 1998.

"Instead of clearing the air with a professional review of the circumstances surrounding the gun, he further complicated and confused the situation with summary statements that were inaccurate, unsubstantiated and refuted by the facts," Robenson wrote.

In the report, Robenson cites Scheopner for failure to take administrative action against Moore and Vasquez, who could have been "negatively sanctioned."

"The gun had been retained instead of destroyed," Robenson wrote. "Capt. Vasquez had violated department directives and good police practices by assigning it to Moore. Moore was carrying the gun without any qualify-

no other reason that the shooter might accidentally injure themselves or someone else while practicing," Robenson wrote. "No matter how slight the chance, *it is* more prudent not to permit the person to use the department-issued weapon."

In the report, Robenson charges Scheopner "provided inaccurate information which misled" former City Manager Natalie Prim and former Assistant City Manager Joe LaBeau. The report attacks Scheopner's credibility.

While a citizen turned in the assault rifle for destruction, Scheopner repeatedly claimed the weapon had been "donated" to the police department," Robenson wrote.

"Whether the statement of the chief that the weapon had been 'donated' to the department was intended to mislead the city administration and the public is debatable," Robenson wrote. "What is clear is that the use of the word did not qualify...



COURTESY PHOTO

MOTION TO TRANSFER
EXH. 1C

HERALD | THURSDAY, JULY 26, 2001

held his award from the city

## ghter honored
## sion for heroism

States and Canada to be given the Carnegie Hero Medal by the Carnegie Foundation.

ghter
ored

...... ....... ...... ..... ave this

Los Fresnos mayor confirms he will resign / Page A2

# Valley Morning Star

Mng the
Grande Valley

THURSDAY, JULY 26, 2001

www.valleystar.com

50 cents

NATION
'YCHIC SUIT
Iiss Cleo hot line
ices 2 lawsuits,
ccused of fraud
olations
D2

SPORTS
SPURS DEAL DEREK
San Antonio trades
Derek Anderson to
Portland for Steve
Smith
B1

LIVING
ALMOST LEGAL
MTV celebrates its 20th
birthday with big bash
C1

TODAY'S WEATHER
FORECAST: Partly cloudy,
isolated showers
High 96 Low 75   B2



## Ex-police chief violated policies

### Report findings also conclude Harlingen lawmen's actions warranted strict administrative action

/ FERNANDO DEL VALLE
ley Morning Star

BROWNSVILLE — A city nsultant's investigation nd former Harlingen Police nief Jim Scheopner violated veral department policies in s handling of a police-issued le that a detective's son used kill two U.S. Border Patrol ents.

In a document filed esday in U.S. District Court, v enforcement consultant mes Robenson also conclud the actions of Harlingen lice Detective R.D. Moore d Capt. Joey Vasquez warnted strict administrative tion.

In a report of the city-commissioned probe conducted in lovember 1998, Robenson noes Scheopner for failure to operly investigate "the cir-

ownership and chain of custody" of the semi-automatic assault rifle that a citizen turned in to the police department for destruction in June 1998.

"The person responsible for investigating whether the city owned the assault rifle — an Olympic Arms .223 caliber-automatic rifle, serial No.FA-0698 (AR.15 style). The gun was used in a shooting incident on July 7, 1998 that resulted in three persons being shot and killed — two U.S. Border Patrol Agents and the suspect in their deaths, Ernest Moore.

■ Finding 1: Chief Jim Scheopner conducted a brief inquiry into an incident that should have been



thoroughly investigated.

■ Finding 2: Chief Jim Scheopner provided inaccurate information which misled City Manager Nadale Prim and Assistant City Manager Joe LeBeau about the extent to which the city of Harlingen might be involved in the incident.

■ Finding 3: Chief Jim Scheopner failed to take the appropriate action when he learned that Capt. Vasquez had violated department policy by assigning a weapon to a Harlingen police officer without requiring that the officer demonstrate his proficiency with that weapon or providing a valid reason

to make the exception.

■ Finding 4: Chief Scheopner failed to take action against Vasquez and/or Detective Moore when he learned that the gun had been taken into the department "for disposal" by Moore, who later requested that Vasquez assign it to him.

■ Finding 5: Vasquez failed to notify Scheopner, in writing of his action in assigning the gun to Moore. Vasquez may have told the chief verbally. Vasquez said that he told the chief about his assigning the gun to Moore. The chief did not recall the conversation.

■ Finding 6: Vasquez violated

department policy by assigning a weapon to a Harlingen police officer without requiring that the officer demonstrate his proficiency with that weapon.

■ Finding 7: Moore failed to notify the regular property custodian of the circumstances by which the gun was received by the department. Moore violated Harlingen Police Department Directive#4.04.002 in that he failed to demonstrate proficiency with the gun that he was authorized to carry. He also used poor judgment in allowing his son to shoot his assigned Harlingen Police Department gun in practice.

## INVESTIGATION FINDINGS

Valley Morning Star

Following are the findings of an investigation, conducted by Consultant James Robenson, of the circumstances surrounding the ownership and chain of custody of an Olympic Arms .223 caliber-

Tom Lockhart, a Texas Municipal League-appointed

the city of Harlingen, also declined comment Wednesday

Throughout much of the stinging 18-page report, Robenson cites Scheopner for

providing inaccurate informa-

Please see 'REPORT,' Page A8

MOTION TO TRANSFER
EXH. 1D

**Thursday, July 26, 2001**

## DRT / Investigation results show former Harlingen police chief violated policies

ued from Page A1

surrounding the police department's handling of the misled" former City Manager Natalie Prim and former Assistant City Manager Joe LaBeau.

The report attacks Schoepner's credibility.

While a citizen turned in the assault rifle for destruction, Schoepner repeatedly claimed the weapon had been "donated" to the police department, Robenson wrote.

"Whether the statement of the chief that the weapon had been 'donated' to the department was intended to mislead the city administration and the public is debatable, but what is clear is that the use of the word did not accurately denote the language on the receipt."

The report also cites Schoepner for falsifying statements regarding his knowledge of the rifle's chain of custody.

While Schoepner claimed he had not seen a copy of the rifle's receipt until about July 21, 1998, police officials said he received the original receipt July 8, 1998, a day after the shootings, the report states. When he detailed the rifle's July 14, 1998, memorandum, Schoepner knew the information listed on the rifle's receipt.

"The only way he would know the detailed description of the gun, including the serial number, was to have seen the receipt or have someone read it to him," Robenson wrote

---

## In the report, Robenson charges Schoepner "provided inaccurate information which misled" former City Manager Natalie Prim and former Assistant City Manager Joe LaBeau.

---

The report also questions Moore's status as an on-call detective.

"The chief discusses detective Moore's 24-hour status in the context of his availability with the gun. The idea is that detective Moore with his gun and cell-out status has been available for emergency call-out if necessary," the report states. "This situation is difficult to understand when the chief had stated that he did not know that Capt. Vasquez had assigned the case to detective Moore until he or anyone knew to call Moore out?"

In the report, Robenson indicates Schoepner may have reconsidered his handling of the case.

In an interview with Robenson, Schoepner said he "probably screwed up royally" when he issued a memorandum that stated "no laws or policies were violated by any Employees acted in an appropriate and responsible manner before, during and after the incident."

In the report, Robenson cites Schoepner for failure to

---

tale appropriate action when he learned that Capt. Vasquez had violated department policy by assigning a weapon to (R.D. Moore) without requiring that (Moore) demonstrate his proficiency with that weapon or providing a valid reason to make the exception.

The report concludes, "Clearly detective Moore's possession of the gun was in violation of established and interpretation of departmental policy in that he was carrying a gun he was not qualified with."

While Schoepner repeatedly claimed Moore was issued the assault rifle as part of his role as the department's SWAT team sharpshooter, Robenson's inspection of the rifle determined the weapon was improper for such use.

"An open-sighted semiautomatic .223 rifle is not a rifle used by a 'sharpshooter.' First and foremost, a sharpshooter needs some sort of accurate target acquisition system like a scope or a laser. A range finding device is also important," Robenson wrote. "If detective Moore had been called upon to use this weapon in a life threatening 'sharpshooter' situation, the story

---

Harlingen, detective Moore and the lives of the persons involved would be in a hazardous and disadvantaged position."

The report also cites City Attorney Brendan Hall and Lockhart for failure to advise Prim to order the city to investigate the handling of the rifle.

Since the submission in 1998, the city had held the report secret, claiming it was confidential because it was prepared in anticipation of a lawsuit.

On Aug. 2, the plaintiffs requested that U.S. District Judge Hilda Tagle order the report to release its information.

Tagle ordered the city to release the report July 18.

In November 1998, the city hired Robenson, a Floresville management auditor, to investigate the police department's handling of the rifle. Ernest Moore used in the shootings.

In January 1999, the Valley Morning Star requested the state Attorney General's Office to order the city to release the investigation's findings, arguing public funds paid for the report.

In February 1999, the Attorney General's Office aided with the city, refusing to order its release.

Aug. 2, Tagle is expected to decide whether the case that surrounds a $20 million lawsuit against the city will go to trial. She has said jury selection

---

Associated Press

## Jury suggests death for father who killed 2 of his children

SAN FERNANDO, Calif. — A father should be put to death for torturing, killing and burying two of his young children in a national forest, jurors recommended Tuesday.

Superior Court jurors recommended 38-year-old Marcus Barren on two counts of murder in the beating deaths of Lupita Esquivel, 2, and Ernesto Barragon, 5. Lupita was killed in 1997; Ernesto in 1998.

Barren will be sentenced by a Superior Court judge Aug. 28. The jury's recommendation requires the judge to give reasons for rejecting it, but he may modify the sentence, said Jane Robison, a spokeswoman for the Los Angeles County District Attorney's Office.

Juror Ron Coupland said the death penalty because he is a Christian.

"... If there ever is a case in which the death penalty is warranted, it is this case," Coupland said outside of the court.

Los Angeles County Sheriff's deputies happened upon the family in the Angeles National Forest in March 1998 when a deputy noticed a newly dug grave.

Authorities found Ernesto's body, starved and broken. Lupita's body was uncovered

**Residents vote against spaceport / P**

**SPORTS**

## DALLAS BOUND

Tim Hardaway moves from the Miami Heat to the Dallas Mavericks

**B1**



U.S./ME
Border
● Comprehensive Bill



# Valley Mor

Serving the
Rio Grande Valley

www.valleystar.com

**THURSDAY, AUGUST 23, 2001**

# Focus on the



## Water planning urged

**By EMMA PEREZ-TREVIÑO**
The Brownsville Herald

EDINBURG — U.S. officials at the U.S.-Mexico Border Summit were told Wednesday that they should focus on developing a long-term water management plan with Mexico, instead of feuding over the water debt.

"The most important issue is not the current deficit," Mary Kelly, director of the Texas Center for Policy Studies said, referring to the 1.4 million acre-feet of water that Mexico owes the United States under a 1944 treaty.

Kelly was part of a panel that discussed border water and environmental challenges

MOTION TO TRANSFER
EXH. 1E

# Residents vote against 'space[...]'

## Proposed site meets opposition at public hearing in Kenedy County

BY JOHN HANDY
Valley Morning Star

SARITA — A majority...

## fending city costs more than $200,000

## Harlingen's insurance premium

### RNANDO DEL VALLE
ning Star

RLINGEN — With a...

## Official says Weslaco fire caused by careless smoking

Valley Morning Star

WESLACO — A Tuesday fire that killed a Weslaco man was an accident...

CORRECTION CLUB







— MOTION TO TRANSFER
EXH. 1F



# Valley Morning Star

Valley

FRIDAY, FEBRUARY 8, 2002

www.valleystar.com

50 c

## Trial set in shooting death

### Judge rules on what evidence can be presented

**ONDO DEL VALLE**

ng Star

BROWNSVILLE — A federal
ursday told attorneys she
ow plaintiffs to present evi-
shows a detective's son
been influenced by Nazi
then he killed two U.S.
trol agents and injured a

sheriff's deputy.

In a pre-trial hearing, U.S. District
Judge Hilda Tagle said she would also
allow plaintiffs to present a city con-
sultant's report that found police offi-
cials violated standard policy when

they allowed the semiautomatic rifle
to reach the hands of Ernest Moore.

Tagle set jury selection for Monday
in the case that stems from a $20 mil-
lion lawsuit. She set the trial for Feb.
19.

The plaintiffs' attorney, Broadus
Spivey, told Tagle he could call as
many as 32 witnesses to the stand.

In the 90-minute hearing, Tom
Lockhart, the city's insurance attor-
ney, requested Tagle consider moving

the trial to another part of th
because the *Valley Morning Sta*
erage of the case could inf
jurors Tagle said she would de
if media coverage influenced
after attorneys select a jury M
As attorneys examined evide
the case, Lockhart requested
**Please see TRIAL, Pa**

## TECHNOLOGY ON PARADE

## Blaze
## leaves
## family
## in nee

16 people live



FRI. FEB. 8
THRU SUN.
FEB. 10

Your Choice

3 Days Only!

BONUS BUY

Boneless

New York
Strip Steak
In Our Butcher Block

Small
Cooked Shrimp
In Our Butcher Block

4.99 lb.

SAVE UP TO $5.00 LB.

nuary 8, 2002

CONTINUED FROM PAGE A1

Valley Morning Star, Harlingen, Texas

**TRIAL** / Trial date set in shooting deaths

Continued from Page A1

Tagle block the plaintiffs' plan to present evidence that shows Moore was an avid collector of Nazi paraphernalia.

"What that would only do is taint the jury (to believe) that this was a hate crime, a race crime," Lockhart told Tagle. "That is so volatile an issue that it can so inflame a jury."

Before Moore shot the three officers outside his parents' San Benito home, he broke into the Rio Hondo home of his ex-fiancée's boyfriend, Dan Morin, and mortally wounded his mother and sister.

"There's no question Moore had all kinds of World War II memorabilia in his room," Lockhart said. "There's no question he had more Nazi stuff than anything else. But that was a crime of passion."

But Price Ainsworth, the plaintiffs' attorney, argued it was critical to show jurors that despite Moore's mental state, police allowed the police-issued rifle to fall into his hands.

"His thought process, beliefs go to this cause of action," Ainsworth told Tagle. "This gun was put in the hands of this deranged man."

Tagle also allowed plaintiffs to present city consultant James Robeson's report that found police officials violated standard policies in the chain of custody of the rifle that a citizen turned over to the police department for destruction in 1995.

But Tagle said she would not allow plaintiffs' attorneys to suggest to jurors that the police department deliberately erased police audiotapes recorded on the morning of the shootings.

The police department provided a Texas Rangers investigation with the tapes before they were reused, Lockhart told Tagle.

The suggestion that the police department deliberately erased the tapes would create a "prejudicial effect," Lockhart said.

"There's no evidence they did it in bad faith," he said. "They reuse tapes. It was their routine."

Wednesday, city officials and plaintiffs failed to settle the case out of court after about 10 hours of negotiations in a court-ordered mediation hearing.

On July 7, 1998, Ernest Moore used his father's police-issued assault rifle to kill Border Patrol agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas and injure sheriff's deputy Raul Rodriguez.

In 1996, a citizen turned over the semiautomatic rifle to police for destruction. But detective R.D. Moore took the rifle home, where his son kept it in a gun vault in his room.

In their lawsuit, plaintiffs charge Ernest Moore deliberately chose his father's police-issued rifle for the shootings because practice had made him comfortable with the weapon.

But the city argues Ernest Moore could have used other semiautomatic rifles stored in the gun vault he shared with his father.

On Aug. 2, Tagle dismissed the federal lawsuit, ruling Ernest Moore could have used another semiautomatic rifle in the shootings.

But on Oct. 19, Tagle reversed her decision based on the testimony of Moore's ex-fiancée, Julia Lynn Cox, who claimed he regularly practiced with the police-issued rifle and kept the gun in his pickup truck.

---

**DEBATE** / Morales ready to debate Sanchez on TV

Continued from Page A1

office were not returned.

Previously, Sanchez said he would appear in two TV debates, one in English and

> Previously, Sanchez said he would appear in two TV

would be aired on Spanish TV stations during the last two weeks of the campaign.

Meanwhile, the first authentic poll in the gubernatorial race, conducted by

## THE MONITOR

# VALLEY & STATE

**FRIDAY, FEBRUARY 8, 2002**

SEC10
Obituaries:
PSJA Monitor:
Weather:

☐ BORDER PATROL SLAYINGS

# Judge: Nazi memorabilia is admissibl[e]

By FERNANDO DEL VALLE
Valley Freedom Newspapers

BROWNSVILLE — A federal judge Thursday told attorneys she would allow plaintiffs to present evidence that Tagle's detective son might have been influenced by Nazi memorabilia he kept from a trail for Feb. 19.

Tagle set jury selection for Monday in the $20 million lawsuit. She set the trial for Feb. 19.

Plaintiffs' attorney, Broadus Spivey told Tagle he could call as many as 32 witnesses to the stand.

In the 90-minute hearing,

to present a city consultant's report that found police officials violated standard policy when they allowed the semiautomatic rifle to reach the hands of Benito age of the case could influence Moore.

Tagle said jury selection for Monday in the $20 million lawsuit. She set the trial for Feb. 19.

As attorneys examined evidence in the case, Lockhart requested that Tagle block the plaintiffs' plan to present evidence that shows Moore was an

Tom Lockhart, the city's insurance attorney, requested Tagle consider moving the trial to another part of the state because the Valley Morning Star's coverage of the case could influence jurors, Tagle said 'she would determine if media coverage influenced jurors after attorneys select a jury Monday.

avid collector of Nazi paraphernalia.

"What that would only do is taint the jury (to believe) that this was a hate crime, a race crime," Lockhart told Tagle.

"That is so volatile an issue that it can so inflame a jury"

Before Moore shot the three officers outside his parents' San Benito home, he broke into the Rio Hondo home of his exfiancée's boyfriend, Dan Morin, and fatally wounded his mother and sister.

"There's no question Moore had all kinds of World War II memorabilia in his room," Lockhart said. "There's no question he had more Nazi stuff than anything else. But that was a Robenson's boyfriend Dan Morin crime of passion."

But Price Ainsworth, the plaintiffs' attorney, argued it was critical to show jurors that despite Moore's mental state, police allowed the police-issued rifle to fall into his hands.

"His thought process, beliefs go to this cause of action,"

Ainsworth told Tagle. "Th[e rifle] was put in the hands o[f a] deranged man."

Tagle also allowed pla[intiffs] to present city consultant [...] Robenson's report that police officials violated sta[ndard] policies in the chain of c[ommand] over the rifle that a citizen [caused] destruction in 1995.

But Tagle said she wou[ld]

See SLAYINGS page

---

☐ GOVERNMENT

# Workshop strengthens relations between police, deaf

By JUAN OZUNA
The Monitor

EDINBURG — Organizers said they hoped a two-day workshop beginning tonight at the University of Texas-Pan American would help improve relationships between people with impaired hearing and law enforcement officers

MARDI GRAS
Austin woman organizing bare breast protest for
fest: 11C

# HOMEWORK HELPERS

Friday, February 8, 2002 ■ THE MONITOR, McAllen, Texas

**FATALITY**

# Family tries to rebuild after house fire

By VANESA SALINAS / Freedom Newspapers

SANTA ROSA — Lisa and J.C. Penney Co.

The family said Ramon, whom they call "Pollo," was believed his mother was trapped in the burning house and went back inside to rescue her, only to die in the smoke and flames. His mother had escaped, but was on another side of the house, outside while he went back inside.

Santa Rosa — Lisa Garza Jr. died early Tuesday morning in a house fire. He was the third-youngest of 10 brothers and sisters and a family's baby boy. Sixteen people lived in the house located on Pomelo Road.

The residence was declared a total loss. All that remains in honor of the 18-year-old, the house is charred black wood.

Since her family does not have a place to stay, Moreno decided to take them all into lending emotional support to the family.

Moreno said that it's hard to cope with the death of her brother-in-laws and nieces and nephews as long and difficult in the need. They lost everything.

The Garza family is in terrible need. They lost everything in the house.

Thursday evening, friends and family joined the Garza family in honor of Moreno's home for a rosary new home on the same site.

So many people showed up that they overflowed the home.

An account has been set up for the family at Texas State Bank.

## Learn

Continued from page 1C

nationally, Project Learn began in 1999 and is sponsored by the Boys & Girls Clubs of America and J.C. Penney Co.

The program emphasizes the importance for students to learn more about their school subjects using different life experiences in a relaxed atmosphere. The program also encourages parents to get more involved in the educational efforts of raising their children.

"We are not trying to replace schools," said Jan Still-Lindeman, director of public relations nationally.

26th street locations, Virginia Lovelace, a special education teacher at Dr. Carlos Castañeda Elementary School in McAllen, works with the students on their homework, tutoring folders and computer skills. Lovelace also works with students to prepare for standardized tests.

Assisting Lovelace are four volunteers from the Junior League of McAllen.

"It is everything," organization president Jennifer Lewis said.

their tutoring folders, which are filled with exercises and reinforcing weak academic areas, Lovelace compiles the folders by studying the participants' report cards and finding out what subjects they are not performing in to the best of their abilities.

Students then work on computers after their tutoring assignments are completed. So far this school year, they have worked with maps, menus

benefits outweigh any playtime during the day," Boys & Girls Club executive director Belinda Cowan said.

Ten-year-old Elliot Perez, a fifth grade student at Zavala, is getting assistance with the division, reading and science. He said his parents encouraged him to participate in Project Learn.

"It is fun and we get to do a lot of things," Perez said.

Eleven-year-old Alexandria Garcia, also a fifth grade student

## Slayings

Continued from page 1C

x plaintiffs' attorneys to get to jurors that the police ment deliberately erased the audiotapes recorded on morning of the shootings.

The police department provided a Texas Ranger investigation with the tapes before they were reused, Lockhart said.

He suggestion that the police agents would create a "prejudice," Lockhart said.

Here's no evidence they did it in bad faith," he said. "They reuse tapes. It was their routine."

Wednesday, city officials and plaintiffs failed to settle the case out of court after about 10 hours of negotiations in a court-ordered mediation hearing.

On July 7, 1998, Ernest Moore used his father's police-issued assault rifle to kill Border Patrol agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas and injure deputy sheriff Raul Rodriguez.

In 1995, a citizen turned over the semiautomatic rifle to police for destruction. But detective R.D. Moore took the rifle home, where his son kept it in a gun vault in his room.

In their lawsuit, plaintiffs charge Ernest Moore deliberately chose his father's police-issued rifle for the shootings because his father had made him comfortable with the weapon.

But the city said that Ernest Moore could have used other semiautomatic rifles stored in the gun vault he shared with his father.

On Aug. 2, Tagle dismissed the federal lawsuit, ruling Ernest Moore could have used another semiautomatic rifle in the shootings.

But on Oct. 19, Tagle reversed her decision to dismiss the testimony of Moore's ex-fiancée, Julie Lynn Cox, who claimed he regularly practiced with the police-issued rifle and kept the gun in his pickup.





Willacy County citizen's group targets jail conditions / Page D1

# Valley Morning Star

Serving the Rio Grande Valley

**WEDNESDAY, FEBRUARY 20, 2002**

www.valleystar.com

50 cents

# Trial focuses on rifle disposal

## Woman testifies 'I wanted to have those weapons destroyed'

**BY FERNANDO DEL VALLE**
Valley Morning Star

BROWNSVILLE — A woman testified, Tuesday that she requested her Harlingen Police Department give her lawyers representing the victims' families to assure her that it would dispose of the assault rifle she turned over for destruction.

Sylvia Pirtle appeared shaken when a lawyer showed her the semiautomatic rifle that a detective's son used to kill

two U.S. Border Patrol agents and injure a sheriff's deputy.

In the first day of the trial that stems from a $20 million lawsuit, lawyers representing the victims' families tried to show that Harlingen police officials' policy violations led Ernest Moore to use Pirtle's rifle to kill agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas and injure sheriff's Deputy Raul Rodriguez.


**Lockhart**


**Lopez**


**Spivey**


**Moore**




**Schoephner**

"Since then, I've been in total shock," Pirtle told jurors in U.S. District Court. "It has affected me greatly."

On June 23, 1995, she turned over the rifle and a pistol to be destroyed

because she feared the guns could be stolen amid a rash of neighborhood burglaries, Pirtle told jurors.

Documents show Pirtle turned over the guns to police Detective R.D.

Moore, whose son would use the rifle in the 1998 shootings, said Broadu Spivey, the Austin attorney representing the slain agents' families.

"I told them I wanted to have these weapons destroyed," Pirtle said. "I gave me the impression, like OK, but said I wasn't leaving without a receipt.

But Harlingen police officials didn't Pirtle turned over the weapon "for disposal, meaning for their disposal Spivey argued.

"I went in to give the weapons to destroyed," Pirtle insisted. "I believe made myself clear, that I wanted them

Please see 'TRIAL,' Page A1

## IWO JIMA ANNIVERSARY

## Mexico water



# rovascular
# isease in
# Women.

th

mperador,

M.D. Cardiologist

ified in Cardiology



alley Baptist
ular Institute

30 a.m. - 10:30 a.m.

uesday, February 26

d Conference Center

ptist Medical Center

ase Street, Harlingen

ie number one cause of
lany hold the false idea

VALLEY BAPTIST

## TRIAL / Trial ocuses on disposal of rifle

### Continued from Page A1

destroyed."

Hammering at a point critical to their case, plaintiff attorneys argued Ernest Moore used his father's police-issued rifle because practice had made it his preferred weapon for the shootings.

"A police detective practiced with his son so his son could be proficient with his Harlingen Police Department rifle," attorney Price Ainsworth told jurors. "This is the gun he would use against law enforcement officers because it was a police department weapon."

A rifle casing found in the back of Ernest Moore's pickup truck contained live rounds and spent cartridges for the murder weapon, Ainsworth claimed.

But Texas Ranger Rudy Jaramillo testified his investigation did not find the bullets in the gun casing. Instead, Department of Public Safety examiners likely found the bullets in the rifle when they inspected the gun, he said.

During nearly two hours of opening statements, plaintiff attorneys argued police officials' policy violations directly led to the shootings.

"It was part of the good old boy system, and along with working with each other they violated policy and procedure together without regard for us," said Sonia Lopez, the Edinburg

attorney representing Raul Rodriguez.

Former Police Chief Jim Scheopner lied to try to cover up violations that led R.D. Moore to store the rifle in a gun vault in his son's room, attorneys argued.

Later, Scheopner would claim the department assigned Moore the rifle because he was a sharpshooter for its SWAT team, attorneys said.

"Upon pressure, they had to come up with a different story," Lopez said. "There was no SWAT team."

In about 15 minutes of opening arguments, attorney Tom Lockhart told jurors the trial "was not about R.D. Moore or Ernest Moore — he's dead."

"You're going to hear evidence that the Harlingen Police Department made mistakes — no question about that," said Lockhart, the city's insurance attorney.

"To prove the city of Harlingen is responsible, it has to be as a result of policy or custom," Lockhart said. "They must show that the city representatives placed these (victims) in this position of danger and stripped them of the ability to defend themselves. You've got to put aside your sympathies and decide this case on the evidence and the law."

Testimony continues at 8:30 a.m. today in U.S. District Judge Hilda Tagle's courtroom.

## WATER / Mexico water release possible

### Continued from Page A1

ment because of votes he missed while caring for his dying mother.

"I wasn't trying to sling arrows at him," England said after the conference. "My intent was to make him aware that we need more access to him."

AGFUND has endorsed Hinojosa for the current election cycle.

Since 1944, the United States and Mexico have shared the water of the river that marks much of the nations' international boundary, abiding by a treaty that runs on five-year cycles to accommodate the ebb and flow of water stores. The treaty is meant to guarantee that the United States gets a water supply from the Rio Grande and that Mexico gets a water supply from the Colorado River.

Under an agreement signed in March as an addendum to the 1944 treaty, Mexico was to grad- ually pay back that water. Citing

can't get any lower. Without (the irrigated) water we have to look at the sky and pray for rain. I've never seen so many people pray for rain as I saw last year."

Mexican Consul Luis Lopez-Moreno told Hinojosa during a break he had just received word Mexico would transfer approximately 90,000 acre feet of the water as soon as today.

"This is a step forward that was made possible by our overcoming of some of the difficulties that we have faced," Alberto Szekely, Mexico's point man on the water issue, said in a telephone interview later Tuesday. "This proves that Mexico is serious about its commitment to honor its wat...

MOTION TO TRANSFER
Exh. 1I

# Valley Morning Star

Serving the
Rio Grande Valley

**THURSDAY, FEBRUARY 21, 2002**

www.valleystar.com

50 cents

## Shooting events unraveled

### Detective testifies he ran license check on victim

**by FERNANDO DEL VALLE**
Valley Morning Star

BROWNSVILLE —
A Harlingen police detective testified Wednesday he ran license plate checks on the man his son later critically wounded in a shooting

spree.

Detective R.D. Moore testified he ran license checks on Dan Morin, who Ernest Moore left paralyzed in an attack that mortally wounded Morin's mother and sister.

The night before the July 1998 shootings, Ernest Moore called Morin's home for the first time, attorney Sonia Lopez told jurors in the second day of a trial that stems from the biggest lawsuit filed against the city of Harlingen in

recent history.

The same night, Ernest Moore called his parents' home to try to get a phone number, Lopez told jurors in the trial that stems from a $20 million lawsuit that claims

**Please see 'TRIAL,' Page A7**



Cox

Moore

Schoepner







**SWEET MUSIC**

## Residents' complaints force item

lley Morning Star, Harlingen, Texas

# CONTINUED FROM PAGE A1

Thursday, February 21, 2002   A7

## RIAL / Shooting events unraveled at trial

ntinued from Page A1

used a police-issued rifle to
US. Border Patrol agents
San Lynn Rodriguez and
zardo Guillermo Salinas and
ure sheriff's Deputy Raul
driguez.

But R.D. Moore said the
ense plate checks turned up a
rth Harlingen address, while
orin lived in Rio Hondo. So he
scarded the information,
vich he never gave his son, he
id.

Ernest Moore "was upset at
o drug dealers in Rio Hondo
o turned his girlfriend on to
caine," Lopez said, referring
Julie Lynn Cox, who left
ore for Morin about a week
fore the shootings.

In the small audience, Lisa
alinas, the mother of the slain

agent, quietly wept as Moore
bluntly unraveled some of the
events that led to the shootings.

As she grilled the veteran
Harlingen police officer, Lopez
questioned whether he "assist-
ed" his son in trying to locate
Morin and his family.

"I ran the license plate check
for my information only," Moore
replied.

Any information would have
been turned over to the police
department's drug task force,
he said.

"I'm a police officer and if
there's crimes being committed,
that's what the system's for,"
Moore said.

Using testimony from Moore
and former Police Chief Jim
Scheopner, plaintiffs' attorney

tried to prove Moore failed to
warn officers that his son hid
it in a gun vault in his son's
room, he said.

Central to the plaintiffs' case
is the legal concept of state-cre-
ated danger. In their lawsuit,
they charge Harlingen officials
prompted circumstances that
resulted in the officers' shoot-
ings.

Moore testified he warned
some responding officers, but
failed to alert others — includ-
ing the three victims of the
ambush.

"At the time, I didn't realize
the magnitude of the situation,"
Moore said.

In other testimony, Moore
said the police department did-
n't dispose of the assault rifle a
citizen turned over for destruc-
tion in 1995. Instead, he took

the rifle home, where he stored
it in a gun vault in his son's
room, he said.

Tuesday, Sylvia Pirtle testi-
fied she gave the rifle to the
police department to be
destroyed because she feared it
would be stolen amid a rash of
neighborhood burglaries. She
testified she requested a
receipt that Moore signed and

"That was the word she used
— she wanted to dispose (of) it
(to) the Harlingen Police
Department," Moore testified.
"My interpretation of disposal
is not to throw away but to dis-
pose of from one party to anoth-
er. I took it to mean we could do
what we wish."

For years, the police depart-
ment had not destroyed fire-
arms because the action re-

quired a lengthy process that
Scheopner, as the police depart-
ment's policymaker, created a
professional environment, wide-
re policy violations led to the
shootings.

"We never intended to
destroy it (the rifle)," he said.

Although he agreed with a
city consultant's findings that
he and other officials violated
some police policy, Moore later
told jurors, "I don't believe we
did do anything wrong."

During four hours on the
witness stand, Scheopner testi-
fied he knew before the shoot-
ings that police Capt. Joey
Vasquez had assigned the rifle
to Moore.

As plaintiff attorney Broa-
Scheopner testified Moore vio-
lated policy when he allowed
his son to shoot the police-
issued rifle.

In building their case, plain-

tiffs have tried to show
Scheopner, as the police depart-
ment's policymaker, created a
professional environment, wide-
re policy violations led to the
shootings.

Driving a not-critical to
their case, plaintiffs continued
to try to prove that Ernest
Moore deliberately picked his
father's police-issued rifle
because practice with it had
made it his preferred weapon.

In making their case, plain-
tiffs relied on Cox's earlier testi-
mony that Ernest Moore pre-
ferred the police-issued rifle.

But after about 15 minutes
on the witness stand, Cox testi-
fied that she could not distin-
guish between the murder
weapon and a privately owned
assault rifle stored in the gun
vault.

## CHINA / Bush

Continued from Page A1

idual's life."

Before leaving South Korea,
Bush told seve...
fatigue-clad  U.S....
Osan Air Base, t...
their regional p...
three million d...
on his six-day ...
in backing his ...
the al-Qaida t...
other term....
"All three...
to defend th...
Bush gave t...
said, gave... 

# BEALLS
## 4-DAY SUPER
### THURSDAY THRU SUNDAY ONLY!

MOTION TO TRANSFER
Exh. 1J



Implant helps loo

ear / Page D1

he
1e Valley

Valley _  | ¬  ning Star

.AY, FEBRUARY 22, 2002

.om

50 cents

# .x-officer tells of cover-up

## Witness says he tried to expose handling of the shooting

**ORNANDO DEL VALLE**
ming Star

WNSVILLE — A former Cameron County sheriff's deputy testified that he saw three men in the pickup truck he chased to the detectives' home before a shootout that left U.S. Border Patrol agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas dead and deputy Raul Rodriguez wounded.

en police official testified also that he was forced to after trying to expose a city of the handling of a police ctective's son used in a shoot-e.

day of stirring testimony, a

In the third day of a trial that stems from a $20 million lawsuit, former Lt. Joe Rubio testified that former Police Chief Jim Scheppner lied to try to cover up the 1998 shootings in which detective R.D. Moore's son used an assault rifle that a citizen turned over to police for destruction.

Rubio testified Scheppner claimed the department assigned Moore the semiautomatic rifle because he was a sharpshooter on its SWAT team, but the department had no SWAT team, Rubio said.

"I believed the chief of police was involved in a cover-up," Rubio told

jurors.

After Rubio took the allegations to a FBI agent, Capt. Joey Vasquez threatened complaining officers with being fired, Rubio testified.

When Rubio and other members of the Harlingen Police Officers Association told the media they wanted an investigation, the city

**Please see TRIAL, Page A7**

## TTIN' LOOSE

## Bond issue price drops $2 million

## CONTINUED FROM PAGE A1

**TRIAL / Ex-officer tells of cover-up at trial**

**Continued from Page A1**

retaliated against the union, Rubio said.

"No one wanted that investigation," he said.

Rubio testified that former Assistant City Manager Joe LaBeau went to the Cameron County District Attorney's Office with charges that the union had made illegal campaign contributions. Former Assistant Police Chief Robert Archer told then-union treasurer Eric Vasquez, Joey Vasquez's son, to turn over the agency's checkbook to prosecutors, Rubio said.

In September 2000, a grand jury indicted the union on charges of making illegal campaign contributions to the 1998 campaigns of mayoral candi-

date Humberto Zamora and former Attorney General Jim Mattox.

Under the threat of personal indictment, Dennis Zamarron, another union official, resigned as part of a plea bargain agreement, Rubio testified.

Plaintiffs' attorney Sonia Lopez told jurors that state district judges select grand jury members. In Rubio's case, 197th State District Judge Migdalia Lopez chose members of the grand jury that indicted the police union, Lopez said.

In other testimony, Cameron County Sheriff's Deputy Roberto Rodriguez testified he saw three men in the pickup truck he chased to the San Benito home where R.D. Moore lived with his son.

"It was clear," he said. "I know there was a driver and two other people with him."

Outside the house, he saw R.D. Moore, who didn't know his son Ernest had just killed a mother and daughter in a shooting spree at the Rio Hondo home of the man who his ex-girlfriend was living with.

"I think he's contemplating suicide," Rodriguez said R.D. Moore told him. "If not, he's going to come back and kill us or he's going to have you guys do it."

Then Rodriguez saw Ernest Moore open fire from a sunflower patch, he said.

After Rodriguez shot Moore, the father ran to his dying son, Rodriguez said.

"I saw R.D. put his weapon down and grab and cradle him and tell him, 'You damn fool, you damn fool, why'd you do this?'" Rodriguez said. "I told him I was sorry. He grabbed my shoulder and he said, 'I should have took care of him a long time ago.'"

As plaintiffs tried to build their case, a criminologist testified police policy violations led to the shootings.

"It was a clear and extremely serious violation of nationally accepted standards," George Kirkham, an author and retired Florida State University professor, said of policy violations that put the police-issued rifle into the hands of Ernest Moore.

"There was gross incompetence and indifference to safety consequences," said Kirkham, a consultant special-

izing in police shooting cases. "There was no legitimate reason for R.D. Moore to be given this weapon."

In a hearing before U.S. District Judge Hilda Tagle, Kirkham testified R.D. Moore unlawfully purchased an assault rifle for Ernest Moore.

About a month before the shooting, R.D. Moore bought a semiautomatic rifle after filing a federal form that requires the buyer to provide information such as whether the buyer had been committed to a mental institution or has used illegal drugs.

Wednesday, Lopez argued R.D. Moore had served as the gun's buyer because his son could not have lawfully purchased the weapon because he had been in a mental institution and had used illegal drugs.

---

**DEA official: Trafficking remains lucrative**

**By RICARDO SANDOVAL**
The Dallas Morning News

MEXICO CITY — Drug smuggling from Mexico to the United States remains a thriving business despite heightened border scrutiny and close cooperation among agents of both countries, the top U.S. anti-drug official said Thursday.

But Asa Hutchinson, chief of the U.S. Drug Enforcement Administration, said he is co-

---

SUPER WEEKEND SALE

SAVE 75%   SAVE 75%

Fresh from the factory floor

MOTION TO TRANSFER
— EXH. 1K

Valley Morning Star, Harlingen, Texas

VALLEY

Saturday, February 23, 2002 - A3

the
nde Valley
URDAY, FEBRUARY 23, 2002

# Valley Morning Star

Younger workers feeling financial pinch / Page D2

www.valleystar.com

50 cents

## ity calls no witnesses, rests

### e could set new standards for safe handling of police firearms if plaintiffs emerge victorious

**RNANDO DEL VALLE**
orning Star

WNSVILLE — The case of a dent-setting case that would set standards for the safe handling of police firearms, attorneys said.

en detective's son who used ver's police-issued rifle in a g spree marks the second time theory goes before a jury in Fifth Circuit, attorneys said

1 very, very significant case," adius Spivey, an Austin attor- resenting the families of vic-

tims killed in the 1998 shootout.

A victory would make it a prece-dent-setting case that would set standards for the safe handling of police firearms, attorneys said.

"It will then become one of the most significant cases in the country," Spivey said of the $20 million case.

The lawsuit claims detective R.D. Moore's son used a police-issued assault rifle to kill U.S. Border Patrol agents Susan Lynn Rodriguez and

Ricardo Guillermo Salinas as well as injure "Sheriff's Deputy Raul Rodriguez.

After plaintiffs' lawyers put on four days of testimony, city attorneys quickly closed their case without call-ing witnesses to the stand.

City lawyer Roger Hughes argued the case failed to meet criteria neces-sary to try it under the legal theory of state created danger.

U. S. District Judge Hilda Tagle

overruled the request to dismiss the case.

The case becomes the first based on the theory to go to a jury since the Fifth Circuit Court of Appeals recog-nized the concept of state created danger in a ruling last year.

"We feel very happy that a judge has finally decided to put it in the hands of jury," said Richard Pena, an Austin attorney on the plaintiffs' legal team.

To prove a case based on the theo-ry of state-created danger, plaintiffs must show the city of Harlingen's actions directly led to the July 7, 1998, shootings.

In the trial, plaintiffs argued for-mer Police Chief Jim Scheopner's vio-lations of police policy and proce-dures led Moore's son Ernest Moore to turn the police-issued rifle into a murder weapon.

**Please see DAY 4, Page A7**





LA-Z-BOY ... Ultimate Fam[ily]

La-Z-Boy Recliners starting at

$299

Over 450 in stock
Available for immediate delivery

All Leather Luxury Sofa Handsome sofa with pillowtop cushions and pillow arms. Solid hardwood frame. Great value! Also available: Loveseat $949, Chair $899, Ottoman $299

$999

Leather Trend
Premium 100% top grain leather, Kiln dried solid hardwood frames with hand driven brass nailhead trim. Leather made by craftsmen.

$1,699

All Leath[er] cushions an[d] Loveseat $6[...]

$6[99]

**DAY 4 / Trial continues**

Continued from Page A1

After a citizen turned over the assault rifle to the police department for destruction, R.D. Moore took it home, storing it in a gun vault in his son's room to which both had bad keys.

"I think we demonstrated there was a custom of issuing weapons without documentation and he was aware of this, yet he failed to do anything about it," attorney Sonia Lopez said of Schnopper.

Closing the plaintiffs' case, Cameron County Sheriff's Deputy Raul Rodriguez and victims' family members testified in the fourth day of the trial. The lawsuit is the biggest filed against the city of Harlingen in recent history.

In other testimony, Lucia Prather told jurors she saw two men get into a white pickup truck outside the Rio Hondo home in which Ernest Moore left a mother and sister dead in an early morning shooting spree.

Prather's claim supported Thursday's testimony in which sheriff's deputy Robert to Rodriguez told jurors he saw three men in the white pickup truck he chased to R.D. Moore's home before Ernest Moore ambushed three law enforcement officers there.

In gripping testimony, Raul Rodriguez held back tears when he testified Ernest Moore gazed into his eyes as he opened fire with his father's semiautomatic rifle.

"When I made eye contact, he was just shooting at me. I could see bullets bouncing in front of me, then I felt a large blow to my arm," Rodriguez said. "I made up my mind he's not going to take me without a fight. After eight or nine rounds, I saw him go down."

After a bullet hit his heart, he spoke to his partner and started to pray, Rodriguez told jurors.

"I told him to tell my wife and kids I love them," he said. "You start making peace with God as far as, 'Forgive me father for I have sinned.'"

The shooting turned him into a man "upset with the world," said Rodriguez, who said his trauma led to his divorce.

a jury.

...pauses for the death of his brother two decades ago. His case has not yet been heard by

COMMENTS                                      http://www.vai. . star.com/comments.php?id=P40353_0_1_0_C

<< JURY: $35 MILLIONCITY FOUND NEGLIGENT IN DEATHS OF BORDER PATROL AGENTSNO WORD ABOUT HOW HARLINGEN WILL PAY AWARD | WEBLOG | COMMISSIONERS CONSIDER OPTIONS FATE OF $42 MILLION BOND ISSUE CLOUDED BY VERDICT >>

## No action against any officers

By LAURA B. MARTINEZ

Valley Morning Star

HARLINGEN-- Although a federal jury ruled that the actions of some police officers violated the department's rules and procedures, which in turn contributed to the deaths of two U.S. Border Patrol agents and the wounding of a sheriff's deputy, they will face no disciplinary action, officials said.

Families of the slain agents had repeatedly questioned why no disciplinary action had been taken against former Police Chief Jim Scheopner, Detective R.D. Moore and Capt. Joey Vasquez.

They claimed actions by the trio contributed to the deaths of Border Patrol agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas and injury to Sheriff's Deputy Raul Rodriguez.

City Manager Roy Rodriguez said that Chapter 143 of the Texas' Civil Service rules states the city has up to 180 days after an incident occurs to discipline officers involved. After the 180 days have passed, no action can be taken.

"It (Chapter 143) doesn't allow me or anyone to discipline them for that," Roy Rodriguez said.

"If they go and do something today, that's a whole different story," he said. "But for that issue that happened in 1998, we do not have the power to do that."

During the trial, the plaintiffs argued that mismanagement of the police department allowed Ernest Moore to turn a police-issued rifle into a murder weapon.

Ernest Moore deliberately chose the weapon issued to his father because he had practiced with it prior to the July 1998 shootings, the plaintiffs contended.

A private citizen had turned over the semiautomatic assault rifle to the city in 1995 and asked that the weapon be destroyed.

Scheopner was chief of police at the time of the July 1998 shooting deaths.

During the trial, he said the rifle was issued to R.D. Moore because he was one of the department's sharpshooters.

However, testimony revealed that R.D. Moore had not trained with the weapon. The only practice he had was shooting the gun in front of his home.

Price Ainsworth, one of the attorneys representing the families of Ricardo Salinas and Susan Rodriguez, said Tuesday that the next issue would be "to see those responsible are properly sanctioned."

Attorney Sonia Lopez, who represented deputy Raul Rodriguez, said that legally there is nothing that can be done. However, Civil Service rules should be looked into to see whether a pending investigation would allow for some type of action to be taken against the officers in question, she said.

"It just doesn't make any common sense that someone would be forced to keep

**MOTION TO TRANSFER**
**— EXH. 1L**

COMMENTS

someone," she said.

"It just doesn't seem logical to me that there would be such a deadline of a 180 days in order for someone to make such a decision as to whether to fire, discipline or reprimand someone."

Posted by: DOUG on Feb 28, 02 | 10:23 am | PROFILE

**COMMENTS**



name

Email

Location

Homepage

Show email ⌐    Remember me ✓

Notify me when someone replies to this post? ⌐

SUBMIT    PREVIEW



COMMENTS                                                    http://www.val..,star.com/comments.php?id=P44121_0_1_0_C

<< BISHOP WAS WARNED OF PRIEST RECTOR SENT LETTER RECOMMENDING ASSISTANT BE REMOVED |
WEBLOG | WHITEWINGS GET BACK ON TRACK RIO GRANDE PUTS END TO EDINBURG'S SEVEN-GAME
WINNING STREAK, 9-3 >>

**Judge clarifies lawsuit award City must pay all of $35 million judgment assessed by trial jury**

By FERNANDO DEL VALLE

Valley Morning Star

BROWNSVILLE-- A federal judge Thursday clarified a ruling that orders the city
of Harlingen to pay a $35 million jury verdict.

After a closed-door meeting with lawyers, Mayor Connie de la Garza said the
city will "contest the judgment."

Two weeks after issuing a final judgment, U.S. District Judge Hilda Tagle
clarified her ruling, ordering the city to pay damages as jurors specified
after a February trial.

Tagle also set interest on the judgment amount in the case that stems from a
1998 incident in which a detective's son used a police-issued assault rifle to
kill two U.S. Border Patrol agents and injure a sheriff's deputy.

After a 40-minute executive session meeting scheduled before Tagle's ruling,
de la Garza said city commissioners were calling a special meeting for 7:30
a.m. Monday to request attorneys contest the judgment.

"We will authorize legal counsel to contest the judgment through appropriate
postjudgment motions and through the appeals process as it's the city's right
to do so," he said.

"The City Commission remains confident that the city will be vindicated in our
challenge of the judgment," he said. "We're in unanimous agreement that the
judgment remains disputable and it will be in dispute as long as the city
pursues its legal right to challenge the judgment."

Tagle issued a clarification of her June 28 ruling after plaintiffs filed a
request July 5 that she clarify the ruling. In her original ruling, Tagle
failed to include an order demanding the city pay specific damages.

But plaintiffs had remained confident Tagle's original ruling gave them the
$35 million jury verdict, said Arturo Salinas, father of slain rookie agent
Ricardo Guillermo Salinas.

"I'm not surprised at all," he said. "Harlingen officials have been in denial
since the incident in 1998 and they were in denial about the verdict."

In Thursday's ruling, Tagle ordered the city pay damages as jurors specified
when they handed down their verdict.

In her ruling, Tagle ordered the city pay $10 million to Raul Rodriguez, the
deputy critically injured in the shooting. Tagle also ordered the city pay $10
million to Megan Rodriguez, the daughter of slain agent Susan Lynn Rodriguez,
and $5 million to Gilbert Rodriguez, the agent's husband.

Tagle also ordered the city to pay $2.5 million to each parent of the slain
agents.

In the ruling, Tagle set prejudgment interest at 2.13 percent, designating
Nov. 9, 1998 as the date from which interest would be accrued.

In her June 28 ruling, Tagle ordered a writ of mandamus to demand the city pay

**MOTION TO TRANSFER
EXH. 1M**

COMMENTS                                    http://www.val..,star.com/comments.php?id=P44121_0_1_0_C

damages.

"(C)ity property and monies are exempt from garnishment or forced seizure,"
she wrote. "The appropriate method under Texas law is a writ of mandamus to
order city officials to pay the judgment from general funds or levy and
collect taxes sufficient to pay the judgment."

On Feb. 26, a jury handed down its verdict after the trial in which
plaintiffs' attorneys argued a citizen had requested police destroy the
assault rifle that detective R.D. Moore's son Ernest used in the shootings.

Posted by: DOUG on Jul 22, 02 | 10:23 am | PROFILE

## COMMENTS

name

Email

Location

Homepage



Show email ☐   Remember me ☑

Notify me when someone replies to this post? ☐

SUBMIT    PREVIEW



COMMENTS                                http://www.val..star.com/comments.php?id=P48036_0_1_0_C

<< COUPLE CHARGED IN KILLINGS MOTHER, COMMON-LAW HUSBAND COULD FACE DEATH PENALTY IF GUILTY
|  WEBLOG  |  GUN BATTLE IN STREETS OFFICIALS FEAR CARTEL'S LOSS WILL CAUSE VIOLENT SUCCESSION
WAR >>

### Judgment dismissed City won't have to pay $35 million in shooting of 2 BP agents

By FERNANDO DEL VALLE

Valley Morning Star

BROWNSVILLE-- In a stunning turnaround, a federal judge Thursday dismissed a
$35 million judgment and the case that's tied the city of Harlingen to a legal
roller coaster for nearly five years.

U.S. District Judge Hilda Tagle reversed a previous ruling, dismissing the
case that stems from a 1998 shooting spree in which a detective's son used a
police rifle to kill two U.S. Border Patrol agents and injure a sheriff's
deputy.

Plaintiffs said they would appeal Tagle's ruling to the U.S. Fifth Circuit
Court of Appeals.

In a 22-page order, Tagle wrote she based part of her decision on the Fifth
Circuit's ruling that set aside a case plaintiffs had held as central to their
claim that the city's actions produced "a state-created danger."

The city requested Tagle dismiss the case on March 3 after the U.S. Supreme
Court denied hearing a precedent-setting Mississippi case based on the legal
theory of state-created danger.

"We're extremely pleased," Harlingen Mayor Connie de la Garza said Thursday
evening. Obviously, it will be appealed. We certainly hope, if it is appealed,
the Fifth Circuit and the Supreme Court will agree with our interpretation of
the law."

The $35 million judgment that loomed over the city threatened to hold back
plans for several projects, including a proposed $45 million bond issue that
officials call critical to the city's future.

"This is a new day for us," City Manager Roy Rodriguez said after getting the
news about 4:20 p.m. "When I heard it, I said, Oh, my God, thank you.' This
brings a little normalcy back to our lives and we can move forward with the
business of the city. So many things have been almost on hold."

Despite the stunning ruling, Arturo Salinas, father of slain Border Patrol
agent Ricardo Guillermo Salinas, seemed composed when he said plaintiffs would
appeal the case.

"This obviously leaves us one choice, and that's to appeal," said Boardus
Spivey, the Austin attorney whose legal team consists of a group of top
personal injury lawyers. "This could be the ultimate test. If they'll ever
recognize police-created danger, this is the case," Spivey said, referring to
the Fifth Circuit. Tagle's decision marked the second time she reserved her
rulings in the case.

In August 2001, Tagle dismissed the lawsuit, ruling gunman Ernest Moore could
have used other semiautomatic rifles he kept in a gun vault with his father's
police-issued assault rifle.

In October 2001, Tagle reversed her decision based on the affidavit of Moore's
ex-girlfriend, who testified he regularly practiced with the police-issued
rifle he often kept in his pickup truck.

MOTION TO TRANSFER
— EXH. 1N                                              —

http://www.val... star.com/comments.php?id=P48036_0_1_0_C

Then in February 2002, a jury handed down a $35 million verdict in the case.

In September 2002, the Fifth Circuit dismissed the precedent-setting Mississippi case known as McClendon v. the city of Columbia, in which the plaintiff argued a police detective lent his gun to a police informant who used it to shoot the plaintiff.

"The McClendon decision, and other more recent decisions, dictate that the court set aside the jury's verdict because evidence was not presented that could lead a jury to conclude the city acted with deliberate indifference to constitutional violations," Tagle wrote in the Thursday ruling.

The judge said that negligence alone is "not enough to trigger liability" in a state-created danger theory. Instead, the Fifth Circuit precedent calls for a defendant to act with "deliberate indifference."

While Tagle's ruling states that the state-created danger theory is a viable cause of action, the judge said that there was insufficient evidence in this case to support that argument.

"Namely, no reasonable jury could find the city, by virtue of the policymakers, acted with deliberate indifference..." Tagle wrote. "As such, the jury's verdict cannot stand."

In their case, plaintiffs argued former Police Chief Jim Scheopner, as the department's policy maker, failed to establish written policy in the issuance of police weapons.

Instead, Scheopner ratified a custom through which the department recklessly issued weapons, including the assault rifle a citizen turned over to police for destruction, plaintiffs argued.

When Capt. Joey Vasquez issued detective R.D. Moore the assault rifle, he took the gun home, storing it in a gun vault in his son's room, plaintiffs argued. Both shared keys to the vault, plaintiffs said.

On July 7, 1998, Ernest Moore used the assault rifle to kill Border Patrol agents Ricardo Guillermo Salinas and Susan Lynn Rodriguez and injure Cameron County Sheriff's Deputy Raul Rodriguez.

Posted by: **DOUG** on Mar 14, 03 | 10:23 am | PROFILE

## COMMENTS



name

Email

Location

Homepage

COMMENTS                                    http://www.val..star.com/comments.php?id=P47961_0_1_0_C

<< PADDLING AWAY DUCK RACES ONE OF THE NEWEST ATTRACTIONS AT THE LIVESTOCK SHOW  |  WEBLOG
       |  U.S. STRIKES BOMBS, MISSILES TARGET SADDAM FAMILIES OF TROOPS WATCH, WORRY >>

**Negligence award insured Harlingen's carrier would pay $500,000 if city doesn't appeal**

By FERNANDO DEL VALLE

Valley Morning Star

BROWNSVILLE-- The city's insurance carrier would pay $500,000 in damages
stemming from a state claim if courts uphold a jury's verdict, Harlingen City
Manager Roy Rodriguez said Monday.

Thursday, U.S. District Judge Hilda Tagle dismissed a $35 million federal
claim that stems from a 1998 incident in which a Harlingen detective's son
used a police rifle to kill two U.S. Border Patrol agents and injure a
sheriff's deputy.

But Tagle upheld a state claim for which a jury awarded plaintiffs $500,000,
the maximum under law. Under the Texas Tort Claims Act, a jury decided the
city of Harlingen's reckless negligence led to the shootings.

"That's their total award right now," Rodriguez said.

The city has not determined whether it will appeal the state case, he said.

"We're still considering that," Rodriguez said.

If courts uphold the jury's award, the city's insurance carrier, the Texas
Municipal League, will cover the damages, Rodriguez said.

"That's completely covered," he said.

Under the city's $10 million insurance coverage, the city would pay a $1,000
deductible, he said.

Under state law, plaintiffs claimed Harlingen police exercised reckless
negligence when its officials gave a semiautomatic assault rife to police
detective R.D. Moore, who stored the rifle in a gun vault in his son's room.

In a series of documents, the city filed motions requesting Tagle dismiss the
state claims.

"This court has previously determined the state claims survived defendant's
motions ," Tagle wrote in a footnote to Thursday's court order. "The court
does not, therefore, now revisit arguments concerning the state claims. As a
result, the jury verdict will stand on the state law claims."

In Thursday's order, Tagle dismissed a federal claim for which a jury had
awarded $35 million in damages.

Filed under federal law, the claim based on the legal theory of state-created
danger required a heavier burden of proof than the state claim.

Under the law, plaintiffs were required to show the city exercised a
"deliberate indifference" that directly led to the shootings.

In a 22-page order, Tagle wrote she based part of her decision on the U.S.
Fifth Circuit Court of Appeal's ruling that set aside a case plaintiffs had
held as central to their claim that the city's actions produced "a
state-created danger."

March 3, the city requested Tagle dismiss the case after the U.S. Supreme

**MOTION TO TRANSFER**
**— EXH. 10**                              —

Court denied hearing a precedent-setting Mississippi case based on the legal theory of state-created danger that was central to the Harlingen case.

Tagle's decision marked the second time she reversed her ruling in the case.

In August 2001, Tagle dismissed the lawsuit, ruling gunman Ernest Moore could have used other semiautomatic rifles he kept in a gun vault with his father's police-issued assault rifle.

In October 2001, Tagle reversed her decision based on the affidavit of Moore's ex-girlfriend, who testified he regularly practiced with the police-issued rifle.

But in a February 2002 trial, Julie Lynn Cox failed to distinguish between the police-issued assault rifle and other semiautomatic weapons.

After the trial, a jury handed down a $35 million verdict against the city.

In September 2002, the Fifth Circuit dismissed the precedent-setting Mississippi case known as McClendon v. the city of Columbia, in which the plaintiff argued a police detective loaned his gun to a police informant who used it to shoot the plaintiff.

In their case, plaintiffs argued former Harlingen police chief Jim Scheopner, as the department's policymaker, failed to establish written policy in the issuance of police weapons.

Instead, Scheopner ratified a custom through which the department recklessly issued weapons, including the assault rifle a citizen turned over to police for destruction, plaintiffs argued.

When Capt. Joey Vasquez issued detective R.D. Moore the assault rifle, he took the gun home, storing it in the gun vault he shared with his son, plaintiffs said.

On July 7, 1998, Ernest Moore used the assault rifle to kill Border Patrol agents Ricardo Guillermo Salinas and Susan Lynn Rodriguez and injure deputy Raul Rodriguez.

Posted by: DOUG on Mar 19, 03 | 10:23 am | PROFILE

**COMMENTS**



name

Email

Location

Homepage

## AFFIDAVIT OF ROGER W. HUGHES

STATE OF TEXAS                    §
                                 §
COUNTY OF CAMERON                 §

BEFORE ME, the undersigned Notary Public in and for the State of Texas, on this

day personally appeared ROGER W. HUGHES, known to me to be the person whose name

is subscribed hereto, who being first duly sworn in the manner provided by law, on oath

stated as follows:

1.  My name is ROGER W. HUGHES. I am over the age of 18 years and am competent to make this affidavit. I am associate counsel for the Defendant City of Harlingen in the above styled and referenced case.

2.  On February 7, 2002, I was watching the 10:00 p.m. news on Channel 4, KGBT. Channel 4 is a news station located in Harlingen, Texas. It can be received in Cameron, Willacy and Hidalgo Counties. During the course of the newscast, one of the reporters reported on this case. To the best of my memory, the newscaster was Martha Benavides. To the best of my memory, I recall Ms. Benavides saying words to the effect that after the parties have been engaged in ten months of mediation, that the case had not settled and that the Court had ordered the parties to proceed to trial next week.

3.  I have attempted to obtain a video tape of the broadcast. However, I have been informed that Channel 4's policy is that they do not duplicate copies of broadcast, except in response to a Court's subpoena.

4.  Attached as Exhibit 2 is a true and correct copy of an article that appeared in the *Valley Morning Star* newspaper published on February 7, 2002.

5.  Attached as Exhibit 3 is a true and correct copy of an article that appeared in the *Valley Morning Star* newspaper published on February 8, 2002. Attached as Exhibit 4 is a true and correct copy of an article I downloaded from that newspapers website, www.valleystar.com, the same day.

6.  Attached as Exhibit 5 is a true and correct copy of an article that appeared in the *McAllen Monitor* newspaper published on February 8, 2002. Attached as

Exhibit 6 is a true and correct copy of an article I downloaded from that newspapers website, www.themonitor.com, the same day.

7.   Attached as Exhibit 7 is a copy of an article I downloaded on February 8, 2002, from the website for KURV radio, www.kurv.com. KURV radio is an AM radio station located in Cameron County, broadcasting on AM frequency 710. It has a "talk radio" format and can be received in Cameron, Willacy, and Hidalgo County. Attached as Exhibit. 8, is the People Poll and its results conducted by KURV on the same date; I downloaded Exhibit 8 from the KURV website on February 8 & 9, 2002.

8.   During KURV's 5:00 p.m. news broadcast on February 8, 2002, the two news commentators discussed the People Poll result. I listened to it. Attached as Exhibit 9 is a transcript of the discussion prepared by my secretary from a tape of the broadcast and reviewed by me for accuracy. It it is correct except that the tape ended during the discussion and had to be flipped over to record the remainder; this caused about 10 seconds not to be recorded.

9.   The above and foregoing is true to my personal knowledge.

ROGER W. HUGHES

SWORN TO AND SUBSCRIBED before me, the undersigned authority, by the said Affiant, on the _____ day of February, 2002, to certify which witness my hand and seal of office.

RITA BALLI
Notary Public
State of Texas
My Comm. Exp. 03-14-2005

Notary Public, State of Texas
Printed Name: _Rita Balli_
My Commission Expires: _03-14-05_



Powell talks tough about Iraq / Page C6

# Valley Morning St

Serving the
Rio Grande Valley

**THURSDAY, FEBRUARY 7, 2002**     www.valleystar.com

# City bar district takes a

## Owners say their businesses are unfairly targeted

By FERNANDO DEL VALLE
Valley Morning Star

HARLINGEN — City commissioners Wednesday took sweeping action in a campaign to clean up the city's old bar district, shutting down one of the area's biggest saloons and imposing a moratorium on bar permits there.

In a meeting, commissioners denied La Tejana Bar's request for a liquor license renewal.

In another move, they denied a bar permit to a woman who applied to open a saloon at the site of the old Laredo Bar, which the city closed after it denied a request for a liquor license renewal in December.

But commissioners approved three requests to open bars in other parts of town.

Before a crowd that packed commission chambers, a lawyer representing La Tejana Bar accused city officials of targeting the area known as La Placita.

"We're not singling out La Tejana. We're singling out the incidents that occur there," said Roy Alvarez, chairman of the La Placita Advisory Board, the citizens committee that oversees the an overlay of people Alvarez said. the crime A city for 45 from January

# Mediat talks fi

## City, plaintiffs end shooting death of

By FERNANDO DEL VALLE
Valley Morning Star

BROWNSVILLE — After about 10 hours of negotiations, Harlingen officials and plaintiffs Wednesday evening failed to reach a settlement in the $20 million lawsuit that claims a detective's son deliberately picked a police-issued rifle to kill two U.S. Border Patrol agents and injure a sheriff's deputy.

"The parties went in there in good faith and it didn't happen," City Manager Roy Rodriguez said Wednesday night.

A pre-trial hearing is set for 1:30 p.m. today in U.S. District Court.

The case will go to trial Monday.

At city hall, officials were anxiously awaiting the outcome of the mediation hearing between Tom Lockhart, the city's insurance attorney, plaintiffs' attorneys Broadus Spivey and Sonia Lopez and the families of victims of the 1998 shootings.

"There's a lot of anxiety, I'm

sure on said T

The began and ran

Faced suit in t Mayor said Tu the city into me we can all."

But Border Lynn R Guillern said the case out planned of there for the repeate views.

Both James I judge of of Texas for the District court d

"Our
**Please**

VIDEO SLOT MACHINE: Joey Eddeek sits near the video slot machines inside his convenience store in Harlingen, where many people play the arcade games. After police raids at some Harlingen, San Benito and Brownsville arcades, some of the facilities closed, leaving the false impression that all the shops were operating illegally.

Star photo by Chesly De La Garza

Exh. 2

# A Different Spin

## Gambling arcades close for fear of losing machines

Austin, said that gambling is a local

# :ley Morning Star

www.valleystar.com

**50 cents**

# r district takes a hit

## :rs say their businesses are unfairly targeted

: jana Bar's request for a renewal.
:move, they denied a bar woman who applied to n at the site of the old which the city closed d a request for a liquor

license renewal in December.

But commissioners approved three requests to open bars in other parts of town.

Before a crowd that packed commission chambers, a lawyer representing La Tejana Bar accused city

officials of targeting the area known as La Placita.

"We're not singling out La Tejana. We're singling out the incidents that occur there," said Roy Alvarez, chairman of the La Placita Advisory Board, the citizens committee that

oversees the area the city designated an overlay district in 1999.

"We're trying to improve the types of people coming through the area," Alvarez said. "We're trying to reduce the crime incidence we're having."

A city investigation cited the bar for 45 public intoxication arrests from January to November 2001, said

**Please see 'BARS,' Page A8**



- Star photo by Christy De La Garza

:video
:ngen,
:olice.

raids at some Harlingen, San Benito and Brownsville arcades, some of the facilities closed, leaving the false impression that all the shops were operating illegally.

# :erent Spin

## :ose for fear of losing machines

Austin, said that gambling is a local

# Mediation talks fizzle

## City, plaintiffs end talks in shooting death of BP agents

**By FERNANDO DEL VALLE**
Valley Morning Star

BROWNSVILLE — After about 10 hours of negotiations, Harlingen officials and plaintiffs Wednesday evening failed to reach a settlement in the $20 million lawsuit that claims a detective's son deliberately picked a police-issued rifle to kill two U.S. Border Patrol agents and injure a sheriff's deputy.

"The parties went in there in good faith and it didn't happen," City Manager Roy Rodriguez said Wednesday night.

A pre-trial hearing is set for 1:30 p.m. today in U.S. District Court.

The case will go to trial Monday.

At city hall, officials were anxiously awaiting the outcome of the mediation hearing between Tom Lockhart, the city's insurance attorney, plaintiffs' attorneys Broadus Spivey and Sonia Lopez and the families of victims of the 1998 shootings.

"There's a lot of anxiety, I'm

sure on both sides," Rodriguez said Tuesday evening.

The mediation hearing began at 8 a.m. Wednesday and ran until 5:45 p.m.

Faced with the biggest lawsuit in the city's recent history, Mayor Connie de la Garza said Tuesday that it was "in the city's best interest to go into mediation and hopefully we can settle this once and for all."

But the families of slain Border Patrol agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas repeatedly said they would not settle the case out of court. Instead, they planned to go to trial "to get to the truth," Arturo Salinas, the father of the rookie agent, repeatedly said in past interviews. "It's not about money."

Both parties chose Judge James De Anda, former chief judge of the Southern District of Texas, to serve as mediator for the hearing at the U.S. District Courthouse here, court documents show.

"Our insurance representa-
**Please see 'MEDIATE,' Page A8**



WINE Mix or Match
3 bottles .750 **10% off**

ray Gin 1.75 94.6°  $28.99

Vodka
$7.98

Job Beer
? bottles  $3.99

d.

MCALLEN
1810 S. 10th
3010 N. 10th

SOUTH
PADRE ISLAND
1514 Padre Blvd.

www.valleyspirits.com   VALLEYWIDE

FELDMAN'S — 5 OF THE WEEK • SPECIAL OF THE WEEK • SPECIALS OF THE W

**MEDIATE** / Mediation talks fizzle

**Continued from Page A1**

tives along with (the plaintiffs') legal counsels have mutually agreed to mediation," de la Garza said Tuesday.

Before entering the mediation hearing, plaintiffs' lawyers remained prepared to take their case to trial.

"We're getting ready to go to trial on Monday — definitely," said Lopez, the Edinburg lawyer representing Cameron County Sheriff's Deputy Raul Rodriguez, who was critically injured in the shootout.

If the plaintiffs win the requested $20 million judgment, the city's insurance premium, carried by the Texas Municipal League, would cover as many as $10 million in damages.

It was the second time the parties failed to settle the case out of court.

In December 1998, the parties entered into mediation, failing to reach a settlement after seven hours of negotiations.

On July 7, 1998, Ernest Moore used his father's police-issued assault rifle to kill the two Border Patrol agents and injure the sheriff's deputy. In 1995, a citizen turned over the semiautomatic rifle to police for destruction. But detective R.D. Moore took the rifle home.

In their lawsuit, plaintiffs charge Ernest Moore deliberately picked his father's police-issued rifle because practice had made him comfortable with the weapon.

But the city argues Ernest Moore could have used other semiautomatic rifles stored in the gun vault in his bedroom.

On Aug. 2, U.S. District Judge Hilda Tagle dismissed the federal lawsuit, ruling Ernest Moore could have used another semiautomatic rifle in the shootings.

But on Oct. 19, Tagle reversed her decision based on the testimony of Moore's ex-fiancée, Julie Lynn Cox, who claimed Moore regularly practiced with the police-issued rifle and kept the gun in his pickup.

**ARCADES** / Gambling

**Continued from Page A1**

mately $15. Each ticket he received in exchange is equivalent to $1. The player could exchange the tickets for food, gas and merchandise at the store.

"They are not here to get rich or the gambling part of it. They have a little time to spare," Eddeek said.

A man playing the video slot machine at Joe's Quick Stop, who asked to remain anonymous, said he has won a television and a VCR.

Eddeek said that after gambling arcades offering money started opening in the area, he lost about 50 percent of his clientele.

The illegal gambling machines also affected Valley Race Park.

Charlie McIntosh, director of operations for VRP, said the track is at a disadvantage because it is regulated by the Texas Leasing Commission and can't operate such gambling machines.

That disadvantage disappeared with the seizure of many of the illegal slot machines.

McIntosh said that Wednesday was VRP's best day since it opened for the season in November. Attendance was more than 1,500.

The boost in attendance he attributes directly to the closing of some gambling arcades.



*winter apparel*
SALE

# SAVE 75%
**America's favorite Designer Sweaters**
Save on a collection of wear-now designer winter sweaters in lots of colors and styles.
Orig. $49-$118. **now 24.50-59.00.**

# SAVE 50%
**All-American Designer Sweaters**
A great selection of crewnecks and V-necks in solids or stripes with flag logo detailing.
Orig. $59-$89. **now 29.50-44.50.**

# SAVE 50%
**Westbound Knits**
Choose from mocknecks, turtlenecks and scrunchnecks in assorted colors and styles for the winter weather. Orig. $18. **now 9.00.**

# SAVE 50%
**Joan Leslie Career Sportswear**
Great savings on career jackets, pants, skirts, blouses and knits.
Orig. $40-$80. **now 20.00-40.00.**

# SAVE 50%
**Bechamel Novelty Knit Dressings**
Select from a large assortment of fall novelty knit tunics, henleys and cardigans.
Orig. $28-$48. **now 14.00-24.00.**

m shown represents department and may no longer be available.
tage savings based on original prices. All items subject to prior sale.

a, MasterCard, American Express, Discover or Diners Club card.
? P.M.; SUNDAY, NOON TO 6 P.M. - Valle Vista Mall - 428-8181



# Dillard's


Lawsuit claims contaminated water supply caused miscarriages — Page A2

Serving the
Rio Grande Valley

# Valley Morning Star

FRIDAY, FEBRUARY 8, 2002

www.valleystar.com

50 cents

## Trial set in shooting deaths

### Judge rules on what evidence can be presented

By FERNANDO DEL VALLE
Valley Morning Star

BROWNSVILLE — A federal judge Thursday told attorneys she would allow plaintiffs to present evidence that shows a detective's son may have been influenced by Nazi doctrine when he killed two U.S. Border Patrol agents and injured a sheriff's deputy.

In a pre-trial hearing, U.S. District Judge Hilda Tagle said she would also allow plaintiffs to present a city consultant's report that found police officials violated standard policy when

they allowed the semiautomatic rifle to reach the hands of Ernest Moore.

The plaintiffs' attorney, Broadus Spivey, told Tagle he could call as many as 32 witnesses to the stand.

In the 90-minute hearing, Tom Lockhart, the city's insurance attorney, requested Tagle consider moving

the trial to another part of the state because the Valley Morning Star's coverage of the case could influence jurors. Tagle said she would determine if media coverage influenced jurors after attorneys select a jury Monday.

As attorneys examined evidence in the case, Lockhart requested that

Please see 'TRIAL,' Page



# TECHNOLOGY ON PARADE



## Blaze leaves famil- in nee[d]

16 people lived, home destroyed by deadly fire

By VANESA SALINAS
Valley Morning Star

SANTA ROSA — Moreno feels devastated th[at] she will no longer see her 1[ ]year-old brother roam arou[nd] her house.

Ramon Garza Jr. died ea[rly] Wednesday morning in house fire. He was the thi[rd] youngest of 20 brothers [and]

Exh. 3

## TRIAL / Trial date set in shooting deaths

Continued from Page A1

Tagle block the plaintiffs' plan to present evidence that allows Moore was an avid collector of Nazi paraphernalia.

"What that would only do is taint the jury (to believe) that this was a hate crime, a race crime," Lockhart told Tagle. "That is so volatile an issue that it can so inflame a jury."

Before Moore shot the three officers outside his parents' San Benito home, he broke into fiancee's boyfriend, Dan Morin, and critically wounded his mother and sister.

"There's no question Moore had all kinds of World War II memorabilia in his room," Lockhart said. "There's no question he had more Nazi stuff than anything else. But that was a crime of passion."

But Price Ainsworth, the plaintiffs' attorney, argued it was critical to show jurors that, despite Moore's mental state, police allowed the police-issued rifle to fall into his hands.

"His thought process, beliefs go to this cause of action," Ainsworth told Tagle. "This gun was put in the hands of this deranged man."

Tagle also allowed plaintiffs to present city consultant James Roberson's report that found police officials violated standard policies in the chain of custody of the rifle that a citizen turned over to the police department for destruction in 1995.

But Tagle said she would not allow plaintiffs' attorneys to suggest to jurors that the police department deliberately erased the tapes recorded on the morning of the shootings.

In 1995, the police department provided a Texas Rangers investigation with the tapes before they were reused, Lockhart told Tagle.

The suggestion that the police department deliberately erased the tapes would create a "prejudicial effect," Lockhart said.

"There's no evidence they did it in bad faith," he said. "They reuse tapes. It was their routine."

Wednesday, city officials and plaintiffs failed to settle the case out of court after about 10 hours of negotiations in a court-ordered mediation hearing.

On July 7, 1998, Ernest

Moore used his father's newly issued assault rifle to kill Border Patrol agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas and FBI sheriff's deputy Raul Rigoroz.

In 1995, a citizen turned over the semiautomatic rifle to police for destruction. R.D. Moore took the rifle home, where his son kept it in a gun vault in his room.

In their lawsuit, plaintiffs charge Ernest Moore deliberately chose his father's semiautomatic rifle for the shooting because practice has made him comfortable with the weapon.

But the city argues Ernest Moore could have used another semiautomatic rifle stored in the gun vault he shared with his father.

On Aug. 2, Tagle dismissed the federal lawsuit, ruling Ernest Moore could have used another semiautomatic rifle in the shootings.

But on Oct. 19, she reversed her decision based on the testimony of Moore's fiancee, Julie Lynn Cox, who claimed he regularly practiced with the police-issued rifle kept the gun in his gun truck.

## DEBATE / Morales ready to debate Sanchez on TV

Continued from Page A1

office were not returned.

Previously, Sanchez said he would appear in two TV debates, one in English and one in Spanish. Morales said he wants a minimum of six.

Spanish language channels Univision and Telemundo are trying to host the Spanish-language debate.

Emilio Nicolas Jr., general manager and executive producer of Telemundo's San Antonio station KVDA-TV, said he was ready to host a debate and had a panel of experienced reporters lined up.

"As we near April for the candidates to confirm their participation," Nicolas said. "This year pays in Texas history is in

Previously, Sanchez said he would appear in two TV debates, one in English and one in Spanish. Morales said he wants a minimum of six.

raphical theme, he refers to his period as Texas attorney general and the $17 billion legal victory he won over the tobacco industry. "The largest damage award in American history for Texas children," Morales said.

Sanchez, a Laredo businessman, garnered 35 percent in the likely Democratic primary voters while Morales got 33 percent.

A Wexahachie businessman Bill Lyon was selected by 5 percent of those polled, while Houston lawyer John W. laFrance had 6 percent.

Seventeen percent of voters remained undecided

would be aired on 5 stations during the last weeks of the campaign.

Meanwhile, the authentic poll in the gubernatorial race, conducted Survey USA and released Wednesday by KSAT-TV San Antonio, shows Sanchez and Morales in a statistical dead heat.



Albertson's

3 Days Only!

FRI. FEB. 8 THRU SUN. FEB. 10

Boneless New York Strip Steak
In Our Butcher Block
Your Choice

Small Cooked Shrimp
In Our Butcher Block
BONUS BUY

4.99 lb.

SAVE UP TO $5.00 LB.

Large Roma Tomatoes
69¢ lb.
BONUS BUY
SAVE 40¢ LB.

Valley Morning Star - News                                    wysiwyg://57/http://www.valleystar.com/files/n202081.hi...





## NEWS

Full Site Index

E-mail t

**FEATURES**

**CLASSIFIEDS**

**BUSINESS DIRECTORY**

**AUTOFINDER**

**RGV REAL ESTATE LOCATOR**

**"CAREER CONNECTIONS"**

**ONLINE COUPONS**

**PAY YOUR TRAFFIC TICKETS ONLINE**

**SUBSCRIBE TO VALLEY MORNING STAR**

**SECTIONS**

**NEWS**

**WORLD NEWS**

**SPORTS**

**BUSINESS**

**OPINION**

**RIOLIVING**

**TECHNOLOGY**

**HEALTH**

**OBITUARIES**

**CONTACT US**

**GUEST BOOK**

**TOWN HALL**

**ONLINE**

Updated Thursday, February 07, 2002 23:33:53 CST

## Trial set in shooting deaths

### Judge rules on what evidence can be presented

**By FERNANDO DEL VALLE**
Valley Morning Star

BROWNSVILLE — A federal judge Thursday told attorneys she would allow plaintiffs to present evidence that shows a detective's son may have been influenced by Nazi doctrine when he killed two U.S. Border Patrol agents and injured a sheriff's deputy.

In a pre-trial hearing, U.S. District Judge Hilda Tagle said she would also allow plaintiffs to present a city consultant's report that found police officials violated standard policy when they allowed the semiautomatic rifle to reach the hands of Ernest Moore.

Tagle set jury selection for Monday in the case that stems from a $20 million lawsuit. She set the trial for Feb. 19.

The plaintiffs' attorney, Broadus Spivey, told Tagle he could call as many as 32 witnesses to the stand.

In the 90-minute hearing, Tom Lockhart, the city's insurance attorney, requested Tagle consider moving the trial to another part of the state because the Valley Morning Star's coverage of the case could influence jurors. Tagle said she woul determine if media coverage influenced jurors after attorneys select a jury Monday.

As attorneys examined evidence in the case, Lockhart requested that Tagle block the plaintiffs' plan to present evidence that shows Moore was an avid collector of Nazi paraphernalia.

"What that would only do is taint the jury (to believe) that this was a hate crime, a race crime," Lockhart told Tagle. "That is so volatile an issue that it can so inflame a jury."

Before Moore shot the three officers outside his parents' San Benito home, he broke into the Rio Hondo home of his ex-fiancée's boyfriend, Dan Morin, and mortally wounded his mother and sister.

"There's no question Moore had all kinds of World War II memorabilia in his room," Lockhart said. "There's no question he had more Nazi stuff than anythin else. But that was a crime of passion."

But Price Ainsworth, the plaintiffs' attorney, argued it was critical to show juror that despite Moore's mental state, police allowed the police-issued rifle to fall

Ex\. 4

Valley Morning Star - News

wysiwyg://57/http://www.valleystar.com/files/n202081.ht

**ONLINE**

**RIOSUN**

**VALLEYSTAR FORUM**

**RIO RUN NEWS**

that despite Moore's mental state, police allowed the police-issued rifle to fall into his hands.

"His thought process, beliefs go to this cause of action," Ainsworth told Tagle. "This gun was put in the hands of this deranged man."

Tagle also allowed plaintiffs to present city consultant James Robenson's report that found police officials violated standard policies in the chain of custody of the rifle that a citizen turned over to the police department for destruction in 1995.

But Tagle said she would not allow plaintiffs' attorneys to suggest to jurors that the police department deliberately erased police audiotapes recorded on the morning of the shootings.

The police department provided a Texas Rangers investigation with the tapes before they were reused, Lockhart told Tagle.

The suggestion that the police department deliberately erased the tapes would create a "prejudicial effect," Lockhart said.

"There's no evidence they did it in bad faith," he said. "They reuse tapes. It was their routine."

Wednesday, city officials and plaintiffs failed to settle the case out of court after about 10 hours of negotiations in a court-ordered mediation hearing.

On July 7, 1998, Ernest Moore used his father's police-issued assault rifle to kill Border Patrol agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas and injure sheriff's deputy Raul Rodriguez.

In 1995, a citizen turned over the semiautomatic rifle to police for destruction. But detective R.D. Moore took the rifle home, where his son kept it in a gun vault in his room.

In their lawsuit, plaintiffs charge Ernest Moore deliberately chose his father's police-issued rifle for the shootings because practice had made him comfortable with the weapon.

But the city argues Ernest Moore could have used other semiautomatic rifles stored in the gun vault he shared with his father.

On Aug. 2, Tagle dismissed the federal lawsuit, ruling Ernest Moore could have used another semiautomatic rifle in the shootings.

But on Oct. 19, Tagle reversed her decision based on the testimony of Moore's ex-fiancée, Julie Lynn Cox, who claimed he regularly practiced with the police-issued rifle and kept the gun in his pickup truck.

E-ma

©2000, Valley Morning Star, a Freedom Communications, Inc. Company. All rights res

This article appeared in the Valley Morning Star, the Rio Grande Valley's ne
Subscribe to Valley Morning Star.

# THE MONITOR

# VALLEY & STATE

**FRIDAY, FEBRUARY 8, 2002**

SECTION C
Obituaries: 2C
PSJA Monitor: 3C
Weather: 12C

**MARDI GRAS**
Austin woman organizing bare breast protest for fest: 11C

□ BORDER PATROL SLAYINGS

## Judge: Nazi memorabilia is admissible

By **FERNANDO DEL VALLE**
Valley Freedom Newspapers

BROWNSVILLE — A federal Judge Thursday told attorneys she would allow plaintiffs to present evidence that shows a detective's son might have been influenced by Nazi doctrine when he killed two U.S. Border Patrol agents and injured a deputy sheriff.

In a pre-trial hearing, U.S. District Judge Hilda Tagle said she would also allow plaintiffs

to present a city consultant's report that found police officials violated standard policy when they allowed the semiautomatic rifle to reach the hands of Ernest Moore.

Tagle set jury selection for Monday in the case that stems from a $20 million lawsuit. She set the trial for Feb. 19.

Plaintiffs' attorney Broadus Spivey told Tagle he could call as many as 32 witnesses to the stand.

In the 90-minute hearing,

Tom Lockhart, the city's insurance attorney, requested Tagle consider moving the trial to another part of the state because the *Valley Morning Star's* coverage of the case could influence jurors. Tagle said she would determine if media coverage influenced jurors after attorneys select a jury Monday.

As attorneys examined evidence in the case, Lockhart requested that Tagle block the plaintiffs' plan to present evidence that shows Moore was an

avid collector of Nazi paraphernalia.

"What that would only do is taint the jury (to believe) that this was a hate crime, a race crime," Lockhart told Tagle. "That is so volatile an issue that it can so inflame a jury."

Before Moore shot the three officers outside his parents' San Benito home, he broke into the Rio Hondo home of his exfiancée's boyfriend, Don Morin, and finally wounded his mother and sister.

"There's no question Moore had all kinds of World War II memorabilia in his room," Lockhart said. "There's no question he had more Nazi stuff than anything else. But that was a crime of passion."

But Price Ainsworth, the plaintiffs' attorney, argued it was critical to show jurors that despite Moore's mental state, police allowed the police-issued rifle to fall into his hands.

"His thought process, beliefs go to this cause of action,"

Ainsworth told Tagle. "This gun was put in the hands of this deranged man."

Tagle also allowed plaintiffs to present city consultant Jo Robenson's report that found police officials violated standard policies in the chain of custody of the rifle that a citizen turned over to the police department for destruction in 1995.

But Tagle said she would not

See **SLAYINGS** page 12C



□ GOVERNMENT

# HOMEWORK HELPERS

## Workshop strengthens relations between

Exh. 5

□ FATALITY

# Family tries to rebuild after house fire

By VANESA S. LINAS
Valley Freedom Newspapers

SANTA ROSA — Lisa Moreno feels devastated that she will no longer see her 18-year-old brother around her house.

Ramon Garza Jr. died early Wednesday morning in a house fire. He was the third-youngest of 20 brothers and sisters and the family's baby boy. Sixteen people lived in the house located on Pomelo Road.

The family said Ramon, whom they call "Pollo," believed his mother was trapped in the burning house and went back inside to rescue her, only to die in the smoke and flames. His mother had escaped, but was on another side of the house, outside while he went back inside.

The residence was declared a total loss. All that remains of the house is charred black wood.

Since her family does not have a place to stay, Moreno decided to take them all into her home. She will provide shelter to her parents, sisters, brother-in-laws and nieces and nephews as long as they need.

The Garza family is in terrible need. They lost everything in the house.

Thursday evening, friends and family joined the Garza family in Moreno's home for a rosary in honor of the 18-year-old.

So many people showed up that they overflowed the home.

Many stood outside in the cold, lending emotional support to the family.

Moreno said that it's hard to cope with the death of her 6-foot-2-inch brother, but it is also difficult since they don't know what caused the fire.

Moreno said that her family, who had been living in their home for seven years, must start from scratch and build a new home on the same site.

An account has been set up for the family at Texas State Bank.

# Slayings Continued from page 1C

allow plaintiffs' attorneys to suggest to jurors that the police department deliberately erased police audiotapes recorded on the morning of the shootings.

The police department provided a Texas Rangers' investigation with the tapes before they were reused, Lockhart told Tagle.

The suggestion that the police department deliberately erased the tapes would create a "prejudicial effect," Lockhart said.

"There's no evidence they did

it in bad faith," he said. "They reuse tapes. It was their routine."

Wednesday, city officials and plaintiffs failed to settle the case out of court after about 10 hours of negotiations in a court-ordered mediation hearing.

On July 7, 1998, Ernest Moore used his father's police-issued assault rifle to kill Border Patrol agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas and injure deputy sheriff Raul Rodriguez.

In 1995, a citizen turned over the semiautomatic rifle to police for destruction. But detective R.D. Moore took the rifle home, where his son kept it in a gun vault in his room.

In their lawsuit, plaintiffs' charge Ernest Moore deliberately chose his father's police-issued rifle for the shootings because practice had made him comfortable with the weapon.

But the city said that Ernest Moore could have used other

semiautomatic rifles stored in the gun vault he shared with his father.

On Aug. 2, Tagle dismissed the federal lawsuit, ruling Ernest Moore could have used another semiautomatic rifle in the shootings.

But on Oct. 19, Tagle reversed her decision based on the testimony of Moore's ex-fiancée, Julie Lynn Cox, who claimed he regularly practiced with the police-issued rifle and kept the gun in his pickup.

# Learn Continued from page 1C

Nationally, Project Learn began in 1999 and is sponsored by the Boys & Girls Clubs of America and J.C. Penney Co.

26th street locations. Virginia Lovelace, a special education teacher at Dr. Carlos Castañeda Elementary School in McAllen,

their tutoring folders, which are filled with exercises aimed at reinforcing weak academic areas. Lovelace compiles the

benefits outweigh any playtime during the day," Boys & Girls Club executive director Belinda Cowan said.

ACCU WEATHER

Texas

North Texas:
Sunshine will dominate the area. Tonight will be also. Tonight will be clear to partly cloudy and breezy

West Texas:
Sunshine today with a breezy and warm afternoon. Tonight will be a partly northwest wind.

South Texas:
Today will be mostly sunny with a cool morning and a nice afternoon. Tonight will be mainly clear with big late.

Mexico

Five-Day Forecast for the

| Today | Saturday | Sunday |
|---|---|---|
| Mostly sunny with a nice afternoon. | Morning fog, then warm with some sun. | Breezy, cooler, nice sun. |
| ▲74 ▼50 | ▲80 | ▲60 |

Almanac

The Monitor - Local - Judge: Nazi memorabilia is admissible     wysiwyg://39/http://www.themonitor...ories/2002/02/08/10131777202.shtml

 **themonitor.com**      Helping you write the story of your life

| Home | | |
|---|---|---|
| **Home** | Home | Friday February 8, 2002 |

Home
News
- Local
- State/Nation
- Sports
- Business
- Opinion
- Obituaries
- Letters
- Politics
- Entertainment
- Weather
- Columnists
- Last 7 Days
- Photo Gallery
- Talk Back
- Archive Search
Marketplace
- Classifieds
- Place an Ad
- Special Sections
- myRGV.com
- Web Development
Autos
- Buy a Car
- Car Info
Entertainment
- Festiva
- Local Links
- Event Calendar
Careers
- Job Openings
- Employers
- Post Resumes
The Monitor
- Subscribe
- Terms of Use
- Privacy Policy
- About Us
- Contact Us
- Job Openings

The Monitor
1101 Ash Avenue
McAllen, Texas
78501
956-686-4343
800-366-4343
Email
Copyright © 2001

**Local News**

Friday, February 8, 2002 8:15 am

## Judge: Nazi memorabilia is admissible

By FERNANDO DEL VALLE
Valley Freedom Newspapers
BROWNSVILLE — A federal judge Thursday told attorneys she would allow plaintiffs to present evidence that shows a detective's son might have been influenced by Nazi doctrine when he killed two U.S. Border Patrol agents and injured a deputy sheriff.

In a pre-trial hearing, U.S. District Judge Hilda Tagle said she would also allow plaintiffs to present a city consultant's report that found police officials violated standard policy when they allowed the semiautomatic rifle to reach the hands of Ernest Moore.

Tagle set jury selection for Monday in the case that stems from a $20 million lawsuit. She set the trial for Feb. 19.

Plaintiffs' attorney Broadus Spivey told Tagle he could call as many as 32 witnesses to the stand.

In the 90-minute hearing, Tom Lockhart, the city's insurance attorney, requested Tagle consider moving the trial to another part of the state because the Valley Morning Star's coverage of the case could influence jurors. Tagle said she would determine if media coverage influenced jurors after attorneys select a jury Monday.

As attorneys examined evidence in the case, Lockhart requested that Tagle block the plaintiffs' plan to present evidence that shows Moore was an avid collector of Nazi paraphernalia.

"What that would only do is taint the jury (to believe) that this was a hate crime, a race crime," Lockhart told Tagle. "That is so volatile an issue that it can so inflame a jury."

Before Moore shot the three officers outside his parents' San Benito home, he broke into the Rio Hondo home of his ex-fiancée's boyfriend, Dan Morin, and fatally wounded his mother and sister.

"There's no question Moore had all kinds of World War II memorabilia in his room," Lockhart said. "There's no question he had more Nazi stuff than anything else. But that was a crime of passion."

But Price Ainsworth, the plaintiffs' attorney, argued it was critical to show jurors that despite Moore's mental state, police allowed the police-issued rifle to fall into his hands.

"His thought process, beliefs go to this cause of action," Ainsworth told Tagle. "This gun was put in the hands of this deranged man."

Tagle also allowed plaintiffs to present city consultant James Robenson's report that found police officials violated standard policies in the chain of custody of the rifle that a citizen turned over to the police department for destruction in 1995.

But Tagle said she would not allow plaintiffs' attorneys to suggest to jurors that the police department deliberately erased police audiotapes recorded on the morning of the shootings.

The police department provided a Texas Rangers' investigation with the tapes before they were reused, Lockhart told Tagle.

The suggestion that the police department deliberately erased the tapes would create a "prejudicial effect," Lockhart said.

"There's no evidence they did it in bad faith," he said. "They reuse tapes. It was their routine."

Wednesday, city officials and plaintiffs failed to settle the case out of court after about 10 hours of negotiations in a court-ordered mediation hearing.

On July 7, 1998, Ernest Moore used his father's police-issued assault rifle to kill Border Patrol agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas and injure deputy sheriff Raul Rodriguez.

*Exh. 6*

In 1995, a citizen turned over the semiautomatic rifle to police for destruction. But detective R.D. Moore took the rifle home, where his son kept it in a gun vault in his room.
In their lawsuit, plaintiffs' charge Ernest Moore deliberately chose his father's police-issued rifle for the shootings because practice had made him comfortable with the weapon.
But the city said that Ernest Moore could have used other semiautomatic rifles stored in the gun vault he shared with his father.
On Aug. 2, Tagle dismissed the federal lawsuit, ruling Ernest Moore could have used another semiautomatic rifle in the shootings.
But on Oct. 19, Tagle reversed her decision based on the testimony of Moore's ex-fiancée, Julie Lynn Cox, who claimed he regularly practiced with the police-issued rifle and kept the gun in his pickup.

## LOCAL NEWS

Mission woman files suit in Alamo water case

STCC enrollment increases from last year

Four Enron execs plead the Fifth

Judge: Nazi memorabilia is admissible

Homework Helpers

Workshop strengthens relations between police, deaf

Democratic candidate gave to Perry camp

Truan moves to help Muñoz with lien

Area football players ink college deals



© Copyright The Monitor and Freedom Interactive Newspapers of Texas, Inc.
Contents of this website may not be reproduced without written permission from The Monitor and Freedom Interactive Newspapers of Texas, Inc.
About Us | Contact Us | Terms of Use | Privacy Policy

## Jury Selection To Start In Harlingen Lawsuit
by KURV News-Tim Sullivan





[Harlingen] - Jury selection will begin Monday in a 20-million-dollar lawsuit against the city of Harlingen stemming from the 1998 shooting deaths of two Border Patrol agents. Also, Federal Judge Hilda Tagle says she may rule Monday on a motion to move the trial to another part of the state. Attorneys for the city argue pre-trial publicity could prevent the selection of an impartial jury. Yesterday, Judge Tagle ruled plaintiffs' attorneys may present as evidence a city consultant's report that found police officials violated department policy in failing to destroy a semi-automatic rifle that a citizen had turned in for destruction. Instead, police detective R-D Moore took it home. It wound up in the hands of his son, Ernest Moore, who used it to ambush two Border patrol agents and a Cameron County sheriff's deputy. An attempt to reach an out-of-court settlement this week was unsuccessful

CLOSE WINDOW

Exh. 8

KURV.COM - PEOPLE POLL - RESULTS                          wysiwyg://7/http://www.kurv.com/cgi-bin/QQ/QQpro.cgi?vote

ON THE AIR
DR. DEAN EDELL
SAT 12P-3P (CT)

Febr

Today's People Poll                                                    SECUR

"KURV - People Poll"
"Should the lawsuit over the 1998 shooting deaths of two Border Patrol agents be settled out

Choices:                        Results:
Yes:                            62%
No:                             38%
>>Previous Polls

Home | News | Weather | Talk Shows | Agri-Business | Sports | Programming | Sales | Departments

Ex4 9

KURV.COM - PEOPLE POLL



KURV.COM - PEOPLE POLL

wysiwyg://22/http://www.kurv.com/ppoll.html



**ON THE AIR**
THE DRIVE HOME
M-F 5P-6P (CT)

**Wanna New Chevy Truck?**

Today's People Poll

**SECURITY** LAND TITLE CO

**KURV - People Poll**
Should the lawsuit over the 1998 shooting deaths of two Border Patrol agents be settled out of court?

○ Yes.

○ No.

**VOTE!**

Vote to see results
Previous Polls

Home | News | Weather | Talk Shows | Agri-Business | Sports | Programming | Sales | Departments

## PEOPLE'S POLL - KURV, 710 AM
### FRIDAY, FEBRUARY 8, 2002

**Tim Sullivan:** OUR PEOPLE POLL QUESTION FOR THE DAY:

Should the lawsuit over the 1998 shooting deaths of two Border Patrol agents be settled out of court?  383-8255, # 710 on your Sprint PCS and voice your views on the air with us this afternoon.

This People Poll made possible by Tom Wingate and Staff at Security Land Title.  And admittedly, it , I guess almost four years after the fact, it's still a very touchy issue here. There have been a couple of attempts to settle this out of court.  The first just a few months after the incident, but a second one just this week, in fact.  And that's of that, despite that Plaintiffs maintaining they do not want a settlement.  They want the "truth" as they say to come out in the courtroom.

Harlingen Mayor Connie de la Garza reporting to the Valley Morning Star this week as saying going into mediation would be in the City's best interest.

**Sergio Sanchez:** Well there is a lot of information that would remain sealed, would remain private, I am sure, if this trial does not come.  But, I wonder if that's the motivation behind most folks saying "no."  It is almost 50 - 50 here.  I am surprised. It is half and half.

I would have suspected that the majority of everyone would have said, "yeah, let's get this settled out of Court."

**Tim Sullivan:**  Well, 53% say yes, . . .

**Sergio Sanchez:** Its split 50 -50.  Half say yes, the other half say no we should go ahead and let this thing go to trial and see what comes of it.  I wonder it that's the motivation behind it.  See, to try and get more information out.  To see the whole story, and to know the whole truth.  Or whatever truth still needs to be discovered here.

**Tim Sullivan:**Yeah.  There has been a lot of publicity, pre-trial publicity as they call it and right now that is making both sides keep quiet.  At least right now.  Neither side saying much any more, what with jury selection to start on Monday.

The City's lawyer. . .

**Sergio Sanchez:**  With so much publicity down here, do you think they can get a jury that is impartial of this?

**Tim Sullivan:**  Well, we'll find out Monday.  I think the judge will select the panel on Monday and after that Federal Judge Hilda Tagle will decide on. . .

**[tape break to flip tape over]**

Exhb 10

**Sergio Sanchez:**    . it comes out that, I thought that we had already gone over this issue enough to know what had happened with the rifle, the fact that the rifle was supposed to be destroyed, it wasn't, it left the department with Mr. Moore and his son got a hold of it and so all this mess. . . I thought that, what more can we find out from this, uh. . .

**Tim Sullivan:**  The consultant's report that, that was pretty vindictive against the City showed that, you know, police department policy was indeed violated because of all of that. Yeah, that's out.

**Sergio Sanchez:**  And we have seen all of that and I don't think there is much more we can learn from having a law suit. I think this matter can be settled out of court. Either way it looks like the City is in for some tough times in the near future legally. They are really going to have to maneuver well to try to get out of this one, but, we'll see what comes out of this one.

We're surprised, 50-50 split on this one.

Log-In | Register | Members

<< COMPANY BOXES IN BUSINESSMAQUILADORAS PROVE NICHE MARKET FOR RIO CONTAINER INC. |
WEBLOG | MORIN FAMILY FILESBORDER PATROL SHOOTING VICTIMS BRING TWO LAWSUITS >>

## After two years, Morin struggles to heal

By FERNANDO DEL VALLE

Valley Morning Star

LOZANO-- A cane now helps Dan Morin hold up his right hip, shattered in a
barrage of gunfire that left his mother and sister dead.

Two years ago today, Ernest Moore was looking for his ex-girlfriend when he
burst into Morin's Rio Hondo home, killing his mother, Margarita Flores, 53,
and sister, Delia Morin, 31.

Today, Morin and his family will file a lawsuit against the City of Harlingen
in U.S. District Court in Brownsville, said Douglas McMaster, the Harlingen
lawyer representing the family. The lawsuit will demand unspecified damages,
McMaster said.

"I'm not going to quit until I see the case through," Morin said.

"Time has made it worse," the former champion powerlifter said. "The more time
goes by, the more I've been away from my mother. It feels like a lifetime and
my anger has built. The only thing that's going to make me okay is going to
court to see that justice is done."

Last July, Morin was in a wheelchair, a colostomy bag bulging from under his
shirt.

Now, he walks with the help of cane. He's also going to Texas State Technical
College in Harlingen, where he's majoring in business.

"I feel a lot stronger and I feel a lot better than a year ago," Morin said.
"I still don't have a right hip, but I'm getting along on the cane."

It wasn't until September or October 1998 that Morin got out of the hospital,
where he underwent six surgeries. Operations removed much of his large
intestine and part of his small intestine.

Morin fumes with anger when he argues the killings of U.S. Border Patrol
agents Susan Rodriguez and Ricardo Salinas have overshadowed the deaths of his
mother and sister.

"I think it's bull they're putting the Border Patrol in front of me and my
family," Morin argued.

The family is taking its case to court to reveal the mishandling of the
shooting incident, Morin said.

"I'm very confident about going to court," Morin said. "I want to see that
justice is done -- an eye for an eye, that they get what they deserve."

In the early morning of July 7, 1998, Moore forced his way into the Morins'
small Rio Hondo home. He was looking for his ex-fiance, Julie Cox, he told the
family.

Morin vividly remembers Moore's shaved head basted with Vaseline jelly.

When Cox stepped into her bedroom to get her purse, Moore opened fire with a
MAC-90, a Chinese-made semiautomatic version of a Russian AK-47 military
rifle. High on a mix of cocaine, alcohol and Prozac, he blasted a spray of

MOTION TO TRANSFER
EXH. 3A

COMMENTS

gunfire that killed Flores and her daughter, Delia Morin.

Then, at point-blank range, Moore stood in front of him and fired four rounds, squeezing the trigger until the rifle jammed.

When his brother, Donald Morin, pulled the rifle away, Moore fled in his pickup truck.

Morin believes Moore shot him out of "jealousy." He recalled meeting Moore's old girlfriend at the San Benito restaurant where they worked. Then they started dating. But he doesn't know why Moore shot his mother and sister.

After the shootings, Moore drove to the San Benito home of his father, Harlingen police Detective R.D. Moore. There, the 25-year-old construction worker killed the two U.S. Border Patrol agents and critically wounded a Cameron County sheriff's deputy. Police officers and sheriff's deputies mortally wounded Moore in a volley of gunfire.

Posted by: DOUG on Jul 07, '00 | 10:23 am | PROFILE

## COMMENTS



name

Email

Location

Homepage

Show email ☐   Remember me ☑

Notify me when someone replies to this post? ☐

SUBMIT   PREVIEW


pMachine POWERED

http://www.va_ _ystar.com/comments.php?id=P32236_0_1_0_0

Log-In | Register | Members

<< BORDER PATROL LEARNS WATER RESCUE TACTICSAGENTS TRAIN WITH HORSES IN LIFESAVING TECHNIQUES ALONG RIO GRANDE | WEBLOG | MIGRANT STUDENTS GET PUSHSUMMER PROGRAM HELPS YOUTHS KEEP UP WITH WORK WHEN AWAY FROM SCHOOL >>

## Morin family filesBorder Patrol shooting victims bring two lawsuits

By FERNANDO DEL VALLE

Valley Morning Star

BROWNSVILLE-- Members of a former Rio Hondo family Friday filed two lawsuits charging two Harlingen police officers owned an assault rifle a Harlingen man used to kill a mother and her daughter and critically injure her son.

On the second anniversary of the killing spree, members of the Morin family filed two lawsuits in U.S. District Court against the City of Harlingen, former Police Chief Jim Scheopner, Capt. Joseph Vasquez and Detective R.D. Moore.

In one lawsuit, Donald Morin, Diana Morin, Danny Morin, Jennifer May Gwin, Ruben Rios Sr. and Ruben Rios Jr. charge the defendants' negligence led to the deaths of Margarita Flores, 52, and Delia Morin, 31.

In a second lawsuit, Dan Morin charges the defendants' negligence led to the deaths of his mother and sister and left him physically disabled.

"I want justice done," Dan Morin said, referring to the lawsuit filed by Corpus Christi attorney Robert Patterson. The lawsuit demands unspecified compensatory damages and punitive damages.

The second lawsuit filed by four of Flores' children and Delia Morin's son and his father also demands unspecified damages.

The lawsuits demand jury trials.

"We feel these two people's deaths were wrongful. They never would have happened if it wasn't for the negligence of the City of Harlingen and some city officials," said Harlingen lawyer Jesse Trevino, the attorney representing the family members.

Scheopner, Vasquez and Moore could not be reached for comment Friday afternoon.

"I don't know how the city would be responsible for that," City Attorney Brendan Hall said.

The lawsuits charge Moore's son, Ernest Moore, used the assault rifle his father bought from Vasquez to kill the mother and daughter in their Rio Hondo home July 7, 1998.

The lawsuits charge Vasquez sold the assault rifle to R.D. Moore, who kept it in his son's room.

The family lawsuit filed by Trevino further charges Scheopner allowed Moore to keep the assault rifle as a "service weapon."

The lawsuit also charges the City of Harlingen failed "to implement policies and procedures regarding the issuance, purchase and possession of deadly weapons by police officers, including their storage and security in order to prevent their unlawful use against citizens."

The lawsuit charges Scheopner and the city allowed R.D. Moore "to keep rifles in his son's room and allowing the use of the weapon, knowing that his son

**Motion to Transfer**
**Exh. 3B**

Ernest Moore was psychologically unstable, a cocaine and marijuana user, under Prozac medication and a collector of neo-Nazi propaganda."

In the early morning of July 7, 1998, Ernest Moore forced his way into the Morins' small Rio Hondo home to find his ex-fiance, Julie Cox.

Moore opened fire with a MAC-90, a Chinese-made semiautomatic version of a Russian AK-47 military rifle, mortally wounding Flores and her daughter. Then Moore shot Dan Morin.

After the shootings, Moore drove to his father's San Benito home, where he killed two U.S. Border Patrol agents and critically wounded a Cameron County sheriff's deputy. Police officers and sheriff's deputies mortally wounded Moore in a volley of gunfire.

Posted by: DOUG on Jul 09, 00 | 10:23 am | PROFILE

## COMMENTS



name

Email

Location

Homepage

Show email ⌐    Remember me ☑

Notify me when someone replies to this post? ⌐

SUBMIT    PREVIEW



Log-In  |  Register  |  Members

<< ARCHIVED STORY   |   WEBLOG   |   ARBITRATOR: REINSTATE MERCEDES OFFICER >>

## Amendment revisits lawsuitAddition involves 2nd gun used on day of Border Patrol killings

By FERNANDO DEL VALLE

Valley Morning Star

BROWNSVILLE-- A citizen gave the Harlingen Police Department an assault rifle that a detective's son used to kill a Rio Hondo mother and her daughter, the family claims in an amendment to a lawsuit.

The orignial lawsuit involves the gun used to kill two Border Patrol agents.

The most recent action claims police Capt. Joey Vasquez turned over the military-style rifle to Detective R.D. Moore, who placed it in a gun safe in the bedroom of his son, Ernest Moore.

On July 7, 1998, the younger Moore used the rifle, described as an AK-47, to kill Margarita Flores, 52, and her daughter, Della Morin, 31, said the amendment filed Sept. 20 in U.S. District Court against R.D. Moore, Vasquez and former Police Chief Jim Scheopner.

"That's totally false," R.D. Moore said of the rifle's origin in a brief telephone interview.

Vasquez referred questions to attorney Tom Lockhart, the lawyer appointed by the Texas Municipal League to represent the city.

"This rumor's been floating around for about a month and it's already been addressed," Vasquez said.

Lockhart failed to return several telephone calls requesting comment.

"Those allegations are totally false," City Attorney Brendan Hall said.

Scheopner did not respond to a message left at the police department.

Dan Morin, who was left permanently injured in the attack that claimed the lives of his mother and sister, said a citizen requested the police department destroy another assault rifle, which R.D. Moore also placed in the gun safe in his son's room.

Ernest Moore used the AR-15 rifle to kill U.S. Border Patrol agents Susan Rodriguez and Ricardo Salinas, whose families have filed two $10 million lawsuits against the city.

"It was negligence, but hell, those guns should have been destroyed, not put back on the street," Morin said.

"I don't know how (the defendants) can still be working there. How many guns that went into the police department have ended up back on the street? I'd be better off if they would have stayed in the police department," he said.

The amendment to the original lawsuit, filed July 7, 2000, claims a "concerned citizen" turned over AR-15 to the police department.

The action claims Vasquez took possession of the rifle before turning it over to R.D. Moore.

The amended lawsuit claims Scheopner allowed Moore to keep the rifle as a "service weapon" that he stored in a gun safe in his son's bedroom.

**MOTION TO TRANSFER**
**EXH. 3C**

COMMENTS                                    http://www.va. ystar.com/comments.php?id=P33449_0_1_0_C

The action describes Ernest Moore as "unstable, a cocaine user, under medication" who "decorated his room with neo-Nazi propaganda."

The lawsuit argues R.D. Moore "could have reasonably foreseen that his son Ernest Moore would use the weapon to hurt someone."

The action charges the police department's handling of the rifle presented "a state-created danger."

"The practices of the city of Harlingen ultimately allowed a military assault rifle to fall into the hands of a person who is not a police officer and who was extremely dangerous," the lawsuit said.

In the early morning of July 7, 1998, Ernest Moore forced his way into the Morins' small Rio Hondo home to find his ex-fiance, Julie Cox.

Moore opened fire with a semiautomatic version of a Russian AK-47 military rifle, mortally wounding Flores and her daughter. Then Moore shot Dan Morin.

After the shootings, Moore drove to his father's San Benito home, where he used a police-issued assault rifle to kill Border Patrol agents Rodriguez and Salinas, and critically wounded Cameron County sheriff's deputy Raul Rodriguez. Police officers and sheriff's deputies mortally wounded Moore in a volley of gunfire.

Posted by: DOUG on Oct 25, 00 | 10:23 am | PROFILE

## COMMENTS



name

Email

Location

Homepage

Show email ▢   Remember me ☑

Notify me when someone replies to this post? ▢

SUBMIT    PREVIEW

  

**Water Pumps & Tanks** Now at **SEARS**.com

USPRS    **Log-In**    **Register**    **Members**    **Forums**    **El Nuevo Heraldo**    **RGV Sports**

**Top Local Stories**
**Sports**
**Entertainment**
**Education**
**Community**
**Viewpoints**
**Lifestyle**
**Events**
**Classifieds**
**Obituaries**
**Weather**
**Subscribe**
**Contact Us**
**E-Mail Us**

[FIND]
**Advanced search**

**Health Calendar**

**View All from this Month**

**JOIN OUR MAILING LIST FOR DAILY HEADLINES!**

[SEND]

`00012846`

<< **Archived Story**  |  **Main**  |  **Archived Story** >>

**Origin of gun used in BP death questioned Violence: Gun used to kill a mother and daughter allegedly marked for destruction.**

By FERNANDO DEL VALLE

Valley Morning Star

A citizen gave the Harlingen Police Department an assault rifle that a detective's son used to kill a Rio Hondo mother and her daughter, the family claims in an amendment to a lawsuit.

The action claims police Capt. Joey Vasquez turned over the military-style rifle to Detective R.D. Moore, who placed it in a gun safe in the bedroom of his son, Ernest Moore.

On July 7, 1998, the younger Moore used the rifle, described as an AK-47, to kill Margarita Flores, 52, and her daughter, Delia Morin, 31, said the amendment filed Sept. 20 in U.S. District Court against R.D. Moore, Vasquez and former Police Chief Jim Scheopner.

"That's totally false," R.D. Moore said of the rifle's origin in a brief telephone interview.

Vasquez referred questions to attorney Tom Lockhart, the lawyer appointed by the Texas Municipal League to represent the city.

"This rumor's been floating around for about a month and it's already been addressed," Vasquez said.

Lockhart failed to return several telephone calls requesting comment.

"Those allegations are totally false," City Attorney Brendan Hall said.

Scheopner did not respond to a message left at the police department.

Dan Morin, who was left permanently injured in the attack that claimed the lives of his mother and sister, said a citizen requested the police department destroy another assault rifle, which R.D. Moore placed in the gun safe in his son's room. Ernest Moore used the AR-15 rifle to kill U.S. Border Patrol agents Susan Rodriguez and Ricardo Salinas, whose families have filed two $10 million lawsuits against the city.

"It was negligence, but hell, those guns should have been destroyed, not put back on the street," Morin said in an interview. "I don't know how (the defendants) can still be working there. How many guns that went into the police department have ended up back on the street? I'd be better off if they would have stayed in the police department."

The amendment to the original lawsuit filed July 7, 2000, claims a "concerned citizen" turned over the assault rifle to the police department.

The action claims Vasquez took possession of the rifle before turning it over to R.D. Moore.

The amended lawsuit claims Scheopner allowed Moore to keep the rifle as a "service weapon" that he stored in a gun safe in his son's bedroom.

The action describes Ernest Moore as "unstable, a cocaine user, under medication" who "decorated his room with neo-Nazi propaganda."

The lawsuit argues R.D. Moore "could have reasonably foreseen that his son Ernest Moore would use the weapon to hurt someone."

The action charges the police department's handling of the rifle presented "a state-created danger."

"The practices of the city of Harlingen ultimately allowed a military assault rifle to fall into the hands of a person who is not a police officer and who

MOTION TO TRANSFER
EXH. 3D

The Brownsville Herald - Online Edition http://www.brownsvil...erald.com/comments.php?id=P14216_0_1_0_C

was extremely dangerous," the lawsuit said.

In the early morning of July 7, 1998, Ernest Moore forced his way into the Morins' small Rio Hondo home to find his ex-fiancée, Julie Cox.

Moore opened fire with a semiautomatic version of a Russian AK-47 military rifle, mortally wounding Flores and her daughter. Then Moore shot Dan Morin.

After the shootings, Moore drove to his father's San Benito home, where he used a police-issued assault rifle to kill Border Patrol agents Rodriguez and Salinas, and critically wounded Cameron County sheriff's deputy Raul Rodriguez. Police officers and sheriff's deputies mortally wounded Moore in a volley of gunfire.

Posted by: **Doug** on Oct 27, 00 | 10:23 am | **Profile**

**COMMENTS**

Notify me when someone replies to this post?

SUBMIT PREVIEW

The Brownsville Herald
1135 E. Van Buren
Brownsville, TX 78520

956-542-4301
1-800-488-4301

Note: To subscribe to The Brownsville Herald Newspaper, Click Here.

The entire content of BrownsvilleHerald.com, including its logotype, are fully protected by copyright and registry and cannot be reproduced in any form for any purpose without written permission from The Brownsville Herald.

© 2000 The Brownsville Herald

6/1/2003 10:22 PM

MOTION TO TRANSFER
EXH. 3E

- Sunday, July 8, 2001

Valley Morning Star, Harlingen, Texas

## Killing Spree

### DAY OF DEATH

The series of events that led to the shooting deaths of five people, including two Border Patrol agents, in separate incidents in Rio Hondo and San Benito.

**6:35 a.m.**
Rio Hondo police receive a 911 call reporting a shooting that killed Margarita Flores, 53, and her daughter Dalia Moin, 31. Wounded was Flores' son, Dan Moin, 22.

**8:45 a.m.**
A Cameron County sheriff's deputy chases the suspect's white pickup truck, but loses sight of it. He reports there were three suspects.

**8:48 a.m.**
Dan Moin arrives at Valley Baptist Medical Center. He is listed in critical condition.

**8 a.m.**
Other deputies find the pickup truck near San Benito about 10 miles away. It is parked near a cornfield next to the home of a suspect, Ernest Moore, 25. Border Patrol Agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas are killed, and Cameron County Sheriff Deputy Raul Rodriguez is wounded in an ambush by Moore.

**7:41 a.m.**
Susan Lynn Rodriguez is pronounced dead on arrival at Valley Baptist. She becomes the first female Border Patrol agent slain in the line of duty in the agency's 74-year history.

**7:15 a.m.**
Rodriguez, the sheriff's deputy, arrives at Valley Baptist and is taken to surgery. He is listed in stable condition.

**7:38 a.m.**
Suspect Ernest Moore arrives at Valley Baptist. He is listed in critical condition.

**7:45 a.m.**
Authorities say a second suspect is taken into custody, but that information is later altered.

**9:30 a.m.**
The Edinburg SWAT team and armored tank pull into the site of the manhunt south of San Benito.

**12:15 p.m.**
About a dozen hounds are unleashed and confined near to the Moore home.

**12:46 p.m.**
A funeral hearse arrives at Ernest Moore's father's home. Shortly after, Justice of the Peace Stalin Gonzalez pronounces Salinas dead and the hearse leaves.

**12:58 p.m.**
Authorities confirm there was no more suspects and call off the manhunt.

**3:11 p.m.**
Authorities report that Ernest Moore had died.

**3 p.m.**
At a news conference, Cameron County Sheriff Conrad Lucio announces authorities believe Moore was the only person involved in both shootings.

**5 p.m.**
A hospital spokesman confirms that Ernest Moore had died.

## Morin family still grieves for loved ones

**Victims remember brutal shooting, very day of lives**

**FERNANDO DEL VALLE**
Valley Morning Star

SAN BENITO — When his eyes close, Dan Morin sees the shooting in a room filled with blue smoke.

In the drifting murk, shadows of his mother and sister suddenly take their form.

And in a crashing thunder, gunshots shatter.

"I cry every night for my sister and sister when I go to ..."

"They had nothing to fear.
They had no reason to think that they would be gone like that. ... They know I'm gone."

"They know I'm missing. We'll never be the same."

oming Star

SAN BENITO — When his ice floe, Dan Morin sees splashing in a room with blue smoke.

He drifting murk, shadows this mother and sister take their forever... life, creating thunder.

"Every night for my and sister when I go to bed," Morin said.

"Mortin said.

I tell them good night." ree years after the of Margarita Flores, 55, elia Morin, 31, the slaughter tortures him.

"...pion pored his right hip, res the shirt hides a col-way sack.

...got pain shot up all the up the back of my neck ...to the tips of my fingers," ...a nail last week.

ter the shooting spree ...ended there in the deaths of Su-Border Patrol agent Rio-Lynn Rodriguez Salinas, the

Guillermo Salinas, the a... an attack on Mar- a... ...home have been ...eden, her children said. ...her family has been for- ...because my mother and ...Antonio home to be closer to ...we were regular citizens ...not law enforcement, said her family.

But most of her brothers and sisters moved away.

"Our family has just departed," she said.

"We separated and went our own ways. There's a big open hole in us that won't be closed.

my sister left three beautiful boys behind. I grieve for the (agent' deaths). I know what their families are going through."

The slaughter tore her fam- ily apart, said Diana Morin, a mother of five who worked at a Harlingen auto parts assem- bly plant.

"My mom was our heart of gold. We all lived around her," she said.

"Come holidays, come Sun- days, we were all there. We were alive, and our lives just ended."

After the shootings, Diana Morin moved from her San Antonio home to be closer to her family.

"They're coming," she said, adding the children never re- ceived the psychological coun- seling provided to other vic- tims' families.

"They had to see their mother die. Can you imagine how traumatizing that would

### FAMILY GRIEF THAT KNOWS NO BOUNDARIES: The July 1998 killings at his Rio Hondo home has left Dan Morin per- manently disabled. Morin, his sister, Diana, and brother, Bill,

be?

"People say they know what we're going through. But they'll have to walk in our shoes."

I think the only ones who know are the families of the (agents)."

"With the help of family and friends, her brother is learning to cope, she said.

About four months after the shootings, Morin was re- attended Texas State Tech-

are still learning to cope with the loss of their mother and sis- ter. The women were shot and killed by Ernest Moore of San Benito.

he underwent multiple surg-ies.

Operations removed much of the large intestine and part of his small intestine.

"I'm very proud of him," Diana Morin said.

"He's turned around a lot this year. He's a strong man. He's determined."

In the rustic living room of his home, Morin pauses and folds his hands over the curved handle of his wooden cane.

"But time has made me a stronger person."

• Since March 2000, he has attended Texas State Tech-

...ical College, where he'd pur- ...ming a business degree.

"I'm very proud of him," Diana Morin said.

## HEALING / Does time heal all wounds

Continued from Page A1

In their two-story brick home in Austin, Megan's father agonizes about the story, he'll tell her.

"There's so many details she's going to want to know," said Rodrigue,33, an Immi- gration and Naturalization and Naturalization U.S. Service.

"My biggest fear is that she'll feel the futility; that she'll lose her faith in our life — doing what's good, what's right," he said.

"The grieving process is going to start right then. It's like a locomotive coming.

As a parent, you want to stop it, but you can't to any- thing about that," Moore also

R.D. Moore the rifle he stored in a vault in his son's room.



COMMENTS

http://www.va    star.com/comments.php?id=P38393_0_1_0_C

Log-In | Register | Members

<< PERRY DECLARES AGAINST NAVY BOMBING TEXAS CHIEF EXECUTIVE JOINS OTHER STATE OFFICIALS IN OPPOSITION TO PLAN | WEBLOG | FARMING WITHOUT CHEMICALS SCIENTISTS AT USDA TEACH GROWERS HOW TO BE ENVIRONMENTALLY FRIENDLY >>

## Morin family still grieves for loved ones Victims remember brutal shooting every day of lives

By FERNANDO DEL VALLE

Valley Morning Star

SAN BENITO-- When his eyes close, Dan Morin sees blood splashing in a room thick with blue smoke.

In the drifting murk, shadows of his mother and sister gently take their form.

And in a crashing thunder, they shatter.

"I cry every night for my mother and sister when I go to sleep," Morin said.

"And I tell them good night."

Three years after the deaths of Margarita Flores, 53, and Delia Morin, 31, the slaughter tortures him.

A cane supports the former champion powerlifter after gunfire shattered his right hip.

A baggy shirt hides a colostomy sack.

"I get pain shot up all the way up the back of my neck down to the tips of my fingers," Morin said last week.

After the shooting spree that ended in the deaths of U.S. Border Patrol agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas, the victims in the attack on Margarita Flores' home have been forgotten, her children said.

"Our family has been forgotten because my mother and sister were regular citizens and not law enforcement," said Diana Morin, 36.

"When the (agents) got shot, the story stopped and ended there. Nobody remembered the other family involved," she said.

"My mother had 14 grandchildren and nine children and my sister left three beautiful boys behind. I grieve for the (agents' deaths). I know what their families are going through."

The slaughter tore her family apart, said Diana Morin, a mother of five who works at a Harlingen auto parts assembly plant.

"My mom was our heart of gold. We all lived around her," she said.

"Come holidays, come Sundays, we were all there. We were alive; and our lives just ended."

After the shootings, Diana Morin moved from her San Antonio home to be closer to her family.

But most of her brothers and sisters moved away.

"Our family has just departed," she said.

"We separated and went our own ways. There's a big open hole in us that won't be closed."

http://www.va_  ,star.com/comments.php?id=P38393_0_1_0_C

Since her sister's death, the family has helped raise her three sons.

Delia's boys were 2, 8, and 11 when their mother died, Diana Morin said.

"They're coping," she said, adding the children never received the psychological counseling provided to other victims' families.

"They had to see their mother die. Can you imagine how traumatizing that would be?

"People say they know what we're going through. But they'd have to walk in our shoes. I think the only ones who know are the families of the (agents)."

With the help of family and friends, her brother is learning to cope, she said.

About four months after the shootings, Dan Morin was released from the hospital where he underwent multiple surgeries.

Operations removed much of his large intestine and part of his small intestine.

"Time hasn't healed my wounds, and time will never heal my wounds, now that my mother and my sister aren't here," Dan Morin said.

"But time has made me a stronger person."

Since March 2000, he has attended Texas State Technical College, where he's pursuing a business degree.

"I'm very proud of him," Diana Morin said.

"He's turned around a lot this year. He's a strong man. He's determined."

In the rustic living room of his home, Dan Morin pauses and folds his hands over the curved handle of his wooden cane.

"We've got to make the best of what we've got left," he said softly.

Posted by: DOUG on Jul 08, 01 | 10:23 am | PROFILE

**COMMENTS**



name

Email

Location

Homepage





C4 B1 D1 during [illegible] High 97 Low 73 B8

# Valley Morning Star

/ 8, 2001 www.valleystar.com $1.25

"We all died a little bit that day."
— Arturo Salinas
father of fallen Border Patrol agent










VICTIMS: Killed in the 1988 shooting spree were, from left, Margarita Flores, Delia Morin, Ricardo Guillermo Salinas and Susan Lynn Rodriguez

# AY OF DEATH



## Questions, lawsuits remain 3 years after shooting spree

By FERNANDO DEL VALLE
Valley Morning Star

Just before dawn, the porch light flared over a bald man in oily black pants, his wiry hands clutching a military-style rifle.



Ernest Moore

At the back door of the small frame house in Rio Hondo, Ernest Moore stuck the rifle's muzzle against Donald Morin's head and walked inside.

"His head was shaved and his body was slicked with Vaseline," said Dan Morin, a younger brother.

At 5:30 a.m., the 25-year-old construction worker came looking for his former fiancée.

Two weeks earlier, Julie Cox had left his parent's house. Now she was staying with Dan Morin.

"He turned on the lights and said, if I moved, he was going to blow my brother's head off," Dan Morin, 25,

High on a mix of cocaine and alcohol, Moore sprayed bursts of gunfire that left Margarita Flores, Morin's mother, dead.

Sister Delia Morin, 31, collapsed near her.

Then Moore pointed the barrel at Dan Morin and fired at least four rounds before Donald Morin wrestled the rifle away.

"He was going to shoot again but the gun jammed," Bill Morin, 22, said.

"We jumped on him and beat him and beat him. But he slipped away."

The rifle Moore left behind was an MAK-90, a Chinese-made semi-automatic version of a Russian AK-47 military rifle.

His father, Harlingen police Detective R.D. Moore, had bought it from Harlingen police Capt. Joey Vasquez.

The detective had bought it for his son.

In a lawsuit appealed last month to the U.S. Fifth Circuit Court of Appeals, the Morin family claims a




MOTION TO TRANSFER
EXH. 3F

/ Tragedy still haunts victims

on Page A1

psychologically
the and mar-
under Proac
a collector of
ganda."

Moore said the
dismissed the
t R.D. Moore,
former Har-
ief Jim Sche-
city of Har-

, well appeal
, Dan Mórin

t, and Dennis Zam-
s charges were filed
retaliation for their
f the shooting deaths
rtier Patrol agents
, Lt. Rubio and De-

ing illegal campaign
their campaign on
led, the storage of
partment was supposed to have de-
with a rifle in the Harlingen Police De-
lermo Salinas, 24, were gunned down
Rodriguez, 28, and Ricardo Gull-
Border Patrol agents Susan Lynn
— Two former Har-

their effort to expose
officers continuing to
, way to police the

"I decided I had better do

Moore said Zamarron.

stroyed.
Instead of being destroyed, the
weapon ended up being stored in Har-
lingen police Detective R.D. Moore's
property room.

illegal campaign contributions in-
deception and retaliation."

---

found about 100 rounds of
ammunition.

Outside, R.D. Moore told
sheriff's deputies, "I need to
know what is going on."

"I said, my son you're
talking about," Moore said.

"And I finally got out
the deputy that there was
that there had been some,
some people injured, or
something to that effect, or
some people injured, or
something to that effect, in
Rio Hondo, and that they
had chased the truck to my
house."

From a cornfield across
the road, Ernest Moore
sprayed the yard with bursts
— gunfire — of his father's
Border Patrol's agent-in-
charge.

In the yard, Border Pat-
riguez and Ricardo Gull-
lermo Salinas lay mortally
wounded.

Nearby, critically injured
Rodriguez surrounded Ro-
bert Moore's bullet-mangled
body, he finished them an ob-
scene hand gesture.

something myself and I pu-
lled him out of the way and
ran in the house and found
him in the house and return fire,
get a weapon and return fire,
and returned to the front
yard with my service pistol."

The detective did not
return fire.

In a shootout with law
officers, Ernest Moore fired
as many as 100 rounds from
the .223-caliber assault rifle,
said John Brinning, the
R.D. Moore told the sheriff's
department the day after the
shootings.

"I know what he did was a
horrendous crime, and I
would like to apologize to
everyone involved.

With a motion of the
shooting, a lawsuit charging
R.D. Moore failed to warn the
slain agents that his son was
armed with an assault rifle as

---

SEARCHING FOR SHOOTER: A Texas Department of Public Safety trooper walks down Gamble
Road, which was lined with law enforcement vehicles that aided in the manhunt for Ernest
Moore.

Star photo by Ric Vasquez

---

He had been shot eight
times.

His father came running,
He cried as he reached down
to his son, yelling, "Ernie,
Ernie, why did you do it?"
recalled Harlingen police Sgt.
Mike Garcia in a statement
to the sheriff's department.

"I knelt down in front of
him and I asked him why he
did it and he was moving and
appeared to be unconscious,
a gun vault in his son's room,

Both the detective and the
son had keys to the vault, the
suit claims.

he hid nearby.

The lawsuit, which de-
mands more than $20 mil-
lion, charges that a citizen
gave the rifle to the police de-
partment for destruction.

Instead, Vasquez gave it to
R.D. Moore, who stored it in

COMMENTS

Log-In | Register | Members

<< PERRY DECLARES AGAINST NAVY BOMBING TEXAS CHIEF EXECUTIVE JOINS OTHER STATE OFFICIALS IN OPPOSITION TO PLAN | WEBLOG | FARMING WITHOUT CHEMICALS SCIENTISTS AT USDA TEACH GROWERS HOW TO BE ENVIRONMENTALLY FRIENDLY >>

**DAY OF DEATH Questions, lawsuits remain 3 years after shooting spree**

By FERNANDO DEL VALLE

Valley Morning Star

Just before dawn, the porch light flared over a bald man in oily black pants, his wiry hands clutching a military-style rifle.

At the back door of the small frame house in Rio Hondo, Ernest Moore stuck the rifle's muzzle against Donald Morin's head and walked inside.

"His head was shaved and his body was slicked with Vaseline," said Dan Morin, a younger brother.

At 5:30 a.m., the 25-year-old construction worker came looking for his former fiance.

Two weeks earlier, Julie Cox had left his parent's house. Now she was staying with Dan Morin.

"He turned on the lights and said, if I moved, he was going to blow my brother's head off," Dan Morin, 25, recalled.

"His eyes were so black and cold. His face was blank. There was no emotion in him. Then he turned the gun on me and took us to the back door. And, then, he started shooting."

High on a mix of cocaine and alcohol, Moore sprayed bursts of gunfire that left Margarita Flores, Morin's mother, dead.

Sister Delia Morin, 31, collapsed near her.

Then Moore pointed the barrel at Dan Morin and fired at least four rounds before Donald Morin wrestled the rifle away.

"He was going to shoot again but the gun jammed," Bill Morin, 22, said.

"We jumped on him and beat him and beat him. But he slipped away."

The rifle Moore left behind was an MAK-90, a Chinese-made semiautomatic version of a Russian AK-47 military rifle.

His father, Harlingen police Detective R.D. Moore, had bought it from Harlingen police Capt. Joey Vasquez.

The detective had bought it for his son.

In a lawsuit appealed last month to the U.S. Fifth Circuit Court of Appeals, the Morin family claims a citizen gave the rifle to the police department for destruction.

Instead, it fell into the hands of Ernest Moore, whom the lawsuit describes as "psychologically unstable, a cocaine and marijuana user under Prozac medication and a collector of neo-Nazi propaganda."

In May, U.S. District Judge Filemon Vela dismissed the lawsuit against R.D. Moore, Joey Vasquez, former Harlingen Police Chief Jim Scheopner and the city of Harlingen.

http://www.va. /star.com/comments.php?id=P38385_0_1_0_C

"If we have to, we'll appeal it until we die," Dan Morin said.

"We know the guns came out of the Harlingen Police Department. (Ernest Moore) was mentally unstable-- he was a ticking time bomb. If it wasn't for their negligence, this would have never happened."

As Ernest Moore fled the Morin's Rio Hondo home, the Cameron County Sheriff's Department issued an all-points bulletin for his white 1997 Chevrolet pickup truck.

At about 6:30 a.m., his mother, Patsy Moore, heard a door slam at her home near San Benito.

"She said something to the effect, Dwayne, you need to get up. There's something wrong. Ernie's truck is in the driveway and the safe is open,'" R.D. Moore told lawyers in a deposition in May 2000.

The detective found the assault rifle missing from the gun vault.

In the pickup truck, he found about 100 rounds of ammunition.

Outside, R.D. Moore told sheriff's deputies, "I need to know what is going on."

"I said, It's my son you're talking about. I want to know what happened,'" Moore said.

"And I finally got out of the deputy that was there that there had been some, some people injured, or something to that effect, in Rio Hondo, and that they had chased the truck to my house.

"And at that point, I didn't know how the people were injured and, but I figured-- now Ernest is not home; there's a gun missing out of the safe.

And at that instant I told the deputy-- and there was two of them-- that there is an AK-47 missing out of the safe and that my son is a very good shot ."

"Finally, a sergeant advised me that there had been two people dead in Rio Hondo and possibly a third was going to die and that my son was the main suspect."

When deputies entered to search the home, R.D. Moore did not allow Border Patrol agents inside.

"I didn't feel, at the time, there was any federal violations committed, and my son was not an illegal immigrant ," he said.

When gunfire erupted, R.D. Moore ran into the garage.

From a cornfield across the road, Ernest Moore sprayed the yard with bursts of gunfire from his father's police-issued AR-15 assault rifle, a semiautomatic version of the U.S. military's M-16.

"I went and got behind my boat, (where) another officer was at the time, clamoring all over the top of me and firing his weapon, scaring the hell out of me," R.D. Moore told attorneys.

"I decided I had better do something myself and I pushed him out of the way and ran in the house and tried to get a weapon and return fire, and returned to the front yard with my service pistol."

The detective did not return fire.

In a shootout with law officers, Ernest Moore fired as many as 100 rounds from the .223-caliber assault rifle, said John Brinning, the Border Patrol's agent-in-charge.

COMMENTS                                    http://www.va⌐   ⌐tar.com/comments.php?id=P38385_0_1_0_C

In the yard, Border Patrol agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas lay mortally wounded.

Nearby, Deputy Raul Rodriguez lay critically injured.

As officers surrounded Ernest Moore's bullet-mangled body, he flashed them an obscene hand gesture.

He had been shot eight times.

His father came running. He cried as he reached down to his son, yelling, "Ernie, Ernie, why did you do it?" recalled Harlingen police Sgt. Mike Garcia in a statement to the sheriff's department.

"I knelt down in front of him and I asked him why he did it and he was moving and appeared to be unconscious," R.D. Moore told the sheriff's department the day after the shootings.

"I know what he did was a horrendous crime, and I would like to apologize to everyone involved."

Within a month of the shootings, the victims' families filed a lawsuit charging R.D. Moore failed to warn the slain agents that his son was armed with an assault rifle as he hid nearby.

The lawsuit, which demands more than $20 million, charges that a citizen gave the rifle to the police department for destruction.

Instead, Vasquez gave it to R.D. Moore, who stored it in a gun vault in his son's room, the lawsuit charges.

Both the detective and his son had keys to the vault, the suit claims.

U.S. District Judge Hilda Tagle has set Aug. 6 for jury selection in the case against the city of Harlingen.

"This is the only way we have to get to the truth," said Arturo Salinas, the father of agent Salinas.

"We want to ensure that the police department and the city are held to the highest standards in the future."

Posted by: DOUG on Jul 08, 01 | 10:23 am | PROFILE
**COMMENTS**

name

Email

Location

Homepage

MOTION TO TRANSFER
EXH. 3G

# Valley Morning Star

www.valleystar.com    50 cents

**Tropical Storm Barry heads for U.S. coast / Page B8**

AY, AUGUST 3, 2001

**TODAY'S WEATHER**

FORECAST:
Thunderstorms
High 93 Low 75

B8

## ITY/COUNTY

**PUTED**

y of inmate that
lone in cell
tes findings of
sy report

A3

## SPORTS

**HEADED NORTH**

Longtime Rockets center
Hakeem Olajuwon is headed to
the Toronto Raptors

B1



## RIO SUN

**IT'S THE WORD**

New production of 'Grease'
uses two casts for twice the
music



## lawsuit's federal claim dismissed

### lge upholds claim police actions y have contributed to deaths

**RNANDO DEL VALLE**
orning Star

WNSVILLE — A U.S. district
that the city of Harlingen
'caused the deaths of two U.S.
Patrol agents and injury to a
n County sheriff's deputy.

But Judge Hilda Tagle upheld the
state claim that police
violations may have contributed to
the deaths of agents Susan Lynn
Rodriguez and Ricardo Guillermo
Salinas and injury to deputy Raul
Rodriguez.

In the hearing, Tagle said she

wanted to put the state case on trial
Monday, but attorneys on both sides
requested it be delayed until a feder-
al appeals court ruling. In state court,
damages are limited to $250,000 per
claim, while federal court has no
limit on damages.

"The idea to give everyone his day
in court is very important to me,"
Tagle told attorneys in the hearing.
The case, Tagle said, "is like an open
wound for everyone concerned."

The plaintiffs in the $20 million

lawsuit, said they would appeal the
case to the U.S. Fifth Circuit Court of
Appeals.

In an opinion supporting her rul-
ing, Tagle castigated former Police
Chief Jim Scheopner and police
Detective R.D. Moore for giving
Moore's son, Ernest Moore, access to
the police-issued assault rifle he used
in the shooting July 7, 1998.

"The ruling is one that occurred
after much thought and much
research," Tagle told attorneys. "I've

done a tremendous amount of work
to get to this point in time."

Attorney Tom Lockhart, of
lawyer appointed by the Texas
Municipal League to represent the
city, requested Tagle delay a state
trial he described as a "very painful
trial for everyone involved."

After Tagle's ruling, Lockhart's
wife Elaine beamed as she gazed at
her husband.

**Please see 'LAWSUIT,' Page A8**

| Log-In | Register | Members |

<< OFFICIALS APPROVE BIRDING CENTER PROJECT HARLINGEN COMMISSIONERS ALSO OK STADIUM RENOVATION | WEBLOG | EXPRESSWAY JOB RIGHT ON SCHEDULE DRAINAGE SYSTEM REPRESENTS JUST THE FIRST PHASE OF WORK >>

**Judge dismisses assault lawsuit Victim of shooting says How can they act like nothing happened?'**

By FERNANDO DEL VALLE

Valley Morning Star

BROWNSVILLE-- Family members have appealed a federal judge's decision to dismiss two lawsuits that charge the son of a Harlingen police detective used his father's assault rifle to kill a Rio Hondo woman and her daughter.

Members of the Morin family filed appeals June 15 after U.S. District Judge Filemon Vela dismissed the lawsuits.

"It's crazy. How can they hide the deaths?" said Dan Morin, who was left permanently disabled after Ernest Moore shot him in the rampage that took the lives of his mother and sister. Moore's attack at the Rio Hondo home left Margarita Flores, 52, and her daughter, Delia Morin, 31, dead July 7, 1998.

"How can they act like nothing happened?" Morin said. "They're acting like lives don't mean anything."

Morin and his family filed the lawsuits July 7, 2000, against Detective R.D. Moore, police Capt. Joey Vasquez, former Police Chief Jim Scheopner and the city of Harlingen.

In the lawsuits, the family claims a citizen gave the police department an AK-47 assault rifle for destruction, but Vasquez turned the gun over to R.D. Moore. The lawsuits charge Moore stored the rifle in a gun safe in the room of his son, who used it to kill the mother and daughter.

In an October interview, Moore described the claim as "totally false."

Based on U.S. Magistrate Judge John William Black's recommendations, Vela dismissed the lawsuits May 16.

"It was a tragedy but a tragedy the city had nothing to do with," City Attorney Brendan Hall said.

Morin appealed the case to the U.S. Fifth Circuit Court of Appeals in New Orleans.

The family's claim "does not specify whether the defendants are being sued in their individual or official capacities," Black wrote in his recommendation. "A complaint that fails to specify the capacity in which the defendants are being sued is ordinarily construed to be against them in their official capacity.

"The parties in this case have admittedly operated under the assumption that the defendants are being sued in their individual capacities," Black continued. "To prevail on (a) claim against a state official performing a discretionary function and to overcome the qualified immunity defense, a plaintiff must show that the officer violated clearly established constitutional rights of which a reasonable person would have known.'"

Black also argued "neither the removal of the AK-47 from the Harlingen Police Department nor the entrustment of the gun to detective Moore" violated tort law.

Black argued "the defendants' actions that culminated with the storage of an

http://www.v. star.com/comments.php?id=P35569_0_1_0_C

AK-47 rifle at detective Moore's residence, while imprudent and ultimately tragic, were not sufficiently willful and targeted toward specific harm ."

"The claim against (R.)D. Moore is that the gun used by Ernest was stored in a gun safe in Ernest's room and that Ernest had access to it. This is not enough to make out a claim of negligent entrustment," Black wrote. "(I)t is difficult to see how (R.D.) Moore can be liable for Ernest having taken a gun from the gun safe and attacking the Flores home."

In the early morning of July 7, 1998, Ernest Moore forced his way into the Morins' small Rio Hondo home to find his former fiance, Julie Cox. Moore opened fire with the assault rifle, mortally wounding Flores and her daughter. Then Moore shot Dan Morin at close range.

After the shootings, Moore drove to his father's San Benito home, where he used a police-issued assault rifle to kill two U.S. Border Patrol agents and critically injure a Cameron County sheriff's deputy. Lawmen mortally wounded Ernest Moore in a volley of gunfire.

Three lawsuits stemming from the rampage are expected to go to trial in August.

Jury selection is set for Aug. 6 in cases filed by the families of slain Border Patrol agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas and Cameron County Sheriff's Deputy Raul Rodriguez.

Posted by: DOUG on Jun 22, 01 | 10:23 am | PROFILE

**COMMENTS**



name

Email

Location

Homepage

Show email ☐    Remember me ☑

Notify me when someone replies to this post? ☐

SUBMIT    PREVIEW

The Brownsville Herald - Online Edition          http://www.brownsv\ ̲erald.com/comments.php?id=P6518_0_1_0_C

  

· More Flights to More Places
· A Clean, Safe, Modern Facility
· Frequent Flyer Business Center

UCFRS     Log-In     Register     Members     Forums     El Nuevo Heraldo     RGV Sports

**Top Local Stories**
**Sports**
**Entertainment**
**Education**
**Community**
**Viewpoints**
**Lifestyle**
**Events**
**Classifieds**
**Obituaries**
**Weather**
**Subscribe**
**Contact Us**
**E-Mail Us**

FIND

**Advanced search**

**Health Calendar**

**View All from this Month**

JOIN OUR MAILING LIST FOR DAILY HEADLINES!

SEND

<< **Nine receive honors as teachers of the year in Los Fresnos school district**  |  **Main**  |  **Expressway project on schedule >>**

### Family appeals ruling Court: Judge dismisses lawsuits in fatal shootings.

By FERNANDO DEL VALLE

Valley Morning Star

Family members have appealed a federal judge's decision to dismiss two lawsuits that charge the son of a Harlingen police detective used his father's assault rifle to kill a Rio Hondo woman and her daughter.

Members of the Morin family filed appeals June 15 after U.S. District Judge Filemon Vela dismissed the lawsuits.

"It's crazy. How can they hide the deaths?" said Dan Morin, who was left permanently disabled after Ernest Moore shot him in the rampage that took the lives of his mother and sister. Moore's attack at the Rio Hondo home left Margarita Flores, 52, and her daughter, Delia Morin, 31, dead July 7, 1998.

"How can they act like nothing happened?" Morin said. "They're acting like lives don't mean anything."

Morin and his family filed the lawsuits July 7, 2000, against Detective R.D. Moore, police Capt. Joey Vasquez, former Police Chief Jim Scheopner and the city of Harlingen.

In the lawsuits, the family claims a citizen gave the police department an AK-47 assault rifle for destruction, but Vasquez turned the gun over to R.D. Moore. The lawsuits charge Moore stored the rifle in a gun safe in the room of his son, who used it to kill the mother and daughter.

In an October interview, Moore described the claim as "totally false."

Based on U.S. Magistrate Judge John William Black's recommendations, Vela dismissed the lawsuits May 16.

"It was a tragedy but a tragedy the city had nothing to do with," City Attorney Brendan Hall said.

Morin appealed the case to the U.S. Fifth Circuit Court of Appeals in New Orleans.

The family's claim "does not specify whether the defendants are being sued in their individual or official capacities," Black wrote in his recommendation. "A ... complaint that fails to specify the capacity in which the defendants are being sued is ordinarily construed to be against them in their official capacity.

"The parties in this case have admittedly operated under the assumption that the defendants are being sued in their individual capacities," Black continued. "To prevail on (a) ... claim against a state official performing a discretionary function and to overcome the qualified immunity defense, a plaintiff must show that the officer violated 'clearly established ... constitutional rights of which a reasonable person would have known.'"

Black also argued "neither the removal of the AK-47 from the Harlingen Police Department nor the entrustment of the gun to detective Moore" violated tort law.

Black argued "the defendants' actions that culminated with the storage of an AK-47 rifle at detective Moore's residence, while imprudent and ultimately tragic, were not sufficiently willful and targeted toward specific harm ...."

"The claim against (R.)D. Moore is that the gun used by Ernest was stored in a gun safe in Ernest's room and that Ernest had access to it. This is not enough to make out a claim of negligent entrustment," Black wrote. "(I)t is difficult to see how (R.D.) Moore can be liable for Ernest having taken a gun from the gun safe and attacking the Flores home."

0 0 0 1 2 8 4 5

MOTION TO TRANSFER
EXH. 3H

In the early morning of July 7, 1998, Ernest Moore forced his way into the Morins' small Rio Hondo home to find his former fiancée, Julie Cox. Moore opened fire with the assault rifle, mortally wounding Flores and her daughter. Then Moore shot Dan Morin at close range.

After the shootings, Moore drove to his father's San Benito home, where he used a police-issued assault rifle to kill two U.S. Border Patrol agents and critically injure a Cameron County sheriff's deputy. Lawmen mortally wounded Ernest Moore in a volley of gunfire.

Three lawsuits stemming from the rampage are expected to go to trial in August.

Jury selection is set for Aug. 6 in cases filed by the families of slain Border Patrol agents Susan Lynn Rodriguez and Ricardo Guillermo Salinas and Cameron County Sheriff's Deputy Raul Rodriguez.

Posted by: **Doug** on Jun 22, 01 | 10:23 am | **Profile**

**COMMENTS**

Notify me when someone replies to this post?

SUBMIT PREVIEW

The Brownsville Herald
1135 E. Van Buren
Brownsville, TX 78520

956-542-4301
1-800-488-4301

Note: To subscribe to **The Brownsville Herald Newspaper, Click Here.**

The entire content of BrownsvilleHerald.com, including its logotype, are fully protected by copyright and registry and cannot be reproduced in any form for any purpose without written permission from The Brownsville Herald.

© 2000 The Brownsville Herald

Log-In | Register | Members

<< JURY: $35 MILLIONCITY FOUND NEGLIGENT IN DEATHS OF BORDER PATROL AGENTSNO WORD ABOUT HOW HARLINGEN WILL PAY AWARD | WEBLOG | COMMISSIONERS CONSIDER OPTIONS FATE OF $42 MILLION BOND ISSUE CLOUDED BY VERDICT >>

## Morin silent on lawsuit verdict

By TONY VINDELL

Valley Morning Star

HARLINGEN-- The $35 million verdict a federal jury handed down against the city of Harlingen brought some encouragement to another victim of the 1998 shooting perpetrated by Ernest Moore.

On Wednesday, the jury awarded that sum to the families of two slain U.S. Border Patrol agents and a sheriff's deputy injured in the shooting spree that also left two other people dead and a third injured.

"Did I hear the news? said Dan Morin, who sustained several gunshots when Moore came into Morin's home in Rio Hondo looking for his ex-fiance Julie Cox. "I lived through it."

Morin's mother, Margarita Flores, and his sister, Delia, were killed at the house.

But when asked about the verdict, Dan Morin simply responded that on the advice of his attorney, Larry Warner, he could not comment.

Morin was initially represented by Corpus Christi attorney Robert Patterson who filed two lawsuits in July 2000, charging two Harlingen police officers owned the assault rifle Moore used to kill Morin's mother and his sister.

But on May 16, 2001, U.S. District Judge Filemon Vela dismissed the lawsuits based on the recommendations of U.S. Magistrate John William Black.

In his ruling, Black said the family's claim "does not specify whether the defendants are being sued in their individual or official capacities."

But now that the verdict is out, Warner said he was encouraged by the jury's decision.

"We anticipate that after the appellate process is complete," he said. "We will have the opportunity to pursue our claim further at the trial court level."

Warner said his client would seek medical expenses, loss of earnings, pain and suffering and other damages.

"When someone is careless and causes injuries to others, you try to make sure that other people do not go through the same thing," Warner said.

"He is going through intensive medical rehabilitation. He got shot more that one time and suffers from colostomy."

He said Morin spent five and half months in a hospital, and added that his mother and sister died.

"We feel confident that an appropriate result would come out" from the U.S. Court of Appeals Fifth District in New Orleans, Warner said. ""It's always possible that this matter is resolved without further litigation."

Posted by: DOUG on Feb 28, 02 | 10:23 am | PROFILE

MOTION TO TRANSFER
EXH. 3I

## COMMENTS



Show email    Remember me

Notify me when someone replies to this post?

SUBMIT    PREVIEW

pMachine POWERED

COMMENTS                                                   http://www.va   star.com/comments.php?id=P45460_0_1_0_C

<< VALLEY HARVEST CITRUS QUALITY IS GOOD; PRODUCTION DOWN   |   WEBLOG   |   STHS PARENTS FIGHT
CHANGE SCHOOL FACES POSSIBLE CLOSURE, REDIRECTION >>

**Court overturns dismissal of negligence claim against city**

By FERNANDO DEL VALLE

Valley Morning Star

BROWNSVILLE-- A U.S. appeals court has reversed a federal judge's ruling that
dismissed a negligence claim against the city of Harlingen and a detective
whose son killed a mother and her daughter in a 1998 shooting spree.

A panel of the U.S. Fifth Circuit Court of Appeals has reversed U.S. District
Judge Filemon Vela's dismissal of a state negligence claim against the city
and Detective R.D. Moore, whose son Ernest Moore killed Margarita Flores, 53,
and Delia Morin, 31, in an attack on their Rio Hondo home. The shooting left
Dan Morin permanently disabled.

"It's highly unusual," David Sergi, an Austin attorney representing the Morin
family, said referring to the appeals court decision to reverse a district
judge's ruling. "We want to proceed to trial to make the city accountable."

The state negligence claim could hold the city and Moore liable for up to
$500,000 in damages.

"I'm thrilled," said Dan Morin, now a business student at Texas State
Technical College. "Maybe it will open up how our police department is run."

In the same decision, the court's three-judge panel upheld a ruling that
dismissed the Morins' federal claim which requested unspecified damages.

The panel also upheld a ruling that dropped former Police Chief Jim Scheopner
and Capt. Joey Vasquez as defendants.

Under a federal claim, damages are unlimited.

"We feel we have enough evidence to overturn that in a state trial," Mayor
Connie de la Garza said of the negligence claim.

In a case that stems from two lawsuits, the Morin family claims a private
citizen turned over the AK-47 assault rifle to police for destruction, but
Capt. Joey Vasquez gave the gun to R.D. Moore, who stored it in a gun vault in
his son's bedroom.

In the early morning of July 7, 1998, Ernest Moore forced his way into the
Morin's Rio Hondo home to find his ex-girlfriend, Julie Lynn Cox. Inside, he
used the assault rifle to kill Flores and Delia Morin, leaving Dan Morin
critically wounded.

Plaintiffs expect the case to go trial in state court, Sergi said.

"No matter what happens, nothing, nothing is ever going to change the fact
that my mother and sister were murdered that night. I have to look at my
wounds everyday," Dan Morin said. "It will haunt me until the day I die."

On Wednesday, the three-judge panel reversed part of Vela's May 2001 ruling
which was based on the recommendation of U.S. Magistrate John William Black.

"(P)laintiffs assert that the magistrate judge glossed over their allegations
of negligence," the judges wrote. "A review of the magistrate judge's report
and recommendation, however, reveal that the magistrate judge did not address
the negligence claim."

**Motion to Transfer
Exh. 3J**

http://www.va      star.com/comments.php?id=P45460_0_1_0_C

The judges cited Moore for storing the rifle in his son's bedroom.

"We conclude that the district court erred in dismissing the Dan Morin plaintiffs' negligent entrustment claim against officer Moore ," the judges wrote. "Although the Dan Morin plaintiffs did not allege Ernest had permission to use the gun , they did allege that the gun was stored in Ernest's room and that Ernest had access to the weapon."

The judges cited the city for Moore's alleged actions on duty.

"Because we have determined that there are adequate allegations of negligent entrustment against officer Moore, who obtained the gun from the police department, and because the plaintiffs have alleged that officer Moore was acting within the scope of his employment, a claim has been property alleged against the city," the judges wrote.

"The fact that the acts that ultimately caused the injuries in this case were undertaken by a third party does not relieve the city from liability for its negligence in allowing officers, under its control, access to an assault rifle that was subsequently used in a dangerous and violent manner," they wrote.

After the attack on the Morin home, Ernest Moore drove to his parents' San Benito home, where he killed two U.S. Border Patrol agents and critically wounded a sheriff's deputy.

In a $35 million case against the city of Harlingen, plaintiffs claim the murder weapon was an AR-15 assault rifle that a private citizen had turned over to police for destruction.

But Vasquez assigned to rifle to R.D. Moore, who stored it in a gun vault in his son's bedroom, plaintiffs claim. Both father and son had keys to the vault, they claim.

The city will likely appeal the case to the Fifth Circuit Court of Appeals.

Posted by: DOUG on Oct 26, 02 | 10:23 am | PROFILE

## COMMENTS

name

Email

Location

Homepage



# Valley Morr

Serving the
Rio Grande Valley

**THURSDAY, MAY 1, 2003**

www.valleystar.com

# San Benito roads

**By PALLAVI AGARWAL**
Valley Morning Star

## Residents want streets fixed with

SAN BENITO — Juan Sandoval has grown up watching the Resaca City's streets fall apart a bit more every year.

Occasionally, road crews patch the potholes near his home on Reagan Street.

But when rains wash away the latest topping, it's back to bumpy streets for Sandoval and the motorists passing through this city of 25,000 residents.

"The city should have done regular maintenance of streets," Sandoval said. "Bad streets affect economic development and growth."

Repairs or upgrades for city streets have been on campaign priority lists for several current and former City Commission candidates.

But in a city that has only recently experienced substantial economic growth, a method for funding expensive

street projects has be issue.

It would cost more t million to reconstruc repair all the streets, mal assessment done showed.

Talk of placing a before voters fizzled wh



AP





The Monitor / Larry W. Clubb



# Storm pummels Hidalgo Co

Winds clocked up
to 100 mph leave
path of destruction

**By DANIEL PERRY**
and **TRAVIS M. WHITEHEAD**
The Monitor



MOTION TO TRANSFER
EXH. 3K

# une date set for Morin trial against city

## n left paralyzed following a 1998 oting spree at Rio Hondo home

**ERNANDO DEL VALLE**
Morning Star

OWNSVILLE — After a londo family's five-year battle, a federal judge t a June trial date in the f a Harlingen detective's ho killed two women and zed a man in a 1998 ng spree.

District Judge Filemon as set a June 18 trial in state negligence case st the city and Detective

R.D. Moore, whose son Ernest Moore killed Margarita Flores, 53, and Delia Morin, 31, in an attack on their Rio Hondo home. The shooting left Dan Morin permanently disabled.

The Morin family demands about $2 million in damages, their attorney said.

"Hopefully justice will be served — hopefully, hopefully said Dan Morin, whose right hip was shattered in the shoot-ing.

Even though it is a state case, because it started in a federal court, Judge Vela will preside over the trial.

Under a federal claim, damages are unlimited. In state negligence cases damages are capped at $500,000

Plaintiffs are seeking $250,000 for Morin and each of about seven family members, said David Sergi, the San Marcos attorney representing the family.

"I think our clients are willing to make their peace with the city," Sergi said, referring to a possible settlement. "I

> "I think our client is willing to make their peace with the city."
> — plaintiff attorney

think it's time the city put this case behind

But Morin said take the case before a jur

"I want to said. "It's my

ter who died in front of my eyes because of (the city's) negligence. There's no amount of money that can ever replace what they took away. I'm going to live the rest of my life in agony and pain."

The plaintiffs' case is based on R.D. Moore's testimony that he used a police department database to search for Morin's address, Sergi said.

"He misused city property ... a computer data base to ... down where Dan Morin lived so that his son could find him," he said.

Please see MORIN, Page A7

---

Brownsville issued a severe nderstorm warning for Zapata unty about 9:30 p.m. Tuesday. eteorologist Greg Flatt said. e storm picked up force as it led into Hidalgo County during early morning hours.

Kurt Vanspeybroeck, another ather service meteorologist, d the subdivision's residents countered a weak tornado, ich contained winds between and 100 miles per hour. He id there was damage from the rthwest corner of Seven Mile ad that extended southeast a arter of a mile across the sub-vision.

"The damage path really does t support straight line winds, t there are some minor indica-ns that there was some rota-n in there," Vanspeybroeck id.

The sights of mangled mobile

homes, broken furniture and shredded clothing were sobering to members of the La Joya Volunteer Fire Department.

"This is the worst thing I have ever seen," said Jonathan

Reyna III on Wednesday morning in the Pueblo de Palmasi subdivision, located about 7 miles north of La Joya. A storm struck the area early Wednesday.

is left in a propane tank, cush-ions brown upholstered recliners

Maldonado, a department mem-ber. "I can't explain. It just hap-pened."

Subdivision resident Arminda Aranda planned to fix her house and add two rooms. Now all that

**DAMAGE:** Standing by a bed removed from her demolished mobile home, seen in the background, Margarita Reyna holds her 1-year-old son Ismael

*The Monitor / Larry W. Cobb*

Please see STORM, Page A7

▪ Family story, A7

---

**EEDOM**
UNICATIONS, INC.

Vol. 91 No. 351
Copyright 2003

### CONTENTS

| | | |
|---|---|---|
| Amusements | A13 | Obituaries | C3 |
| Business | B4 | Opinion | A4 |
| Classified | C4 | RioLiving | C1 |
| Comics/Crossword | B7 | Sports | B1 |
| Community | A12 | TV listings | A13 |
| Movies | C2 | Valley | A9 |

---

emale inmates involving Zamora and for-mer punishment officer Alex Garcia.

Both men were suspended without pay Dec. 10 and fired Feb. 28 during a Cameron County district attorney investigation that included forensic probes in the county's downtown female detention center.

Zamora turned himself in last week at the Carrizales-Rucker Detention Center, where he had worked until his suspension, and immediately posted $15,000 bail. The father of four behind bars for up to two years with up to $10,000 in fines. The grand jury did not indict Garcia, although District Attorney Yolanda de Leon said last week that the case is still under investigation.

De Leon also responded to Zamora's claims that investigators had never contact-ed him during the more than five-month probe.

"Mr. Zamora's lawyer did not contact us until very recently and there was absolutely no discussion about having a conversation

Please see 'EX-JAILER,' Page A8


Dan Morin                    *Star photo by Ric Vasquez*

# Deal of the Day
## Sports
Page B14

**NBA PLAYOFFS**
## Mavericks take Trail Blazers

Weslaco: "It pretty much blew up in La Joya, Sullivan City and by the time it came to Weslaco, it was nothing."

## MORIN / June trial

### Continued from Page A1

The city is prepared to go to court, Mayor Connie de la Garza said.

"The city's position in this lawsuit is the facts will stand on their own," he said. "We feel the facts are on our side."

In October, a panel of the U.S. Fifth Circuit Court of Appeals reversed Vela's dismissal of the state negligence claim.

In the same ruling, the court's three-judge panel upheld a decision that dismissed the Morins' federal claim which requested unspecified damages.

The panel also upheld a ruling that dropped former Police Chief Jim Scheopner and Capt. Joey Vasquez as defendants.

In the case that stems from two lawsuits, the Morin family claims Vasquez gave an AK-47 assault rifle to R.D. Moore, who stored it in a gun vault in his son's bedroom.

In the early morning of July 7, 1998, Ernest Moore forced his way into the Morins' Rio Hondo home to find his ex-girlfriend, Julie Lynn Cox. Inside, he used the assault rifle to kill Flores and Delia Morin, leaving Dan Morin critically wounded.

After the attack on the Morin home, Ernest Moore drove to his parents' San Benito home, where he killed two U.S. Border Patrol agents and critically wounded a sheriff's deputy.

March 13, U.S. District Judge Hilda Tagle dismissed a $35 million federal claim against the city in the case that stemmed from Ernest Moore's use of a police-issued AR-15 assault rifle to kill the Border Patrol agents and injure the deputy.

But Tagle upheld the state negligence case.

The city's insurance covers up to $10 million in damages.

• Send a picture to other Vision
• Attach your voice or text mes

Share

500

▶ Unlimited PCS to PCS

▶ Unlimited Night & Wee

▶ Nationwide Long Dista

Certified PCS Vision℠ Specialists.


Sprint Store
The PCS Center

For free delivery with phone purchase and activation
www.sprintpcs.com
1-800-480-4PCS

*Monthly service plan rate excludes taxes, surcharges (including a USF

**Nationwide network reaches more than 230 million people.** Services are not available on Sanyo 8100 at participating retailers with purchase by 6/29/03. Instant savings 6/29/03 and activation by 7/13/03 on a PCS Consumer Service Plan. Savings may not exceed applies. Up to a $250 deposit may be required. Voice usage rounded to next whole minute. charged $0.50 per minute and, if applicable, an additional $0.25 per minute for long distance with any device used as a modem. Access to and downloading of premium content is

1

```
          IN THE UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF TEXAS
                 BROWNSVILLE DIVISION
```

ARTURO GUILLERMO SALINAS, ET AL )
                                )
                                ) CIVIL ACTION NO.
VS.                             ) B-98-162
                                )
CITY OF HARLINGEN, ET AL        )

```
                VOIR DIRE PROCEEDINGS
          BEFORE THE HONORABLE HILDA G. TAGLE
                  FEBRUARY 11, 2002
```

APPEARANCES:

For the Plaintiffs,          MR. BROADUS A. SPIVEY
Salinas and Rodriguez:       MR. PRICE AINSWORTH
                             Attorneys at Law
                             Austin, Texas

For the Plaintiff,           MRS. SONIA LOPEZ
Rodriguez:                   MR. RAMON GARCIA
                             Attorneys at Law
                             Edinburg, Texas

For the Defendants:          MR. TOM LOCKHART
                             MR. ROGER HUGHES
                             Attorneys at Law
                             Harlingen, Texas

Transcribed by:              BRECK C. RECORD
                             Official Court Reporter
                             600 E. Harrison, Box 16
                             Brownsville, Texas  78520
                             (956) 548-2510

Captured and Transcribed by Computer - Eclipse

---

I-N-D-E-X

|  | Page No. |
|---|---|
| Jury panel out | 29 |
| Recess taken | 37 |
| Jury panel in | 37 |
| Jury panel out | 116 |
| Lunch recess | 117 |
| Bench conference | 118 |
| Bench conference concluded | 119 |
| Jury panel in | 119 |
| Jury panel complete | 120 |
| Jury panel out | 124 |
| Discussion off the record | 130 |
| Jury panel in | 134 |
| Recess taken | 134 |
| Bench conference | 134 |
| Jury panel out | 137 |
| Court Reporter's Certificate | 140 |

Captured and Transcribed by Computer - Eclipse

---

3

1    THE COURT:  Ladies and gentlemen of the jury, my name is
2  Hilda Tagle and I'm the judge that will be presiding in this
3  case which is styled in its entirety as -- let me get the full
4  style.  This case that we are selecting a jury for is styled
5  Arturo G. Salinas, et al, Heriberto M. Rodriguez, et al, and
6  Raúl Rodriguez versus the City of Harlingen, Texas.  I'm going
7  to -- there's a lot of questions I need to ask you, but I'm
8  going to start off by telling you that the jury that we're -- we
9  select in any case, whether it is a civil or criminal, is a jury
10 that can tell me under oath that they have no impediment to
11 being able to take the oath as a juror.
12    Now, you have already been sworn in.  You've told The Court
13 by that oath that you're going to give truthful answers about
14 your qualifications as jurors for this case.  We've already
15 inquired about the qualifications for you just to be a juror in
16 a case and you have met those qualifications.  The
17 qualifications that we're talking about now are qualifications
18 to serve as a juror in this particular case.  Again, the oath
19 that you would take if you are selected for the jury is one that
20 promises The Court and the parties and the public that you will
21 render a verdict based upon the law that The Court gives you and
22 the evidence that you have heard in this courtroom.  If there is
23 any opinion, experience or belief that you hold that's going to
24 be a factor in how you decide this case, then in all honesty,
25 you are not complying with that oath.  The purpose of voir dire,

Captured and Transcribed by Computer - Eclipse

---

4

1  which roughly means to tell the truth, is for The Court and the
2  parties to determine whether there is any experience that you
3  have had, anything that you've been exposed to, whether it is
4  media accounts or conversations such that you feel that you
5  already have an opinion about the facts of this case.  And so
6  laying that as a predicate, because I know when there is a case
7  involving something that is widely published, that a lot of
8  people may have read newspaper accounts in the past or maybe
9  even in the most recent past.  You might have had watched
10 television news accounts, you may have heard radio news
11 accounts.  If you are proficient with the computer, you might
12 have seen something on the Internet that gives news information.
13 For you to tell me on the one hand, "Judge, I promise to make a
14 decision based on the evidence that I hear in this case," but
15 instead rely on the information that you may have heard on
16 television -- heard or seen on television or heard on the radio
17 or seen in the newspaper or the Internet and use that
18 information to make a decision is a violation of that oath.  You
19 know, when a witness takes the oath to testify truthfully,
20 that's something that you as a juror have to rely on that they
21 know the seriousness of the oath.  Well, when you take an oath
22 as a juror, it is as solemn a promise to The Court of your
23 willingness to make a decision based upon the law and the
24 evidence as the promise that I took when I said I would uphold
25 the laws and the constitution of this United States.  So, I

Captured and Transcribed by Computer - Eclipse

5

1  assure you that your job as a juror is an extremely important
2  one and it starts off by being truthful about any experiences,
3  opinions or beliefs that you have that might in some way be a
4  factor in the way you evaluate the evidence and how you make a
5  decision in this case.
6      Let me start off by asking whether any of you on the panel
7  know any of the people who are involved in this case and I'll
8  start off with the attorneys representing the Plaintiffs. And
9  Mr. Spivey, if you will please list for the panel the
10  individuals who you represent, counsel who's with you, and any
11  staff.
12      MR. SPIVEY: Good morning. I'm Broadus Spivey, one of
13  the lawyers representing the Plaintiffs in this case. And with
14  me today is Mr. Price Ainsworth, my partner, and Mrs. Ann
15  Merriman, a paralegal with our office who will be helping.
16      I represent and present in the courtroom today Mr. Art
17  Salinas, Mr. Gilbert Rodriguez, and should I read the other
18  witnesses at this time or what?
19      THE COURT: No. At this point, I just wanted to have
20  them meet the people in the courtroom and are you introducing
21  Mr. Pena, as well.
22      MR. SPIVEY: I'm sorry. My friend, Richard Pena. And I
23  apologize.
24      THE COURT: All right. Now, Mrs. Lopez, would you
25  please introduce yourself and your co-counsel and your

Captured and Transcribed by Computer - Eclipse

6

1  representatives of your clients.
2      MRS. LOPEZ: Yes, Your Honor. Good morning. My name is
3  Sonia Lopez. I'm one of the plaintiff's attorney on this case.
4  My co-counsel in this case is Mr. Ramon Garcia. And the client
5  that I have the privilege of representing is Mr. Raúl Rodriguez.
6      THE COURT: Thank you. And also Mr. Spivey, please -- I
7  think you just listed -- just said my clients. Please indicate
8  the entire list of clients whom you represent.
9      MR. SPIVEY: I will, Your Honor. Mr. Gilbert Rodriguez
10  is here for himself and his young daughter, Megan, who's a minor
11  and she will not be here. He represents himself, his daughter
12  and the estate of his deceased wife, Susan Rodriguez. And then
13  her parents, Mr. and Mrs. Williams from Tennessee, who will be
14  here for the trial but are not here today. Mr. Salinas
15  represents, of course, himself and his wife Mrs. Idalia Salinas
16  who will also be here for the trial.
17      THE COURT: All right. Thank you.
18      Mr. Lockhart, would you please introduce who's with you?
19      MR. LOCKHART: Thank you, Your Honor. Good morning I'm
20  Tom Lockhart and my partner there is Roger Hughes, Mary
21  Martinez.
22      THE COURT: If you will stand as your name is called
23  please. If you will stand as your name is called.
24      MR. LOCKHART: Roger Hughes. Mary Martinez. Rita
25  Balli. We're all with the law firm of Adams & Graham in

Captured and Transcribed by Computer - Eclipse

7

1  Harlingen. Also with us today is the city manager of Harlingen,
2  Roy Rodriguez.
3      THE COURT: All right. Thank you.
4      MR. LOCKHART: Thank you, Your Honor.
5      THE COURT: Now, what I'm going to be asking information
6  about right now is whether any of you know any of the folks who
7  have been introduced to you. And if you do, I will -- you have
8  probably been instructed already that you will help us by giving
9  us your number rather than your name. I hate to treat people as
10  numbers, but it is just a necessity sometimes. And if you will
11  just give us your number and tell us who it is that you know.
12  And the fact that you know somebody who's been introduced to you
13  doesn't disqualify you. It merely is the starting point and
14  because what I want to know is do you know that person because
15  of professional contact with them, professional dealings or
16  personal friendship. Is it a relative? The fact that they are
17  a relative, how close of a relative are they to you? Do they
18  discuss their work with you? Anything about that personal
19  relationship that would cause you to render a decision one way
20  or the other in this case? And I've not been told from this
21  side, do we start off with No. 1?
22      (Consultation between the judge and the court reporter.)
23      THE COURT: I'm going to ask you to respond by row on
24  this side. First of all, does anybody in the first row know any
25  of the individuals who have been introduced to you or who have

Captured and Transcribed by Computer - Eclipse

8

1  been mentioned to you this morning?
2      Madam, if you will stand please. Give us your number.
3      PROSPECTIVE JUROR: No. 9. I'm Rachel Hendricks. And
4  yes, I do know the city manager, Roy Rodriguez. He's my
5  husband's employer -- or my husband works for the City of
6  Harlingen.
7      THE COURT: All right.
8      MR. LOCKHART: And I know Tom Lockhart, but it is on a
9  business level.
10      THE COURT: Madam, if you can tell me the kind of work
11  that your husband does for the City of Harlingen.
12      PROSPECTIVE JUROR: He's the risk manager in Harlingen.
13  Marvin Hendricks.
14      THE COURT: Okay. Has he discussed anything about the
15  facts of this case with you.
16      PROSPECTIVE JUROR: No, not necessarily, because he has
17  said that this was a very private matter, that he could not
18  bring it home and I respect him for that.
19      THE COURT: All right. Is the fact that your husband is
20  employed by the city of Harlingen going to be a factor that it
21  is going to influence your decision in this case, how you view
22  the evidence either for or against the city in any way?
23      PROSPECTIVE JUROR: No. I really I thought for a while
24  maybe it would, but I don't, personally speaking, because I
25  think this is an individual case. You know, both sides -- we

Captured and Transcribed by Computer - Eclipse

9

1   weigh both sides on it and we go from there; so, I don't foresee
2   any problem, no.
3           THE COURT:  If you were in the shoes of the plaintiff or
4   the any of the plaintiffs, how would you feel if a juror were to
5   make that representation to you saying, "Look, my husband's
6   employed by the City of Harlingen, but it is not going to be a
7   factor"?  I mean, would you be uneasy about that representation?
8           PROSPECTIVE JUROR:  I don't really believe so to be
9   honest with you.  I've always been a very biased person, look at
10  both sides coming from a large family and being the middle one
11  of a family of 13, I have had to be the mediator, you know.  So,
12  anybody with a big family in that situation would realize
13  there's both sides to both -- or, you know, happens to both
14  sides.
15          THE COURT:  You use the word bias.  Maybe you misspoke.
16  Did you mean to say that you were unbiased?  I don't want to put
17  words in your mouth.                 !
18          PROSPECTIVE JUROR:  Unbiased means that you don't take
19  sides.
20          THE COURT:  Bias means you do take sides.
21          PROSPECTIVE JUROR:  Kind of turned around a little bit
22  there.  But basically I've had to be a mediator all my life.
23          THE COURT:  All right.  And so are you telling The Court
24  that there's nothing in that relationship, that business
25  relationship that your husband has that would make it impossible

10

1   for you to take an oath that says that you're promising to The
2   Court and the parties and the public that you will render a
3   verdict based upon the law and the evidence?  The question is,
4   is there anything to --
5           PROSPECTIVE JUROR:  No.
6           THE COURT:  -- keep you from taking that oath and being
7   honest about that oath?
8           PROSPECTIVE JUROR:  No, I don't.
9           THE COURT:  All right.  Thank you.  Anybody else on the
10  first row?  Second row?
11          PROSPECTIVE JUROR:  No. 18.  I work for the City of
12  Harlingen.  I'm an accountant there.
13          THE COURT:  You're an accountant.
14          PROSPECTIVE JUROR:  Yes.
15          THE COURT:  It would be in the city manager's office or
16  budget department or --
17          PROSPECTIVE JUROR:  In the finance department.
18          THE COURT:  In the finance department.  All right.  So,
19  basically, you have a even closer relationship than the other
20  juror or the other lady who just spoke out.
21          Madam, is there anything that would, in your opinion, make
22  it impossible for you to take an oath that you will render a
23  verdict based upon the law and the evidence?  And before you
24  answer that, I just want to make sure that what I'm asking about
25  covers the situation where you would be in the jury room

11

1   deliberating and, you know, if there was a -- any inclination on
2   your part to favor the city because you don't -- you wouldn't
3   want repercussions after the jury returns its verdict that you
4   would not be willing to make a decision because you would be
5   fearful of any repercussions at your job once you go back to
6   work.
7           PROSPECTIVE JUROR:  I wouldn't be fearful of
8   repercussions at all, but I don't know that I could be unbiased
9   about it.  Another factor is that R.D. Moore is my cousin.
10          THE COURT:  All right.  Thank you, madam.  Anybody else,
11  second row?
12          PROSPECTIVE JUROR:  I'm No. 16.  Jack Hatfield.  And I
13  know all three of the gentlemen at the defense table.  And a
14  further complicating factor is that at the time these events
15  occurred, I was a city commissioner for the City of Harlingen.
16          THE COURT:  Thank you, sir.  Well, let me ask you this.
17  Just for the record, because we do need to make a record, is
18  there anything then -- any of those experiences then that would
19  make it impossible for you to take the oath as a juror?
20          PROSPECTIVE JUROR:  That's difficult to say, but it
21  would be difficult for me to be unbiased.
22          THE COURT:  Thank you, sir.
23          Third row?
24          Fourth row?
25          PROSPECTIVE JUROR:  No. 37.  My husband is the recycling

12

1   supervisor for the City of Harlingen.
2           THE COURT:  All right.  And has he discussed anything at
3   all about this case to the extent that he may have had some
4   knowledge, either by knowing people involved or anything like
5   that?
6           PROSPECTIVE JUROR:  No, ma'am.
7           THE COURT:  Is there anything that would make it
8   impossible for you to take the oath that you will render a
9   verdict based upon the law and the evidence?
10          PROSPECTIVE JUROR:  No.
11          THE COURT:  Thank you, madam.  Anybody else on that same
12  row?
13          PROSPECTIVE JUROR:  No. 35.  Raul Garza, Jr.  And I've
14  been associated with Mr. Pena's office on a professional matter.
15          THE COURT:  Has he represented you or maybe have been on
16  the other side of a case that you were involved in?
17          PROSPECTIVE JUROR:  No.  His office in Harlingen
18  represented me on a personal injury case that I had.  Workmens'
19  case.
20          THE COURT:  So, in effect, you have had a relationship
21  where you had to confide things in him and it is a very close
22  relationship, the attorney/client relationship.  Is the fact
23  that you have had that relationship in the past going to make it
24  difficult for you to be impartial in how you view the evidence,
25  because, you know, basically as a juror, you have to listen to

13

1  the evidence and decide on the credibility of witnesses, you
2  know, based on what you hear in the courtroom and not based on
3  any personal relationship that you may have had with one of the
4  attorneys.  Can you do that?
5      PROSPECTIVE JUROR:  Well, dealing with the company that
6  I was dealing with -- well, it becomes a battle in discussions
7  that you have with them; so, you tend to kind of hold yourself
8  back from -- how can I put this -- you become more defensive.
9  So, as far as companies or large places are concerned, as far as
10 employers, you tend to want to hold back and not really listen
11 to everything that they have or that they're stating from their
12 side because -- it's like an underdog thing.
13     THE COURT:  Well, let me just ask you to clarify things.
14 I'm getting from you that based on your experience in your case
15 you are basically in the shoes similar to the plaintiffs in this
16 case and that as a result of that experience that you may tend
17 to favor the plaintiffs because you might see your situation as
18 similar to theirs in what occurred in your case?
19     PROSPECTIVE JUROR:  Yes, that's correct.  I've been a
20 correctional officer before, too, so I understand the law and,
21 you know, how things work and everyone is guilty about, you
22 know, whatever may have happened, but with personal experiences,
23 it is kind of hard to weigh the sides.
24     THE COURT:  And that's what I wanted to tell me and
25 I'm going to take the opportunity to use you as an example for

Captured and Transcribed by Computer - Eclipse

14

1  everybody else and merely to say that there are no right or
2  wrong answers in this process.  What is wrong is for you to have
3  an opinion, experience, or belief and not to express it in a way
4  that makes it clear to The Court that you understand the
5  seriousness of the oath, that, you know, your promise that you
6  have to promise that you're going to be unbiased and make a
7  decision based only on what you hear.  And if there's a personal
8  experience that you have and not what your son says, you
9  cannot take that oath.  And is that what you're telling me, sir?
10     PROSPECTIVE JUROR:  Yes, I am.
11     THE COURT:  Thank you.  Anybody else on that same row?
12 All right.  The first row on the other side, please?
13 Anybody know any of these folks who were introduced to you?
14 Next row?  Gentleman at the very end.
15     PROSPECTIVE JUROR:  Yes, ma'am.  I'm No. 50, Guadalupe
16 Sanchez.  And I believe one of the officers is involved in this
17 case, Joe Vasquez.  And I deliver his mail.
18     THE COURT:  All right.  So, although we've not listed
19 the witnesses, you have heard either through news accounts or
20 radio reports or something that you understand now that you know
21 one of the witnesses --
22     PROSPECTIVE JUROR:  Yes, ma'am.
23     THE COURT:  -- or somebody who may be called as a
24 witness by one side or the other?
25     PROSPECTIVE JUROR:  Yes, Your Honor.

Captured and Transcribed by Computer - Eclipse

15

1      THE COURT:  All right.  And, sir, is the fact that you
2  know this potential witness going to be a factor in how you
3  evaluate either his testimony or any testimony about him that
4  another witness may give?
5      PROSPECTIVE JUROR:  Yes.
6      THE COURT:  All right.  So, are you saying then that
7  because of that business relationship that you're going to be
8  unable to weigh that testimony in an objective way?
9      PROSPECTIVE JUROR:  Yes, ma'am.
10     THE COURT:  All right.  So then are you saying then that
11 because of that that you would not be able to take an oath as a
12 juror that you would render a verdict based upon the law and the
13 evidence?
14     PROSPECTIVE JUROR:  Yes, Your Honor.
15     THE COURT:  Thank you, sir.
16 Anybody else on that same row?  Madam, go ahead.
17     PROSPECTIVE JUROR:  I'm 52.  My number is 52.  And I do
18 have a son that works for the police department in Harlingen.
19     THE COURT:  Okay.
20     PROSPECTIVE JUROR:  But, you know, I would base
21 everything on whatever the -- the witnesses.
22     THE COURT:  In other words, you're telling me that you
23 would render a verdict based upon what you -- the evidence that
24 you hear in the courtroom and not --
25     PROSPECTIVE JUROR:  Not on what my son tells me, but

Captured and Transcribed by Computer - Eclipse

16

1  just I would like to hear that.
2      THE COURT:  And that you would not be influenced by the
3  fact that you have a son who's employed by the City of
4  Harlingen?
5      PROSPECTIVE JUROR:  Right.
6      THE COURT:  And you understand that -- well, has your
7  son discussed this case with you?
8      PROSPECTIVE JUROR:  No, just what -- the paper, you
9  know.
10     THE COURT:  Okay.  We'll cover that momentarily.  But
11 when you said something about you're going to make a decision on
12 what the witnesses say and not what your son says, you
13 understand that if you were a juror, even before you're brought
14 in to be sworn, that once you are notified that you are on a
15 jury -- on this jury, you cannot allow anyone to talk to you
16 about this case.  And that if somebody were to attempt to talk
17 to you about this case, that you are to report that to The
18 Court, do you understand that?
19     PROSPECTIVE JUROR:  Yes.  He never told me anything.
20     THE COURT:  Well, even afterwards, if I were to tell
21 you, madam, you're going to be on the jury and then the next day
22 or that evening somebody talks to you about it, then you have to
23 report that to The Court, do you understand that?
24     PROSPECTIVE JUROR:  I sure will.  Thank you, Your Honor.
25     THE COURT:  Anybody else.  There's another lady on the

Captured and Transcribed by Computer - Eclipse

17

1  first row?

2      PROSPECTIVE JUROR:  I apologize for not understanding up

3  awhile ago but I thought -- I'm sorry, 48.  And I thought the

4  question was if I knew anybody that was here, which I don't.

5  But my son does work for Cameron County Sheriff Department and

6  he has been employed by Harlingen P.D., also.

7      THE COURT:  Okay.  I'm going to get to that line of

8  questioning in a moment, but since you stood up, let me go ahead

9  and ask you.  Has your son ever discussed anything to you --

10  with you about the facts of this case?

11      PROSPECTIVE JUROR:  If this is the case I think it is,

12  when it first happened, he was one of the officers on the scene

13  when the events took place.  Very little did he say, but just

14  like that day, you know, things that happened, but no opinions

15  on his part or anything anyway.

16      THE COURT:  More importantly, on your part, are there

17  any opinions that you have formed about the facts of this case?

18      PROSPECTIVE JUROR:  No, because I don't know the

19  evidence of the case.

20      THE COURT:  And is the fact that your son was from what

21  you understand involved to some extent, how ever limited it may

22  have been, is there anything about that particular fact that

23  would make it impossible for you to be objective in how you

24  evaluate the evidence?

25      PROSPECTIVE JUROR:  No.

Captured and Transcribed by Computer - Eclipse

18

1      THE COURT:  All right.  Thank you, madam.

2  The question is is there anyone on the panel who knows any

3  of the folks who have been introduced to you?

4  All right.  The next row?

5  I think on the last row, somebody was raising their hand.

6      PROSPECTIVE JUROR:  I'm 78.  And I know Tom Lockhart.  I

7  was in banking for 30 years and he was a customer.  But in all

8  honesty, I personally believe the Harlingen Police Department --

9      THE COURT:  Madam, before you go any further, let me

10  just ask you to -- I guess if you will just hold on to what you

11  were going to say and if necessary we'll bring you back and

12  discuss your opinion outside the presence of the rest of the

13  panel.  And only if it is necessary.  Thank you, madam.

14  Anybody else?

15      PROSPECTIVE JUROR:  I'm No. 80.  I know the city

16  manager, Mr. Rodriguez.  I work with him -- not with him, but

17  with the city on a professional.

18      THE COURT:  I'm sorry, are you employed by the city or

19  are you --

20      PROSPECTIVE JUROR:  No.  We do business in the City of

21  Harlingen.  I've had the chance to work with the city manager to

22  clear up some issues with regards to --

23      THE COURT:  In regards to what?

24      PROSPECTIVE JUROR:  Code.  I'm a developer and builder;

25  so, occasionally we have to answer clarification code.

Captured and Transcribed by Computer - Eclipse

19

1      THE COURT:  Sir, is that professional relationship going

2  to be such that there would be an impediment to your taking the

3  oath that you will render a verdict based on the law and the

4  evidence?

5      PROSPECTIVE JUROR:  No.

6      THE COURT:  So there's nothing in your experience or

7  your contacts with the city officials that would make you either

8  have a strong feeling against or strong feeling for the City of

9  Harlingen?

10      PROSPECTIVE JUROR:  No.  No.

11      THE COURT:  All right.  Thank you, sir.

12  Very briefly for those who mentioned -- somebody mentioned

13  they're not sure what case this is, but let me just give you a

14  very brief statement of the case that has been drawn up by the

15  parties which says, "On July 7th, 1998, U.S. Border Patrol Susan

16  Lynn Rodriguez and Ricardo "Rick" Salinas and Cameron County

17  Deputy Sheriff Raúl Rodriguez were shot by Ernest Moore,

18  Detective R.D. Moore's adult son, with a Harlingen Police

19  Department AR-15 semiautomatic rifle.  The agents were killed

20  and Deputy Rodriguez was seriously injured.  Okay.  That's the

21  extent of the -- that's basically a very short overview about

22  what this case involves.

23  Now I'm going to be asking you about any exposure that you

24  have had to news accounts in any way, shape or form, but it is

25  not just exposure to news accounts; it is whether, as a result

20

1  of those news accounts, you have formed an opinion about who

2  should or should not be held responsible in connection with the

3  events or the injuries that were incurred on that date.  I don't

4  want you to tell me what that opinion is, but if you do hold an

5  opinion about what person or persons or entities are to be held

6  responsible in connection with this case and you do not tell me

7  that you have such an opinion, that would be a violation of the

8  oath that you have taken that you're going to give truthful

9  answers to my questions about your qualifications.  And I cannot

10  stress that enough because, again, to have such an opinion, for

11  you not to tell me, in turn, and then for you to take the oath

12  that you are going to render a verdict based upon the law and

13  the evidence when, in fact, you're going to be forming that

14  opinion or making a decision as a juror based on an opinion you

15  already hold before you have any evidence is a violation also of

16  the oath as a juror.  So, please understand that this is an

17  extremely important area of questioning again.  And let me give

18  you an example of what I mean about I don't want you to tell me

19  what your opinion is.  Frequently, when I'm questioning jurors,

20  I tell them "I want to know, have you ever served on a jury?

21  And I don't want to know what that decision was, but just tell

22  me did you reach a decision?"  And inevitably, somebody says,

23  "Yes, I served on a jury and we found the guy guilty."  Well, I

24  don't -- you know, when I tell you, I don't want you to tell me

25  what that opinion is.  I just want for you to examine your

Captured and Transcribed by Computer - Eclipse

21

1 conscience and tell me have you formed an opinion based on what
2 exposure you had to news accounts in any way, whether it is
3 newspaper, television, radio, Internet, any kind of coverage or
4 any conversations that you have had with your family, friends,
5 co-workers such that you already have in your mind an opinion
6 about who should be or should not be responsible as a result of
7 the events that occurred on this day.
8       First row on the left side, have any of you been exposed to
9 news accounts in any way, shape or form?
10      PROSPECTIVE JUROR: Number is 10 and I have an opinion.
11      THE COURT: All right. Well, let me just ask -- I tell
12 you what, for those who do have an opinion, just tell me
13 and then we may follow up with more questioning. Let's just
14 start off with that.
15      First row, anybody else? Have y'all -- maybe it should be
16 easier to say who has not seen or heard any news accounts about
17 this event on the first row?      !
18      PROSPECTIVE JUROR: Has not?
19      THE COURT: Anybody who has not seen any television
20 accounts or news accounts on the television or radio? And I
21 just want -- because I want to do it by process of elimination.
22 So, you don't know anything about the facts of this case? And
23 your number?
24      PROSPECTIVE JUROR: No. 4.
25      THE COURT: And there's somebody to your right? Nobody

22

1 else? Yes?
2       PROSPECTIVE JUROR: No. 2.
3       THE COURT: All right. Then I'm going to assume that
4 other than the gentleman who first spoke everybody else has read
5 or heard news accounts except for the two ladies who just now
6 told us you haven't, but you have no opinion about the facts of
7 this case; is that correct? And everybody -- let me start off
8 with No. 1. Is that a correct statement, sir?
9       PROSPECTIVE JUROR: Correct.
10      THE COURT: All right. And No. 3, sir, is that a
11 correct statement? Is that correct?
12      PROSPECTIVE JUROR: Yes, correct.
13      THE COURT: No. 4, madam; is that correct? I'm sorry,
14 No. 5?
15      PROSPECTIVE JUROR: Yes.
16      THE COURT: No. 6?
17      PROSPECTIVE JUROR: Correct.
18      THE COURT: Seven?
19      PROSPECTIVE JUROR: Correct.
20      PROSPECTIVE JUROR: Correct.
21      PROSPECTIVE JUROR: Correct.
22      THE COURT: On the next row, is there anyone here on
23 that row who has not heard anything about the facts of this case
24 in any way, shape or form?
25      PROSPECTIVE JUROR: No. 20.

23

1       THE COURT: No. 20.
2       PROSPECTIVE JUROR: Yes, No. 20.
3       THE COURT: Anybody else on that row? All right then.
4       Of that row, is there anyone here who, as a result of the
5 media coverage in this case, has formed an opinion about who
6 should be held responsible or not be held responsible in
7 connection with the events of that day?
8       PROSPECTIVE JUROR: No. 18. I have an opinion.
9       THE COURT: Thank you, madam.
10      PROSPECTIVE JUROR: No. 20. And as member of the City
11 Commission of Harlingen during the time of these events and the
12 two years, we had periodic updates about the trial or about the
13 lawsuit over a period of two years.
14      THE COURT: All right.
15      CASE MANAGER: He was No. 16.
16      THE COURT: All right. If you will give us your number
17 when you respond.
18      PROSPECTIVE JUROR: No. 11 and I have an opinion.
19      THE COURT: Thank you.
20      On the next row, is there anyone on that row who has not
21 heard any news accounts in any way, shape, or form about the
22 events that I've just mentioned?
23      PROSPECTIVE JUROR: I'm No. 21. And I did not know. I
24 don't know any of the facts.
25      THE COURT: All right. Is there anyone on that same

24

1 row, who, after having had exposure to media coverage about the
2 events that I have just mentioned, has already formed an opinion
3 about who should be or should not be held responsible for the
4 injuries that -- or that have occurred on that day?
5       PROSPECTIVE JUROR: I'm No. 23. I have an opinion.
6       THE COURT: Thank you.
7       PROSPECTIVE JUROR: No. 26, and I have an opinion.
8       PROSPECTIVE JUROR: I'm No. 30, and I have an opinion.
9       THE COURT: All right. The last row, you have heard the
10 question. Is there anyone on that row who does not know or has
11 not been exposed to any media coverage or not had anybody
12 discuss that case with them?
13      PROSPECTIVE JUROR: Number 38. I don't know anybody and
14 I didn't know what the case was about, but my son is a border
15 patrolman.
16      THE COURT: Okay. Well, if you will just -- when I get
17 to that momentarily, you'll be allowed to tell us more. Anybody
18 else who does not know anything about this case because you have
19 not seen any accounts or heard --
20      PROSPECTIVE JUROR: No. 34, and I don't know anything
21 about the case and I don't know anybody there.
22      THE COURT: All right. Thank you. There was another
23 person.
24      PROSPECTIVE JUROR: No. 31. I don't know anything about
25 this here.

25

1    THE COURT: Sir, I'm sorry, just hang on to the
2    microphone for the moment. Now, is there anyone here on that
3    row who has been exposed to media coverage in any way, shape or
4    form or has discussed this case with somebody in such that you
5    have formed an opinion about who should or should not be held
6    liable if at all in connection with this case? There's a hand
7    that --
8    PROSPECTIVE JUROR: I'm No. 39, and I have an opinion.
9    THE COURT: All right. All right. Was there somebody
10   else.
11   PROSPECTIVE JUROR: I'm No. 35, and I have an opinion.
12   THE COURT: All right. Thank you.
13   PROSPECTIVE JUROR: No. 36, and I have an opinion.
14   THE COURT: Thank you. All right. On the first row on
15   the right-hand side?
16   PROSPECTIVE JUROR: No. 47, and I don't know anything
17   about the case.
18   THE COURT: Anybody else wishes to respond. I think
19   there's a lady in the --
20   PROSPECTIVE JUROR: I'm No. 49, and I know nothing about
21   the case.
22   PROSPECTIVE JUROR: No. 46, and I don't know anybody
23   either.
24   THE COURT: Well, it is not whether you know anybody.
25   Do you know anything about this case, either through any news

Captured and Transcribed by Computer - Eclipse

26

1    accounts of any way, shape or form?
2    PROSPECTIVE JUROR: No, ma'am.
3    THE COURT: Thank you.
4    PROSPECTIVE JUROR: No. 41, and I don't know anything
5    about the case?
6    THE COURT: All right. Now, on that row, is there
7    anyone, who because of or as a result of any media coverage --
8    television, radio, newspaper, Internet -- and as a result of
9    that exposure has already formed an opinion about the facts of
10   this case? All right.
11   The next row who -- if anybody has not heard anything at all
12   about this case?
13   PROSPECTIVE JUROR: No. 51, and I don't know anything
14   about the case.
15   THE COURT: All right. Anybody else on that row? Is
16   there anyone on that row who has, as a result of the media
17   coverage -- radio, TV, newspaper or Internet -- has already
18   formed an opinion about who should be held responsible or should
19   not be held responsible in connection with the events of that
20   day?
21   PROSPECTIVE JUROR: No. 53.
22   COURT SECURITY OFFICER: Please rise.
23   PROSPECTIVE JUROR: No. 53, and I have an opinion.
24   THE COURT: Thank you. There's another gentleman.
25   PROSPECTIVE JUROR: No. 50, and I have an opinion.

Captured and Transcribed by Computer - Eclipse

27

1    THE COURT: Thank you.
2    All right. On the next row, is there anyone who has not
3    heard anything about the facts of this case at all?
4    PROSPECTIVE JUROR: I'm No. 60 and I have no knowledge
5    of this story.
6    THE COURT: Thank you. Anybody else?
7    PROSPECTIVE JUROR: 59, and I have an opinion.
8    THE COURT: All right. In other words, madam, just to
9    clarify it, I have not asked the question yet, but as a result
10   of the media coverage or discussions with family, friends or
11   co-workers, you already have an opinion about the facts of this
12   case?
13   PROSPECTIVE JUROR: Yes, ma'am.
14   THE COURT: Thank you. Anybody else who has a response
15   to that question?
16   PROSPECTIVE JUROR: No. 62, and I do have an opinion.
17   PROSPECTIVE JUROR: No. 65, and I have an opinion.
18   PROSPECTIVE JUROR: No. 66, and I do have an opinion.
19   THE COURT: Thank you.
20   PROSPECTIVE JUROR: No. 67, I do have an opinion and I
21   want to say for the record that I went to high school with
22   Ernest Moore. I used to tutor him in algebra in high school.
23   THE COURT: Okay. Thank you. Anybody else?
24   Next row? Is there anyone on that row who has not heard
25   anything about the facts of this case?

28

1    Is there anyone who, as a result of the media coverage, has
2    formed an opinion about who should be held responsible or should
3    not be held responsible in connection with these events?
4    PROSPECTIVE JUROR: No. 78, and I do have an opinion.
5    THE COURT: Thank you.
6    PROSPECTIVE JUROR: No. 72, and I do have an opinion.
7    THE COURT: All right. There was another gentleman who
8    raised his hand on this side.
9    PROSPECTIVE JUROR: No. 14. I apologize for not telling
10   you earlier. I guess I do have an opinion.
11   THE COURT: Anybody else? All right.
12   Members of the jury panel, I'm going to recess you
13   momentarily and I'm going to ask you to keep in mind these
14   instructions while you are in recess. Do not talk about the
15   kinds of questions that I have asked you, do not talk about
16   anything to do with this case, because you may not realize it,
17   but you know how sometimes a person says something and somebody
18   overhears and they only catch part of what the conversation is
19   and that part sounds to them different than how you meant it? I
20   want to avoid somebody saying something during the recess until
21   you are called back in that could be misconstrued by somebody
22   else. So, in order to avoid that situation, please, do not
23   discuss this case at all, do not leave the building. I
24   anticipate calling you back to resume at 11 o'clock. It is now
25   20 -- or I guess it is 10:42, so, you'll have a little bit more

Captured and Transcribed by Computer - Eclipse

29

1  than I guess -- or a little bit less than 20 minutes, but I'm
2  trying to get this jury selection done in a way that will
3  inconvenience you in the least possible way.  But consistent
4  with justice, because we want to do a thorough questioning, so
5  please be ready to resemble at 11 o'clock and because it may be
6  necessary to bring back some of you for individual questioning,
7  but it may not be necessary; so, if you will kind of stand close
8  by, don't wander off too far or make it difficult for us to find
9  you.
10     The jury panel's now in recess.  Thank you.
11     (Jury panel out.)
12     THE COURT:  All right.  Counsel, during the break, let's
13  go over so far what we have.  First, I understand that No. 3 has
14  indicated that they do not speak English.  What I anticipate
15  doing is going over right now those individuals who have
16  indicated that they have an opinion already and I don't think it
17  is necessary to bring them back in to ask what that opinion is
18  necessarily.  I mean, you know, we could go through it, but, you
19  know, you can't rehabilitate somebody; so, you have plenty of
20  jurors and -- I mean, we can bring them back in for the purpose
21  of finding out what that opinion is, but I don't know that it is
22  going to yield much more than, you know, doing I guess informal
23  poll of sorts.  But, basically, from my count, if you're going
24  to be entitled to a total of 12 strikes, what I had thought
25  about doing was picking nine jurors today when they report for

Captured and Transcribed by Computer - Eclipse

30

1  the evidence on the 19th.  You know, I would inquire again
2  whether anybody has been exposed to anything in the meantime and
3  then thereafter if, you know, everybody's not, you know -- you
4  know, you don't have any problem with anybody being exposed to
5  media, I thought maybe cutting loose two of them so that we
6  would still have an alternate that would be available if
7  something were to happen between then and the time that the
8  evidence closes.  So, we could still have then at the -- you
9  know, hopefully nothing would happen and we would have at the
10  very most seven to deliberate and we would have at least six if
11  something were to happen to one for a total of six jurors for
12  the final decision.  What I'm saying is that I want to hang
13  on to one to hear the evidence just to have an extra in the
14  event it becomes necessary.
15     That being the case, that brings up the number to 21 that we
16  at least need to start counting back from, not knowing the
17  number of challenges for cause.  If we could just go through, at
18  this point in time, and mark the ones -- I mean, I'm proposing
19  that we eliminate at this point in time the individuals who said
20  they already have an opinion and see where we are with that as
21  far as how far down that goes.
22     Mr. Spivey, do you wish --
23     MR. SPIVEY:  Certainly have no objection.  I think that
24  is appropriate, Your Honor.
25     MR. LOCKHART:  Yes, we agree with that, Your Honor.

Captured and Transcribed by Computer - Eclipse

31

1     THE COURT:  Let me look at No. 3 who said they don't
2  speak English.  I could bring them back in for that purpose, but
3  if you can agree to anything.  Mr. Tavera says he doesn't speak
4  or understand English very well, very good, but he has a degree
5  from a university even if it is --
6     CASE MANAGER:  From Mexican Republic.
7     THE COURT:  But he reads the newspapers; so, I don't
8  think that it is necessarily a problem.  So let's go through --
9  Mr. Spivey, if -- I'll go through everybody's list, but of the
10  ones who had indicated they had an opinion, which ones were
11  those according to your list?
12     MR. SPIVEY:  The opinions are No. 10, 18 -- I'm going to
13  skip some and come back to them -- 11, 23, 26, 30 --
14     THE COURT:  23, 26, 30.
15     MR. SPIVEY:  -- and 30.  And then 39, 35, 36, 53, 50,
16  59, 62, 65, 66.  I'm not sure, I thought 67 said -- 67 did have
17  an opinion.  78, 72.  Then 14.  And then I thought No. 20 either
18  verbalized it or indicated.  He's the one that got periodic
19  updates on the jury.  He didn't say it the first time around.
20     MRS. LOPEZ:  No. 16, I think it was.
21     MR. AINESWORTH:  He said his number wrong the first
22  time.
23     CASE MANAGER:  No. 16.
24     THE COURT:  Former city commissioner?  What is his
25  number?

Captured and Transcribed by Computer - Eclipse

32

1     MR. AINESWORTH:  16.
2     MR. SPIVEY:  So 20.  No. 20.
3     THE COURT:  Mrs. Lopez?
4     MRS. LOPEZ:  I've got those exact same numbers, Your
5  Honor.
6     THE COURT:  Mr. Lockhart?
7     MR. LOCKHART:  We have the same, Your Honor.
8     THE COURT:  All right.  Is there any objection to a
9  challenge for cause of those numbers?
10     MR. SPIVEY:  No objection.  I think that's proper.
11     MR. LOCKHART:  Your Honor, excuse me, I didn't mean to
12  interrupt.  Did we have No. 39?  Did you give us 39?
13     THE COURT:  Yes.  I'll go over -- let me go over the
14  list before I continue.  I have No. 10, 11, 14, 16, 18, 23, 26,
15  30, 35, 36, 39, 50, 53, 59, 62, 65, 66, 67, 72, 78.
16     Mr. Lockhart, any objection to challenge for cause of these
17  individuals?
18     MR. LOCKHART:  No, Your Honor.
19     THE COURT:  All right then.  The challenge is sustained.
20     Any other basis -- I think there was a gentleman who had
21  already indicated that he could not be fair, but I think he's
22  the one also who said he had an opinion.  What I propose to do
23  is rather than having those folks come back in and continue
24  participation with jury selection, when they come back in
25  indicate to them that they are being excused and that way we can

Captured and Transcribed by Computer - Eclipse

33

1  continue with just the questioning of what remains.  And then
2  also -- let me go back again.  So if we've got 21 and we've got
3  somebody -- help me count them.
4      (Consultation between the Judge and the case manager.)
5      THE COURT:  Okay.  Again, trying to get an idea, it
6  looks like if we have 62 and we've eliminated -- no, I'm sorry,
7  we had 80 and we've eliminated 18 from that, we have 62 and then
8  we subtract the 21 -- that No. 21 which is the number of strikes
9  for each side and the number of jurors we're going to need to
10 report on the 19th, that comes out to 41.  So, at this point in
11 time, we would -- without any other challenges for cause, we're
12 down to 41.  And then we can kind of keep track of how many
13 other challenges for cause so that we don't go for anymore
14 questioning than necessary.
15     MR. SPIVEY:  Do you want the other challenges for cause
16 at this time, Your Honor?
17     THE COURT:  The ones that have appeared up to this
18 point?
19     MR. SPIVEY:  Yes.
20     THE COURT:  Let me hear what you've got.
21     MR. SPIVEY:  There are four that are employees of the
22 City of Harlingen and I think in this type of case should
23 probably subject them to cause.  No. 9, who's husband works --
24 whose husband's employer is here.
25     THE COURT:  I tell you what, if they have told me

Captured and Transcribed by Computer - Eclipse

34

1  they're employed, but they could take the oath, I'm not going to
2  consider challenge for cause at this point in time.  If there's
3  any other basis other than, you know, you're not believing them,
4  it becomes a credibility issue.
5      MR. SPIVEY:  It's not a question of belief, Your Honor,
6  it is question of employment and the role they play in the
7  employment.  I'll do that later.
8      MR. LOCKHART:  Your Honor, you had pointed out earlier
9  Witness No. 3 -- I'm sorry, Juror Member No. 3 that said I don't
10 speak and understand English very good.  Also No. 7 said, "I
11 don't have enough education.  My English is poor and so is my
12 writing."
13     THE COURT:  Okay.  I'll ask further questions unless
14 there's -- if y'all can agree on any challenges for cause for
15 that nature, you know, I'll grant anything that y'all can agree
16 to.
17     Mrs. Lopez, do you wish to address The Court?
18     MRS. LOPEZ:  No, Your Honor, just that we did not agree
19 on that one.
20     MR. GARCIA:  Your Honor, may I say something?  My
21 math -- I'm counting -- you said 18, but I'm counting --
22     CASE MANAGER:  There's 20.  I miscounted.  There's 20
23 that would have an opinion.
24     MR. GARCIA:  Yes.
25     THE COURT:  So it is 60 that we have.

Captured and Transcribed by Computer - Eclipse

35

1      CASE MANAGER:  No. 61, Judge, has a question about
2  attending Van Guard in Harlingen.  I don't know if that's --
3  what kind of school that is.  No. 61.
4      THE COURT:  Okay.  Okay.  No. 61 is -- looks like maybe
5  a proprietary school or something.  No. 61, if you will turn to
6  that.  If they're wanting to exercise their right to be excused
7  for being a full-time student or student, I propose that we cut
8  that person loose unless you want me to inquire specifically of
9  her.
10     Mr. Spivey?
11     MR. SPIVEY:  I think under those circumstances, it would
12 be appropriate to let that juror go.
13     MR. LOCKHART:  I'm sorry, Your Honor, I apologize.
14     THE COURT:  No. 61 says that, "I am attending Van Guard
15 in Harlingen and would not like to miss."  I don't know what --
16 it might be a proprietary school.  I can bring her in to find
17 out more about it and that way if she's wishing to exercise her
18 right to be excused for being a student.
19     MR. LOCKHART:  Okay.
20     MR. SPIVEY:  I think she has right to do that.
21     MR. LOCKHART:  We have no objection to her being
22 excused.
23     THE COURT:  We'll excuse No. 61, as well.
24     CASE MANAGER:  I have a question on No. 10.
25     THE COURT:  We'll bring that up later.

Captured and Transcribed by Computer - Eclipse

36

1      All right.  So just to get a count again, we've excused now
2  21.  Is that it, a total of 21; is that right?
3      MR. LOCKHART:  That's what we believe, Your Honor, 21.
4      THE COURT:  So that's leaving -- that still leaves us 59
5  to pick from.  Okay.  Anything else you want to bring up before
6  I bring back the jury panel?
7      MR. LOCKHART:  Yes, Your Honor.  In all do respect to
8  The Court's earlier rulings and in all due respect to The Court
9  conducting complete and comprehensive voir dire, we are still
10 concerned about the fact that there's only 12 folks out there
11 that have not read or heard anything about this incident or the
12 lawsuit.  And I would respectfully suggest to The Court that we
13 need to talk to everybody individually that has said that they
14 have heard or read something about it because unless and until
15 we do, we won't know the subject matter.  And specifically the
16 insurance available to the city, the amount of that insurance,
17 federal law provides that a jury will not know about that,
18 should not know about that, and it cannot be admitted into
19 evidence.
20     And additionally, The Court's rulings on out motion in
21 limine are not proper matters for the jury.  So, I respectfully
22 suggest to this court that they may think they can be fair in
23 their understanding of it, but if they already know we have
24 insurance or how much that insurance is or how much they believe
25 it is, they, as a matter of law, have been tainted.  And so the

Captured and Transcribed by Computer - Eclipse

37

1  only way to get to the bottom of that would be to ask each one
2  of these people that has heard or read about it individually
3  outside the presence of the others.
4      THE COURT:  All right.  Request denied.
5      All right.  Now, I propose then that the jurors -- if you'll
6  go over this list with me, the CSOs, I'm going to ask that
7  whenever you re-assemble the individuals, before they're brought
8  in and indicate to these folks that they've been excused by The
9  Court.  Those numbers are 10, 11, 14, 16, 18, 23, 26, 30, 35,
10  36, 39, 50, 53, 59, 61, 62, 65, 66, 67, 72, 78.  If you will
11  make sure that those folks know that they've been excused and
12  that they do not have to come back in and please re-assemble the
13  rest of the panel and bring them in.  Thank you.
14      (Recess taken.)
15      COURT SECURITY OFFICER:  Your Honor, I've assembled the
16  number and the rest of the group's ready to come in.
17      THE COURT:  All right.  Thank you.
18      (Jury panel in.)
19      THE COURT:  All right.  Thank you.
20      First of all, again, thank you for your patience.  You know,
21  the term voir dire is as I mentioned earlier is a French phrase
22  that very roughly means to tell the truth.  And sometimes you
23  may not understand the necessity of the questions that I'm
24  asking, but I assure you that the questions that I'm concerned
25  about or issues that I'm concerned about are not in any way,

Captured and Transcribed by Computer - Eclipse

38

1  shape or form a wish to embarrass you or to put you on the spot,
2  but it is really important for everybody in this courtroom and,
3  you know, for the administration of justice that these issues be
4  dealt with, even if they may be uncomfortable.  There may be a
5  situation where you prefer not to discuss a particular issue in
6  the presence of other people in the courtroom and if you will
7  express that to us, we'll certainly honor that request and bring
8  you back outside the presence of everybody else.  But every
9  delay is something that can be a little time consuming and I
10  certainly don't want to deny you the right to bring up anything
11  that would be of concern to The Court.  And also keep in mind
12  that even if I don't raise a question or an issue that you think
13  is important for The Court and the parties and the lawyers to
14  know about to please raise your hand and let us know that
15  there's something that I have not inquired about that you think
16  is relevant and important as far as your qualifications to serve
17  as a juror.
18      Again, as a judge as I told you earlier, I've taken an oath
19  that I'm going to uphold the laws of the United States.  And
20  that means upholding the laws of how the trial is conducted.
21  So, you know, I have my responsibility and that's the process
22  that I'm involved in right now to determine whether there are
23  any opinions, beliefs, or experiences that you have had in the
24  past that would influence your decision in this case.  And, you
25  know, I frequently get responses from jurors who say, "Well, you

Captured and Transcribed by Computer - Eclipse

39

1  know, I don't know.  I can't be sure whether that's going to
2  play a part or not."  And so if you feel that way, that's not
3  the first time and it won't be the last time, but it is
4  certainly something that is important for me to know about so
5  that I can inquire about it.
6      Again, the role of a juror who will be basically becoming a
7  judge is to determine what the facts in the case are.  Those
8  facts are determined by hearing the testimony of live witnesses,
9  it may be by hearing the testimony of witnesses who have been
10  deposed where the witnesses are brought before a court reporter,
11  they're placed under oath and questioned by the attorneys where
12  both sides will have an opportunity to ask question.  And if
13  deposition testimony is what you hear, if it is a video
14  deposition or deposition that's been recorded and there's a
15  question and answer, you're told that that testimony -- you are
16  to consider it just as if that person was testifying live.  It
17  is also in the form of exhibits, such as documents, and any
18  other evidence that The Court will admit into evidence during
19  the process of the trial.  And again, you are to decide after
20  you hear all the evidence.  There may be two versions of an
21  incident and you have to decide, you have to weigh the
22  credibility of witnesses, decide whether they have a motive --
23  you know, the instructions that I give you at the conclusion of
24  the evidence on how you weigh the testimony and, you know,
25  that's what you're going to be guided by.  So, when you tell me,

Captured and Transcribed by Computer - Eclipse

40

1  "I promise I will render a verdict based upon the law," you're
2  telling me that if I give you an instruction not to consider
3  concern evidence because I have sustained an objection, you're
4  promising me, "Judge, I will not consider that evidence."
5      If I have made any ruling and I give you a specific
6  instruction on how to deliberate, you know, when you take that
7  oath that says, "Judge, I will promise I will follow the rules
8  just the way you followed the rules in conducting the trial," I
9  am expecting that you are honest in telling me that you're going
10  to follow the instruction that I give you and not be persuaded
11  by something other than the evidence or the law.
12      For example, I will be instructing you that you are not to
13  allow sympathy to play a part in your deliberations in how you
14  decide the evidence.  If you allow sympathy to play a role in
15  how you evaluate the evidence, it is to -- you know, whether you
16  believe a witness or not, that is, you've got a sympathy for
17  either the plaintiffs because of what you hear about the events
18  occurred or whether you have a sympathy for the City of
19  Harlingen because, you know, if you're resident of Harlingen,
20  you know, sympathy could be in the form of being concerned that
21  any results that would hold the city liable and that any results
22  of awarding damages, you know, if you have a concern that that's
23  going to affect you as a taxpayer in the future, you know,
24  that's the kind of sympathy that is improper for you consider.
25  You're supposed to make a decision based upon the law that I

Captured and Transcribed by Computer - Eclipse

41

1  give you and the evidence that you hear, not on something other
2  than those two factors. So, the rest of the questioning is
3  going to be to try to make a determination. But we're going to
4  continue with the questioning on the publicity that you may have
5  heard. Now, there have been some of you who have told me that
6  you have not heard anything about this case before. But of
7  those of you who are present, what I want to know about the
8  media coverage that you have been exposed to whether you have
9  made it a concern of yours to follow the story.
10     Is there anyone on the first row who has made it a concern
11  or made it an issue to follow the story, whether it is through
12  television accounts, radio accounts, or newspaper accounts or on
13  the Internet -- you know, access to the Internet. Anybody who
14  has made it their business to find out what's happening on this
15  particular story. On row one?
16     On the second row?
17     The third row?                    !
18     All right. On the first row of this side?
19     On the second row?
20     Third row?
21     Is there a fourth row? I believe there is a fourth row.
22         COURT SECURITY OFFICER: Yes, Your Honor.
23         THE COURT: Of those who have been exposed to media
24  accounts, how many of you have heard -- well, let me start off
25  with this thought first. One of the instructions that you may

Captured and Transcribed by Computer - Eclipse

42

1  be getting from The Court is that on the issue of damages, that
2  you are to consider the evidence that you hear in making a
3  decision on whether the parties are entitled to damages that,
4  you know, they're going to be placing figures before you. If
5  you get to that point or if there's argument of certain kind of
6  damages such as mental anguish, is there anyone here who,
7  because of news accounts you've been exposed to, feels like
8  there is a certain figure or understands that there's a certain
9  figure of liability in money damages that have been discussed in
10  the media as far as the City of Harlingen? Is there anyone here
11  on row one who feels that they know something or remember
12  something about the extent of damages sought or the extent of
13  damages that -- or, you know, money damages that the City of
14  Harlingen may have coverage for if, in fact, there is anything
15  like that on. On row three?
16     Row two?
17     Row three?
18     Okay. On this side, row one?
19     Row two?
20     Row three?
21     Row four?
22     Okay. Now, if you were to be instructed by The Court that
23  you were not to be concerned with anything at all to do with the
24  issue of insurance, if the -- there is going to be a concern in
25  your mind or you're going to be considering whether there is or

Captured and Transcribed by Computer - Eclipse

43

1  there is not insurance in connection with this event, is there
2  anything you have read about or heard about in news accounts
3  that you recall being discussed in that account as far as
4  insurance, either lack of coverage or coverage for anybody in
5  connection with this lawsuit?
6     Row one?
7     Row two?
8     Row three?
9         COURT SECURITY OFFICER: Your Honor, we have one person
10  on row four.
11         THE COURT: I don't mean to --
12         PROSPECTIVE JUROR: Not a problem.
13         THE COURT: Dot in the very back. And I'm including you
14  in my question. Anybody here on this side of the room that
15  feels like they know something about coverage if any exists at
16  all?
17     On this side, row one?
18     Again, the question is, as a result of the news accounts of
19  any form, do any of you recall having read anything at all about
20  any insurance coverage or lack of coverage or any particular
21  amount that has been given out as request for damages by the
22  plaintiffs? Any certain figure or also a figure as far as the
23  city is concerned?
24     Second row?
25     Third row?

Captured and Transcribed by Computer - Eclipse

44

1     The fourth row?
2     Now, is there anybody who has heard anything on television
3  or radio or in the newspaper or in the Internet regarding any
4  efforts to settle any case or mediate this case? In row one --
5  or that you recall reading anything at all about that? Yes?
6         PROSPECTIVE JUROR: No. 8. I just heard that there was
7  a breakdown in the mediation, that's why it was going to trial.
8         THE COURT: Okay. Now, if you'll have a seat, I want to
9  bring that up to say that the fact that a case is going to trial
10  and that there might have been coverage about efforts to settle
11  or mediate, those are things that are prohibited to be
12  considered by a jury in evaluating evidence, in making a
13  decision in this case.
14     Sir, is there anything about the fact that you have read
15  about, you know, what you have just indicated that would make
16  you feel that one party or the other is not -- I mean should be
17  held responsible or should be punished or in any way, shape or
18  form, are you going to allow what you have read to play a part
19  in how you evaluate the evidence?
20         PROSPECTIVE JUROR: No, because I've only in passing,
21  without extreme interest, but have read the accounts of what
22  went on and so forth, but have not formed an opinion about that
23  at this time.
24         THE COURT: So you're saying that the fact that you read
25  what you read or just told us about, is that going to impede

Captured and Transcribed by Computer - Eclipse

45

1 in any way, shape or form in how you -- in taking the oath that
2 you will render a verdict based upon the law and the evidence?
3          PROSPECTIVE JUROR: No, ma'am.
4          THE COURT: All right. Thank you. Anybody on that row?
5      The question is whether you have recall reading or hearing
6 anything at all about settlement efforts on any way resolving
7 this case other than a trial?
8      On the second row?
9      The third row?
10     The fourth row?
11     The first row here?
12     Second row?
13     Third row?
14     Fourth row?
15     Okay. You are also going to be -- I mean I anticipate that
16 you may be instructed that you are not to decide who you think
17 should win and then answer the question accordingly. Is there
18 anyone here on in this panel who could not follow such an
19 instruction?
20     Row one?
21     Row two?
22     Row three?
23     Row four?
24     On this side, row one?
25     Row two?

Captured and Transcribed by Computer - Eclipse

46

1      Row three?
2      Row four?
3      Okay. Is there anyone here who -- well, I tell you what,
4 I'm going to ask the parties to list the witnesses whom they
5 anticipate calling. If you will listen carefully, some of the
6 witnesses may be listed and then not called for whatever reason,
7 but they need to know and so do I whether you know any of these
8 folks, whether you have a business relationship with them or
9 related to them in some way, whether you know them in some
10 capacity or another and then I'm going to ask the Defendants to
11 do the same. Please listen carefully because I'm going to ask
12 about all of those witnesses at the time -- I mean one row at a
13 time.
14     Mr. Spivey, will you please list the witnesses that the
15 Plaintiffs intend -- may be calling.
16         MR. SPIVEY: Yes, Your Honor. Mrs. Sylvia Pirtle, Texas
17 Ranger Rodolfo Jaramillo, former captain Jim Scheopner,
18 Detective R.D. Moore, Mr. Joe LaBeau, Julie Cox, Javier Reyna,
19 Shawn Foist, James Robenson, Arnold Rodriguez, Robert Rodriguez,
20 Louise Prather, Dr. George Kirkham, Officer George Hupp,
21 Officer John Brinning, Raúl Rodriguez, Art Salinas, Elsa
22 Salinas, Stephen and Robyn Williams, Gilbert Rodriguez, Dr.
23 Phyllis Silverman, Joe Rubio, Albert Perry, Victor Rodriguez --
24 now captain of the city police in McAllen -- Miguel Garcia,
25 Chris Ledezma, Pasty Moore, Ronald Saenz, Jason Walence, Melody

Captured and Transcribed by Computer - Eclipse

47

1 Matlock and Natalie Prim.
2          THE COURT: Mrs. Lopez, any other witnesses besides
3 those listed by Mr. Spivey?
4          MRS. LOPEZ: That's an all-inclusive list of all the
5 witnesses we intend to call, Your Honor.
6          THE COURT: Mr. Lockhart for the Defendant?
7          MR. LOCKHART: Yes, Your Honor. Try not to be
8 repetitive. I was trying to check them off. Captain Joseph
9 Vasquez, Michael James Riley, Orlando Sanchez, Gail Lynn Jones,
10 and Antonio Medina.
11         THE COURT: All right. Is there anyone on row one who
12 knows any of the individuals whose names have been listed for
13 you?
14         PROSPECTIVE JUROR: Jim Scheopner.
15         COURT SECURITY OFFICER: State your number.
16         PROSPECTIVE JUROR: No. 8. I know Jim Scheopner. I
17 work with the school district and I have had a relationship with
18 him working with the school district for, oh, approximately 10
19 years, I guess, over the years.
20         THE COURT: All right. So it's been a professional one
21 with them as head of a law enforcement agency and with you with
22 the school district.
23         PROSPECTIVE JUROR: Correct. But I also know him
24 personally.
25         THE COURT: Sir, is the fact that you have had this

48

1 relationship -- been supplemented with a personal
2 relationship -- if he were to testify, would you be able to
3 follow The Court's instructions that you're supposed to evaluate
4 that witness's testimony the same way that you would any other
5 witness?
6          PROSPECTIVE JUROR: I think I can.
7          THE COURT: So if -- and I'm using you as an example and
8 I'm not -- everything I say is not evidence, but the way I'm
9 trying to -- what the attorneys say is not evidence either --
10 but I'm just trying to set a scenario so you can be clear about
11 what your response truthfully is. If, for example, this witness
12 were to say something or a witness that you know -- especially
13 this one -- would say something that in your heart you felt was
14 totally untrue, could you make that decision about your
15 assessment without concern about how you would, if you were to
16 meet him on the street the next day, how he would view you if he
17 realized, if he knew that you could not believe his testimony?
18 I mean because of that personal relationship, you know, are you
19 going to have any reservation about being objective in weighing
20 his testimony like you would somebody whom you never met before?
21         PROSPECTIVE JUROR: No, ma'am. I feel I can listen to
22 the evidence and if the evidence is presented, I can make the
23 decision based on the evidence presented in both cases.
24         THE COURT: Thank you.
25     Madam?

Captured and Transcribed by Computer - Eclipse

49

1    PROSPECTIVE JUROR: Juror No. 9. I know quite a few of
2  them on a personal basis. And I don't think I could be, how do
3  you say, biased on there.
4        THE COURT: All right. The individuals that you're
5  saying that you know quite a few of them, are they on a
6  professional basis or a personal basis?
7        PROSPECTIVE JUROR: Both. Both.
8        THE COURT: And, for example, who would you know
9  personally?
10       PROSPECTIVE JUROR: I know Rodriguez, Natalie Prim, Joe
11  Schoepner, LaBeau.
12       THE COURT: All right. And you've heard my questions of
13  the gentleman to your right. Is there anything about this
14  personal relationship that you have with the witness or
15  professional relationship that would give you a reason to
16  believe them more than you would a person who you have never
17  seen until they come into the courtroom to testify?
18       PROSPECTIVE JUROR: I find them to be really true, law
19  abiding citizens and honest people.
20       THE COURT: Well, let me stop you there. Do you
21  understand that if you have an opinion about their credibility,
22  you're basically a witness about that issue because, you know,
23  technically a person's credibility is be -- I mean, an
24  individual can come in to testify whether a person is a truthful
25  person or is not a truthful person. If you have got a certain

Captured and Transcribed by Computer - Eclipse

50

1  opinion about their truthfulness, then you're basically a
2  witness and you cannot be a witness and a juror at the same
3  time.
4        PROSPECTIVE JUROR: I know.
5        THE COURT: So if you're telling me that because of your
6  personal relationship you already have a certain opinion about
7  how you evaluate a witness's testimony versus other people on
8  the jury who have never seen these folks or have had a very
9  limited exposure to them, you're, in effect, could -- your
10  opinion could sway them in a way a witness's testimony would.
11       PROSPECTIVE JUROR: It would be very difficult for me to
12  make a decision on there.
13       THE COURT: All right. And again, that's the kind of
14  thing that I was talking about earlier. Having a personal
15  opinion about somebody's credibility, whether it is, you know,
16  that they're truthful or not truthful is part of what I was
17  talking about earlier. If you have such an opinion, then that's
18  a problem as far as you're being able to truthfully discharge
19  your duties as a juror.
20       PROSPECTIVE JUROR: Yes.
21       THE COURT: Are you telling me that this opinion that
22  you have would be an impediment or tell me whether it would not
23  be impediment to you taking the oath?
24       PROSPECTIVE JUROR: It would be an impediment for me
25  really. I know these people on a personal level.

Captured and Transcribed by Computer - Eclipse

51

1        THE COURT: All right. Thank you.
2  On the second row?
3  The third row?
4        PROSPECTIVE JUROR: My number is 29. And I know several
5  of the persons that you mentioned and especially the Moore
6  family.
7        THE COURT: All right. Madam, are you their neighbors,
8  are you there --
9        PROSPECTIVE JUROR: I used to go to school with both of
10  them.
11       THE COURT: Are you talking about the parents?
12       PROSPECTIVE JUROR: Yes, ma'am.
13       THE COURT: And have you had any contact with them since
14  your school days?
15       PROSPECTIVE JUROR: No, ma'am. It's been quite a while.
16  It's been over 30 years now that I haven't had contact with
17  them.
18       THE COURT: And is the fact that you knew them 30 years
19  or more ago going to play a part in -- I mean, the relationship
20  you had with them at that point, is that going to be something
21  that you are going to use to evaluate their testimony?
22       PROSPECTIVE JUROR: No, not really because I wasn't
23  very, very close to them. I just knew them because they were in
24  my class.
25       THE COURT: All right. Thank you, ma'am.

Captured and Transcribed by Computer - Eclipse

52

1  Anybody else on that same row?
2  Last row?
3  All right. On the first row?
4        PROSPECTIVE JUROR: No. 44. And I know Natalie Prim.
5  She attended church and Sunday school class that I attended. So
6  on a limited basis.
7        THE COURT: And that's a very important basis, as well,
8  because, you know, if you know somebody because they work at a
9  business that you have contact with, you just -- it's a little
10  bit different if you have somebody who attends church with you.
11  That almost, you know, is subtly, you know, kind of an informal
12  as far as their -- how you view them as a person and their
13  character, that kind of thing. And there's nothing wrong with
14  that. I think that that's -- it is very understandable if that
15  were the situation. What I'm asking you then is is the fact
16  that you have that contact with that witness or have had that
17  contact in the past going to play a part in how you evaluate her
18  testimony? Are you going to find her more credible than if your
19  contact with her had been as an employee with the city that you
20  had to deal with.
21       PROSPECTIVE JUROR: No. I believe I could take her
22  testimony at face value and evaluate it.
23       THE COURT: All right.
24  Anybody else on the first row?
25       PROSPECTIVE JUROR: No. 48. Some of the officer's name

Captured and Transcribed by Computer - Eclipse

53

1 that you mentioned I have met. I do not know them personally.
2 Like I said, by my son being in law enforcement, I'm familiar
3 with the names. I know he knows them, but I have met them. I
4 doubt if they saw me they would say, "Oh, that's so and so."
5 But I have meet them, run into them with my son on the street or
6 wherever.
7 THE COURT: All right. Is the fact that you have had
8 this contact going to play a part in how you evaluate their
9 testimony -- either their testimony directly or the testimony
10 about what actions they might have been involved with or what
11 they may have done in connection with this event?
12 PROSPECTIVE JUROR: No.
13 THE COURT: All right. Thank you.
14 Anybody else on that first row?
15 Next row, second row?
16 Third row?
17 Fourth row?
18 PROSPECTIVE JUROR: Juror No. 80. And I'm familiar with
19 Mrs. Natalie Prim on a professional level.
20 THE COURT: Yes. Is the fact that you know her in a
21 professional capacity going to play a part in how you evaluate
22 her testimony?
23 PROSPECTIVE JUROR: No, ma'am.
24 THE COURT: Thank you, sir. All right. Also, I'm going
25 to be asking about your relationship with law enforcement

Captured and Transcribed by Computer - Eclipse

54

1 officers. I would like to know whether you have family members
2 or close friends who are law enforcement officers. But, you
3 know, and I want to know the agency that they work with. And
4 also, you know, the ultimate question is, you know, have they
5 discussed their work with you and as a result of their work -- I
6 mean, their conversations about their work, are you so partial
7 to one side or the other. Obviously, here, we have a situation
8 where there's law enforcement on one side, you know, that is, as
9 far as the plaintiffs are concerned, as well as law enforcement
10 officers on the other side. So, we don't have as much a problem
11 as we would in a different kind of case. But is there anything
12 about the fact that your relative or friend is a law enforcement
13 officer that's going to give you a certain inclination for one
14 side or the other? And there's nothing wrong with your having
15 that opinion. What is wrong is for you to have that opinion and
16 to not tell me about it. So, let's talk about -- find out who
17 of you have friends or relatives who are law enforcement
18 officers in the first row?
19 PROSPECTIVE JUROR: No. 5.
20 THE COURT: Please stand, madam.
21 PROSPECTIVE JUROR: No. 5.
22 THE COURT: Okay. Who is it?
23 PROSPECTIVE JUROR: I have friends.
24 THE COURT: Okay. You need to hold --
25 PROSPECTIVE JUROR: Friends.

Captured and Transcribed by Computer - Eclipse

55

1 THE COURT: Okay. Friends. Basically people you
2 socialize with?
3 PROSPECTIVE JUROR: Yes.
4 THE COURT: Do they discuss their work with you.
5 PROSPECTIVE JUROR: Not really, but I have few --
6 THE COURT: Pardon?
7 PROSPECTIVE JUROR: I have a feeling I might side with
8 one or the other.
9 THE COURT: Okay. Is the fact that -- you know, that
10 feeling is something only you can know. It is like you can't be
11 just a little bit pregnant. You know, you are either pregnant
12 or you're not. So, in this case, sometimes it is impossible to
13 really know. But the fact of the matter is that you can't have
14 that feeling and then all of a sudden in the jury room it just
15 comes to light all of a sudden -- well, I've got an opinion and
16 it is based on whether it is being related to law enforcement
17 officer, having friends or just anything at all. And if you're
18 of that opinion or that position, this is the time to speak.
19 PROSPECTIVE JUROR: I think I might be opinionated.
20 THE COURT: All right. Is that opinion such that you
21 could not take the oath as the juror that says that you are
22 promising to The Court and the parties and the public that you
23 will render a verdict based on the law and the evidence?
24 PROSPECTIVE JUROR: Yes.
25 THE COURT: Thank you.

Captured and Transcribed by Computer - Eclipse

56

1 Anybody else on that row?
2 PROSPECTIVE JUROR: No. 9. I've got too many personal
3 friends involved and I can't say any way without it.
4 THE COURT: Thank you, madam.
5 Next row?
6 PROSPECTIVE JUROR: 24. One of my best friends is a
7 border patrol and one of my cousins.
8 THE COURT: Okay. And, sir, do they discuss their work
9 with you, the kinds of contacts with people and the stresses
10 from work and that kind of thing? You know, do you discuss it
11 over nachos and beer or --
12 PROSPECTIVE JUROR: Not that much, but I think I might
13 have an opinion.
14 THE COURT: All right. And so an opinion about the
15 facts of this case; is that what you're telling me? Yes?
16 PROSPECTIVE JUROR: Yes.
17 THE COURT: And is that opinion then such that you would
18 not be able to follow The Court's instructions and therefore
19 that you would be unable to take an oath as a juror that you
20 would follow the law in making a decision in this case?
21 PROSPECTIVE JUROR: Yes, ma'am.
22 THE COURT: Thank you. Anybody else on the second row?
23 PROSPECTIVE JUROR: No. 21. I do have a cousin that is
24 in the border patrol. I hardly see him and it is just, you
25 know, we don't really talk about any issues.

Captured and Transcribed by Computer - Eclipse

57

1    THE COURT: You know, there's a justifiable sense of
2    pride when somebody in your family or somebody that you are
3    close to is in law enforcement. And I just want to make sure
4    that this feeling that's justifiable is understandable, but is
5    it such a strong feeling that you're going to have more sympathy
6    or have such sympathy for the plaintiffs that you're going to,
7    you know, allow that to play a part in how you evaluate the
8    evidence?
9    PROSPECTIVE JUROR: No. No, ma'am.
10    THE COURT: Thank you. Anybody else on the second row?
11    Third row?
12    PROSPECTIVE JUROR: My number is 29 and I have a brother
13    and a nephew working with Cameron County Sheriff's Department.
14    THE COURT: All right. And as far as you know, is
15    there -- has there been any discussion with you by them about
16    this particular event?
17    PROSPECTIVE JUROR: No, má'am, because my brother's very
18    private. He won't discuss none of his cases.
19    THE COURT: Okay. And were you aware at the time that
20    these events were happening that the sheriff's department had
21    been involved in some way?
22    PROSPECTIVE JUROR: Yes, ma'am.
23    THE COURT: And as a result of that awareness, were you
24    concerned then that your relatives may have been involved in
25    some way with what occurred?

58

1    PROSPECTIVE JUROR: In some parts.
2    THE COURT: Okay. And is the fact that had that
3    awareness, did you then, like, tune in to try to find the latest
4    of what had happened and --
5    PROSPECTIVE JUROR: No, I didn't.
6    THE COURT: Okay. Did you try to follow up with
7    relatives to find out if they knew if your relatives were
8    involved in some way?
9    PROSPECTIVE JUROR: No.
10    THE COURT: Okay. Is the fact then that your relatives
11    are employed by the sheriff's department going to play a part in
12    how you evaluate the evidence in making a decision on whether or
13    not an entity or person should be held responsible in connection
14    with that?
15    PROSPECTIVE JUROR: No, it won't be any problem.
16    THE COURT: Thank you, madam.
17    Anybody else on that same row?
18    The last row?
19    All right. First row here on the my right-hand side?
20    COURT SECURITY OFFICER: Your Honor?
21    THE COURT: Yes, madam, go ahead.
22    PROSPECTIVE JUROR: No. 38. My son is a border
23    patrolman.
24    THE COURT: Madam, has he discussed at all what occurred
25    in connection with this incident with you?

59

1    PROSPECTIVE JUROR: No. We seldom see him. He visit --
2    we never contact him. He just calls us once in a while to go to
3    a movie or we go and have dinner and see a movie.
4    THE COURT: Okay.
5    PROSPECTIVE JUROR: But he never discusses his job.
6    THE COURT: Is he stationed here in this area?
7    PROSPECTIVE JUROR: In the Brownsville area.
8    THE COURT: As far as you know from your discussions
9    with him, was at all involved in connection with this
10    incident whether he had -- whether he was on the scene or close
11    by or overheard any dispatch or communications?
12    PROSPECTIVE JUROR: No, because when this happened, he
13    was just -- had just come back from Georgia.
14    THE COURT: Okay.
15    PROSPECTIVE JUROR: So he was a new employee --
16    THE COURT: Okay.
17    PROSPECTIVE JUROR: -- with the border patrol.
18    THE COURT: Madam, as a mother having a son in that
19    position, you understand that -- you know, if you're instructed
20    by The Court that you are not to allow sympathy to basically
21    play any part in how you evaluate the evidence, that you are to
22    divorce any sympathies that you have in determining what
23    happened and whether somebody should be held responsible or not,
24    you know, is there any way that your son's work and your being
25    mother to somebody who's exposed to danger every day, you know,

60

1    in one shape or another whether -- you know, you can only
2    imagine the kind of situation, are you saying that you would not
3    allow that to play a part in how you evaluate the evidence?
4    PROSPECTIVE JUROR: No. I guess just by the evidence.
5    THE COURT: All right. Thank you, madam.
6    I'm sorry, had I completed the questions on this side.
7    Yes, madam, go ahead.
8    PROSPECTIVE JUROR: I work closely with the border
9    patrol. No. 42. I work for a program that houses minors and we
10    work with all the border patrol stations in the valley and with
11    the district in Harlingen.
12    THE COURT: And madam, when this event occurred, was
13    there any discussion with you by these folks that you worked
14    with?
15    PROSPECTIVE JUROR: No, ma'am.
16    THE COURT: And did you follow more closely because of
17    your contact or your professional relationship?
18    PROSPECTIVE JUROR: No, ma'am.
19    THE COURT: You did not allow that to -- or did not
20    pique your curiosity about that?
21    PROSPECTIVE JUROR: No, it didn't influence me at all.
22    I just started working right there in the program.
23    THE COURT: Are you saying that there's nothing in your
24    professional contact that would allow you -- or that would play
25    a part in how you would evaluate the case?

61

1    PROSPECTIVE JUROR: He might speak with my fellow
2  co-workers, but I haven't heard anything about it.
3    THE COURT: Anybody else in that first row?
4    PROSPECTIVE JUROR: 45. My father just retired from the
5  U.S. Customs.
6    THE COURT: Okay. And they kind of work in tandem with
7  the border patrol as a law enforcement agency. Did he discuss
8  his work with you?
9    PROSPECTIVE JUROR: No. No, ma'am.
10   THE COURT: And the fact that -- I mean that your father
11  is also a federal law enforcement officer going to play a part
12  in how you evaluate the evidence in this case?
13   PROSPECTIVE JUROR: No, ma'am.
14   THE COURT: Thank you.
15   PROSPECTIVE JUROR: No. 48. As I said earlier, my son
16  does work with Cameron County Sheriff's Department and has
17  worked with Harlingen Police Department.
18   THE COURT: All right. Was he working for Cameron
19  County when this event occurred back in '98?
20   PROSPECTIVE JUROR: He was a Cameron County sheriff
21  deputy.
22   THE COURT: Okay. And I may have forgotten now. Did
23  you tell me that he was on the scene or somewhere around.
24   PROSPECTIVE JUROR: Yes, ma'am.
25   THE COURT: Did he discuss that with you at the time

Captured and Transcribed by Computer - Eclipse

62

1  that it occurred?
2    PROSPECTIVE JUROR: No. He called me at work when he
3  could later to let me know he was all right because the people
4  at work were wanting to know what was happening. I did try to
5  listen on radio because I knew he was at work and let me know
6  that he was all right and that's been a while back. I know we
7  talked a little about it as far as getting there and everything,
8  but, you know, I know nothing else, nothing like that.
9    THE COURT: Okay. Well, tell me this: If you were to
10  be on the jury and after hearing the evidence and you were in
11  the jury room and discussing the evidence, do you understand
12  that if you were to recall something that your son told you that
13  was not brought out of the evidence here, that it would be a
14  violation of your oath for you to even utter anything at all
15  that -- that would in some way influence the jury? I mean, even
16  if it were not to influence, just the fact that you made any
17  mention of some evidence, no matter how minor, that that would
18  be a violation of your oath as a juror?
19   PROSPECTIVE JUROR: I understand.
20   THE COURT: And so, madam, given what you have told me,
21  is there anything about the fact that your son was involved and
22  he's a law enforcement officer that is involved -- I mean
23  working for the same agency who, you know, these plaintiffs have
24  worked for in the past or still work for, is that going to play
25  a part in how you make a decision in this case?

Captured and Transcribed by Computer - Eclipse

63

1    PROSPECTIVE JUROR: No, it would not.
2    THE COURT: All right. Thank you.
3    PROSPECTIVE JUROR: I'm No. 49. And my son-in-law's
4  brother is a border patrolman in Mobile, Alabama.
5    THE COURT: All right. And have they ever discussed the
6  gentleman's work with you?
7    PROSPECTIVE JUROR: No, ma'am.
8    THE COURT: Anything about that relationship that would
9  influence you in some way?
10   PROSPECTIVE JUROR: No.
11   THE COURT: Anybody else on that row?
12  Second row?
13   PROSPECTIVE JUROR: 52. Your Honor, I have a son that's
14  in the police department and a friend, but I would form my own
15  opinion. They never discuss this -- any of this with me.
16   THE COURT: All right.
17   PROSPECTIVE JUROR: I would be forming my own decision,
18  opinion.
19   THE COURT: You would be able to take the oath as a
20  juror --
21   PROSPECTIVE JUROR: Yes, uh-huh.
22   THE COURT: -- and follow the law as I give it to you?
23   PROSPECTIVE JUROR: Uh-huh, sure will.
24   THE COURT: You have to answer yes or no.
25   PROSPECTIVE JUROR: Yes.

Captured and Transcribed by Computer - Eclipse

64

1    THE COURT: Thank you. Anybody else on that row?
2  The next row, third row?
3    PROSPECTIVE JUROR: No. 75. My husband's cousin is with
4  the sheriff's department right now, but -- and I don't believe
5  he was with them when this incident occurred.
6    THE COURT: And have they discussed or that person
7  discussed -- did you say your husband or somebody else?
8    PROSPECTIVE JUROR: My husband's cousin.
9    THE COURT: Has that relative discussed it with your
10  husband and then you in turn heard about it from our husband or
11  directly from that cousin?
12   PROSPECTIVE JUROR: No, ma'am.
13   THE COURT: Is the fact that you had a relative involved
14  just by virtue of employment, did it cause you to follow the
15  story more closely?
16   PROSPECTIVE JUROR: No. No, ma'am.
17   THE COURT: Anything about that relationship that would
18  influence your decision as a juror in this case?
19   PROSPECTIVE JUROR: No.
20   THE COURT: Thank you.
21   PROSPECTIVE JUROR: No. 71. I got an uncle that is
22  chief of police in Falfurrias and I have a friend with the
23  sheriff's department.
24   THE COURT: All right. Do they discuss -- this
25  sheriff's department or Falfurrias?

Captured and Transcribed by Computer - Eclipse

65

1      PROSPECTIVE JUROR: My uncle is chief of police in

2  Falfurrias and my friend of mine works in Cameron County.

3      THE COURT: Do either one of them discuss their work

4  with you?

5      PROSPECTIVE JUROR: No, ma'am.

6      THE COURT: Was the one who works in Cameron County, did

7  he success anything at all with you about this incident?

8      PROSPECTIVE JUROR: No, ma'am.

9      THE COURT: Anything about those relationships that

10 would play a part in how you would evaluate the evidence?

11     PROSPECTIVE JUROR: No.

12     THE COURT: Thank you. Anybody else on that same row?

13     PROSPECTIVE JUROR: No. 70. And I have daughter in

14 border patrol working out of Harlingen.

15     THE COURT: All right. And how long has she been with

16 border patrol?

17     PROSPECTIVE JUROR: Four years. She did --

18     THE COURT: I'm sorry.

19     PROSPECTIVE JUROR: She did work with Mr. Rodriguez.

20     THE COURT: Was she either in the area or at the site of

21 this incident when it occurred?

22     PROSPECTIVE JUROR: She was in the site about two hours

23 later.

24     THE COURT: Did she discuss all that with you?

25     PROSPECTIVE JUROR: Yes, ma'am.

       Captured and Transcribed by Computer - Eclipse

---

66

1      THE COURT: And as a result of that discussion -- well,

2  let me give you the example I gave the other lady a moment ago.

3  Do you understand that when you take an oath that you are going

4  to render a verdict based upon the law and the evidence that if

5  you were to recall something that your daughter mentioned and it

6  was not testified to by any of the witnesses that you could not

7  say anything about that at all in the jury deliberations if you

8  were on the jury, do you understand that?

9      PROSPECTIVE JUROR: Yes, ma'am.

10     THE COURT: Because to do that would mean that we would

11 have a witness in the jury room itself and that is prohibited by

12 law, do you understand that?

13     PROSPECTIVE JUROR: Yes, ma'am.

14     THE COURT: Knowing that then, is there -- the fact that

15 you know some things, you know, through what your daughter has

16 related to you, is the fact that you had that information going

17 to play a part in how you evaluate the evidence either because

18 of sympathy for a fellow worker of your daughter's or just

19 because of how you heard about the events or what you heard

20 about the events either through your daughter or any news

21 accounts?

22     PROSPECTIVE JUROR: No, I don't think it would.

23     THE COURT: Thank you.

24     PROSPECTIVE JUROR: No. 69. My father is police chief

25 of the Santa Rosa School District.

       Captured and Transcribed by Computer - Eclipse

---

67

1      THE COURT: All right. And does he discuss his work

2  with you?

3      PROSPECTIVE JUROR: No, he does not.

4      THE COURT: Is the fact that he has that kind of work

5  going to influence you in how you view the evidence in this

6  case?

7      PROSPECTIVE JUROR: No, ma'am.

8      THE COURT: Thank you. Anybody else on that row?

9  The last row, the fourth row?

10     PROSPECTIVE JUROR: No. 79. And I have a cousin that

11 works for the border patrol.

12     THE COURT: And here in this area?

13     PROSPECTIVE JUROR: In Brownsville.

14     THE COURT: Does he discuss his work with you?

15     PROSPECTIVE JUROR: No, ma'am.

16     THE COURT: Anything about that relationship that would

17 influence your decision in this case?

18     PROSPECTIVE JUROR: No.

19     THE COURT: Thank you. Anybody else?

20     PROSPECTIVE JUROR: 77. I've got several friends who

21 are members of the border patrol explorer post in Brownsville.

22     THE COURT: And as much -- I mean, do you have any

23 idea -- or have any of those folks talked to you about knowing

24 the individuals involved in this incident?

25     PROSPECTIVE JUROR: No, they don't talk about anything

---

68

1  having to do with the border patrol.

2      THE COURT: Anything about that relationship that would

3  influence your decision in this case?

4      PROSPECTIVE JUROR: No.

5      THE COURT: Thank you, sir. Anybody else?

6  There's a lady on the first row over here.

7      PROSPECTIVE JUROR: No. 2. I apologize. My husband has

8  a cousin who is with U.S. Customs here in Brownsville.

9      THE COURT: And you heard the question that I asked the

10 other lady, the relative's retired from the customs. As a

11 result of that relationship, I mean, have you heard any

12 discussions or had anything at all as a result of that

13 relationship that would influence how you view the evidence in

14 this case?

15     PROSPECTIVE JUROR: No.

16     THE COURT: Thank you, ma'am.

17     Now, I'm going to ask you about jury duty. And what I want

18 to know is if you served on a jury before was it a criminal case

19 or civil case? And sometimes it is difficult to know because it

20 may be -- let me give you an example of O.J. Simpson. You know,

21 O.J. Simpson was put to trial in a criminal case first and then

22 he had a civil case by the family of one of the individuals who

23 was killed. And so you may have one incident and you have two

24 different kinds of cases that arise. So, if you are not clear

25 about it, that's okay. Just tell me what the nature was of the

       Captured and Transcribed by Computer - Eclipse

69

1  case. I want to know whether you were the foreman of the jury,
2  but -- and I want to ask whether you reached a decision in that
3  case. I don't want you to tell me what that decision was. But
4  what I am more interested in is, you know, as I mentioned a
5  couple of times here, you know, you are not to discuss this case
6  among yourselves and we're very strict about that. If you are
7  on a jury before you had to follow those same instructions that
8  you couldn't talk about it with anybody. I mean, you couldn't
9  talk about that case with anybody unless you were in the jury
10 room and been given those instructions to start deliberating.
11 But after the case is over, The Court may very well have
12 released you from those instructions and said you can talk about
13 it if you want to, but you don't have to if you don't want to,
14 as well. And on those occasions, sometimes lawyers, you know,
15 have called on jurors before to find out, you know, how they
16 reached that decision. And if you have that kind of experience,
17 I want to know is there anything about that experience that made
18 you regret the decision that you had made as a juror or, you
19 know, if you had known that kind of information you wouldn't
20 have made the decision that you did.
21     For example, if somebody -- one of the attorneys were to
22 say, "Well, you know, we had certain evidence, but The Court did
23 not allow us to bring it in," and if you were to say, "Well, if
24 I had known that, I wouldn't have voted the way I did." Well,
25 you know, you can't second guess, you know, a court, first of

70

1  all, as to why certain evidence was not admitted. But what I am
2  more interested in is whether as a result of that experience you
3  are now thinking, "Well, wait a minute, I know there's got to be
4  more to it than what we heard because I know that's what
5  happened in the case that I served on the jury before." That is
6  impermissible. You cannot be speculating about what evidence
7  was there and was not brought to you. You cannot be
8  substituting or basically taking that experience and then
9  thinking that is the same way here and therefore you have to
10 either come up with a reason for making your decision that has
11 nothing to do with the law and the evidence. So, that's
12 basically what I'm interested in. The fact that you served on a
13 jury before does not qualify you or disqualify you. What may --
14 what is of interest to me is whether there was anything as a
15 result of that experience as a juror that will now play a part
16 in how you evaluate the evidence and whether it is going to play
17 a part in -- make it impossible for you to follow The Court's
18 instructions as you are given them, because you are told you
19 have to follow my instructions whether you agree with it or not.
20 And if you can't do that, then you can't take the oath as a
21 juror.
22     Let me hear now about your prior jury experience. Row No.
23 1? Anybody served on a jury before? Row No. 1?
24     PROSPECTIVE JUROR: No. 5, I served before.
25     THE COURT: What kind of case was it?

71

1      PROSPECTIVE JUROR: DWI.
2      THE COURT: Did you reach a decision?
3      PROSPECTIVE JUROR: Yes.
4      THE COURT: Were you the foreman?
5      PROSPECTIVE JUROR: No.
6      THE COURT: Anything about that experience that would
7  influence your decision here?
8      PROSPECTIVE JUROR: No.
9      THE COURT: Thank you.
10     Anybody else on the first row?
11     Second row?
12     PROSPECTIVE JUROR: 21. Basically it was about DWIs and
13 drugs.
14     THE COURT: Did you reach a decision?
15     PROSPECTIVE JUROR: Yes, we did.
16     THE COURT: Were you the foreman?
17     PROSPECTIVE JUROR: No, ma'am.
18     THE COURT: And anything about that experience that
19 would influence the way you would decide this case?
20     PROSPECTIVE JUROR: No.
21     THE COURT: Thank you.
22     PROSPECTIVE JUROR: Juror No. 19. And I did serve on a
23 jury about 25 years ago.
24     THE COURT: What kind of case, sir?
25     PROSPECTIVE JUROR: Theft.

72

1      THE COURT: Were you the foreman?
2      PROSPECTIVE JUROR: No, ma'am, I was wasn't.
3      THE COURT: Did you reach a decision?
4      PROSPECTIVE JUROR: Yep.
5      THE COURT: Would that experience influence your
6  decision in this case?
7      PROSPECTIVE JUROR: No, ma'am.
8      THE COURT: Thank you.
9      PROSPECTIVE JUROR: No. 17. I served on a couple of
10 civil juries.
11     THE COURT: Do you recall the nature of the jury --
12     PROSPECTIVE JUROR: It was --
13     THE COURT: -- or the case?
14     PROSPECTIVE JUROR: No, ma'am. Civil lawsuit, I
15 believe.
16     THE COURT: Like a personal injury or contract dispute?
17     PROSPECTIVE JUROR: Personal injury.
18     THE COURT: Okay. Did you reach a decision in both
19 cases?
20     PROSPECTIVE JUROR: Yes, ma'am.
21     THE COURT: Were you the foreman of either jury?
22     PROSPECTIVE JUROR: No, ma'am.
23     THE COURT: Anything about those experiences that would
24 influence your decision here?
25     PROSPECTIVE JUROR: No, ma'am.

73

1      THE COURT: Thank you. There's a couple of folks to
2  your right. Sir?
3      PROSPECTIVE JUROR: No. 12. And it was a civil case.
4      THE COURT: What's -- do you recall the nature of it?
5      PROSPECTIVE JUROR: Rear-ended.
6      THE COURT: Collision?
7      PROSPECTIVE JUROR: Yes.
8      THE COURT: Did you reach a decision?
9      PROSPECTIVE JUROR: Yes, we did.
10     THE COURT: Were you the foreman?
11     PROSPECTIVE JUROR: No, ma'am.
12     THE COURT: Anything about that experience that would
13 influence you?
14     PROSPECTIVE JUROR: No, ma'am.
15     THE COURT: Thank you.
16     PROSPECTIVE JUROR: No. 12. I believe you said --
17     PROSPECTIVE JUROR: No. 13.
18     THE COURT: The gentleman who first spoke is No. 13 and
19 you're No. 12, sir?
20     PROSPECTIVE JUROR: Yes, ma'am. I served on a criminal
21 and civil.
22     THE COURT: What was the nature of the civil one?
23     PROSPECTIVE JUROR: Civil was liability, on-the-job
24 injury.
25     THE COURT: I'm sorry, work-related injury?

Captured and Transcribed by Computer - Eclipse

74

1      PROSPECTIVE JUROR: Yes, ma'am.
2      THE COURT: Criminal case?
3      PROSPECTIVE JUROR: Murder case.
4      THE COURT: Did you reach a decision in both cases?
5      PROSPECTIVE JUROR: Yes, ma'am.
6      THE COURT: Were you the foreman of either jury?
7      PROSPECTIVE JUROR: Yes, ma'am.
8      THE COURT: Anything about those experiences that would
9  influence your decision here?
10     PROSPECTIVE JUROR: No, ma'am.
11     THE COURT: Thank you.
12     Anybody else on that row?
13     The next row? There's folks behind you.
14     PROSPECTIVE JUROR: No. 29 and I served in a DWI and a
15 drowning.
16     THE COURT: Drowning was like a negligence against
17 property owner or something?
18     PROSPECTIVE JUROR: Yes, ma'am.
19     THE COURT: Did you reach a decision in both cases?
20     PROSPECTIVE JUROR: That one case was dismissed.
21     THE COURT: All right.
22     PROSPECTIVE JUROR: The other one we did.
23     THE COURT: And were you the foreman of --
24     PROSPECTIVE JUROR: No, ma'am.
25     THE COURT: -- either one? Anything about those

Captured and Transcribed by Computer - Eclipse

75

1  experiences that would influence your decision here?
2      PROSPECTIVE JUROR: No, ma'am.
3      THE COURT: Thank you.
4      PROSPECTIVE JUROR: No. 28. It was an assault and
5  battery. We reached a decision.
6      THE COURT: And were you the foreman?
7      PROSPECTIVE JUROR: No, ma'am.
8      THE COURT: Would that experience influence you in any
9  way in this case?
10     PROSPECTIVE JUROR: No, ma'am.
11     THE COURT: Thank you.
12     PROSPECTIVE JUROR: No. 25. I served in three civil and
13 one criminal.
14     THE COURT: And do you recall the nature of the civil
15 cases?
16     PROSPECTIVE JUROR: One was construction, one was like a
17 contract dispute, and the other we settled before we --
18     THE COURT: Before what?
19     PROSPECTIVE JUROR: They settled before they even told
20 us.
21     THE COURT: The nature of the case. What about the
22 criminal case?
23     PROSPECTIVE JUROR: Criminal was murder.
24     THE COURT: And were you the foreman of any of those
25 juries?

Captured and Transcribed by Computer - Eclipse

76

1      PROSPECTIVE JUROR: No, ma'am.
2      THE COURT: Did you reach a decision? You indicated one
3  was dismissed, but the other ones?
4      PROSPECTIVE JUROR: Another one was also dismissed. We
5  reached a decision in the civil and in the murder one, also.
6      THE COURT: Were you the foreman of any of those juries?
7      PROSPECTIVE JUROR: No.
8      THE COURT: Anything about those experiences that would
9  influence your decision here?
10     PROSPECTIVE JUROR: No, ma'am.
11     THE COURT: Thank you. There's a lady on the third row,
12 I believe? Madam?
13     PROSPECTIVE JUROR: No. 38. And I served on four civil
14 and one drug cases.
15     THE COURT: And the civil cases, can you give me an idea
16 of what they involved?
17     PROSPECTIVE JUROR: Lawsuits.
18     THE COURT: Was it like personal injury or contract
19 disputes?
20     PROSPECTIVE JUROR: It was theft in one and the other
21 one's just a long time ago. I don't remember. But they were
22 just lawsuits.
23     THE COURT: Okay. And were you the foreman of any of
24 those juries?
25     PROSPECTIVE JUROR: No, ma'am.

Captured and Transcribed by Computer - Eclipse

77

1    THE COURT: Did you reach a decision in all cases.

2    PROSPECTIVE JUROR: Yes, ma'am.

3    THE COURT: Anything about those experiences that would

4  influence your decision here?

5    PROSPECTIVE JUROR: No, ma'am.

6    THE COURT: Anybody else on that side?

7  The next side, the first row?

8    PROSPECTIVE JUROR: No. 46. And I was in a jury for a

9  child custody case.

10    THE COURT: And madam, did you reach a decision in that

11  case?

12    PROSPECTIVE JUROR: Yes.

13    THE COURT: Were you the foreman?

14    PROSPECTIVE JUROR: No, ma'am.

15    THE COURT: Anything about that experience that would

16  influence your decision?

17    PROSPECTIVE JUROR: No, ma'am.

18    THE COURT: Thank you, madam. Anybody else on that row?

19    PROSPECTIVE JUROR: No. 48. I was on one that was a

20  job-related injury and also an assault and battery and then I

21  served on the grand jury.

22    THE COURT: All right. And did you reach a decision in

23  connection with all the cases that you -- I mean the regular

24  petit jury?

25    PROSPECTIVE JUROR: Both settled out of court.

Captured and Transcribed by Computer - Eclipse

78

1    THE COURT: Anything about those experiences that would

2  influence your decision here?

3    PROSPECTIVE JUROR: No.

4    THE COURT: Anybody else?

5  Second row?

6    PROSPECTIVE JUROR: No. 55. I was on a criminal case.

7    THE COURT: And was it a felony case, misdemeanor?

8    PROSPECTIVE JUROR: Illegal smuggling of aliens.

9    THE COURT: All right. Did you reach a decision in that

10  case?

11    PROSPECTIVE JUROR: Yes, ma'am.

12    THE COURT: Were you the foreman?

13    PROSPECTIVE JUROR: No.

14    THE COURT: Anything about that experience that would

15  influence your decision here?

16    PROSPECTIVE JUROR: No, ma'am.

17    THE COURT: Thank you, sir.

18  There was another person to your right?

19    PROSPECTIVE JUROR: No. 60. I served in two juries.

20  One criminal and one civil, and I was the foreman to the

21  criminal.

22    THE COURT: What about the civil case, what did it

23  involve?

24    PROSPECTIVE JUROR: The criminal one?

25    THE COURT: Civil.

Captured and Transcribed by Computer - Eclipse

79

1    PROSPECTIVE JUROR: Civil? It involved personal injury.

2    THE COURT: Were you able to reach a decision in both

3  cases?

4    PROSPECTIVE JUROR: Yes, we did.

5    THE COURT: And anything about those experiences that

6  would influence your decision here?

7    PROSPECTIVE JUROR: No, absolutely not.

8    THE COURT: Thank you.

9  Anybody else on that row?

10  The next row?

11    PROSPECTIVE JUROR: No. 75. On a criminal case, I

12  believe, and it was assault and battery?

13    THE COURT: Okay. Were you the foreman, madam?

14    PROSPECTIVE JUROR: No, ma'am.

15    THE COURT: Did you reach a decision?

16    PROSPECTIVE JUROR: Yes.

17    THE COURT: Anything about that experience that would

18  influence your decision here?

19    PROSPECTIVE JUROR: No.

20    PROSPECTIVE JUROR: 74. It was a civil and a criminal.

21  One was sexual harassment case and the other one was a murder

22  trial. And I was -- reached a decision in both.

23    THE COURT: Were you the foreman of either jury?

24    PROSPECTIVE JUROR: No, ma'am.

25    THE COURT: Anything about those experiences that would

Captured and Transcribed by Computer - Eclipse

80

1  influence your decision here?

2    PROSPECTIVE JUROR: No.

3    THE COURT: Thank you.

4  Anybody else on the same row?

5    PROSPECTIVE JUROR: 71. Child molester case.

6    THE COURT: Speak up, please?

7    PROSPECTIVE JUROR: Child molester case.

8    THE COURT: Were you the foreman of the jury?

9    PROSPECTIVE JUROR: No, ma'am.

10    THE COURT: Did you reach a decision?

11    PROSPECTIVE JUROR: Yes, ma'am.

12    THE COURT: Anything about that experience that

13  influence your decision here?

14    PROSPECTIVE JUROR: No, ma'am.

15    THE COURT: Thank you.

16    PROSPECTIVE JUROR: No. 68. I've served on a criminal

17  case and also on grand jury?

18    THE COURT: Did you reach a decision in that criminal

19  case?

20    PROSPECTIVE JUROR: Yes, ma'am.

21    THE COURT: What was the nature of the case?

22    PROSPECTIVE JUROR: Murder.

23    THE COURT: Were you the foreman?

24    PROSPECTIVE JUROR: No, ma'am.

25    THE COURT: Anything about either the grand jury

Captured and Transcribed by Computer - Eclipse

81

1   experience or the jury trial that would influence your decision

2   here?

3        PROSPECTIVE JUROR:  No, ma'am.

4        THE COURT:  Thank you.

5        PROSPECTIVE JUROR:  No. 63.  I served on a civil jury

6   case and it was concerning a piece of defective equipment bought

7   for a small business.  We did reach a verdict.  I was not the

8   foreman of the jury.

9        THE COURT:  Would that experience influence you in any

10  way?

11       PROSPECTIVE JUROR:  No.

12       THE COURT:  Anyone else on that row?

13  The next row?

14       PROSPECTIVE JUROR:  No. 79.  I served on a civil case.

15       THE COURT:  And what was the nature of the case?

16       PROSPECTIVE JUROR:  Personal injury.

17       THE COURT:  Did you reach a decision?

18       PROSPECTIVE JUROR:  Yes, we did.

19       THE COURT:  Were you foreman?

20       PROSPECTIVE JUROR:  No.

21       THE COURT:  Anything about that experience that would

22  influence your decision here?

23       PROSPECTIVE JUROR:  No.

24       THE COURT:  Anybody else?  I'm sorry, go ahead.

25       PROSPECTIVE JUROR:  I served -- 76.  I served on a civil

Captured and Transcribed by Computer - Eclipse

82

1   case between -- it was about some faulty medical equipment.

2        THE COURT:  And --

3        PROSPECTIVE JUROR:  And we came to a decision and I was

4   the foreman.

5        THE COURT:  Anything about that experience that would

6   influence your decision here?

7        PROSPECTIVE JUROR:  No, ma'am.

8        THE COURT:  All right.

9        Anybody else?

10       Okay.  Now, I'm going to ask you about your -- any family or

11  friends or yourself if you have been -- or somebody that you

12  were close to filed a lawsuit in which -- I mean the basis of it

13  was a personal injury.  I want to know whether you -- if it was

14  not you, if there was a family member or friend, whether you

15  attended court proceedings with them, you know, such that you

16  were really involved in it, or as a result of the results of any

17  injury, maybe even if there wasn't a trial, whether -- you know,

18  you have a strong opinion about cases involving either, you

19  know, an injury or a fatality, whether it was, you know,

20  somebody who was killed in a motor vehicle accident, where

21  somebody was charged with driving while intoxicated, something

22  like that.  I'm basically trying to find out from you is whether

23  you have had a person in your family who has either been, you

24  know, a victim of a crime or an incident that resulted in some

25  kind of proceeding where a person was -- maybe even had to go to

Captured and Transcribed by Computer - Eclipse

83

1   court in connection with trying to get compensation.

2        The first row, anybody who has had a family member who's

3   been involved in such a situation or you yourself been involved

4   in such a situation or somebody that you are close to as a

5   family, friend, or personal friend?

6        On the second row?  Yes, madam, you have a response?

7        PROSPECTIVE JUROR:  No.. 4.  My father was involved in a

8   personal injury, but they never went to court.  They settled out

9   of court.

10       THE COURT:  All right.  Did you -- was there a lawsuit

11  filed?

12       PROSPECTIVE JUROR:  Yes, ma'am.

13       THE COURT:  Did you have to go with him to an attorney's

14  office or go to anything at all like a deposition that he had

15  to, you know, be involved in.

16       PROSPECTIVE JUROR:  No, ma'am.

17       THE COURT:  Anything about your father's experience that

18  would influence how you evaluate the evidence in this case?

19       PROSPECTIVE JUROR:  No, ma'am.

20       THE COURT:  Thank you.

21       Second -- I'm sorry, same row, anyone else?

22       Second row?

23       PROSPECTIVE JUROR:  No. 20.  And I was in a car accident

24  and I was injured, but it was settled out of court.

25       THE COURT:  And madam, as a result of that experience --

Captured and Transcribed by Computer - Eclipse

84

1   well, did you hire an attorney?

2        PROSPECTIVE JUROR:  Yes, ma'am.

3        THE COURT:  Is there anything about your experience that

4   would in some way color your opinion or influence your opinion

5   about the nature of this case or any decision that you would

6   make in connection with this case?

7        PROSPECTIVE JUROR:  No, ma'am.

8        THE COURT:  Thank you.

9        PROSPECTIVE JUROR:  Thank you.

10       PROSPECTIVE JUROR:  No. 17.  We have pending a lawsuit

11  our family against -- malpractice lawsuit.

12       THE COURT:  Okay.  It is against a physician or medical

13  service provider, like a hospital --

14       PROSPECTIVE JUROR:  A hospital.

15       THE COURT:  -- or nursing home, something like that?

16       PROSPECTIVE JUROR:  Hospital.

17       THE COURT:  Okay.  And so you have an attorney

18  representing you?

19       PROSPECTIVE JUROR:  Yes, ma'am.

20       THE COURT:  And did it involve the death or some kind of

21  disability or --

22       PROSPECTIVE JUROR:  Death.

23       THE COURT:  A death?

24       PROSPECTIVE JUROR:  Yes, ma'am.

25       THE COURT:  And have you had to attend depositions or

Captured and Transcribed by Computer - Eclipse

85

1   any kind of court proceedings at all?

2        PROSPECTIVE JUROR: Uh-huh. It is in the works right

3   now.

4        THE COURT: So you have not had to be deposed or

5   attended a deposition?

6        PROSPECTIVE JUROR: Not yet.

7        THE COURT: And how long ago did the incident that

8   you -- you know, that was the basis for this --

9        PROSPECTIVE JUROR: Been about three years now.

10       THE COURT: And was it a family member?

11       PROSPECTIVE JUROR: Family member.

12       THE COURT: And sir, is the fact that you are basically

13  in the shoes of some of the individuals that you have been

14  introduced to this morning, is that going to play a part in how

15  you evaluate the evidence in their case?

16       PROSPECTIVE JUROR: No, ma'am.

17       THE COURT: So, are you telling me then that there is --

18  you're not going to -- you're telling me that your experience is

19  not going to influence your decision in this case?

20       PROSPECTIVE JUROR: No, ma'am.

21       THE COURT: There's nothing in your experience that's

22  going to be an impediment to your taking the oath and your

23  promise to The Court that you would -- you're going to render a

24  verdict based upon the law and the evidence.

25       PROSPECTIVE JUROR: No, ma'am.

Captured and Transcribed by Computer - Eclipse

86

1        THE COURT: All right. Thank you.

2   Anybody else?

3   Next row, please?

4        PROSPECTIVE JUROR: No. 25. My husband was in a car

5   accident one time. Hit by somebody else, a negligent driver.

6        THE COURT: And was he hospitalized?

7        PROSPECTIVE JUROR: Yes.

8        THE COURT: Did you have to hire an attorney or have --

9        PROSPECTIVE JUROR: We contacted an attorney and then

10  the insurance asked us to settle without attorneys.

11       THE COURT: Okay. Is there anything as a result of that

12  experience that would make you either -- because you favored the

13  plaintiff's, can identify with them, or because of your

14  experience with the defendant's insurance company or anybody,

15  you know, that was representing them that's going to make you

16  inclined to hold it against the City of Harlingen in connection

17  with this case?

18       PROSPECTIVE JUROR: Well, I kind of haven't put the two

19  together until you asked the question a while ago, but there's

20  similarity in the type. I don't know how much I can go into it,

21  but there's a similarity in the type of person that hit him.

22       THE COURT: Okay. So if -- you know, you're the only

23  one who knows what's in your heart and sometimes we're not even

24  sure until push comes to shove, but is there anything that you

25  feel would be such a strong feeling that you're going to allow

Captured and Transcribed by Computer - Eclipse

87

1   that experience in your life to influence how you view the

2   evidence for one side or the other?

3        PROSPECTIVE JUROR: It is a difficult question because,

4   you know, it is -- the best answer would be to say that you can

5   be fair and then like you said, push comes to shove, I'm not

6   sure.

7        THE COURT: All right. So -- and you've given me an

8   excellent opportunity to make this point that when you're not

9   sure, that means that, to me, you know, unless you are clear

10  that you can take the oath, then you're basically doubting that

11  you can take the oath that you will render a verdict based upon

12  the law and the evidence. Is that what you're telling me?

13       PROSPECTIVE JUROR: Yes, ma'am.

14       THE COURT: Thank you.

15  Anybody else on that side of the room?

16  All right. First row here?

17       PROSPECTIVE JUROR: No. 44. And we had a lawsuit,

18  negligence malpractice lawsuit, from the death of my sister. It

19  was back in '87.

20       THE COURT: Were you deposed?

21       PROSPECTIVE JUROR: No. She was living in Austin at the

22  time.

23       THE COURT: Did you go to any court proceedings in

24  connection with that?

25       PROSPECTIVE JUROR: No, ma'am.

88

1        THE COURT: Anything about that experience that would

2   influence how you evaluate the evidence or sympathy that you may

3   have for one party or the other?

4        PROSPECTIVE JUROR: No, ma'am.

5        THE COURT: So there's nothing to impede you from taking

6   the oath that you would render a verdict based upon the law and

7   the evidence?

8        PROSPECTIVE JUROR: No, ma'am.

9        THE COURT: Thank you.

10  Anybody else on that same row?

11  The next row?

12  Third row?

13       PROSPECTIVE JUROR: No. 71. I was in a car wreck and I

14  got a lawyer working on it.

15       THE COURT: Okay. At this time you have a pending

16  action against somebody; is that what you're telling me?

17       PROSPECTIVE JUROR: Yes, ma'am.

18       THE COURT: Okay. Sir, have you had to be deposed or

19  had to go to court in connection with any of this that occurred?

20       PROSPECTIVE JUROR: Well, not yet. I've been still

21  pending.

22       THE COURT: All right. So, in effect, you're

23  basically -- you know, I guess you could say you're in the same

24  shoes as the plaintiffs in connection with this case. Can you

25  tell me that you -- the fact that you might be in a similar

Captured and Transcribed by Computer - Eclipse

89

1   posture to some extent, to a limited extent, is not going to
2   play a part in how you evaluate the evidence, or will it play a
3   part in how you evaluate the evidence.
4        PROSPECTIVE JUROR:  No.
5        THE COURT:  So you're telling me that your experience is
6   not going to make it impossible for you to take the oath that
7   you will render a verdict based upon the law and the evidence?
8        PROSPECTIVE JUROR:  No.
9        THE COURT:  All right.  Thank you.
10       Anybody else on that same row?
11       The next row?
12       PROSPECTIVE JUROR:  77.  My father was rear-ended by a
13  Brownsville police officer probably about 10 years ago.  I was a
14  little kid.  I don't remember anything about it, didn't go to
15  any of the court proceedings.
16       THE COURT:  Okay.  And anything about that experience --
17  well, was your father disabled permanently?
18       PROSPECTIVE JUROR:  No.
19       THE COURT:  Anything about that experience that would
20  influence how you deliberate in this case?
21       PROSPECTIVE JUROR:  No.
22       THE COURT:  All right.  Thank you.
23       PROSPECTIVE JUROR:  I do have one other.  I had an
24  acquaintance of mine who was murdered several years ago also.  I
25  did not keep track of the case at all.  I didn't know him very

Captured and Transcribed by Computer - Eclipse

90

1   well.
2        THE COURT:  Okay.  And so would that influence you in
3   any way?
4        PROSPECTIVE JUROR:  No.
5        THE COURT:  Okay.  Thank you.  I was going to read you
6   something and ask you about that, but let me find it first.
7        Okay.  Some of you have told me from your jury experience
8   have served on criminal case and some have served on both
9   criminal and civil.  Let me explain to you that a criminal case
10  is different from a civil case, which is what we have here.  You
11  know, this is a lawsuit in which plaintiffs are seeking to have
12  the City of Harlingen be declared responsible for the events and
13  then also are asking for damages if you find that the City of
14  Harlingen is responsible.
15       Now, there's a burden of proof in a civil case and I'm going
16  to read you the definition.  And again, civil case is
17  different from a criminal case.  In a criminal case a person
18  could be subjected to a fine or imprisonment; so, the burden of
19  proof in a criminal case is beyond a reasonable doubt.  In a
20  civil case the burden of proof is different.  It is not as great
21  a burden, but, you know, lawyers frequently resort to the -- a
22  very apt example of the scales of justice that when a -- before
23  a lawsuit -- before you hear any evidence, you can basically see
24  the parties as both sides of the scales of justice.  They come
25  out on an even scale, both of them are on the same level, and

Captured and Transcribed by Computer - Eclipse

91

1   that it is the plaintiff who seeks recovery -- or the plaintiffs
2   who seek recovery who have the burden of proof.  The burden of
3   proof is -- well, this is what I anticipate will be an
4   instruction that you, if you take an oath as a juror, are
5   promising that you will be bound by.  That's the law that I've
6   been referring to or that's part of law that I've been referring
7   to that you are bound to follow.
8        You would be instructed that you must answer all questions
9   from a preponderance of the evidence.  By this is meant the
10  greater weight and degree of credible evidence before you.  In
11  other words, a preponderance of the evidence just means the
12  amount of evidence that persuades you that a claim is more
13  likely so than not so.  In determining whether any fact that's
14  been proved by a preponderance of the evidence in the case, you
15  may, unless otherwise instructed, consider the testimony of all
16  witnesses, regardless of who may have called them, and all
17  exhibits received in evidence, regardless of who may have
18  produced them.
19       Now, is there anyone here who would have a problem with
20  following that instruction, that -- is there anybody here who
21  feels that although this may be a civil case, you feel like, you
22  know, this is such a serious case and so different from a
23  contract dispute, for example, that you feel like the plaintiffs
24  have to prove to you beyond a reasonable doubt versus by a
25  preponderance of the evidence that the events occurred the way

Captured and Transcribed by Computer - Eclipse

92

1   they -- they will summarize to you that they believe, you know,
2   that's how the events occurred and that they're going go to ask
3   you to so find?  Is there anyone here who feels that kind of
4   burden is just too low for the plaintiffs, that they should be
5   held to a higher burden?
6        Okay.  Now, I'm going to ask you about an area of inquiry
7   that I'm not trying to pry.  Everybody's opinion about this
8   issue is going to be -- you know, you have the right to your
9   opinion.  Some people have very strong feelings about weapons
10  and whether a person has a right to carry a firearm or have a
11  firearm in their home.  And, you know, some people may belong to
12  an organization that has a strong stance on that issue, such as
13  the National Rifle Association.  Some people belong -- may
14  belong to an organization that has just the opposite opinion,
15  that advocates for the banning of individuals owning firearms.
16  And there's no right or wrong answers on this issue.  I just
17  want to know whether any of you either own firearms or have
18  family members who own firearms and whether you belong to an
19  organization that has taken a position in connection with
20  firearms, either such as the National Rifle Association or an
21  organization that lobbies against or for laws that would
22  prohibit the use of firearms or possession of firearms by anyone
23  other than law enforcement.
24       Anyone on the first row?
25       Okay.  Second row?

Captured and Transcribed by Computer - Eclipse

93

1      PROSPECTIVE JUROR: No. 21. Yes, we do own firearms.
2  My husband and kids, they enjoy hunting. They aren't part of a
3  group or an organization.
4      THE COURT: Okay. When you say they like to go hunting,
5  do they ever go target shooting and --
6      PROSPECTIVE JUROR: Well, where I live, it is out, you
7  know, I live in the 6 acres and they go and hunt, target
8  shooting, or -- it is dove hunting, you know, things of that
9  sort.
10     THE COURT: Are any of these firearms what would be
11 characterized semiautomatic, if you know?
12     PROSPECTIVE JUROR: No.
13     THE COURT: Like rifles or shotguns or handguns?
14     PROSPECTIVE JUROR: Yes.
15     THE COURT: Anything beyond that that you know?
16     PROSPECTIVE JUROR: No.
17     THE COURT: All right. Thank you. Anybody else on that
18 second row?
19     PROSPECTIVE JUROR: No. 12. I don't belong to any
20 groups that -- I belong to the National Rifle Association or on
21 the other side either, but I do have hunting guns. I have deer
22 rifles, I deer hunt, I dove hunt and --
23     THE COURT: Okay. And so, as a result of, you know,
24 your own personal ownership, anything about the fact that the
25 allegations involve the kind of firearm that I just mentioned

Captured and Transcribed by Computer - Eclipse

94

1  earlier going to play a part in how you evaluate the evidence,
2  either for one side or the other?
3      PROSPECTIVE JUROR: No, ma'am.
4      THE COURT: Thank you, sir.
5  The next row?
6      PROSPECTIVE JUROR: No. 28. My son owns a rifle. He
7  goes hunting with my husband and my older son, but mostly out of
8  town.
9      THE COURT: And is the fact that your husband and son
10 own a firearm and use it for that purpose going to influence how
11 you evaluate the evidence in this case?
12     PROSPECTIVE JUROR: No, ma'am.
13     THE COURT: You don't have any membership or strong
14 opinion on this issue at all?
15     PROSPECTIVE JUROR: No, there's no membership.
16     THE COURT: Anyone else on that same row?
17     PROSPECTIVE JUROR: No. 38. My husband owns an old, old
18 rifle. Had it for a long time.
19     THE COURT: And does he use it for hunting or target
20 shooting?
21     PROSPECTIVE JUROR: He used to use it when my son was
22 young. He has in it the closet. He doesn't use it.
23     THE COURT: And as far as you know, does he belong to
24 any organization that advocates that?
25     PROSPECTIVE JUROR: No.

Captured and Transcribed by Computer - Eclipse

95

1      THE COURT: Anything about that situation that would
2  influence how you evaluate the evidence in this case?
3      PROSPECTIVE JUROR: No, ma'am.
4      THE COURT: Thank you.
5  Anybody else on that row?
6  The last row?
7  First row on this side?
8      PROSPECTIVE JUROR: No. 44. We own a number of guns.
9  My son hunts and he also is recently certified to teach rifling
10 through the Boy Scouts. I don't personally belong to any of the
11 NRA, but my dad does.
12     THE COURT: And madam, is the fact that you have got
13 somebody -- I mean, who obviously is very familiar with firearms
14 and your father belongs to a gun organization, is that going to
15 influence how you evaluate the evidence either for one side or
16 the other?
17     PROSPECTIVE JUROR: No, ma'am.
18     THE COURT: Does either one own the kind of weapon that
19 I have described as allegedly being used in this case?
20     PROSPECTIVE JUROR: You mean a semiautomatic?
21     THE COURT: Yes.
22     PROSPECTIVE JUROR: No, ma'am.
23     THE COURT: Thank you.
24 Anyone else on that row?
25     PROSPECTIVE JUROR: No. 49. My husband and I have

Captured and Transcribed by Computer - Eclipse

96

1  pistol at home. We have no bullets. It belonged to my
2  father-in-law. When died, he left it to my husband. And
3  both of my sons in Alabama are deer hunters and they have
4  weapons. And my son-in-law has some weapons. As far as I know,
5  they don't belong to any organization.
6      THE COURT: And anything that resulted from that use
7  of -- I mean, you know, the hunting or whatever they use those
8  weapons for that makes you have a strong feeling about ownership
9  of guns such that you would favor one side or the other?
10     PROSPECTIVE JUROR: No, I don't think so.
11     THE COURT: Thank you, madam.
12 Anyone else on that first row?
13 Second row?
14     PROSPECTIVE JUROR: No. 55. I have several rifles and
15 shotguns, pistols, and I've got permits to carry a concealed
16 handgun.
17     THE COURT: All right. And, sir, do you belong to an
18 organization such as I've listed?
19     PROSPECTIVE JUROR: No.
20     THE COURT: No?
21     PROSPECTIVE JUROR: No, ma'am.
22     THE COURT: Anything about your ownership of guns or
23 your feelings, personal opinion that you may have that would
24 influence how you would evaluate the evidence in this case?
25     PROSPECTIVE JUROR: No, ma'am.

Captured and Transcribed by Computer - Eclipse

97

1   THE COURT: Thank you.

2   PROSPECTIVE JUROR: I'm No. 60. I have a very, very old

3   rifle at home and pretty much afraid to use it.

4   THE COURT: Okay. Anything about that fact that you own

5   a weapon that would make you favor one side or the other?

6   PROSPECTIVE JUROR: No, none.

7   THE COURT: Thank you.

8   All right. Anybody else? Yes?

9   PROSPECTIVE JUROR: I got two old rifles.

10   THE COURT: Do you use them for target shooting and

11   hunting?

12   PROSPECTIVE JUROR: We use them around the farm for

13   just -- go rabbit hunting, but there ain't to rabbits anymore.

14   THE COURT: I was going to say do you take them to the

15   deer blind so you can have them there and hang out with the

16   guys.

17   PROSPECTIVE JUROR: Not no more. I'm No. 71.

18   THE COURT: Anything about the fact that you own such

19   firearms that would influence you one way or the other?

20   PROSPECTIVE JUROR: No, ma'am.

21   THE COURT: Number, sir?

22   PROSPECTIVE JUROR: 71.

23   THE COURT: All right. Thank you.

24   PROSPECTIVE JUROR: No. 63. My husband owns a rifle and

25   a shotgun that he hasn't used in years. But he used to go

Captured and Transcribed by Computer - Eclipse

98

1   hunting. He does not belong to an organization.

2   THE COURT: Madam, would your husband's ownership of

3   weapons, influence you one way or the other and -- I mean, does

4   it make you form an opinion such that would influence your

5   decision in this case?

6   PROSPECTIVE JUROR: No.

7   THE COURT: Thank you, madam.

8   The last row?

9   PROSPECTIVE JUROR: 77. I am an NRA certified archery

10   instructor with the Boy Scouts of America. Most of my adult

11   family members own weapons. I don't own one myself, though I

12   have shot everything from a bow and arrow to an AK-47 assault

13   rifle, which is semiautomatic.

14   THE COURT: Sir, is there anything about your personal

15   experience that would influence your evaluation of the evidence

16   in this case? I mean, if the issue specially evolved around the

17   chain of custody basically of a semiautomatic rifle, is the fact

18   that you have had that experience going to influence how you

19   evaluate the evidence either for one side or the other?

20   PROSPECTIVE JUROR: No.

21   THE COURT: Thank you. Now, is there anyone here who

22   has had a family member who has been injured in a shooting or

23   injured or possibly fatally injured in a shooting incident

24   whether it was -- well, I mean not -- you know, accidental

25   discharge or, you know, being at the wrong place at the wrong

Captured and Transcribed by Computer - Eclipse

99

1   time? Anybody who's had that experience, either a family member

2   or close friend?

3   On this side of the room?

4   On that side of the room? Madam?

5   PROSPECTIVE JUROR: No. 44. My husband was murdered.

6   Gun shot.

7   THE COURT: Okay. And madam, as a result of this --

8   your husband's death, was there a criminal prosecution?

9   PROSPECTIVE JUROR: Yes, there was.

10   THE COURT: Did you attend the trial and were you called

11   as a witness?

12   PROSPECTIVE JUROR: No, ma'am.

13   THE COURT: Is there anything about that experience that

14   would influence how you would evaluate the evidence in this

15   case?

16   PROSPECTIVE JUROR: In this case, no, ma'am.

17   THE COURT: Is there some kind of case that you would

18   feel -- was there any kind of civil proceeding that resulted

19   from that, as well?

20   PROSPECTIVE JUROR: No, ma'am, it was just criminal.

21   THE COURT: Is there anything -- are you saying that --

22   you said not in this case. Is there any kind of case in which

23   your husband's -- or your experience with your husband's death

24   would influence or you feel would be influenced in some way.

25   PROSPECTIVE JUROR: No. I feel I could weigh the

Captured and Transcribed by Computer - Eclipse

100

1   evidence presented.

2   THE COURT: All right. How long ago did this take

3   place?

4   PROSPECTIVE JUROR: 12 years ago.

5   THE COURT: Where?

6   PROSPECTIVE JUROR: '91.

7   THE COURT: Did id occur in Texas?

8   PROSPECTIVE JUROR: Yes, in Cameron County.

9   THE COURT: Okay. And was the person who was -- was the

10   person found guilty or what occurred?

11   PROSPECTIVE JUROR: Yes, ma'am.

12   THE COURT: Was it somebody he knew or a stranger?

13   PROSPECTIVE JUROR: Stranger.

14   THE COURT: Okay. Thank you.

15   Anybody else on that row or on that side of the room?

16   PROSPECTIVE JUROR: My number is 56. My uncle committed

17   suicide with a shotgun.

18   THE COURT: All right. And, sir, is there anything

19   about your experience and your family's experience with that

20   event that would influence how you would evaluate the evidence

21   here?

22   PROSPECTIVE JUROR: No, ma'am.

23   THE COURT: Thank you. There's another gentleman on the

24   same row?

25   PROSPECTIVE JUROR: No. 55. My grandson accidentally

Captured and Transcribed by Computer - Eclipse

101

1   shot himself on the side of the head with a pistol several years
2   ago.
3       THE COURT: Was it with -- was he an adult or a minor
4   when this happened?
5       PROSPECTIVE JUROR: He was a minor.
6       THE COURT: Was it a weapon that was -- belonged to your
7   son or daughter?
8       PROSPECTIVE JUROR: It was mine. Got it out of the
9   bottom of the deer bag and he was just three years old and shot
10  himself upside the head with it.
11      THE COURT: How long ago was that?
12      PROSPECTIVE JUROR: About 20 years ago.
13      THE COURT: Is there anything about that experience that
14  would influence how you would evaluate the evidence in this
15  case?
16      PROSPECTIVE JUROR: No, ma'am.
17      THE COURT: Let me just -- and I'm not asking this to
18  pry, but I need to know. Is there anything that -- was there
19  any kind of civil claim against you by your -- by the child's
20  parents?
21      PROSPECTIVE JUROR: Just homeowner's insurance.
22      THE COURT: Okay. And so was there proceeding where
23  they eventually had to go to court on that?
24      PROSPECTIVE JUROR: No, ma'am.
25      THE COURT: Anything about that experience, either the

Captured and Transcribed by Computer - Eclipse

102

1   injury itself or what flowed from it that would influence how
2   you would evaluate the evidence in this case?
3       PROSPECTIVE JUROR: No, ma'am.
4       THE COURT: Thank you.
5   Anybody else on that row?
6   The next row?
7   The last row?
8       PROSPECTIVE JUROR: 77. My father's a World War II vet.
9   Talks about being shot at all the time. I also mentioned that
10  my acquaintance that was murdered. He was duct-taped, had to
11  kneel down and shot, execution style, in the back of the head.
12      THE COURT: Okay. Well, sir, did you have to -- did you
13  attend any proceedings in connection with that incident?
14      PROSPECTIVE JUROR: No, I did not.
15      THE COURT: Is the fact that, you know, you were
16  obviously very close to somebody who was a victim in that manner
17  going to influence how you evaluate the evidence in this case?
18      PROSPECTIVE JUROR: I wasn't close to him at all. I
19  knew him, I knew of him. He was a boy in my Boy Scout Troop.
20  He was hanging out with the wrong people, was in the wrong place
21  at the wrong time.
22      THE COURT: So are you saying that that experience is
23  not going to influence how you evaluate the evidence in this
24  case?
25      PROSPECTIVE JUROR: No, it would not influence me.

Captured and Transcribed by Computer - Eclipse

103

1       THE COURT: Thank you, sir.
2   Anybody else?
3   The other gentleman?
4       PROSPECTIVE JUROR: Your Honor, No. 6. And my -- one of
5   my cousins -- actually, we were not that close -- he was shot
6   execution style, also. Wrong place at the wrong time with the
7   wrong people. But it wasn't here in the United States. It was
8   in another country.
9       THE COURT: Okay.
10      PROSPECTIVE JUROR: And my uncle was also shot from
11  behind. We were not that close because we were very distant
12  from around 15 years. We were not that close, but it was a long
13  time ago.
14      THE COURT: All right.
15      PROSPECTIVE JUROR: Both cases.
16      THE COURT: All right. And understandably that --
17  understanding that they were very traumatic, but is there going
18  to be something as a result of that experience that is going to
19  influence how you evaluate the evidence in this case?
20      PROSPECTIVE JUROR: No, Your Honor, because actually I
21  wasn't very involved in the events or the facts, okay? Just
22  only that I heard the news and I said, "Well, I'm sorry," okay?
23  But that's it. It won't influence, not at all, any decision
24  that I should take.
25      THE COURT: Okay. Thank you.

Captured and Transcribed by Computer - Eclipse

104

1   All right.
2       COURT SECURITY OFFICER: One more, Your Honor.
3       THE COURT: Yes.
4       PROSPECTIVE JUROR: My brother was hot in the leg
5   accidentally by a friend, but nothing was done about it, no
6   charges pressed or anything.
7       THE COURT: I'm sorry, your number again?
8       PROSPECTIVE JUROR: 38.
9       THE COURT: And so there was no criminal case or civil
10  case that came from it?
11      PROSPECTIVE JUROR: No.
12      THE COURT: Anything about that experience that would
13  influence your decision here?
14      PROSPECTIVE JUROR: No, ma'am.
15      THE COURT: Thank you, madam.
16  Now, let me ask you if you are instructed that the law
17  provides that if the plaintiffs prove their case they are
18  entitled to have the jury assess damages for such intangible
19  items such as mental anguish and loss of companionship. Is
20  there anyone here, who, if you were given that instruction,
21  could not follow such an instruction?
22  Okay.
23  For those of you who live in the City of Harlingen, is there
24  anyone who can assess money damages in this case? If the
25  plaintiffs carry their burden of proof, can you assess money

Captured and Transcribed by Computer - Eclipse

105

1  damages without regard to concern as to how those damages would
2  be paid?  I haven't had a chance to look at each one of your
3  juror information cards, which by the way we have copies of, but
4  if any of you live in Harlingen, is there anyone here who would
5  have a reservation with the damages issues because of your
6  concern as to how the damages would be paid?
7      Okay.
8      I have seen signs and I'm not sure whether you may have seen
9  it, but this is what I'm trying to inquire about now.  There's
10  an organization entitled Citizens Against Lawsuit Abuse and
11  there may be commercials you might have seen on television or
12  heard on radio accounts or maybe seen in newspaper ads.  Is
13  there anyone who either belongs to such an organization or
14  strongly identifies with a position of such an organization that
15  is basically trying to -- I mean is part of a program to bring
16  to the public's attention their position that there are too many
17  frivolous lawsuits?  Again, I'm saying that is the position that
18  they have and they are maybe publicity that you've been exposed
19  to or, you know, you might have even belong to such an
20  organization.  Is there anyone who either belongs to such an
21  organization or has seen the ads and feels like that's a -- the
22  position that you identify with?
23      Okay.  Yes, sir?  There's somebody in the back and there's
24  somebody in the front.
25          PROSPECTIVE JUROR:  77.  I'm not sure if I have seen any

Captured and Transcribed by Computer - Eclipse

106

1  of the commercials or such that you are talking about, but I do
2  believe that there are too many lawsuits out there where people
3  stubbed their toes on something and are trying to get money for
4  something.
5          THE COURT:  Let me stop you at that point.  And there's
6  nothing wrong with having that opinion, but what's wrong is if
7  you have that opinion and that opinion would influence how you
8  would evaluate the evidence in this case?
9          PROSPECTIVE JUROR:  I don't believe it would.
10          THE COURT:  All right.  And, you know, sometimes, like I
11  said, you don't know until you are in the jury room.  If there's
12  going to be any reservation on your part -- you know, if you
13  were in the plaintiff's shoes and you had somebody on the jury
14  with your opinion, would you feel uncomfortable having such a
15  juror on the jury if you're the one who was seeking
16  compensation?
17          PROSPECTIVE JUROR:  No.
18          THE COURT:  Thank you.
19      The gentleman on the -- my left, first row?
20          PROSPECTIVE JUROR:  I feel -- my number is 1.  I feel
21  the same way he does, that there's --
22          THE COURT:  And, sir, if you have a strong opinion, can
23  you tell me whether you would be able to make a decision
24  objectively in this case without a regard to your opinion?
25          PROSPECTIVE JUROR:  I would be able to make a decision.

Captured and Transcribed by Computer - Eclipse

107

1          THE COURT:  So you're telling me that there would be
2  nothing in your opinion -- or the fact that you had that opinion
3  would not impede your ability to be -- to take the oath as a
4  juror where you're promising to the parties and to The Court and
5  to the public that you were going to make a decision based upon
6  the law and the evidence that you hear and that you're going to
7  be able to do that without concern for your opinion?
8          PROSPECTIVE JUROR:  Yes, I think I would be able to make
9  a decision.  There would be nothing to impede my decision.  I
10  used to -- well, back there was lot of commercials about lawsuit
11  abuse, but I haven't seen that many anymore.  I do know several
12  people that for every little thing they've taken it to court
13  trying to get money from it.
14          THE COURT:  Okay.  Well, I mean -- and I'm going to rely
15  on your promise to me.  As I stressed earlier, I don't mean to
16  belabor the point because it is a very important point that, you
17  know, you're the only one who can tell me and if you can
18  truthfully tell me from your heart of hearts that you are not
19  going go to allow that opinion to paint how you decide this case
20  or influence how you decide this case, then that's a promise
21  that you're making when you take that oath.
22          PROSPECTIVE JUROR:  Yes, Your Honor.
23          THE COURT:  And that's what you're telling me.
24          PROSPECTIVE JUROR:  I'm promising you that.
25          THE COURT:  Thank you, sir.

Captured and Transcribed by Computer - Eclipse

108

1      Okay.  Let me ask you whether there is anything that I have
2  not -- oh, you know what, I should tell you that this case,
3  we're scheduled to begin the evidence on February the 19th,
4  which will be a week from tomorrow.  I anticipate that the
5  evidence will -- or this case may go into the following week.  I
6  can't promise you with exactness how long it is going to take
7  because, you know, even if the evidence ends on a certain date,
8  we still have final arguments and then the jury deliberation and
9  that would be up to the jury to -- you know, as to how long they
10  deliberate.  But, you know, in all fairness, I want to know
11  whether there is anyone on this panel who would have a problem
12  if the evidence begins on the 19th and goes -- I mean, if the
13  case continues through the 28th or maybe even March the 1st
14  which would be that Friday, anyone here who has a commitment or
15  conflict that I need to know about?
16      Sir, you have raised your hand?
17          PROSPECTIVE JUROR:  No. 1.  I've been planning a trip to
18  Georgia to see my son graduate from Army boot camp on that date.
19          THE COURT:  On what day?
20          PROSPECTIVE JUROR:  On the 19th.
21          THE COURT:  Okay.  Thank you.
22          PROSPECTIVE JUROR:  We leave the 19th or the 20th.
23          THE COURT:  All right.  Thank you.
24      Anybody else on the first row?
25      Second row?

Captured and Transcribed by Computer - Eclipse

109

1    PROSPECTIVE JUROR: No. 21. On March the 1st, where I
2    work, I work with the cosmetology department and we're hosting a
3    La Vica skills contest there at our building at the school on
4    March 1st. That's the date.
5    THE COURT: Okay. Is there someone who can take your
6    place? I'm sorry that I don't have your information right in
7    front of me, but let me -- you're No. 21?
8    PROSPECTIVE JUROR: Yes.
9    THE COURT: Let me look real quick just a second. Okay.
10   You're a teacher so you're an instructor in that department
11   and how many instructors do you have?
12   PROSPECTIVE JUROR: Well, it is -- I do have a
13   paraprofessional that works with me and I don't know that -- Mr.
14   Jennings, can I take off?
15   PROSPECTIVE JUROR: I'm her boss.
16   THE COURT: Well, my question really comes down to this
17   is. Is your commitment for this event going to be so -- I mean
18   weigh so much on your mind that you would be concerned about
19   that and would be wanting to hurry up and maybe not give the
20   evidence the due deliberation that it requires because of your
21   commitment and your concern that -- you know, that the event is
22   being carried on without you?
23   PROSPECTIVE JUROR: Yes. I guess I would because --
24   well, it is not only that, but it is since we are hosting it,
25   the preparation that's involved in getting everything together

Captured and Transcribed by Computer - Eclipse

110

1    and leading up to that. It is not just on the 1st, but the 2nd,
2    also.
3    THE COURT: Okay. Thank you, madam.
4    Anybody else on that row?
5    The next row?
6    On the next row?
7    PROSPECTIVE JUROR: No. 37. I'm an instruction
8    facilitator at one of the Harlingen high schools and I'm
9    scheduled to go to two conferences in Austin on -- we're leaving
10   on the 25th and returning on the evening of the 28th.
11   THE COURT: Okay. And are those conferences for
12   purposes of continuing your certification or what's the nature
13   of the conference?
14   PROSPECTIVE JUROR: In preparation for the new state
15   assessment comp test, TAKS.
16   THE COURT: Is this a conference or subject of this
17   conference going to be repeated sometime in the future or is
18   this a one-shot.
19   PROSPECTIVE JUROR: I don't know that. There are other
20   people from my school going.
21   THE COURT: Okay.
22   PROSPECTIVE JUROR: I'm not the only one.
23   THE COURT: So, basically, if you were not with that
24   deligation, I mean, is it something that you would still be able
25   to get from another event or, you know, the fact --

Captured and Transcribed by Computer - Eclipse

111

1    PROSPECTIVE JUROR: Yes, they could give me the
2    information.
3    THE COURT: Thank you, madam.
4    PROSPECTIVE JUROR: No. 31. I'm starting -- my friend
5    is a director and I'm his casting director and we're going to
6    start to cast for the film that we're shooting down here and it
7    starts like in the next couple of weeks. So, we're going to
8    start shooting in March.
9    THE COURT: And I'm sorry, your number again?
10   PROSPECTIVE JUROR: 31.
11   THE COURT: Okay. Is this basically like a commercial
12   film or --
13   PROSPECTIVE JUROR: No, it is an independent film --
14   THE COURT: Okay.
15   PROSPECTIVE JUROR: -- that we've already had known for
16   a long time. Right now he's finishing up the script and he's
17   got it down to organize it.
18   THE COURT: Your role in this?
19   PROSPECTIVE JUROR: Casting director and I have a small
20   part in the movie.
21   THE COURT: Okay. And is there a part for judge?
22   (Laughter.)
23   THE COURT: Just kidding. Just kidding.
24   By the way, let me check to see what time it is. Okay. It
25   is 12:49. So there's nobody else that can do your job?

Captured and Transcribed by Computer - Eclipse

112

1    PROSPECTIVE JUROR: Not really.
2    THE COURT: Employment is not a means to get excused
3    from this and I see that you do have a position -- I mean, you
4    are a salesperson basically?
5    PROSPECTIVE JUROR: Yes.
6    THE COURT: This is something that you are doing in
7    addition to that?
8    PROSPECTIVE JUROR: Yes, I am, on top of that.
9    THE COURT: Is there anything about that commitment
10   pending that would be I guess something that would weigh on your
11   mind as you're evaluating the evidence and hearing the evidence
12   and basically -- you know, obviously this is the kind of case
13   that requires serious consideration of the evidence and argument
14   and the law. Is that commitment going to be --
15   PROSPECTIVE JUROR: It does deal with like some border
16   patrol issues about coming over from -- it is about
17   Latin-American life here in the United States and it is talking
18   about stuff that's happened, stories that happened that have
19   people that have tried to come over.
20   THE COURT: So it involves immigration issues.
21   PROSPECTIVE JUROR: Yes.
22   THE COURT: Okay. But I'm going back to your commitment
23   as a casting director. Is there going to be such a -- only you
24   can tell me.
25   PROSPECTIVE JUROR: Yes, I believe it --

Captured and Transcribed by Computer - Eclipse

113

1    THE COURT: Let me finish. Is that going to be a
2  commitment that is going to kind of make it impossible for you
3  to devote the attention that the case requires?
4    PROSPECTIVE JUROR: Honestly, yes.
5    THE COURT: Thank you, sir.
6  Anybody else on that same row?
7  The next row?
8  First row here?
9    PROSPECTIVE JUROR: No. 56. My wife's expecting anytime
10  now; so, I guess that would be -- I don't know if that's a good
11  enough excuse.
12    THE COURT: Yeah. That would be a very serious concern.
13  Is this going to be first child?
14    PROSPECTIVE JUROR: Yes, ma'am.
15    THE COURT: Congratulations. Best wishes.
16    PROSPECTIVE JUROR: Thank you.
17    THE COURT: Anybody else on that row?
18  The next row?
19    PROSPECTIVE JUROR: No. 60. I teach close to 990
20  students in one week and if I'm away they'd be losing a lot of
21  instruction. I'm the only music teacher at my school.
22    THE COURT: Okay. And again, your business commitments
23  are not a way to -- I mean a reason for The Court to excuse you.
24  My question to you is is the fact -- I guess you would have a
25  substitute teacher?

Captured and Transcribed by Computer - Eclipse

114

1    PROSPECTIVE JUROR: Yes. A sub that probably would not
2  do a very good job honestly.
3    THE COURT: Well, but my question is, is that
4  responsibility going to be such a factor in your mind that
5  you're not going to devote the attention that this case needs?
6    PROSPECTIVE JUROR: No, probably not. But I would know
7  still that the kids would lose a lot of instruction time.
8    THE COURT: Okay. But only you can tell me. Is that
9  going to be something that stands in the way of you being able
10  to follow the law and make a decision based on the evidence?
11    PROSPECTIVE JUROR: No.
12    THE COURT: Thank you.
13    PROSPECTIVE JUROR: No. 64. I have airline flights for
14  out of state for the 21st and 22nd.
15    THE COURT: Okay. And is that a -- I guess you've
16  already got the tickets bought?
17    PROSPECTIVE JUROR: Yes, I do.
18    THE COURT: All right. Thank you.
19    PROSPECTIVE JUROR: 77. I'm a music education major at
20  the University of Texas at Brownsville and a member of the Texas
21  Music Educator's Association.
22    THE COURT: Okay. Well, you know, I think you might
23  have been asked whether you were a student and you are certainly
24  entitled to be excused if you're a student.
25    PROSPECTIVE JUROR: It is not on the paper actually. I

Captured and Transcribed by Computer - Eclipse

115

1  read it pretty thoroughly looking for that. I made a note on my
2  paper when it asked about excuses putting that I am a student.
3    THE COURT: Thank you, sir.
4  Anybody else?
5    All right. I tell you, since it is close to 1 o'clock, what
6  I would like to do is to recess you until 2 o'clock. I've got
7  another jury panel standing by for 2 o'clock, but I'm going to
8  recess them until later on in the day, but please return so that
9  we can resume again. As you can see it has taken a little bit
10  of time to select the jury, to go through voir dire, and we want
11  to do it as quickly as possible consistent with justice and we
12  don't want to inconvenience you anymore than we have to, but I'm
13  going to -- well, maybe that would be unrealistic since it is --
14  I guess I'll recess you until 2:30 to give you plenty of time if
15  you have to leave the building to get back here. But please
16  understand that this is a court order -- every instruction I
17  give you is a court order. You are not to listen to any news
18  accounts -- radio, television. You are not to read any news
19  accounts in any publication, whether it is a hard copy or the
20  Internet. You are not to discuss this case or the fact that you
21  have a possibility of serving on this case with anyone. If you
22  overhear someone discussing this case in your presence, you are
23  to report it to me at the time that you return. You are not to
24  allow anyone to attempts to discuss it with you. It doesn't
25  matter who they claim they are. Any violation of this rule

Captured and Transcribed by Computer - Eclipse

116

1  by -- actually, anybody who has anything to do with this case is
2  under The Court's order to not approach any potential juror.
3  Should they approach a potential juror with an attempt to
4  discuss this case, they are subject to being prosecuted for
5  being in contempt of court. So, it is your responsibility when
6  you return to report to me any attempt to discuss this case with
7  you. Any attempt to bring up a matter in any way, shape or
8  form.
9    And so, with that instruction, you are now excused until
10  2:30 this afternoon.
11    (Jury panel out.)
12    THE COURT: Counsel, let's talk now about what we may
13  have any challenges for cause that y'all can agree to or that
14  are pretty clear rather than wasting anytime on questioning them
15  on anything else. I propose that if there are any challenges
16  for cause they're pretty evident and there's no basis for
17  further voir dire of individuals that we go ahead and strike
18  them now and then excuse them at the time that they return at
19  2:30. Y'all want to discuss them and then just let me know,
20  I'll stay right here and --
21    MR. SPIVEY: My thought, Your Honor, might be more
22  productive if we could go ahead and recess and then give us an
23  opportunity to visit and give you notice whether in advance
24  of --
25    THE COURT: Okay. Be prepared to tell me at 2 o'clock

Captured and Transcribed by Computer - Eclipse

117

1  and that way if there's anything that we still need to discuss,
2  I can do that and then, you know, I can take care of the other
3  jury panel in this case.
4      Thank you.  We're in recess.
5      (Lunch recess.)
6      THE COURT:  All right.  Counsel, please advise me of any
7  mutual challenges for cause or any challenges for cause that are
8  not opposed.  Mr. Spivey?
9      MR. SPIVEY:  There are two.  No. 3 and No. 9 we agree
10  are clearly subject to challenge.
11      THE COURT:  Three and which one?
12      MR. SPIVEY:  Three and nine.
13      THE COURT:  Okay.  And basically all I want to know is
14  what you can agree to because what I will do now is before the
15  panel comes in excuse numbers three and nine and then we'll
16  continue.  You'll have an opportunity to argue any challenges
17  for cause at the appropriate time.
18      MR. SPIVEY:  Okay.
19      THE COURT:  Also, I think the Pequeno case, you've been
20  advised that I've given the jury a break until or 3:30.  We'll
21  find out more or less or have an idea whether we're going to
22  start today or begin early tomorrow morning.
23      MR. COSTILLA:  Thank you, Your Honor.
24      THE COURT:  Any other housekeeping matters before the
25  jury comes in?

Captured and Transcribed by Computer - Eclipse

118

1      Please excuse numbers three and nine and bring in the
2  balance of the jury panel.
3      COURT SECURITY OFFICER:  Yes, Your Honor.
4      THE COURT:  Also, Counsel, if you will approach the
5  bench while the panel's being seated.  And please tell the panel
6  to keep their voices down.
7      (Bench conference.)
8      THE COURT:  Okay.  I am not going to allow individual
9  voir dire for publicity unless it is necessary.  Aside from that
10  issue, is there any other question for the plaintiffs or area of
11  inquiry for the plaintiffs that you're asking The Court to
12  inquire of for the balance of the panel that remains?  Mr.
13  Spivey?
14      MR. SPIVEY:  I don't think so.
15      MRS. LOPEZ:  There's several people that I understand
16  from the reports that we've gotten that work with San Benito
17  I.S.D. and I recall R.D. Moore's sister works with San Benito
18  I.S.D. and may work with some of the people that have indicated
19  that they work with San Benito I.S.D. and I don't know whether
20  they've had any contact with R.D. Moore's sister or whether they
21  have any knowledge or any dealings with R.D. Moore's sister.
22      MR. LOCKHART:  The only one we'd have, Your Honor, is if
23  anybody's had any problem with the City of Harlingen.
24      MRS. LOPEZ:  Judge, if anybody has a problem with suing
25  a city.

Captured and Transcribed by Computer - Eclipse

119

1      (Bench conference concluded.)
2      (Jury panel in.)
3      THE COURT:  Mr. Lockhart, I blanked out.  Is there any
4  question that you asked -- inquired about?  I didn't write it
5  down.
6      MR. LOCKHART:  Your Honor, I have it right here.  May I
7  approach.
8      THE COURT:  Well, you can just tell me here.  Just if
9  anybody had any problem with City of Harlingen that they -- all
10  right.
11      Now, members of the jury panel --
12      COURT SECURITY OFFICER:  We're missing some.
13      THE COURT:  Okay.  I'm sorry.  I thought everybody was
14  seated.
15      Mrs. Lopez, the name that you asked The Court to inquire
16  about?
17      MRS. LOPEZ:  Your Honor, we're trying to obtain that
18  last name of that individual for you.
19      MR. SPIVEY:  May I approach the bench?
20      THE COURT:  To answer what question?
21      MR. SPIVEY:  To answer the question that was raised.
22      THE COURT:  Give me the name.
23      MR. SPIVEY:  It is about a question.  About a question.
24  She's got it now.
25      MRS. LOPEZ:  We've got the name now.

Captured and Transcribed by Computer - Eclipse

120

1      THE COURT:  All right.  If all you've got is to give me
2  the name, just give it to me?  Mrs. Lopez.
3      MRS. LOPEZ:  Yes, Your Honor.  The name is a Elena Gail
4  Todd.
5      COURT SECURITY OFFICER:  Your Honor, the remaining three
6  members of coming up the stairs now.
7      (Jury panel complete.)
8      THE COURT:  Members of the jury panel, the remaining
9  questions I have for you include as you -- as we've discussed,
10  one of the parties is a city that is an entity, the City of
11  Harlingen.  I have two questions about that.
12      One is have any of you on this panel ever had a problem or
13  that you characterize or felt was a problem with the City of
14  Harlingen in any way, such as, you know, maybe you were given a
15  citation by traffic enforcement officer or somebody with
16  building inspections or something of a nature where you've had
17  to possibly dispute the allegations in that citation or, you
18  know, something where you were basically on one side of an issue
19  and the City of Harlingen was on the other side of that issue?
20  And so is there anybody on the panel who has had a situation
21  arise specifically with the City of Harlingen of that nature?
22      Okay.
23      Now, is there anyone here again because you're talking about
24  a city that is incorporated and you have -- you know, I've
25  touched upon the question of whether any of you would have a

Captured and Transcribed by Computer - Eclipse

121

1  problem with assessing damages or making a decision on damages
2  because an entity that is funded by taxes assessed, you know, is
3  involved.  Is there anyone here, who, as a rule, just has a
4  problem with having a city be the defendant in a lawsuit
5  regardless of the nature of the claim against the city whether
6  it is, you know, of this nature, whether it is, you know, a
7  dispute involving, you know, taking of property by the city, you
8  know, under eminent domain.  Anything like that where you feel
9  like it is not proper, it is not right, it is not fair to have
10 the entity be -- defending itself against any allegations or any
11 party who is seeking compensation?  Is there anyone on the panel
12 who feels that way?
13      Is there anyone on the panel who might -- even if you do not
14 know any of the witnesses who were listed -- might know any
15 relatives of the witnesses or people that you know to have an
16 interest in the outcome of this lawsuit?  And I've been asked to
17 inquire specifically anyone who works with or is from San Benito
18 who might know a relative of the party named Elena Gail Todd?
19 Is there anyone here who knows any family member or that
20 specific family or person I have just inquired about?
21      Is there any other issue that I have not discussed that you
22 wish to apprise The Court of that would be a factor in The
23 Court's evaluation of your ability to serve on this particular
24 case?  And I'm going to go row by row.  This is extremely
25 important?

122

1  Row one on my left?
2  Row two?
3  Row three?
4  The fourth row?
5  On my right, first row?
6  Second row?
7  Third row?
8  Fourth row?
9      I take it by your silence that then there is no issue that
10 The Court has discussed, no issue that you have personal
11 knowledge of that I've not inquired about that would affect your
12 ability to serve as a fair and impartial juror in this case?
13 And specifically I'll now go back to the first area that I
14 covered, that is, I want to reiterate the importance of the oath
15 that you take as jurors and that you are -- have been truthful
16 to me about your experiences, opinions, and beliefs that you may
17 have, especially the experience you have having been exposed to
18 any media, written, or broadcast on radio or television, or the
19 Internet that have to do with the facts of this case?  And I'm
20 going to ask you that if there is any reason that you know of
21 that -- because of what you have read, what you've been told,
22 that would make you predisposed to believe that the City of
23 Harlingen is or is not responsible if it is responsible for any
24 of the incidents that occurred or any of the injuries that
25 occurred on that date?

123

1  Row one?
2  Row two?
3  Row three?
4  Row four?
5  On my right, row one?
6  Row two?
7  Row three?
8  Row four?
9  All right.
10 Mr. Spivey any other area of inquiry for the plaintiff?
11      MR. SPIVEY:  No other areas, Your Honor.
12      THE COURT:  Mrs. Lopez?
13      MRS. LOPEZ:  Nothing further, Your Honor.
14      THE COURT:  Mr. Lockhart?
15      MR. LOCKHART:  None, Your Honor.
16      THE COURT:  All right then.
17 Members of the jury panel, at this time I'm going to recess
18 you and I'm hoping that we are able to get back to you by no
19 later than -- we see it's 20 till 3 o'clock -- by no later
20 than 3:30, just to be on the safe side.
21      Please, during this recess, I again admonish you that you
22 must not discuss this case.  You must not form or express any
23 opinion about the facts of this case.  And you are to report to
24 The Court any conversation that you may overhear, any effort to
25 attempt to discuss with you or approach you about your service

124

1  or potential service as jurors in this case.  And I also ask you
2  to not leave the building.  And I ask you to also return
3  promptly or be available to return by no later than 3:20 so that
4  if we can reassemble at 3:30.  I have another panel in an
5  entirely different case to choose and the longer we delay this
6  case, we're going to inconvenience other people who are waiting
7  since this morning to start their jury selection.  So, I would
8  ask you to please be prompt so that we can return and if you're
9  delayed, I promise you it is not we're not sitting here
10 twiddling our thumbs.  We're trying to get some work done and
11 try to get you out of here as soon as possible and get you going
12 on with your life.
13      And so at this time, the jury panel is in recess until 3:30
14 and be ready to reassemble at 3:20.  Thank you.
15      (Jury panel out.)
16      THE COURT:  All right.  Mr. Spivey, challenges for
17 cause?
18      MR. SPIVEY:  I'm sorry?
19      THE COURT:  Any challenges for cause.
20      MR. SPIVEY:  If The Court please, Mr. Ainsworth will
21 address those.
22      THE COURT:  Yes.
23      MR. AINSWORTH:  Your Honor, would you prefer I do the
24 list or just go on each one?
25      THE COURT:  List them for me and then I'll hear

125

1  argument.

2      MR. AINSWORTH:  In numerical order, No. 1 is Mr.

3  Briones.

4      Mr. Briones had read the Citizens Against Lawsuit Abuse ads

5  and indicated that he felt there were too many lawsuits.  And he

6  indicated that he had a conflict with his son's boot camp

7  graduation coming up.  There was no follow-up regarding would he

8  be able to concentrate or did he say he would be able to

9  concentrate one way or the other.  It is clear he's got

10 something else on his mind.  With those two thoughts in mind,

11 also in light of fact that we have so many other jurors, it

12 looks like he should be let go for cause at this time.

13     THE COURT:  Just give me list.

14     MR. AINSWORTH:  I'm sorry.

15     THE COURT:  I'll hear argument.

16     MR. AINSWORTH:  No. 5, No. 8, No. 52.

17     THE COURT:  We may not even get that far.

18     MR. AINSWORTH:  Next one will be 77, Your Honor.

19     THE COURT:  Okay.  Mrs. Lopez?

20     MRS. LOPEZ:  Your Honor, the only two that we would add

21 would be No. 12 and No. 37.

22     THE COURT:  All right.  And if you'll -- Mr. Lockhart,

23 if you will, please?

24     MR. LOCKHART:  Yes, Your Honor.  We will agree with No.

25 5.  With No. 5.  I didn't realize that --

126

1      THE COURT:  Okay.

2      MR. LOCKHART:  -- we were in agreement on that one.  And

3  then we have No. 24.

4      THE COURT:  Just a second, let me find it.  Okay.

5      MR. LOCKHART:  And No. 25.

6      THE COURT:  Okay.  Let me hear argument then on the

7  plaintiff's now that I know which ones they are.

8      You mentioned No. 1.  Let's go to No. 8, Mr. Ainsworth.

9      MR. AINSWORTH:  No. 8, Mr. Jennings.  He indicated that

10 he was a personal friend of Mr. Scheopner and that he'd also

11 read about the breakdown in mediation.  It is clear he has some

12 working knowledge of both the party -- former party to the case,

13 a key witness in a case, and has read some pressure points

14 regarding the incident.  We'd challenge him for cause, Your

15 Honor.

16     THE COURT:  Mr. Lockhart?  If you'll remain because I'm

17 going to be hearing argument on the things y'all have.

18     MR. LOCKHART:  Yes, Your Honor.  The Court did question

19 him in some detail following his acknowledgement and disclosure

20 of those relationships.  The Court asked if he could be fair, if

21 he could follow the evidence and render an unbiased opinion

22 and he straight line said yes, he could.  So, we believe there's

23 nothing to disqualify this potential juror member.

24     THE COURT:  Challenge is overruled.  By the way, on No.

25 1, Mr. Lockhart, what's your position on that, the gentleman

127

1  whose son is graduating?

2      MR. LOCKHART:  We would oppose it.  We don't think that

3  he gave any reason why he couldn't be fair.

4      THE COURT:  I'm going to sustain the challenge.  Okay.

5  So then the next challenge, Mr. Lockhart, No. 12?

6      MR. LOCKHART:  Yes, Your Honor.

7      THE COURT:  I'm sorry, Mr. Ainsworth?

8      MR. AINSWORTH:  That's Mrs. Lopez's.

9      THE COURT:  Mrs. Lopez?

10     MRS. LOPEZ:  Yes, Your Honor.

11     THE COURT:  Why don't you tell me about your basis for

12 challenging No. 12.

13     MRS. LOPEZ:  I believe Juror No. 12, Your Honor, was the

14 gentleman who had advised that he had been a foreman of the

15 jury.  Obviously, that's not a basis for the challenge for

16 cause, but he had also stated that he was a member of the NRA.

17 I think that was the extent of his statements to this court was

18 his involvement with the NRA and the fact that he liked hunting,

19 he went dove hunting, and deer hunting and I believe that there

20 is a problem there regarding his affiliation with the National

21 Rifle Association.

22     THE COURT:  Challenge overruled.

23     I guess the next one would be -- numerically I guess would

24 be 24.

25     MR. LOCKHART:  Yes, Your Honor, that's the Defendant's.

128

1  This was Mr. Zavala who was seated right where the Court

2  Security is at this point.  And he told The Court, according to

3  my notes and my staff's notes, that he did have I believe that

4  was a family member that was border patrol agent and Your Honor

5  asked him specifically if he could be fair and he did say he

6  already had an opinion.  That was the young bearded man.  And I

7  thought it was clear that he had disqualified himself.

8      THE COURT:  Okay.  Mr. Ainsworth?

9      MR. AINSWORTH:  Your Honor, I don't have him down as

10 saying that he already had an opinion.  And when we went through

11 the list of those that had formed an opinion and dismissed them,

12 I did not have his name down.  The only note I have on No. 24 is

13 that his best friend and cousin are on the border patrol and in

14 an earlier question he had said he might have an opinion.  He

15 did not say that he had an opinion or anything that would keep

16 him from being fair in this case.  And when we went through the

17 list of everybody that had formed an opinion, he did not raise

18 his hand and go off at that time.

19     THE COURT:  I'm going to pull that one up, because I do

20 recall that he did say that he had an opinion and I was prepared

21 to sustain challenge for cause; so, I want to confirm that.  So

22 let's go on to No. 25.  If we need, we'll pull it up.

23     MR. LOCKHART:  Yes, Your Honor.  Mrs. Molina was seated

24 on the third row back over against the wall and she had shared

25 with us earlier about some I believe previous litigation she'd

129

1  been involved in and she then raised her hand again and said
2  that her situation was similar to this lawsuit, had similar
3  matters in it or similar issues and that she had her doubts.
4  And then Your Honor asked her that's telling me that you
5  couldn't follow the evidence and render a verdict on the
6  evidence and she said that's right.
7       THE COURT:  Mr. Ainsworth your response.
8       MR. AINSWORTH:  My notes also indicate that she said she
9  had her doubts.  My memory of what she said about the other
10 incident was that somebody like that ran into any husband's car
11 in an auto accident.  Obviously, dissimilar situation.  I don't
12 know if it means that they were using drugs or on DWI or
13 something like that.  That might be what she's referring to, I
14 don't know.  It may be the kind of thing that we ought to call
15 her up and ask her what this doubt is that she has.  She didn't
16 say she couldn't be fair or anything like that.  She just said I
17 have some doubts.
18      THE COURT:  Mrs. Lopez, anything?
19      MRS. LOPEZ:  No, Your Honor.
20      THE COURT:  Challenge is sustained.
21      Somebody do a count.  How far do we need to go.  37 or past
22 37?
23      MR. SPIVEY:  I count through 34 being 21.
24      MR. LOCKHART:  That's what I'm showing.  I think it is
25 34 would be six and through the six jurors is what I'm showing,

130

1  but I'm not -- well, I'm not sure about that now because I had
2  included --
3       THE COURT:  Why don't you check that out while we look
4  for the record on No. 24.
5       MRS. LOPEZ:  Your Honor, we were concerned again with
6  the challenge on No. 8 and we would like to see if we could go
7  back to the record to check on what the testimony was on No. 8.
8  We believe that his testimony was that he said that I think I
9  can listen to the facts and the evidence in this case.  It
10 wasn't so unequivocal as has been stated earlier.
11      THE COURT:  Do your count right now, please.
12      (Discussion off the record.)
13      THE COURT:  Mr -- well, I'm sorry the last challenge
14 that you were urging, give me the number again.
15      MR. LOCKHART:  Yes, Your Honor, that was No. 24, Mr.
16 Zavala.
17      THE COURT:  Right.  All right.  The challenge for cause
18 of No. 24 is also sustained.
19      Those being the challenges for cause and actually what I
20 wanted to make sure the record reflected on Juan Briones, No. 1,
21 is The Court who's excusing this venireman based on his
22 indicating that he had plans already to travel to his son's
23 graduation; so, I'm excusing him.  It is not a challenge for
24 cause that has been urged by any of the parties.
25      All right.  That being the case then, can you give me an

131

1  idea of the count.  How far down do we go?
2       CASE MANAGER:  I believe that might bring us down to 37
3  and that's the individual that's going to be out.  There's in
4  indication she's a school teacher and they're going to be
5  testing February the 25th through the 28th.
6       THE COURT:  Okay.
7       CASE MANAGER:  So that's down to 38.
8       THE COURT:  Okay.  Then let me hear about the challenge
9  for cause of No. 37.  This is a juror who said that she could --
10 she was attending a conference to learn about the TAKS or some
11 other testing for her work, but that she would be able to get
12 the information from her colleagues who were attending that
13 conference.  But Mrs. Lopez, since this is your challenge, you
14 may address The Court.
15      MRS. LOPEZ:  Your Honor, our main concern with respect
16 to this juror is the fact that her spouse is employed by the
17 City of Harlingen in an administrative position.  He is the
18 recycling center supervisor for the City of Harlingen.  We
19 believe that there's obviously a conflict of interest here
20 regarding his employment and the defendants in this case.
21      THE COURT:  Challenge is overruled.
22      Okay.  So does that mean that the strikes can include up to
23 No. 37 or 38, what has that?  The peremptory?
24      CASE MANAGER:  No. 37 is No. 21.
25      THE COURT:  All right.  Anything else on any challenges

132

1  for cause?  Mr. Ainsworth?
2       MR. AINSWORTH:  Your Honor, we're looking back in our
3  notes on No. 8.  I don't have him saying unequivocally about he
4  could set aside his knowledge of the events and the fact that he
5  knows Mr. Scheopner.  And the fact that he knows a witness looks
6  like he has some involvement in the case and we'd move to
7  challenge him, but my notes don't show that.  He said I could
8  set that aside.  That's what we've been whispering about.
9       THE COURT:  Challenge has been overruled.  All right.
10 Mrs. Lopez, anything else?
11      MRS. LOPEZ:  Nothing further.
12      THE COURT:  Mr. Lockhart?
13      MR. LOCKHART:  No, Your Honor.
14      THE COURT:  All right.
15      MR. SPIVEY:  I do think it might be healthy for me to
16 read off the ones that I understand that are not stricken so
17 there will be no confusion.  No. 2, four, six, seven, eight, 12,
18 13, 15, 17, 19, 20, 21, 22, 27, 28, 29, 31, 32, 33, 34, 37.
19      MR. LOCKHART:  That's correct.
20      THE COURT:  Okay.  Correct.
21      (Consultation between the judge and the case manager.)
22      THE COURT:  Okay.  I've been pointed out that No. 32
23 indicates something that looks likes a misdemeanor to me.  I
24 don't know, do y'all want to bring that person in for further
25 questioning.  It is suspended driver's license and not -- I've

133

1  never known of a felony suspended driver's license, but, you
2  know, if, in your experience, have known that to be a felony
3  case or crime of moral turpitude, I'll bring them back in, but I
4  don't think so.
5      All right then.  If you'll give the strikes to the clerk as
6  soon as you complete them, you'll exercise your strikes up to
7  and including No. 37.  And I'm going to discharge the balance of
8  the panel at this point in time so that numbers 38 -- the
9  numbers that remain beginning with 38 on through the balance of
10 the panel will be excused and not be brought back in and I'll
11 give the jurors that remain instructions about the reporting and
12 the time that they are impaneled.  So, if you'll have your
13 strikes to the clerk as soon as you complete them, we'll resume
14 again at 3:30.  Thank you.
15     MR. SPIVEY:  Is there a place -- may we retire across
16 the hall to the courtroom?
17     THE COURT:  You can get with the clerk and CSO's about
18 space available.
19     MR. LOCKHART:  Your Honor, excuse me, I apologize.
20 Could we make one motion for the record very briefly?
21     THE COURT:  Regarding?
22     MR. LOCKHART:  The motion to transfer venue.  Very
23 quick.
24     THE COURT:  You can do so at the time I return.
25     MR. LOCKHART:  Thank you, Your Honor.

Captured and Transcribed by Computer - Eclipse

134

1  (Recess taken.)
2      THE COURT:  Counsel, if you will approach the bench.
3  (Jury panel in.)
4  (Bench conference.)
5      MR. HUGHES:  Your Honor, at this time we wanted to renew
6  motion to transfer venue and opposition to individual voir dire.
7  By my count, I know that at least three-quarters of the panel
8  said they'd been exposed to something about it and according to
9  their individual questions -- I mean their forms they filled out
10 and half of them said they read the Valley Morning Star and at
11 least 25 percent had to be excused because they formed an
12 opinion.  And I think, as you noted, sometimes people remember
13 things as they go along and that they had forgotten and I think
14 on that record, our motion to -- demonstrated that our motion to
15 transfer venue was good.  With respect to the motion on
16 individual voir dire questions, after looking at the strikes
17 that were exercised by the Plaintiff and us, it is apparent that
18 there will be some jurors seated who said they at least read the
19 Valley Morning Star which means they would have been exposed to
20 articles containing the admissible information on things such as
21 the insurance or motion in limine, et cetera.  I listened to the
22 question The Court asked and I heard the answers they gave, but
23 I think the only way we could fairly exercise our peremptory
24 challenges is if either The Court had individually voir dired
25 them on exactly what they read, what they remembered about, that

Captured and Transcribed by Computer - Eclipse

135

1  way we know whether they had been exposed to either -- either
2  now recalled or would later recall reading anything about
3  insurance, the motion in limine, that sort of stuff.
4      THE COURT:  Motion to transfer venue is overruled.  The
5  motion for the individual voir dire is also denied.
6      MR. HUGHES:  All right.
7  (Bench conference concluded.)
8      THE COURT:  Members of the jury panel, at this time the
9  clerk will be calling the names of the jurors who are to report
10 on February 19th, 2002, at 9 o'clock.  You're going to be
11 given -- as your name is called, I'm going to be asking that you
12 stand and you'll be given a letter that tells you or gives you
13 that specific information, that is, the date and time.  It also
14 has a telephone number for you to call on the day before --
15 okay, I guess the sentence that tells you that be sure to call
16 the day before you are scheduled to appear and it would be after
17 6 o'clock that you are to call so that you can be advised if
18 there's any change on necessity of reporting at that date and
19 time.  And it tells you that you are to call that number and can
20 do so collect if it is a long distance call.
21     So, at this time, I would ask that the Clerk call the names
22 of jurors.  Please stand as your name is called.
23     CASE MANAGER:  Maria Amaro, Amelia Esparza, Oziel
24 Gonzalez, Roberto Longoria, Rachel Zuniga, Irma Wild, Sylvia
25 Castro, Melva Perez, Sandra Gonzalez.

Captured and Transcribed by Computer - Eclipse

136

1      THE COURT:  All right.  Now that you've been given your
2  letter you can have a seat.  And I'll just thank all of you for
3  your patience, even if you have not been selected.  The fact
4  that you were here ready to serve, presenting yourself for the
5  jury selection process, has helped the administration of
6  justice.  For those of you whose names were called, I will
7  repeat this admonishment and I will probably do so at every
8  break:  You are not to form or express any opinion about the
9  fact of this case.  You should report to The Court any attempt
10 to discuss with you directly or any conversation that you may
11 overhear, even if it is accidental, on the topic of this case
12 immediately.  You must make that report immediately to The
13 Court.  You also are admonished that if someone attempts to
14 approach you about it, whether it is a party who has an interest
15 in this case -- I mean those individuals are under The Court's
16 instructions that they are not to attempt to contact you or a
17 family member or somebody who you know in order to get
18 information about you such that, you know, any effort to
19 influence you in any way, it would be a violation of The Court's
20 order and you are to report any knowledge that you have about
21 any efforts of that type.  And, you know, again, please do not
22 listen to any radio reports, do not watch any television news
23 accounts.  If you walk into a room where those kinds of
24 broadcasts are being made -- like at a restaurant, a lot of
25 times people -- restaurant businesses have those television sets

Captured and Transcribed by Computer - Eclipse

137

1  for people to watch while they're eating -- please be very
2  mindful of that because any exposure to any news accounts can
3  very well cause a problem.  But you need to be -- so you need to
4  be very careful about any activities that you are involved in,
5  no matter how innocent it may be, the fact that you were exposed
6  can very well cause problems; so, be mindful of that.  And
7  especially be mindful of reading any news accounts, whether a
8  newspaper or the Internet or any -- anything of that nature and
9  do not allow anyone to discuss them in your presence or with you
10  directly.  So at this time the -- all of you are in recess and
11  except for again those whose names were called, we'll see you
12  again on February the 19th.
13      You're in recess.
14      (Jury panel out.)
15      THE COURT:  All right.  The jury now being recessed,
16  Counsel, I'm going to ask you about any -- make sure that there
17  were some objections to exhibits.  I'm going to hope that
18  between now and the time you are to report that you work on
19  ironing out any objections.  We're going to be starting another
20  case, but if we see a time in which we can bring you back so
21  that I can hear objections on exhibits or anything of a
22  housekeeping nature, you may be called back for that purpose.
23  So, understand that that's something that you may be required to
24  come back for because I don't know how long, you know, the case,
25  you know, may take and hopefully it won't go past Friday.  But

Captured and Transcribed by Computer - Eclipse

138

1  if something opens up, rather than take up next week's time on
2  those housekeeping matters, I'd rather take care of it this
3  week.  And so be apprised of the fact that you may be required
4  to come back for that purpose.  And if it is something of a
5  nature that can be resolved by telephone conference, obviously,
6  you know, that would be my preference.  But, again, I guess I
7  just need to make sure that you are working on resolving any
8  housekeeping matters such that you won't have to come back
9  unless it is absolutely necessary.  Okay?
10      Mr. Spivey?
11      MR. SPIVEY:  Your Honor, one of the things that we would
12  like to do is we've got exhibits and we've really narrowed the
13  exhibits down from what they were.  And I would suggest if The
14  Court would give us leave that we renumber those exhibits
15  consecutively so that it makes sense with reference on the back
16  to the pretrial order number if that's --
17      THE COURT:  That's fine.  Y'all can sort that out,
18  that's greater.
19      MR. SPIVEY:  We'll be in touch with you.
20      THE COURT:  And like I said, today's Monday, I'll be
21  starting evidence in the other case tomorrow, but if there's
22  anything that you need to apprise me of, you know, let me know
23  and --
24      MR. SPIVEY:  One other thing.  And I would ask for leave
25  of The Court, if we could, to have our experts here during our

Captured and Transcribed by Computer - Eclipse

139

1  testimony or at least parts of it.
2      THE COURT:  They'll be excluded from the rule.  In the
3  meantime, please advise although they've not been sworn, all
4  witnesses are now under the rule.
5      Anything else?  All right.  Then we're in recess.  Counsel,
6  we'll see you Tuesday, if not sooner.

Captured and Transcribed by Computer - Eclipse

140

1  UNITED STATES DISTRICT COURT      *
2  SOUTHERN DISTRICT OF TEXAS        *
3
4      I, BRECK C. RECORD, Official Court Reporter, United States
5  District Court, Southern District of Texas, do hereby certify
6  that the foregoing is a correct transcript from the record of
7  proceedings in the above-entitled matter.
8      I certify that the transcript fees and format comply with
9  those prescribed by the Court and Judicial Conference of the
10  United States.
11
12  3/4/02                    *Breck Record*
13                            BRECK C. RECORD,
                              Official Court Reporter
                              United States District Court
14                            Southern District of Texas

Captured and Transcribed by Computer - Eclipse